# Exhibit A

4/18/2012                  REPORTS OF COMMITTEES                  23781

~~9-102-050 Determination Of Liability.~~

~~The determination of liability for a violation notice issued under this chapter shall be made in accordance with Sections 9-100-050, and 9-100-070 through 9-100-090.~~

~~9-102-060 Notice Of Final Determination.~~

~~(a) If any fine or penalty is owing and unpaid after a determination of liability under this chapter has become final and the respondent has exhausted or failed to exhaust judicial procedures for review, the department of revenue shall cause a notice of final determination of liability to be sent to the respondent in accordance with Section 9-100-050(f).~~

~~(b) Any fine and penalty, if applicable, remaining unpaid after the notice of final determination of liability is sent shall constitute a debt due and owing the city which may be enforced in the manner set forth in Section 2-14-103 of this Code. Failure of the respondent to pay such fine or penalty within 21 days of the date of the notice may result in the immobilization of the person's vehicle pursuant to the procedures described in Section 9-100-120.~~

~~(c) The city shall withdraw a violation notice, following reasonable collection efforts, when the notice was issued to a registered owner who is deceased at the time collection efforts are undertaken.~~

SECTION 7. Section 1-4-170 of the Municipal Code of Chicago is hereby amended by inserting the language underscored and by deleting the language struck through, as follows:

1-4-170 ~~Reserved~~ <u>Reference To Statutes.</u>

<u>Whenever any section of this Code makes reference to the Illinois Complied Statutes such reference shall be deemed to include the current statute in effect, or as thereafter amended, unless the context indicates otherwise.</u>

SECTION 8. This ordinance takes effect July 1, 2012, following due passage and approval.

---

AGREEMENT WITH ALTA BICYCLE SHARE, INC. FOR OPERATION OF BICYCLE SHARING SYSTEM.

[O2012-1342]

The Committee on Pedestrian and Traffic Safety submitted the following report:

23782          JOURNAL--CITY COUNCIL--CHICAGO          4/18/2012

CHICAGO, April 18, 2012.

*To the President and Members of the City Council:*

Your Committee on Pedestrian and Traffic Safety, to which was referred an ordinance to establish a bicycle sharing system on portions of sundry streets, in document Number O2012-1342, begs leave to recommend that Your Honorable Body do *Pass* the proposed ordinance submitted herewith.

This recommendation was concurred in by all members of the Committee present, with no dissenting votes.

Respectfully submitted,

(Signed)    MARGARET LAURINO,
*Chairman.*

On motion of Alderman Laurino, the said proposed ordinance transmitted with the foregoing committee report was *Passed* by yeas and nays as follows:

*Yeas* -- Aldermen Moreno, Dowell, Burns, Hairston, Sawyer, Jackson, Harris, Beale, Pope, Balcer, Cárdenas, Quinn, Burke, Foulkes, Thompson, Thomas, Lane, O'Shea, Cochran, Brookins, Muñoz, Zalewski, Chandler, Solis, Burnett, Ervin, Suarez, Waguespack, Mell, Austin, Colón, Sposato, Mitts, Cullerton, Laurino, P. O'Connor, M. O'Connor, Reilly, Smith, Tunney, Arena, Cappleman, Pawar, Osterman, Moore, Silverstein -- 46.

*Nays* -- Alderman Fioretti -- 1.

Alderman Pope moved to reconsider the foregoing vote. The motion was lost.

The following is said ordinance as passed:

WHEREAS, The City of Chicago wishes to launch a large bikesharing system (the "System") in Chicago, to encourage healthful activity, decrease traffic congestion, improve the environment, and increase the amenities of the City, enhancing its reputation as a world-class, progressive city; and

WHEREAS, As part of this program, the City wishes to purchase and cause to be installed the System's infrastructure, including docking stations and bicycles, as well as appurtenant, informational signage and panels, and to procure the System's operation, marketing and maintenance; and

WHEREAS, The City has received a grant of $18,000,000 from the federal government ("Grantor") to pay for the purchase and installation of the System's infrastructure, which will be supplemented and user fees related to the System; and

WHEREAS, The City expects that the rental fees paid by users will fund the operation and maintenance of the System, it being understood that, to the extent the rental proceeds exceed the operations and maintenance costs and the selected operator achieves performance requirements to be included in its agreement with the City, the City will pay performance incentives to the operator out of such profits; and

WHEREAS, The City has selected, pursuant to an RFP process, an operator, Alta Bicycle Share, Inc., to provide, install, operate, and maintain the System (the "Operator"); and

WHEREAS, Because the System provides revenue-generating opportunities for the City through advertisements and sponsorships of corporate advertising, the City issued an RFP to select one or more brokers for such sponsorships and advertising; and

WHEREAS, Pursuant to authority conferred by Section 2-32-055 of the Municipal Code, the Chief Financial Officer intends to enter into a contract with one or more brokers selected by an RFP process, and enter into agreements with such advertisers and sponsors; now, therefore,

*Be It Ordained by the City Council of the City of Chicago:*

1. Incorporation Of Recitals. The recitals to this ordinance are incorporated herein.

2. Establishment Of Fees. The Commissioner of Transportation, or his duly authorized designee, ("Commissioner") is authorized to establish the fee schedule, to be charged to users, for rental of the System's bicycles.

3. Location Of Bicycle Stations And Permitting. The Commissioner is authorized to identify and establish the sites at which System bicycle stations shall be located. The Commissioner may, in his discretion, include provisions in the agreement with the operator allowing for coordination and input from the operator regarding such sites. The City's Department of Transportation shall be responsible for securing and issuing the required permits. The City Council authorizes the Commissioner to, at no cost to the Operator, issue such permits as may be necessary or appropriate to the installation and operation of the bikesharing system on the public right-of-way. The City Council also authorizes the Commissioner to execute such lease agreements, easement agreements, license agreements, and other use and ancillary agreements as may be necessary or appropriate to locate and operate bikesharing system stations on public and private properties, including, without limitation on property owned by the Chicago Transit Authority, the Chicago Park District, the Board of Education, the Metropolitan Pier and Exposition Authority, Metra, universities and other public and private parties desiring to have such stations located on their properties (collectively, "Bikesharing Station Agreements"). Such Bikesharing Station Agreements shall be (i) on such terms and conditions as the Commissioner deems appropriate, including indemnification by the City, and (ii) in a form and substance satisfactory to the Commissioner and to the Corporation Counsel.

4. Authorization Of Agreement With Operator; Agreement(s) With Broker(s). The Commissioner is authorized to negotiate and enter into an agreement with the selected Operator, on substantially the terms as set forth on Exhibit 1, which is attached hereto and incorporated herein ("Operator Agreement Term Sheet"), with such changes and additional terms as are approved by the Commissioner. Nothing in this ordinance shall be construed in derogation of the authority granted to the Chief Financial Officer ("CFO") under Section 2-32-055 of the Municipal Code. The bikesharing system and associated equipment, informational signage and advertising panels shall be deemed "Assets" for the purposes of such section.

5. Revenues. Any revenues generated from the System will be used to fund the expenses of the System including but not limited to any performance incentives as described in the Agreement, and for any other Title 23 Federal-aid eligible transportation improvements or programs.

6. Effective Date. This ordinance shall be effective upon passage and approval.

Exhibit 1 referred to in this ordinance reads as follows:

*Exhibit 1.*

*Operator Agreement Term Sheet.*

Parties:

City of Chicago and Alta Bicycle Share, Inc. ("Alta") or ("Operator").

Term:

Initial 5 Year Term. City has the option to extend, on the same terms and conditions, for two additional periods of five years each.

Source Of Funding:

A majority of the funding will come from a grant from the Federal Highway Administration ("FHWA") in the amount of $18,000,000 and other federal sources.

Elements Of Bicycle Share System:

A. Initial Purchase.

2012: Purchase of 3,000 bicycles, 301 stations (including docking station and technical platform).

Case: 1:19-cv-05253 Document #: 22-1 Filed: 09/26/19 Page 6 of 8 PageID #:72

Estimated Cost: $17,027,714.

Software Licenses Fees: Included in cost of Operations.

Purchases Of Equipment After Initial Purchase: subject to the availability of funding, the City retains the option to purchase additional bicycles and stations, on the same terms and conditions as prior purchases subject to certain price escalations as determined in the Agreement.

Additional Station Installation Beyond First 301: $5,200 per station.

B. Installation And Start-Up Costs.

Start Up Services and Costs (including marketing for system launch, creation of website, leasing of warehouse): Maximum Cost: $2,454,755.

Installation Services And Costs: $1,558,700.

C. Operation, Support And Maintenance.

Operation and Support and Maintenance include, but are not limited to the following services: ongoing marketing; operation of website; provision of call center for use by the public; bicycle redistribution; on-street bike checking; bike and station maintenance.

Financial Arrangement For Operation And Maintenance:

Costs: The Operator will be reimbursed for actual Operation and Maintenance Costs, which will be estimated in an annual budget negotiated between CDOT and the Operator. The total amount of such budget will act as a cap over which Operator may not seek reimbursement ("Annual Cost Cap"). Operator will be paid for actual costs incurred, and only in categories of costs included in the annual budget. Categories of costs in the budget may not be exceeded without Commissioner approval. Operator is otherwise responsible for any costs that exceed the Annual Cost Cap.

Source Of Payment: Operation and Maintenance Costs will paid out of System revenues unless otherwise directed by the City.

Year 1: Annual Cost Cap for Operation And Maintenance: $7,837,356.

Due to both the uncertainty in adoption rates inherent this System, which is novel in Chicago in size and scope, and the City's strong desire that the System ultimately be a success for the reasons stated herein, in Year 1, the City shall be responsible for 90 percent

of any shortfall between revenues from the System and actual costs incurred up to the Annual Cost Cap. Therefore, in Year 1, the City will be entitled to keep 90 percent of the excess in revenues over actual costs incurred up to the Annual Cost Cap even if Operator meets all performance benchmarks.

Thereafter, the City and Operator shall determine an Annual Cost Cap for operations, an Annual Loss Cap, and the corresponding performance benchmarks and incentive payments as part of annual budget negotiations. It is expected that revenues from bike rentals shall be sufficient to cover all operations and maintenance costs. In the event that operating costs exceed operating revenues the Operator will absorb these losses up to an Annual Loss Cap.

After the first year, if Operations and Maintenance Costs significantly exceed the revenues from the System, and system losses exceed the Annual Loss Cap, the parties must undertake the following actions designed to decease costs and ensure financial self-sufficiency while maintaining high quality service, in the following order: (i) provided that they do not significantly impact performance standards, undertake actions that will lead to a decrease in Operation and Maintenance Costs, then (ii) if the foregoing actions do not prove fruitful, revise benchmarks and incentive payments for the agreement and finally (iii) the parties may recalibrate the bike share system requirements and amend the Agreement to reduce costs and increase revenues with the aim of fiscal self-sustainability. Any revisions affecting scope, performance standards, or compensation must be made by written amendment to the Agreement; any substantial changes pursuant to (iii) above may require approval by City Council.

Incentive Payment Structure: Incentive payments will be paid to Operator, based upon Operator's meeting of defined performance benchmarks. Incentive payments will be paid only to the extent that revenues from rental fees exceed Operational Costs incurred pursuant to the annual approved budget. Incentive fees may not exceed 70 percent of such profits in any calendar year.

Other Important Provisions.

Site Selection: The Operator shall recommend siting, and the Commissioner retains final authority over site selection. Station placement will be subject to certain engineering siting criteria, including the distance from the nearest station.

Rate: The Operator shall recommend a rate structure to the Commissioner. The Commissioner retains final authority over bike rental rates. The rate structure will be consistent with peer systems in North America. Annual membership rates will range from between $60 -- $85 and one-day usage rates will range from $4 -- $7.

Early Termination: The City has the right to early termination pursuant to the Agreement.

Bike Rental Agreement With Users: Users are required to sign Bike Rental Agreements. The City is not a party. The Operator and users agree to hold City harmless from all liability. Operator agrees to keep all data confidential.

Case: 1:19-cv-05253 Document #: 22-1 Filed: 09/26/19 Page 8 of 8 PageID #:74

Indemnity: Operator indemnifies the City for all losses arising or relating to Operator's negligence or wrongful acts or omissions. Operator indemnifies the City for patent infringement.

Warranties: Equipment warranty is five years for all equipment.

Insurance: Alta will provide insurance coverage, and list the City as an additional insured on its insurance policies, for types of insurance, and in coverage amounts, to be approved by City Comptroller's Office.

Missing And Damaged Bicycles: The Operator is responsible for all missing and damaged bicycles beyond the first 1 percent of the number of bikes in the current fleet. The Operator will be required to maintain the fleet at a certain level and in working order.

Compliance With Grant: Operator will agree to comply with all terms of the federal grant.

---

## ESTABLISHMENT AND AMENDMENT OF LOADING ZONES.
[SO2012-2218]

The Committee on Pedestrian and Traffic Safety submitted the following report:

CHICAGO, April 18, 2012.

*To the President and Members of the City Council:*

Your Committee on Pedestrian and Traffic Safety, to which was referred proposed ordinances to establish and amend loading zones on portions of sundry street, begs leave to recommend that Your Honorable Body do *Pass* the proposed substitute ordinance submitted herewith.

This recommendation was concurred in by all members of the Committee present, with no dissenting votes.

Respectfully submitted,

(Signed) MARGARET LAURINO,
*Chairman.*