# Exhibit B

# Contract Summary Sheet

**Contract (PO) Number:** 26459

**Specification Number:** 107555

**Name of Contractor:** ALTA BICYCLE SHARE INC.

**City Department:** CHICAGO DEPARTMENT OF TRANSPORTATION

**Title of Contract:** The Purchase, Installation, and Operation of a Bicycle Sharing System

**Term of Contract: Start Date:** 1/24/2013

**End Date:** 1/23/2018

**Dollar Amount of Contract (or maximum compensation if a Term Agreement) (DUR):**
$65,000,000.00

**Brief Description of Work:** The Purchase, Installation, and Operation of a Bicycle Sharing System

**Procurement Services Contract Area:** COMPTROLLER-OTHER

**Vendor Number: 55595024**
**Submission Date:**

The following is said ordinance as passed:

WHEREAS, The City of Chicago wishes to launch a large bikesharing system (the "System") in Chicago, to encourage healthful activity, decrease traffic congestion, improve the environment, and increase the amenities of the City, enhancing its reputation as a world-class, progressive city; and

WHEREAS, As part of this program, the City wishes to purchase and cause to be installed the System's infrastructure, including docking stations and bicycles, as well as appurtenant, informational signage and panels, and to procure the System's operation, marketing and maintenance; and

WHEREAS, The City has received a grant of $18,000,000 from the federal government ("Grantor") to pay for the purchase and installation of the System's infrastructure, which will be supplemented and user fees related to the System; and

WHEREAS, The City expects that the rental fees paid by users will fund the operation and maintenance of the System, it being understood that, to the extent the rental proceeds exceed the operations and maintenance costs and the selected operator achieves performance requirements to be included in its agreement with the City, the City will pay performance incentives to the operator out of such profits; and

WHEREAS, The City has selected, pursuant to an RFP process, an operator, Alta Bicycle Share, Inc., to provide, install, operate, and maintain the System (the "Operator"); and

WHEREAS, Because the System provides revenue-generating opportunities for the City through advertisements and sponsorships of corporate advertising, the City issued an RFP to select one or more brokers for such sponsorships and advertising; and

WHEREAS, Pursuant to authority conferred by Section 2-32-055 of the Municipal Code, the Chief Financial Officer intends to enter into a contract with one or more brokers selected by an RFP process, and enter into agreements with such advertisers and sponsors; now, therefore,

*Be It Ordained by the City Council of the City of Chicago:*

1. Incorporation Of Recitals. The recitals to this ordinance are incorporated herein.

2. Establishment Of Fees. The Commissioner of Transportation, or his duly authorized designee, ("Commissioner") is authorized to establish the fee schedule, to be charged to users, for rental of the System's bicycles.

3. Location Of Bicycle Stations And Permitting. The Commissioner is authorized to identify and establish the sites at which System bicycle stations shall be located. The Commissioner may, in his discretion, include provisions in the agreement with the operator allowing for coordination and input from the operator regarding such sites. The City's Department of Transportation shall be responsible for securing and issuing the required permits. The City Council authorizes the Commissioner to, at no cost to the Operator, issue such permits as may be necessary or appropriate to the installation and operation of the bikesharing system on the public right-of-way. The City Council also authorizes the Commissioner to execute such lease agreements, easement agreements, license agreements, and other use and ancillary agreements as may be necessary or appropriate to locate and operate bikesharing system stations on public and private properties, including, without limitation on property owned by the Chicago Transit Authority, the Chicago Park District, the Board of Education, the Metropolitan Pier and Exposition Authority, Metra, universities and other public and private parties desiring to have such stations located on their properties (collectively, "Bikesharing Station Agreements"). Such Bikesharing Station Agreements shall be (i) on such terms and conditions as the Commissioner deems appropriate, including indemnification by the City, and (ii) in a form and substance satisfactory to the Commissioner and to the Corporation Counsel.

23784　　　　　　　JOURNAL--CITY COUNCIL--CHICAGO　　　　　4/18/2012

4.　Authorization Of Agreement With Operator; Agreement(s) With Broker(s).　The Commissioner is authorized to negotiate and enter into an agreement with the selected Operator, on substantially the terms as set forth on Exhibit 1, which is attached hereto and incorporated herein ("Operator Agreement Term Sheet"), with such changes and additional terms as are approved by the Commissioner.　Nothing in this ordinance shall be construed in derogation of the authority granted to the Chief Financial Officer ("CFO") under Section 2-32-055 of the Municipal Code.　The bikesharing system and associated equipment, informational signage and advertising panels shall be deemed "Assets" for the purposes of such section.

5. Revenues. Any revenues generated from the System will be used to fund the expenses of the System including but not limited to any performance incentives as described in the Agreement, and for any other Title 23 Federal-aid eligible transportation improvements or programs.

6. Effective Date.　This ordinance shall be effective upon passage and approval.

Exhibit 1 referred to in this ordinance reads as follows:

*Exhibit 1.*

*Operator Agreement Term Sheet.*

Parties:

　City of Chicago and Alta Bicycle Share, Inc. ("Alta") or ("Operator").

Term:

　Initial 5 Year Term.　City has the option to extend, on the same terms and conditions, for two additional periods of five years each.

Source Of Funding:

　A majority of the funding will come from a grant from the Federal Highway Administration ("FHWA") in the amount of $18,000,000 and other federal sources.

Elements Of Bicycle Share System:

　A. Initial Purchase.

　　2012: Purchase of 3,000 bicycles, 301 stations (including docking station and technical platform).

Estimated Cost: $17,027,714.

Software Licenses Fees: Included in cost of Operations.

Purchases Of Equipment After Initial Purchase: subject to the availability of funding, the City retains the option to purchase additional bicycles and stations, on the same terms and conditions as prior purchases subject to certain price escalations as determined in the Agreement.

Additional Station Installation Beyond First 301: $5,200 per station.

B.  Installation And Start-Up Costs.

Start Up Services and Costs (including marketing for system launch, creation of website, leasing of warehouse): Maximum Cost: $2,454,755.

Installation Services And Costs: $1,558,700.

C.  Operation, Support And Maintenance.

Operation and Support and Maintenance include, but are not limited to the following services: ongoing marketing; operation of website; provision of call center for use by the public; bicycle redistribution; on-street bike checking; bike and station maintenance.

Financial Arrangement For Operation And Maintenance:

Costs: The Operator will be reimbursed for actual Operation and Maintenance Costs, which will be estimated in an annual budget negotiated between CDOT and the Operator. The total amount of such budget will act as a cap over which Operator may not seek reimbursement ("Annual Cost Cap"). Operator will be paid for actual costs incurred, and only in categories of costs included in the annual budget. Categories of costs in the budget may not be exceeded without Commissioner approval. Operator is otherwise responsible for any costs that exceed the Annual Cost Cap.

Source Of Payment: Operation and Maintenance Costs will paid out of System revenues unless otherwise directed by the City.

Year 1: Annual Cost Cap for Operation And Maintenance: $7,837,356.

Due to both the uncertainty in adoption rates inherent this System, which is novel in Chicago in size and scope, and the City's strong desire that the System ultimately be a success for the reasons stated herein, in Year 1, the City shall be responsible for 90 percent

of any shortfall between revenues from the System and actual costs incurred up to the Annual Cost Cap. Therefore, in Year 1, the City will be entitled to keep 90 percent of the excess in revenues over actual costs incurred up to the Annual Cost Cap even if Operator meets all performance benchmarks.

Thereafter, the City and Operator shall determine an Annual Cost Cap for operations, an Annual Loss Cap, and the corresponding performance benchmarks and incentive payments as part of annual budget negotiations. It is expected that revenues from bike rentals shall be sufficient to cover all operations and maintenance costs. In the event that operating costs exceed operating revenues the Operator will absorb these losses up to an Annual Loss Cap.

After the first year, if Operations and Maintenance Costs significantly exceed the revenues from the System, and system losses exceed the Annual Loss Cap, the parties must undertake the following actions designed to decease costs and ensure financial self-sufficiency while maintaining high quality service, in the following order: (i) provided that they do not significantly impact performance standards, undertake actions that will lead to a decrease in Operation and Maintenance Costs, then (ii) if the foregoing actions do not prove fruitful, revise benchmarks and incentive payments for the agreement and finally (iii) the parties may recalibrate the bike share system requirements and amend the Agreement to reduce costs and increase revenues with the aim of fiscal self-sustainability. Any revisions affecting scope, performance standards, or compensation must be made by written amendment to the Agreement; any substantial changes pursuant to (iii) above may require approval by City Council.

Incentive Payment Structure: Incentive payments will be paid to Operator, based upon Operator's meeting of defined performance benchmarks. Incentive payments will be paid only to the extent that revenues from rental fees exceed Operational Costs incurred pursuant to the annual approved budget. Incentive fees may not exceed 70 percent of such profits in any calendar year.


Other Important Provisions.

Site Selection: The Operator shall recommend siting, and the Commissioner retains final authority over site selection. Station placement will be subject to certain engineering siting criteria, including the distance from the nearest station.

Rate: The Operator shall recommend a rate structure to the Commissioner. The Commissioner retains final authority over bike rental rates. The rate structure will be consistent with peer systems in North America. Annual membership rates will range from between $60 -- $85 and one-day usage rates will range from $4 -- $7.

Early Termination: The City has the right to early termination pursuant to the Agreement.

Bike Rental Agreement With Users: Users are required to sign Bike Rental Agreements. The City is not a party. The Operator and users agree to hold City harmless from all liability. Operator agrees to keep all data confidential.

Indemnity:  Operator indemnifies the City for all losses arising or relating to Operator's negligence  or  wrongful  acts  or  omissions.    Operator  indemnifies  the  City  for  patent infringement.

Warranties:  Equipment warranty is five years for all equipment.

Insurance:  Alta will provide insurance coverage, and list the City as an additional insured on its insurance policies, for types of insurance, and in coverage amounts, to be approved by City Comptroller's Office.

Missing And Damaged Bicycles:  The Operator is responsible for all missing and damaged bicycles beyond the first 1 percent of the number of bikes in the current fleet.  The Operator will be required to maintain the fleet at a certain level and in working order.

Compliance With Grant:  Operator will agree to comply with all terms of the federal grant.

STATE OF ILLINOIS )
                )SS.
COUNTY OF COOK )

I, SUSANA A. MENDOZA, City Clerk of the City of Chicago in the County of Cook and State of Illinois, DO HEREBY CERTIFY that the annexed and foregoing is a true and correct copy of that certain ordinance now on file in my office <u>authorizing agreement with Alta Bicycle Sharing, Inc. for operation of Bicycle Sharing System.</u>

I DO FURTHER CERTIFY that the said ordinance was passed by the City Council of the said City of Chicago on the <u>eighteenth (18th) day of April, 2012.</u>

I DO FURTHER CERTIFY that the vote on the question of the passage of the said ordinance by the said City Council was taken by yeas and nays and recorded in the Journal of the Proceedings of the said City Council, and that the result of said vote so taken was as follows, to wit:

Yeas <u>46</u>      Nays <u>1</u>

I DO FURTHER CERTIFY that the said ordinance was delivered to the Mayor of the said City of Chicago after the passage thereof by the said City Council, without delay, by the City Clerk of the said City of Chicago, and that the said Mayor failed to return the said ordinance to the said City Council with his written objections thereto at the next regular meeting of the said City Council occurring not less than five (5) days after the passage of the said ordinance.

I DO FURTHER CERTIFY that the original, of which the foregoing is a true copy, is entrusted to my care for safekeeping, and that I am the lawful keeper of the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the corporate seal of the City of Chicago aforesaid, at the said City, in the County and State aforesaid, this thirteenth (13th) day of November, 2012.

[Am]

                                             _____
                                             SUSANA A. MENDOZA, City Clerk

| | |
|---|---|
| **Contract (PO) No** | **26459** |
| **Specification No.** | **100320A** |
| **Vendor No.** | **55595024-A** |

**AGREEMENT**

**BETWEEN**

**THE CITY OF CHICAGO
DEPARTMENT OF TRANSPORTATION**

**AND**

**ALTA BICYCLE SHARE, INC.**



**FOR A
BICYCLE SHARING SYSTEM**

**RAHM EMANUEL
MAYOR**

1

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

## TABLE OF CONTENTS

AGREEMENT ............................................................................................................ 1
BACKGROUND INFORMATION ............................................................................... 1
ARTICLE 1.   INCORPORATION OF BACKGROUND INFORMATION................... 2
ARTICLE 2.   DEFINITIONS .................................................................................... 2
  2.1      Definitions .................................................................................... 2
  2.2      Interpretation................................................................................ 4
  2.3      Incorporation of Exhibits.............................................................. 5
  2.4      Order of Precedence..................................................................... 5
ARTICLE 3.   DUTIES AND RESPONSIBILITIES OF OPERATOR ......................... 6
  3.1.     Scope of Work .............................................................................. 6
  3.2.     Advertisement and Sponsorship .................................................. 6
  3.3.     Incorporation of Operator's Proposal........................................... 7
  3.4.     Compliance with Federal Grant Requirements.............................. 7
  3.5.     Ownership of Equipment and Computer Hardware ....................... 7
  3.6.     Software Licenses and Source Code Escrow................................. 7
  3.7.     Deliverables.................................................................................. 8
  3.8.     Standard of Performance .............................................................. 9
  3.9.     Standard of Performance Project Management and Personnel........ 9
  3.10.    Disadvantaged Business Enterprises (DBE) Commitment ..............10
  3.11.    Insurance.....................................................................................11
  3.12.    Indemnification.............................................................................11
  3.13.    Compliance with Payment Card Industry Data Security Standard .....12
  3.14.    Ownership of Documents and Data................................................12
  3.15.    Copyright Ownership.....................................................................13
  3.16.    Records and Audits........................................................................13
  3.17.    Confidentiality of City Data...........................................................15
  3.18.    Assignments and Subcontracts......................................................16
  3.19.    Collateral Assignment ..................................................................17
  3.20.    Public Works Provisions.................................................................17
ARTICLE 4.   DURATION OF AGREEMENT............................................................17
  4.1.     Term of Performance ...................................................................17
  4.2.     Timeliness of Performance ...........................................................18
  4.3.     Agreement Extension Option ........................................................18
ARTICLE 5.   COMPENSATION.............................................................................18
  5.1.     Fees and Invoices.........................................................................18
  5.2.     Most Favored Nation Pricing.........................................................18
  5.3.     Taxes............................................................................................19
  5.4.     Funding.........................................................................................19
  5.5.     Non-Appropriation.........................................................................19
  5.6.     Subcontractor Payments...............................................................20
ARTICLE 6.   DISPUTES.......................................................................................20
ARTICLE 7.   COMPLIANCE WITH ALL LAWS.......................................................20
  7.1.     Compliance with All Laws Generally ..............................................20

i

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

| 7.2. | Nondiscrimination | 21 |
|---|---|---|
| 7.3. | Inspector General and Legislative Inspector General | 22 |
| 7.4. | MacBride Ordinance | 23 |
| 7.5. | Business Relationships with Elected Officials | 23 |
| 7.6. | Chicago "Living Wage" Ordinance | 24 |
| 7.7. | Environmental Warranties and Representations | 25 |
| 7.8. | Prohibition on Certain Contributions | 25 |
| 7.9. | Firms Owned or Operated by Individuals with Disabilities | 27 |
| 7.10. | Deemed Inclusion | 27 |
| 7.11. | False Statements | 27 |
| ARTICLE 8. | SPECIAL CONDITIONS | 28 |
| 8.1. | Warranties and Representations | 28 |
| 8.2. | Ethics | 29 |
| 8.3. | Joint and Several Liability | 29 |
| 8.4. | Business Documents | 29 |
| 8.5. | Conflicts of Interest | 29 |
| 8.6. | Non-Liability of Public Officials | 30 |
| 8.7. | EDS / Certification Regarding Suspension and Debarment | 31 |
| ARTICLE 9. | EVENTS OF DEFAULT, REMEDIES, TERMINATION, SUSPENSION AND RIGHT TO OFFSET | 32 |
| 9.1. | Events of Default Defined | 32 |
| 9.2. | Remedies | 33 |
| 9.3. | Early Termination | 34 |
| 9.4. | Suspension | 35 |
| 9.5. | Right to Offset | 36 |
| ARTICLE 10. | GENERAL CONDITIONS | 37 |
| 10.1. | Entire Agreement | 37 |
| 10.2. | Counterparts | 37 |
| 10.3. | Changes, Modifications, and Amendments | 38 |
| 10.4. | Governing Law and Jurisdiction | 38 |
| 10.5. | Severability | 38 |
| 10.6. | Assigns | 38 |
| 10.7. | Cooperation | 38 |
| 10.8. | Waiver | 39 |
| 10.9. | Independent Contractor | 39 |
| 10.10. | Electronic Ordering and Invoices | 40 |
| 10.11. | Participation by Other Local Government Agencies | 41 |
| ARTICLE 11. | NOTICES | 42 |
| ARTICLE 12. | AUTHORITY | 42 |
| CONTRACT SIGNATURE PAGE | | 43 |

## List of Exhibits

EXHIBIT 1    SCOPE OF SERVICES and associated Schedules 1 through 25
EXHIBIT 2    PERFORMANCE SCHEDULE
EXHIBIT 3    COMPENSATION SCHEDULE
EXHIBIT 4    SPECIAL CONDITIONS REGARDING DBE COMMITMENT AND SCHEDULES
EXHIBIT 5    ONLINE ECONOMIC DISCLOSURE STATEMENT AND AFFIDAVIT CERTIFICATE OF FILING
EXHIBIT 6    INSURANCE REQUIREMENTS AND EVIDENCE OF INSURANCE
EXHIBIT 7    CONTRACTUAL REQUIREMENTS RELATED TO HIPAA
EXHIBIT 8    PUBLIC WORKS PROVISIONS
EXHIBIT 9    FEDERAL PROVISIONS
EXHIBIT 10   OPERATOR'S PROPOSAL

## AGREEMENT

This Agreement is entered into as of the 24th day of January, 2013 ("**Effective Date**") by and between Alta Bicycle Share, Inc., an Oregon corporation ("**Alta**" or "**Operator**"), and the City of Chicago, a municipal corporation and home rule unit of local government existing under the Constitution of the State of Illinois, acting through its Department of Transportation ("**City**"), at Chicago, Illinois.  The City and Operator agree as follows:

## BACKGROUND INFORMATION

**WHEREAS,** the City wishes to enhance the existing public transportation system by providing bicycles to complete the first and/or last leg of a trip (e.g., from a train station to the workplace), among other reasons; and

**WHEREAS,** the City wishes to help reduce dependency on automobiles, particularly for short trips, thereby reducing traffic congestion, vehicle emissions, and the demand for parking; and

**WHEREAS,** the City is committed to promoting environmentally responsible initiatives and to exploring alternative modes of transportation to ensure that it is a bicycle-friendly municipality; and

**WHEREAS,** the City desires to purchase and implement a bicycle-sharing system that can be used by riders of all abilities; and

**WHEREAS,** the City wishes to hire a vendor to procure various equipment and technology necessary for the foregoing and to assemble, install, develop, implement and operate such equipment and technology such that it operates together as a "System" (as defined herein), and to provide on-going operational support and maintenance of the System (collectively, the "Project"); and

**WHEREAS,** the City Council passed an ordinance on April 18, 2012, published at pages 23782 through 23787 in the Journal of Proceedings of the City Council of such date, authorizing the Commissioner of the Department of Transportation to negotiate and enter into this Agreement.  This Agreement is also subject to the approval by the Illinois Department of Transportation ("IDOT") and the Federal Highway Administration ("FHWA").  This Agreement will not be effective until such time as it has been approved by the IDOT and FHWA and has been executed by the Commissioner of the Department of Transportation or his designee.

**WHEREAS**, Operator represents and warrants that it is highly qualified and competent to provide and to perform such services as described herein and has expertise and knowledge in such matters;

**NOW, THEREFORE**, the City and the Operator agree as follows:

1

## ARTICLE 1.    INCORPORATION OF BACKGROUND INFORMATION

The Background Information set forth above is incorporated and made a part of this Agreement by reference.

## <u>TERMS AND CONDITIONS</u>

## ARTICLE 2.    DEFINITIONS

### 2.1    Definitions

The following words and phrases have the following meanings for purposes of this Agreement:

**"Access Key"** means a fare card for rental of Bicycles, as further described in the Scope of Services, Schedule 3.

**"Agreement"** means this agreement, including all exhibits attached to it and incorporated in it by reference, and all amendments, modifications or revisions made in accordance with its terms.

**"Bicycle"** means a device propelled solely by human power, upon which a person may ride either on or astride a regular seat attached thereto, having two or more wheels in tandem, as further described in the Scope of Services, Exhibit 1, Schedule 3.

**"Capital Costs"** means the costs invoiced to the City for Equipment, Hardware, Software, Start-Up Services and Installation Services.

**"Commissioner"** means the Commissioner of the Department of Transportation, and any representative authorized in writing to act on the Commissioner's behalf.

**"Computer Hardware"** means the hardware to provide on-the-ground operators with tools for real-time management of the Docking System in order to facilitate maintenance, repair, and redistribution and any other computer hardware provided by Operator to operate the System.

**"Data"** means all data recorded, gathered, or produced by the System, including but not limited to data pertaining to individual users, whether gathered through the website, social media, the Equipment, or customer service communications.

**"Department"** means the City Department of Transportation.

**"Documentation"** means the documentation, written materials, work papers, configurations, manuals, and other work product prepared by or on behalf of the PBSC or Alta,

2

its subcontractors or agents in connection with Software, and all specifications related thereto, that Alta and/or PBSC provides to licensees of the Software.

**"Dock" or "Docking Point"** means a locking mechanism contained on a Station designed to receive a Bicycle for locked storage, as further described in Schedule 3 to the Scope of Services, Exhibit 1.

**"Equipment"** means all physical components of the System, including without limitation Bicycles, Docks, Terminals, Station batteries, Bicycle and Station spare parts and all necessary cables.

**"Equipment Costs"** means the actual cost incurred by Alta to procure the Equipment, without mark-up.

**"Information Panel"** means the printed material displayed inside of the Map Frame.

**"Manufacturer's Defect"** means Equipment with a manufacturer's defect, which will be repaired or replaced, as applicable, under warranty, provided such defects are discovered within the warranty period described in Schedules 7 and 8.

**"Map Frame" or "Ad Panel"** means a two-sided metal informational display unit, including translucent covering and lock.

**"Marketing Services"** means promotions and advertising of the System directed at individuals and businesses, as well as reaching all customer bases through the Website and social media accounts.

**"PBSC"** means the Equipment manufacturer and the call center provider, Public Bike System Company.

**"PBSC Software"** means that portion Software that is owned by PBSC and licensed to Alta for use in the System, along with any enhancements, changes or modifications of such PBSC Software, as provided pursuant to the Support obligations set forth in Schedule 6.

**"Rates"** means the customer charges specified in Exhibit 1, Schedule 24.

**"Report"** means a report Alta is required to deliver to the City under the terms hereof.

**"Services"** means all of the services described herein that Operator must perform, in order to provide the Bicycle Sharing System described herein.

**"Site"** means a designated area on publicly or privately owned real property, which area contains one or more of each of the following items made available by Alta to perform the Services: Bicycles, Docks, Terminal, Technical Platforms and Information Panel.

**"Site Plan"** means an illustration which shows the location of all Sites before installation, with distances and dimensions from the nearest property line, all relevant public or private easements, and at least two fixed objects.

**"Software"** means all the software used in the operation of the bicycle sharing program, including, but not limited to the PBSC Software and all the software described in Schedules 4 through 6 of Exhibit 1 to this Agreement, along with any enhancements, changes or modifications of such software.

**"Station"** means all Equipment related items except the Bicycles and Bicycle toolkits, including, without limitation, keys, and shipping costs, as further described in the Scope of Services, Schedules 2 and 3.

**"Subcontractor"** means any person or entity with whom Operator contracts to provide any part of the Services (including Equipment), including subcontractors and subconsultants of any tier, suppliers and materials providers, whether or not in privity with the Operator.

**"System"** means the bicycle sharing system, including all Equipment, Software, Technical Platform, Terminal, and Computer Hardware, operating together as an integrated whole to perform the functions described herein.

**"Technical Platform"** means a base component which rests on the ground and supports the Docks, Terminal, and Information Panel, as further described in the Scope of Services , Schedule 3.

**"Terminal"** means a kiosk which provides Bicycle rental instructions, contains payment equipment (i.e. credit card device), and includes all other means necessary for the rental of Bicycles, as further described in the Scope of Services, Schedule 3.

**"Website"** means the customer-facing and internal websites created by Alta for the System.

### 2.2    Interpretation

(a)    The term **"include"** (in all its forms) means, "include, without limitation" unless the context clearly states otherwise.

(b)    All references in this Agreement to Articles, Sections or Exhibits, unless otherwise expressed or indicated are to the Articles, Sections or Exhibits of this Agreement.

(c)    Words importing persons include firms, associations, partnerships, trusts, corporations and other legal entities, including public bodies, as well as natural persons.

(d)    Any headings preceding the text of the Articles and Sections of this Agreement, and any table of contents or marginal notes appended to it, are solely for convenience or

reference and do not constitute a part of this Agreement, nor do they affect the meaning, construction or effect of this Agreement.

(e)     Words importing the singular include the plural and vice versa.  Words of the masculine gender include the correlative words of the feminine and neuter genders.

(f)     All references to a number of days mean calendar days, unless indicated otherwise.

### 2.3    Incorporation of Exhibits

The following attached Exhibits are made a part of this Agreement:

EXHIBIT 1      SCOPE OF SERVICES and associated Schedules 1 through 23
EXHIBIT 2      PERFORMANCE SCHEDULE
EXHIBIT 3      COMPENSATION SCHEDULE
EXHIBIT 4      SPECIAL CONDITIONS REGARDING DBE COMMITMENT AND SCHEDULES
EXHIBIT 5      ONLINE   ECONOMIC   DISCLOSURE   STATEMENT   AND   AFFIDAVIT
                     CERTIFICATE OF FILING
EXHIBIT 6      INSURANCE REQUIREMENTS AND EVIDENCE OF INSURANCE
EXHIBIT 7      CONTRACTUAL REQUIREMENTS RELATED TO HIPAA
EXHIBIT 8      PUBLIC WORKS PROVISIONS
EXHIBIT 9      FEDERAL PROVISIONS
EXHIBIT 10    OPERATOR'S PROPOSAL

### 2.4    Order of Precedence

In the event of any conflict or inconsistency of terms among the various documents that at any given time, constitute this Agreement, the order of precedence that shall apply is as follows, with each listed document or type of document superseding and prevailing over any subsequently listed document or type of document, and with later-executed documents prevailing over earlier documents of the same type, each solely to the extent of any irreconcilable conflict or inconsistency of the terms and condition thereof:  (i) the terms and conditions set forth in Articles 1 through 12 of this Agreement; (ii) the Scope of Services in Exhibit 1; and (iii) any Schedules and Exhibits to this Agreement.

Notwithstanding anything in the Agreement to the contrary, Operator is subject to and must conform to all of the terms and conditions of this Exhibit 9 relating to Federal Provisions. In the event of any conflict or inconsistency between the terms set forth in the Agreement and the terms set forth in Exhibit 9, the terms and provisions Exhibit 9 take precedence over the terms and provisions in the Agreement, except to the extent that the Agreement contains provisions more favorable to the City or federal government or requiring a higher standard of the Operator. Operator must not by action or omission cause the City to be in breach of the grant agreement between the City and the funding source.

5

**ARTICLE 3.     DUTIES AND RESPONSIBILITIES OF OPERATOR**

### 3.1.   Scope of Work

**General.**   The purpose of this Agreement is for Alta to provide, install, implement, operate and maintain a bike sharing System for use by the public.  Subject to the terms and conditions of this Agreement, Alta must (i) sell to the City the System, including Bicycles, Stations, and Computer Hardware, and provide to the City licenses for the Software, to enable use of the System by the City and the public as contemplated in this Agreement, (ii) install the Stations, at sites to be determined by the Commissioner, subject to the terms of this Agreement, and deliver all Bicycles, and provide all integration services to make the System fully operational, in compliance with the terms of this Agreement, (iii) provide all ancillary services for the launch and operation of the System, including developing a website to be used by the public, marketing of the System to the public, training on the System for up to three City personnel (one of which will be the Project Manager) provided that any new project manager will receive the same training, (iv) operate, support and maintain the System, and (v) provide subscriber information/relation services (collectively, the "Services").   Alta shall provide all technical expertise, qualified personnel, Equipment, tools, and material to safely and competently accomplish all of the Services.  Exhibit 1, Scope of Services, describes in more detail the elements of the Services; this description of the Services is intended to be general in nature and is neither a complete description of Alta's obligations nor a limitation on the Services that Alta is to provide under this Agreement.  Alta must provide City with all work and services required to build, deliver, operate, and maintain the System, including the Services described in the Scope of Services, Exhibit 1, and work and services not specifically delineated in this Agreement, but consistent with, and reasonably inferable to be within, the scope of this Agreement and necessary for the delivery and operation of the System.

All performance must be in accordance with the Performance Schedule, Exhibit 2, as may be adjusted at the mutual agreement of the City and Alta.  Alta must complete all of its obligations hereunder in a timely manner and in accordance with the applicable dates set forth in the Performance Schedule.  Regardless of any other express duties of Alta, City is relying on Alta to provide, and Alta must provide the expertise, assistance, and recommendations that are necessary to ensure the launch of the System and the delivery of a System that meets City's needs and requirements and accomplishes the objectives of the City within the timeframe specified herein.  In performing the Services, Alta must at all times take appropriate advantage of and, unless expressly directed otherwise by City, implement or incorporate with regard to the System, best business practices.

### 3.2.   Advertisement and Sponsorship

The City will be responsible for securing naming rights, sponsorships, and station-based advertising, any advertising related to the bicycles themselves and all other Equipment, and any websites or other digital media or marketing related to the System and will retain these revenues in their entirety.  Any sponsors obtained by the City shall provide the Operator with fender and basket stickers and any advertising signage for the System.

### 3.3. Incorporation of Operator's Proposal

Attached as Exhibit 10 is a copy of Operator's Proposal. The Proposal is incorporated to ensure that any promises of performance, as well as representations and warranties included in the Proposal, are hereby incorporated in this Agreement. To the extent that any term of the Proposal contains terms more favorable to the Operator than the terms included in the remainder of the Agreement, including, without limitation, Exhibit 1 and all of its Schedules, such other terms of the Agreement, including Exhibit 1 and all of its Schedules, will control.

### 3.4. Compliance with Federal Grant Requirements

Operator recognizes that a significant portion of this Agreement is funded through federal grant dollars received through the FHWA and agrees to cooperate with the City to address and if necessary, amend this Agreement, to conform with any additional requirements or changes to the System or Agreement necessary to comply with such grant requirements.

### 3.5. Ownership of Equipment and Computer Hardware

Upon acceptance by the City of any element of the Equipment, including but not limited to Bicycles, the City shall be the owner of all Equipment, including Bicycles, purchased by the City under this Agreement free and clear of all liens, encumbrances, financing statements, and rights of third persons or entities. All owner rights, warranties, and the like shall be in the name and inure to the benefit of the City. At the expiration or termination of this Agreement or earlier upon request, Alta shall prepare and submit and deliver to the City an inventory list of all Equipment and Supplies purchased by the City under this Agreement and all related documentation, such as, maintenance and service manuals and warranty information. The City shall have the right to perform a physical inventory of such Equipment at all times.

Alta must represent and warrant in such bill of sale that the Equipment and any components thereof are entirely new. A serialization process must mark each Equipment component. Alta must maintain and update a single, integrated electronic list of the City's Equipment serial numbers. Alta shall include the original manufacturer's warranty, which shall be transferred to the City.

### 3.6. Software Licenses and Source Code Escrow

**(a)      Licenses**. Alta must obtain in City's name as licensee or sub-licensee for City and its authorized users to access, use, display and reproduce (and permit third party service providers to access, use, display and reproduce) the Software, and any other software used in the System, purchased or described in this Agreement. Alta represents and warrants to City that Alta has the authority and right to provide to City the license rights to all Software embedded in the System or otherwise provided by Alta to City in accordance with the terms and conditions of this Agreement. The terms of the licenses are set forth more fully in Schedule 6.

7

**(b)    Source Code Escrow.**  This Agreement is contingent upon Alta requiring PBSC to enter into a Source Code Escrow Agreement (in substantially the form in Schedule 10 to Exhibit 1), with a trustee mutually acceptable to City, Alta and PBSC, with both the City and Alta as beneficiaries, which provides that PBSC will deposit, within 10 calendar days of the Launch date, into trust the Escrow Materials to permit the City, or Alta as the case may be, to use the Escrow Materials once released to configure, install, and support the PBSC Software solely in conjunction with the System. The Source Code Escrow Agreement shall provide that the City, or Alta as the case may be, have access to the Escrow Materials from the Escrow Agent upon, including but not limited to (i) PBSC discontinues support for the PBSC Software as a result of a decision or order of a governmental authority; (ii) PBSC files a voluntary petition in bankruptcy or liquidation; (iii) PBSC proposes any dissolution, liquidation, reorganization, or recapitalization with its creditors; (iv) an involuntary petition in bankruptcy or liquidation is filed against PBSC or a receiver is appointed or takes possession of PBSC's property, and such petition or receiver is not dismissed or stayed within 90 days after such filing, appointment or taking possession; (v) PBSC makes an assignment for the benefit of creditors or is adjudicated as bankrupt; or (vi) PBSC takes any similar action under similar laws of any jurisdiction.

Alta shall pay the reasonable costs of the Escrow Agent.

Upon gaining access to the Escrow Materials pursuant to the Escrow Agreement, the City, or its third party consultants (subject to limitations in the sentence immediately following), and if applicable, Alta, will be entitled to modify, alter, adjust, translate or create derivative works from the PBSC Software solely as needed for City's own use in support of the operations of the System (to the exclusion of any other use).  Notwithstanding the preceding, the City may not provide access to the Escrow Materials to a third party that is a direct competitor of PBSC, namely an entity engaged in the implementation of bike-sharing systems.

"Escrow Materials" means, with respect to the PBSC Software, the source code of the PBSC Software and associated documentation, including all relevant files called for in Exhibit A of the Escrow Agreement.

PBSC shall be allowed to transfer the Escrow Agreement without the City's or Alta's authorization if (i) PBSC's transferee or assignee has sufficient rights to source code to perform under the escrow, (ii) PBSC's transferee or assignee takes subject to all terms of the Escrow Agreement and this Agreement, and (ii) PBSC sends a written notice to Alta and the City of such assignment at least 30 days before the closing of any such transaction.

**3.7.    Deliverables**

In carrying out the Services, the Operator must prepare or provide to the City various deliverables, including work product, reports (financial or otherwise), recommendations, and analyses, as further described in Exhibit 1.

The City may reject Deliverables that do not include relevant information or data, or do not include all documents or other materials specified in this Agreement or reasonably necessary for the purpose for which the City made this Agreement or for which the City intends

to use the Deliverables. If the City determines that Alta has failed to comply with the foregoing standards, it has 30 days from the discovery to notify Alta of its failure. If Alta does not correct the failure, if it is possible to do so, within 30 days after receipt of notice from the City specifying the failure, then the City, by written notice, may treat the failure as an event of default.

Partial or incomplete Deliverables may be accepted for review only when required for a specific and well-defined purpose for the benefit of the City and when consented to in advance by the City. Such Deliverables will not be considered as satisfying the requirements of this Agreement and partial or incomplete Deliverables in no way relieve Alta of its obligations under this Agreement.

### 3.8. Standard of Performance

Alta must perform all Services required of it under this Agreement with that degree of skill, care and diligence normally shown by a consultant performing services of a scope and purpose and magnitude comparable with the nature of the Services to be provided under this Agreement. Alta acknowledges that it is entrusted with or has access to valuable and confidential information and records of the City and with respect to that information, Alta agrees to be held to the standard of care of a fiduciary. Any review, approval, acceptance of Services or Deliverables or payment for any of the Services by the City does not relieve Alta of its responsibility for the professional skill and care and technical accuracy of its Services and Deliverables. This provision in no way limits the City's rights against Alta under this Agreement, at law or in equity.

Alta must be appropriately licensed to perform the Services, if required by law, and must ensure that all Services that require the exercise of professional skills or judgment are accomplished by professionals qualified and competent in the applicable discipline and appropriately licensed as may be required by law. Alta must provide copies of any such licenses. Alta remains responsible for the professional and technical accuracy of all Services or Deliverables furnished, whether by Alta or its Subcontractors or others on its behalf. All Deliverables must be prepared in a form and content satisfactory to the Department and delivered in a timely manner consistent with the requirements of this Agreement.

If Alta fails to comply with the foregoing standards, Alta must, at the City's option, perform again, at its own expense, all Services required to be re-performed as a direct or indirect result of that failure, unless the reason is failure to have and maintain required licensure, which is an event of default, see Section 9.1(b)(ii) below.

### 3.9. Standard of Performance Project Management and Personnel

(a)    **Project Management.** Each party shall designate a Project Manager, (the "Alta Project Manager" and the "City Project Manager") (collectively, the "Project Managers"), and notify the other party of the identity of its project manager. The Alta Project Manager will be considered Key Personnel of Alta. The City Project Manager shall serve as the primary point of contact for Alta with respect to this Agreement. The Alta Project Manager shall have overall responsibility for day-to-day management and administration of the Services provided under this

Agreement and shall serve as the primary contact for the City with respect to this Agreement. The performance by Alta of the Services is subject at all times to inspection and review by the City Project Manager. Where specifically stated in this Agreement, Alta shall obtain from the City Project Manager prior written approval of specified activities. However, it shall be the responsibility of Alta to manage the details of the execution and performance of the Services under this Agreement. The Alta Project Manager shall, at the request of City, attend any meeting of the management personnel of the City related to this Agreement, the System or the Services.

**(b)** **Adequate Staffing.** Alta must, upon receiving a fully executed copy of this Agreement, assign and maintain during the term of this Agreement and any extension of it an adequate staff of competent personnel that is fully equipped, licensed as appropriate, available as needed, qualified and assigned exclusively to perform the Services. Alta must include among its staff the Key Personnel and positions as identified below. The level of staffing may be revised from time to time by notice in writing from Alta to the City and with prior written consent of the City.

**(c)** **Key Personnel.** Alta must not reassign or replace Key Personnel without the prior written consent of the City. "**Key Personnel**" means those job titles and the persons assigned to those positions in accordance with the requirements of the RFP and as proposed by Alta. The Department may at any time in writing notify Alta that the City will no longer accept performance of Services under this Agreement by one or more Key Personnel listed. Upon that notice Alta must immediately implement a performance improvement plan to which the key person or persons in question will be subject. If the key person or persons fail to meet the minimum goals of the performance improvement plan, then Alta will replace him or them in accordance with the terms of this Agreement. Key Personnel, if any, are identified in Schedule 25 to Exhibit 1.

**(d)** **Salaries and Wages**

Alta and Subcontractors must pay all salaries and wages due all employees performing Services under this Agreement unconditionally and at least once a month without deduction or rebate on any account, except only for those payroll deductions that are mandatory by law or are permitted under applicable law and regulations. If in the performance of this Agreement Alta underpays any such salaries or wages, the Comptroller for the City may withhold, out of payments due to Alta, an amount sufficient to pay to employees underpaid the difference between the salaries or wages required to be paid under this Agreement and the salaries or wages actually paid these employees for the total number of hours worked. The amounts withheld may be disbursed by the Comptroller for and on account of Alta to the respective employees to whom they are due. The parties acknowledge that this clause is solely for the benefit of the City and that it does not grant any third party beneficiary rights.

**3.10. Disadvantaged Business Enterprises (DBE) Commitment**

In the performance of this Agreement, including the procurement and lease of materials or equipment, Operator must abide by the contracting requirements regarding disadvantaged

business enterprises (DBE) as defined and discussed in 49 CFR Part 26 and the Special Conditions Regarding DBE Commitment set forth in <u>Exhibit 4</u>. Operator's completed Schedules C-1 and D-1 in <u>Exhibit 4</u>, evidencing its compliance with this requirement, are a part of this Agreement, upon acceptance by the Chief Procurement Officer. Operator must utilize disadvantaged business enterprises at the greater of the amounts listed in those Schedules C-1 and D-1 or the percentages listed in them as applied to all payments received from the City.

### 3.11. Insurance

Alta must provide and maintain at Alta's own expense, during the term of this Agreement and any time period following expiration if Alta is required to return and perform any of the Services or Additional Services under this Agreement, the insurance coverages and requirements specified in <u>Exhibit 6</u> of this Agreement, insuring all operations related to this Agreement.

### 3.12. Indemnification

(a)     Alta must defend, indemnify, and hold harmless the City, its officers, representatives, elected and appointed officials, agents and employees from and against any and all Losses, including those related to:

(i)     injury, death or damage of or to any person or property;

(ii)     any infringement or violation of any property right (including any patent, trademark or copyright);

(iii)     Alta's failure to perform or cause to be performed Alta's promises and obligations as and when required under this Agreement, including Alta's failure to perform its obligations to any Subcontractor;

(iv)     the City's exercise of its rights and remedies under Section 9.2 of this Agreement; and

(v)     injuries to or death of any employee of Alta or any Subcontractor under any workers compensation statute.

(b)     "Losses" means, individually and collectively, liabilities of every kind, including losses, damages and reasonable costs, payments and expenses (such as, but not limited to, court costs and reasonable attorneys' fees and disbursements), claims, demands, actions, suits, proceedings, judgments or settlements, any or all of which in any way arise out of or relate to Alta's breach of this Agreement or to Alta's negligent or otherwise wrongful acts or omissions or those of its officers, agents, employees, or Subcontractors.

(c)     At the City Corporation Counsel's option, Alta must defend all suits brought upon all such Losses and must pay all costs and expenses incidental to them, but the City has the right, at its option, to participate, at its own cost, in the defense of any suit, without relieving Alta

11

of any of its obligations under this Agreement. Any settlement must be made only with the prior written consent of the City Corporation Counsel, if the settlement requires any action on the part of the City.

(d)     To the extent permissible by law, Alta waives any limits to the amount of its obligations to defend, indemnify, hold harmless, or contribute to any sums due under any Losses, including any claim by any employee of Alta that may be subject to the Workers Compensation Act, 820 ILCS 305/1 *et seq.* or any other related law or judicial decision (such as, *Kotecki v. Cyclops Welding Corporation*, 146 Ill. 2d 155 (1991)). The City, however, does not waive any limitations it may have on its liability under the Illinois Workers Compensation Act, the Illinois Pension Code, any other statute or judicial decision.

(e)     The indemnities in this section survive expiration or termination of this Agreement for matters occurring or arising during the term of this Agreement or as the result of or during Alta's performance of Services beyond the term. Alta acknowledges that the requirements set forth in this section to defend, indemnify, and hold harmless the City are apart from and not limited by Alta's duties under this Agreement, including the insurance requirements in Exhibit 6 of this Agreement.

## 3.13.  Compliance with Payment Card Industry Data Security Standard

Operator shall at all times during the Term of this Agreement be compliant with the Payment Card Industry ("PCI") Data Security Standard to the extent applicable to the operation of the System and shall be responsible for the security of the payment cardholder data in its possession. Operator shall provide City such information as the City may reasonably require regarding Operator's compliance with PCI requirements, including, at a minimum, an annual certificate of compliance by Operator with the PCI Data Security Standard. In the event of Operator's non-compliance with the PCI Data Security Standard, Operator will promptly perform at Operator's expense, all curative measures necessary to remedy such non-compliance.

## 3.14.  Ownership of Documents and Data

(a) All Deliverables, Data, findings or other information (excluding any intellectual property rights or embodiment thereof owned or created by PBSC), in any form prepared, assembled, gathered, or encountered by or provided to Operator under this Agreement (subject to subsection b below) (collectively, City Information) are property of the City, including, as provided below, all copyrights, or other intellectual property rights inherent in their preparation. During performance of the Services, Operator is responsible for any loss or damage to the City Information while in Operator's possession. Any such lost or damaged City Information must be restored at the expense of the Operator. If not restorable, Operator must bear the cost of replacement, and of any loss suffered by the City on account of the destruction.

(b) Any user data provided to or gathered by the System with respect to specific users, including, without limitation, the user's profile, payment information, trip history, and the like ("User Information"). All such User Information shall remain, as between the User and the Operator, the property of the user, and Operator may not claim ownership of such information,

12

and may not request that any user waive his or her ownership rights with respect to such information. User Information may be anonymized or aggregated to generate certain Deliverables or reports as required by the City.

(c) All usage data generated by the System, excluding technical or proprietary data such as technical specifications of the Equipment, is recorded and maintained by Alta's software subcontractor, and will be the property of the City. Alta shall be permitted to use such data in an aggregate form for any other purpose, including the promotion of bike share systems around the world after receiving approval from the City.

### 3.15. Copyright Ownership

Alta and the City intend that, to the extent permitted by law, the Deliverables produced by Alta at the City's instance and expense under this Agreement (excluding any intellectual property rights or embodiment thereof owned or created by PBSC) are conclusively deemed "works made for hire" within the meaning and purview of Section 101 of the United States Copyright Act, 17 U.S.C. '101 *et seq.*, and that the City will be the sole copyright owner of the Deliverables and of all aspects, elements and components of them in which copyright can subsist, and of all rights to apply for copyright registration or prosecute any claim of infringement.

To the extent that any Deliverable does not qualify as a "work made for hire," Alta hereby irrevocably grants, conveys, bargains, sells, assigns, transfers and delivers to the City, its successors and assigns, all right, title and interest in and to the copyrights and all U.S. and foreign copyright registrations, copyright applications and copyright renewals for them, and other intangible, intellectual property embodied in or pertaining to the Deliverables prepared for the City under this Agreement, and all goodwill relating to them, free and clear of any liens, claims or other encumbrances, to the fullest extent permitted by law. Alta will, and will cause all of its Subcontractors, employees, agents and other persons within its control to, execute all documents and perform all acts that the City may reasonably request in order to assist the City in perfecting its rights in and to the copyrights relating to the Deliverables, at the sole expense of the City. Alta warrants to the City, its successors and assigns, that on the date of transfer Alta is the lawful owner of good and marketable title in and to the copyrights for the Deliverables and has the legal rights to fully assign them. Alta further warrants that it has not assigned and will not assign any copyrights and that it has not granted and will not grant any licenses, exclusive or nonexclusive, to any other party, and that it is not a party to any other agreements or subject to any other restrictions with respect to the Deliverables. Alta warrants that the Deliverables are complete, entire and comprehensive, and that the Deliverables constitute a work of original authorship.

### 3.16. Records and Audits

(a)   **Records**

(i)   Alta must deliver or cause to be delivered to the City all documents, including all Deliverables prepared for the City under the terms of this Agreement, promptly in

13

accordance with the time limits prescribed in this Agreement, and if no time limit is specified, then upon reasonable demand for them or upon termination or completion of the Services under this Agreement. If Alta fails to make such delivery upon demand, then Alta must pay to the City any damages the City may sustain by reason of Alta's failure.

(ii)     Alta must maintain any such records including Deliverables not delivered to the City or demanded by the City for a period of 5 years after the final payment made in connection with this Agreement. Alta must not dispose of such documents following the expiration of this period without notification of and written approval from the City in accordance with Article 11.

(b)     **Audits**

(i)     Alta and any of Alta's Subcontractors must furnish the Department with all information that may be requested pertaining to the performance and cost of the Services. Alta must maintain records showing actual time devoted and costs incurred. Alta must keep books, documents, papers, records and accounts in connection with the Services open to audit, inspection, copying, abstracting and transcription and must make these records available to the City and any other interested governmental agency, at reasonable times during the performance of its Services.

The City shall have the right to audit the data and methods by which Alta gathers and reports information to determine whether it has met the Performance Requirements as described in Schedule 20 to Exhibit 1. Alta shall cooperate with the City and its auditor to grant such necessary access to data collected by the System and by Alta in performance of the Services.

(ii)     To the extent that Alta conducts any business operations separate and apart from the Services required under this Agreement using, for example, personnel, equipment, supplies or facilities also used in connection with this Agreement, then Alta must maintain and make similarly available to the City detailed records supporting Alta's allocation to this Agreement of the costs and expenses attributable to any such shared usages.

(iii)     Alta must maintain its books, records, documents and other evidence and adopt accounting procedures and practices sufficient to reflect properly all costs of whatever nature claimed to have been incurred and anticipated to be incurred for or in connection with the performance of this Agreement. This system of accounting must be in accordance with generally accepted accounting principles and practices, consistently applied throughout.

(iv)     No provision in this Agreement granting the City a right of access to records and documents is intended to impair, limit or affect any right of access to such records and documents which the City would have had in the absence of such provisions.

(v)     The City may in its sole discretion audit the records of Alta or its Subcontractors, or both, at any time during the term of this Agreement or within five years after the Agreement ends, in connection with the goods, work, or Services provided under this

14

Agreement. Each calendar year or partial calendar year is considered an audited period. If, as a result of any such audit, it is determined that Alta or any of its Subcontractors has overcharged the City in the audited period, the City will notify Alta.

If, the audit has revealed overcharges to the City representing 10% or more of the total value, based on the Agreement prices, of the goods, work, or Services provided in the audited period, then Alta must reimburse the City for the full cost of the audit.

If no additional payments are due to the Operator, and the City cannot offset the costs, the Operator shall reimburse the City upon notification; failure of Operator to reimburse the City may be an event of default under Section 9.1 of this Agreement, and Operator will be liable for all of the City's costs of collection, including any court costs and attorneys' fees.

### 3.17. Confidentiality of City Data

(a)     All City information must be kept strictly confidential, except as specifically authorized by this Agreement, or as may be required by law. The Operator must not allow the City Information to be made available to any other individual or organization without the prior written consent of the City. Further, all documents and other information provided to Operator by the City are confidential and must not be made available to any other individual or organization without the prior written consent of the City. Operator must implement such measures as may be necessary to ensure that its staff and its Subcontractors are bound by the confidentiality provisions in this Agreement.

Without limiting the foregoing, the Operator agrees that the User Information must be kept strictly confidential, and that Operator may not distribute, convey, transfer, license, or sell, in any fashion, such data, to any third parties, and Operator may not seek permission from users to do such. Notwithstanding this prohibition, the Operator shall seek permission from the users to share with the City User Information, on an aggregated basis, for City purposes, including those of the enhancement and operation of the bicycle sharing program.

(b)     Alta must not issue any publicity news releases or grant press interviews, and except as may be required by law during or after the performance of this Agreement, disseminate any information regarding its Services or the project to which the Services pertain without the prior written consent of the Commissioner.

(c)     If Alta is presented with a request for documents by any administrative agency or with a <u>subpoena duces tecum</u> regarding any records, data or documents which may be in Alta's possession by reason of this Agreement, Alta must immediately give notice to the Commissioner and the Corporation Counsel for the City with the understanding that the City will have the opportunity to contest such process by any means available to it before the records, data or documents are submitted to a court or other third party. Alta, however, is not obligated to withhold the delivery beyond the time ordered by a court or administrative agency, unless the <u>subpoena</u> or request is quashed or the time to produce is otherwise extended.

(d)     HIPAA and AIDS Confidentiality Act. To the extent not defined here the capitalized terms below and in <u>Exhibit 7</u> will have the same meaning as set forth in the Health Insurance Portability and Accountability Act (Act).    See 45 CFR parts 160, 162 and 164. Operator and all its Subcontractors must comply with the Act and all rules and regulations applicable to it including the Privacy Rule, which sets forth the Standards for Privacy of Individually Identifiable Health Information at 45 CFR part 160 and part 164 subparts A and E; the Standards for Electronic Transactions, which are located at 45 CFR parts 160 and 162 and the Security Standards, which are located at 45 CFR parts 160, 162 and 164.   Operator must also comply with the Illinois AIDS Confidentiality Act (410 ILCS 305/1 through 16) and the rules and regulations of the Illinois Department of Public Health promulgated under it.   If Operator fails to comply with the applicable provisions under the ACT or the Illinois AIDS Confidentiality Act, such failure will constitute an event of default under this Agreement for which no opportunity for cure will be provided.

### 3.18.   Assignments and Subcontracts

(a)     Alta must not assign, delegate or otherwise transfer all or any part of its rights or obligations under this Agreement: (i) unless otherwise provided for elsewhere in this Agreement; or (ii) without the express written consent of the Department.  The absence of such a provision or written consent voids the attempted assignment, delegation or transfer and is of no effect as to the Services or this Agreement.   No approvals given by the Commissioner, including approvals for the use of any Subcontractors, operate to relieve Alta of any of its obligations or liabilities under this Agreement.

(b)     All Subcontractors are subject to the prior approval of the Commissioner. Approval for the use of any Subcontractor in performance of the Services is conditioned upon performance by the Subcontractor in accordance with the terms and conditions of this Agreement. If any Subcontractor fails to perform the Services in accordance with the terms and conditions of this Agreement to the satisfaction of the Department, the City has the absolute right upon written notification to immediately rescind approval and to require the performance of this Agreement by Alta personally or through any other City-approved Subcontractor.   Any approval for the use of Subcontractors in the performance of the Services under this Agreement under no circumstances operates to relieve Alta of any of its obligations or liabilities under this Agreement.

(c)     Alta, upon entering into any agreement with a Subcontractor, must furnish upon request of the Department a copy of its agreement.  Subcontracts may not contain any terms and conditions that are in contradiction of the material terms and conditions of this Agreement. Alta must notify subcontractors that subcontracts are subject to the approval of the Department. If the agreements do not prejudice any of the City's rights under this Agreement, such agreements may contain different provisions than are provided in this Agreement with respect to extensions of schedule, time of completion, payments, guarantees and matters not affecting the quality of the Services.

(d)     Alta must not transfer or assign any funds or claims due or to become due under this Agreement without the prior written approval of the Commissioner.  The attempted transfer

or assignment of any funds, either in whole or in part, or any interest in them, which are due or to become due to Alta under this Agreement, without such prior written approval, has no effect upon the City.

(e)     Under 2-92-245 of the Municipal Code, the Chief Procurement Officer may make direct payments to Subcontractors for Services performed under this Agreement.  Any such payment has the same effect as if the City had paid Alta that amount directly. Such payment by the City to Alta's Subcontractor under no circumstances operates to relieve Alta of any of its obligations or liabilities under this Agreement. This section is solely for the benefit of the City and does not grant any third party beneficiary rights.

(f)     The City reserves the right to assign or otherwise transfer all or any part of its interests under this Agreement to any successor.

### 3.19.   Collateral Assignment

(a)     In the event that the City has exercised its right to terminate this Agreement, under the early termination or for cause, all as set forth in Article 9, the City shall have the right, at its election, to take over and operate the System, either directly or through third parties. Notwithstanding the preceding, the City may not operate the System through a third party that is a direct competitor of PBSC, namely an entity engaged in the implementation of bike-sharing systems.

(b) Alta shall ensure that all its subcontractors agree, at City's option, to either (i) authorize the transfer to the City of the supply and/or license agreement such subcontractor has with Alta for the purpose of the Chicago bike-share project, or (ii) negotiate in good faith a direct supply and/or license agreement with the City for the provision of the goods and services such subcontractor previously provided to the City through Alta.  Alta shall further ensure (in its contract with PBSC) that if the City chooses option (ii) immediately preceding, PBSC will offer the same terms on license rights and support that the City has under this Agreement.

### 3.20.   Public Works Provisions

To the extent that any of the Services are considered Public Works, Operator must adhere to the additional terms as outlined in Exhibit 8.


## ARTICLE 4.      DURATION OF AGREEMENT

### 4.1.   Term of Performance

This Agreement takes effect as of the Effective Date and continues for an initial term of 60 months.

### 4.2.  Timeliness of Performance

(a)  Alta must provide the Services and Deliverables within the time limits specified in the Scope of Services.  **Further, Alta acknowledges that TIME IS OF THE ESSENCE and that the failure of Alta to comply with the required time limits may result in economic or other losses to the City.**

(b)  Neither Alta nor Alta's agents, employees or Subcontractors are entitled to any damages from the City, nor is any party entitled to be reimbursed by the City, for damages, charges or other losses or expenses incurred by Alta by reason of delays or hindrances in the performance of the Services, whether or not caused by the City.

### 4.3.  Agreement Extension Option

This Agreement will be in effect for the dates indicated within this Agreement for an initial sixty month term.  The Commissioner may exercise the City's right to extend this Agreement following the expiration of the base Agreement term for up to two additional sixty month terms, subject to acceptable performance by Alta and contingent upon the appropriation of sufficient funds for the Services provided for in this Agreement.

Before expiration of the then current Agreement term, the Commissioner will give the Alta notice, in writing, that the City is exercising its option to renew the Agreement for the approaching option period.  The date on which the Commissioner gives notice is the date the notice is mailed, if it is mailed, or the date the notice is delivered, if sent by courier or messenger service.

With the same amount of notice as for options, the City reserves the right to extend the Agreement for a period of no more than one hundred eighty-one (181) calendar days, either in lieu of exercising an option period or following the exhaustion of all option periods, for the purpose of providing continuity of service while procuring a replacement contract.

### ARTICLE 5.    COMPENSATION

### 5.1.  Fees and Invoices

Alta will invoice the City in accordance with the terms of invoicing and payment set forth in Exhibit 3, Compensation Schedule for the Capital Costs.  An original invoice must be mailed to: Chicago Department of Transportation, 30 North LaSalle Street, Suite 1100, Chicago, Illinois 60602, Attention: City Project Manager (Bicycle Sharing Program, with a copy to the City Comptroller. The City will process payment within 60 days after receipt of invoices and all supporting documentation necessary for the City to verify the Capital Costs.  Alta will invoice the City for Operations Costs, and the City will pay such invoices in accordance with Exhibit 3.

### 5.2.  Most Favored Nation Pricing

Alta must ensure that the City pays the lowest price paid for Equipment and PBSC Software by any direct or indirect customers of PBSC using a bike-share system of the same specifications purchased within 30 days of the City's purchase. If Alta offers to any such customers equipment and software with the same specifications purchased within 30 days of the City's purchase at a price materially lower or a discount materially greater than the applicable fees charged to City hereunder, then such fees shall simultaneously be lowered by Alta to the extent necessary to match such lower price or greater discount (or, to the extent such fees have already been paid, Alta must promptly refund to City the difference between the fees already paid and the lower price for the time period during which such lower price has been in effect). Alta must notify City of the occurrence of such a lower price or greater discount as described in this section within thirty (30) days after Alta's offering or providing such lower price or greater discount to another such customer.

### 5.3. Taxes

Federal Excise Tax does not apply to materials purchased by the City of Chicago by virtue of Exemption Certificate No. 36-6005820 and State of Illinois Sales Tax does not apply by virtue of Exemption Certificate No. E9998-1874-07. Illinois Retailers Occupation Tax, Use Tax, and Municipal Retailers Occupation Tax do not apply to materials or services purchased by the City of Chicago by virtue of Statute. The price or prices quoted herein shall include all other Federal and/or State, direct and/or indirect taxes which apply. The prices quoted herein shall comply with all Federal laws and regulations.

### 5.4. Funding

The source of funds for payments for Capital Costs under this Agreement shall be from such fund numbers identified by the City. The source of funds for payments for Operations Costs will be Operating Revenues from such fund numbers identified by the City. Payments for Capital Costs under this Agreement must not exceed **$22,500,000.00** without a written amendment in accordance with Section 10.3. Payments for Operating Costs must not exceed **$42,500,000.00** for the five year base term of this Agreement without a written amendment in accordance with Section 10.3. Funding for this Agreement is subject to the availability of funds and their appropriation by the City Council.

### 5.5. Non-Appropriation

Pursuant to 65 ILCS 5/8-1-7, any contract for the expenditure of funds made by a municipality without the proper appropriation is null and void.

If no funds or insufficient funds are appropriated and budgeted in any fiscal period of the City for payments to be made under this Agreement, then the City will notify the Contractor of that occurrence and this Agreement shall terminate on the earlier of the last day of the fiscal period for which sufficient appropriation was made or whenever the funds appropriated for payment under this Agreement are exhausted. No payments will be made to the Contractor under this Agreement beyond those amounts appropriated and budgeted by the City to fund payments under this Contract.

### 5.6. Subcontractor Payments

Alta must submit a status report of Subcontractor payments with each invoice for the duration of the Agreement on the "Subcontractor Payment Certification" form required by the City. The form can be downloaded from the City's website at http://egov.cityofchicago.org/webportal/COCWebPortal/COC_EDITORIAL/subcompliance.pdf. The statement must list the following for Alta and for each Subcontractor and supplier for the period for which payment is requested:

(i)     Total amount invoiced by the Alta for the prior month;
(ii)    The name of each particular Subcontractor or supplier utilized during the prior month;
(iii)   Indication if the Subcontractor or supplier is acting as an MBE, WBE, DBE, or non-certified firm on this Agreement;
(iv)    The vendor/supplier number of each Subcontractor or supplier;
(v)     Total amount invoiced that is to be paid to each Subcontractor or supplier.

If a Subcontractor has satisfactorily completed its services, or provided specified materials in accordance with the requirements of the Agreement, Alta must pay Subcontractor for such work or materials within thirty (30) calendar days of Alta receiving payment from the City.

### ARTICLE 6.   DISPUTES

Except for a claim relating to intellectual property or breach of confidentiality provisions, the parties, through their respective project managers, will attempt to settle any dispute arising from this Agreement through consultation and good faith negotiation. If the project managers are unable to resolve the issue, the parties will declare a 30-day resolution period in which the issue will be escalated to the Commissioner, or his designee, and to the President of Alta, or her designee. The parties agree to timely respond to reasonable requests for information required to establish facts related to the dispute that they are not prohibited by law or policy to produce. At the end of the 30-day period, the Operator shall give notice to the City of disputes or claims it believes cannot be resolved before filing any claim with a court of proper jurisdiction.

### ARTICLE 7.   COMPLIANCE WITH ALL LAWS

### 7.1. Compliance with All Laws Generally

(a)     Operator must observe and comply with all applicable federal, state, county and municipal laws, statutes, ordinances and executive orders, in effect now or later and whether or not they appear in this Agreement, including those set forth in this Article 7, and Operator must pay all taxes and obtain all licenses, certificates and other authorizations required by them. Operator must require all Subcontractors to do so, also. Further, Operator must execute an

online Economic Disclosure Statement and Affidavit ("**EDS**") which includes a Disclosure of Retained Parties. Submit an electronically signed, one page Certificate of Filing to Exhibit 5 which validates that the EDS has been filed. The web address to submit your EDS is http://webapps.cityofchicago.org/EDSWeb. Notwithstanding acceptance by the City of the EDS, Operator's failure in the EDS to include all information required under the Municipal Code renders this Agreement voidable at the option of the City. Operator must promptly update its online EDS(s) with the City whenever any information or response provided in the EDS(s) is no longer complete and accurate.

(b)     Notwithstanding anything in this Agreement to the contrary, references to a statute or law are considered to be a reference to (i) the statute or law as it may be amended from time to time; (ii) all regulations and rules pertaining to or promulgated pursuant to the statute or law; and (iii) all future statutes, laws, regulations, rules and executive orders pertaining to the same or similar subject matter.

(c)     The Operator will comply with Section 2-154-020 of the Municipal Code of Chicago. Failure by the Operator or any controlling person (as defined in Section 1-23-010 of the Municipal Code of Chicago) thereof to maintain eligibility to do business with the City of Chicago as required by Section 1-23-030 of the Municipal Code of Chicago shall be grounds for termination of this Agreement.

**7.2.    Nondiscrimination**

(a)    **Operator**

Operator must comply with applicable federal, state, and local laws and related regulations prohibiting discrimination against individuals and groups. If this Agreement is federally funded in whole or in part, additional provisions related to nondiscrimination may be set forth in Exhibit 9.

(i)     **Federal Requirements**

Operator must not engage in unlawful employment practices, such as (1) failing or refusing to hire or discharging any individual, or otherwise discriminating against any individual with respect to compensation or the terms, conditions, or privileges of the individual's employment, because of the individual's race, color, religion, sex, age, handicap/disability or national origin; or (2) limiting, segregating or classifying Operator's employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the individual's status as an employee, because of the individual's race, color, religion, sex, age, handicap/disability or national origin.

Operator must comply with, and the procedures Operator utilizes and the Services Operator provides under this Agreement must comply with, the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e *et seq.* (1981), as amended and the Civil Rights Act of 1991, P.L. 102-166. Attention is called to: Exec. Order No. 11246, 30 Fed. Reg. 12,319

21

(1965), reprinted in 42 U.S.C. 2000e note, as amended by Exec. Order No. 11375, 32 Fed. Reg. 14,303 (1967) and by Exec. Order No. 12086, 43 Fed. Reg. 46,501 (1978); Age Discrimination Act, 42 U.S.C. §§6101-6106 (1981); Age Discrimination in Employment Act, 29 U.S.C. §§621-34; Rehabilitation Act of 1973, 29 U.S.C. §§793-794 (1981); Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.*; 41 C.F.R. Part 60 *et seq.* (1990); and all other applicable federal statutes, regulations and other laws.

### (ii)    State Requirements

Operator must comply with, and the procedures Operator utilizes and the Services Operator provides under this Agreement must comply with, the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.* (1990), as amended and any rules and regulations promulgated in accordance with it, including the Equal Employment Opportunity Clause, 44 Ill. Admin. Code §750 Appendix A.   Furthermore, Operator must comply with the Public Works Employment Discrimination Act, 775 ILCS 10/0.01 *et seq.* (1990), as amended, and all other applicable state statutes, regulations and other laws.

### (iii)    City Requirements

Operator must comply with, and the procedures Operator utilizes and the Services Operator provides under this Agreement must comply with, the Chicago Human Rights Ordinance, ch. 2-160, Section 2-160-010 *et seq.* of the Municipal Code of Chicago (1990), as amended, and all other applicable City ordinances and rules.

### (b)    Subcontractors

For subcontractors that fall within the applicable jurisdictional authority, Operator must incorporate the corresponding parts of Section 7.2 by reference in all agreements entered into with any suppliers of materials, furnisher of services, Subcontractors of any tier, and labor organizations that furnish skilled, unskilled and craft union skilled labor, or that may provide any such materials, labor or services in connection with this Agreement.   Further, Operator must furnish and must cause each of its Subcontractor(s) to furnish such reports and information as requested by the federal, state, and local agencies charged with enforcing such laws and regulations, including the Chicago Commission on Human Relations.

### 7.3.    Inspector General and Legislative Inspector General

It is the duty of any bidder, proposer or Operator, all Subcontractors, every applicant for certification of eligibility for a City contract or program, and all officers, directors, agents, partners and employees of any bidder, proposer, Operator, Subcontractor or such applicant to cooperate with the Inspector General or Legislative Inspector General in any investigation or hearing undertaken pursuant to Chapter 2-56 or 2-55, respectively, of the Municipal Code. Operator understands and will abide by all provisions of Chapter 2-56 and 2-55 of the Municipal Code. All subcontracts must inform Subcontractors of the provision and require understanding and compliance with it.

22

### 7.4.    MacBride Ordinance

The City of Chicago through the passage of the MacBride Principles Ordinance seeks to promote fair and equal employment opportunities and labor practices for religious minorities in Northern Ireland and provide a better working environment for all citizens in Northern Ireland.

In accordance with Section 2-92-580 of the Municipal Code of the City of Chicago, if Operator conducts any business operations in Northern Ireland, the Operator must make all reasonable and good faith efforts to conduct any business operations in Northern Ireland in accordance with the MacBride Principles for Northern Ireland as defined in Illinois Public Act 85-1390 (1988 Ill. Laws 3220).

The provisions of this section do not apply to contracts for which the City receives funds administered by the United States Department of Transportation, except to the extent Congress has directed that the Department of Transportation not withhold funds from states and localities that choose to implement selective purchasing policies based on agreement to comply with the MacBride Principles for Northern Ireland, or to the extent that such funds are not otherwise withheld by the Department of Transportation.

### 7.5.    Business Relationships with Elected Officials

Pursuant to §2-156-030(b) of the Municipal Code , it is illegal for any elected official of the City, or any person acting at the direction of such official, to contact, either orally or in writing, any other City official or employee with respect to any matter involving any person with whom the elected official has a business relationship, or to participate in any discussion in any City Council committee hearing or in any City Council meeting or to vote on any matter involving the person with whom an elected official has a business relationship.  Violation of Section 2-156-030(b) by any elected official with respect to this Agreement is grounds for termination of this Agreement.   The term business relationship is defined as set forth in § 2-156-080 of the Municipal Code.

Section 2-156-080 defines a "business relationship" as any contractual or other private business dealing of an official, or his or her spouse, or of any entity in which an official or his or her spouse has a financial interest, with a person or entity which entitles an official to compensation or payment in the amount of $2,500 or more in a calendar year; provided, however, a financial interest shall not include:  (i) any ownership through purchase at fair market value or inheritance of less than one percent of the share of a corporation, or any corporate subsidiary, parent or affiliate thereof, regardless of the value of or dividends on such shares, if such shares are registered on a securities exchange pursuant to the Securities Exchange Act of 1934, as amended; (ii) the authorized compensation paid to an official or employee for his office or employment;  (iii) any economic benefit provided equally to all residents of the City; (iv) a time or demand deposit in a financial institution; or (v) an endowment or insurance policy or annuity contract purchased from an insurance company.   A "contractual or other private business dealing" shall not include any employment relationship of an official's spouse with an entity when such spouse has no discretion concerning or input relating to the relationship between that entity and the City.

### 7.6. Chicago "Living Wage" Ordinance

(a)     Section 2-92-610 of the Municipal Code provides for a living wage for certain categories of workers employed in the performance of City contracts, specifically non-City employed security guards, parking attendants, day laborers, home and health care workers, cashiers, elevator operators, custodial workers and clerical workers ("**Covered Employees**"). Accordingly, pursuant to Section 2-92-610 and regulations promulgated under it:

(i)     If Operator has 25 or more full-time employees, and

(ii)     If at any time during the performance of this Agreement, Operator and/or any Subcontractor or any other entity that provides any portion of the Services (collectively "**Performing Parties**") uses 25 or more full-time security guards, or any number of other full-time Covered Employees, then

(iii)     Operator must pay its Covered Employees, and must ensure that all other Performing Parties pay their Covered Employees, not less than the minimum hourly rate as determined in accordance with this provision (the "**Base Wage**") for all Services performed under this Agreement.

(b)     Operator's obligation to pay, and to ensure payment of, the Base Wage will begin at any time during the term of this Agreement when the conditions set forth in (a)(i) and (a)(ii) above are met, and will continue until the end of the term of this Agreement.

(c)     As of July 1, 2012, the Base Wage is $11.53 per hour, and each July 1 thereafter, the Base Wage will be adjusted using the most recent federal poverty guidelines for a family of four as published annually by the U.S. Department of Health and Human Services, to constitute the following: the poverty guidelines for a family of four divided by 2000 hours or the current base wage, whichever is higher. The currently applicable Base Wage is available from the Department of Procurement Services. At all times during the term of this Agreement, Operator and all other Performing Parties must pay the Base Wage (as adjusted in accordance with the above).  If the payment of prevailing wages is required for Services done under this Agreement, and the prevailing wages for Covered Employees are higher than the Base Wage, then Operator and all other Performing Parties must pay the prevailing wage rates.

(d)     Operator must include provisions in all subcontracts requiring its Subcontractors to pay the Base Wage to Covered Employees. Operator agrees to provide the City with documentation acceptable to the Chief Procurement Officer demonstrating that all Covered Employees, whether employed by Operator or by a Subcontractor, have been paid the Base Wage, upon the City's request for such documentation.  The City may independently audit Operator and/or Subcontractors to verify compliance with this section.  Failure to comply with the requirements of this section will be an event of default under this Agreement, and further, failure to comply may result in ineligibility for any award of a City contract or subcontract for up to 3 years.

24

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

(e)    Not-for-Profit Corporations: If Operator is a corporation having federal tax-exempt status under Section 501(c)(3) of the Internal Revenue Code and is recognized under Illinois not-for-profit law, then the provisions of subsections (a) through (d) above do not apply.

### 7.7.    Environmental Warranties and Representations

In accordance with Section 11-4-1600(e) of the Municipal Code of Chicago, Operator warrants and represents that it, and to the best of its knowledge, its subcontractors have not violated and are not in violation of the following sections of the Code (collectively, the Waste Sections):

> 7-28-390 Dumping on public way;
> 7-28-440 Dumping on real estate without permit;
> 11-4-1410 Disposal in waters prohibited;
> 11-4-1420 Ballast tank, bilge tank or other discharge;
> 11-4-1450 Gas manufacturing residue;
> 11-4-1500 Treatment and disposal of solid or liquid waste;
> 11-4-1530 Compliance with rules and regulations required;
> 11-4-1550 Operational requirements; and
> 11-4-1560 Screening requirements.

During the period while this Agreement is executory, Operator's or any subcontractor's violation of the Waste Sections, whether or not relating to the performance of this Agreement, constitutes a breach of and an event of default under this Agreement, for which the opportunity to cure, if curable, will be granted only at the sole discretion of the Commissioner.  Such breach and default entitles the City to all remedies under the Agreement, at law or in equity.

This section does not limit Operator's and its subcontractors' duty to comply with all applicable federal, state, county and municipal laws, statutes, ordinances and executive orders, in effect now or later, and whether or not they appear in this Agreement.

Non-compliance with these terms and conditions may be used by the City as grounds for the termination of this Agreement, and may further affect Operator's eligibility for future contract awards.

### 7.8.    Prohibition on Certain Contributions

Operator agrees that Operator, any person or entity who directly or indirectly has an ownership or beneficial interest in Operator of more than 7.5 percent ("**Owners**"), spouses and domestic partners of such Owners, Operator's subcontractors, any person or entity who directly or indirectly has an ownership or beneficial interest in any subcontractor of more than 7.5 percent ("**Sub-owners**") and spouses and domestic partners of such Sub-owners (Operator and all the other preceding classes of persons and entities are together, the "**Identified Parties**"), shall not make a contribution of any amount to the Mayor of the City of Chicago ("**Mayor**") or to his political fundraising committee (i) after execution of this Agreement by Operator, (ii) while this Agreement or any Other Contract is executory, (iii) during the term of this Agreement or any

25

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

Other Contract between Operator and the City, or (iv) during any period while an extension of this Agreement or any Other Contract is being sought or negotiated.

Operator represents and warrants that since the date of public advertisement of the specification, request for qualifications, request for proposals or request for information (or any combination of those requests) or, if not competitively procured, from the date the City approached Operator or the date Operator approached the City, as applicable, regarding the formulation of this Agreement, no Identified Parties have made a contribution of any amount to the Mayor or to his political fundraising committee.

Operator agrees that it shall not: (a) coerce, compel or intimidate its employees to make a contribution of any amount to the Mayor or to the Mayor's political fundraising committee; (b) reimburse its employees for a contribution of any amount made to the Mayor or to the Mayor's political fundraising committee; or (c) bundle or solicit others to bundle contributions to the Mayor or to his political fundraising committee.

Operator agrees that the Identified Parties must not engage in any conduct whatsoever designed to intentionally violate this provision or Mayoral Executive Order No. 2011-4 or to entice, direct or solicit others to intentionally violate this provision or Mayoral Executive Order No. 2011-4.

Operator agrees that a violation of, non-compliance with, misrepresentation with respect to, or breach of any covenant or warranty under this provision or violation of Mayoral Executive Order No. 2011-4 constitutes a breach and default under this Agreement, and under any Other Contract for which no opportunity to cure will be granted. Such breach and default entitles the City to all remedies (including without limitation termination for default) under this Agreement, under Other Contract, at law and in equity. This provision amends any Other Contract and supersedes any inconsistent provision contained therein.

If Operator violates this provision or Mayoral Executive Order No. 2011-4 prior to award of the Agreement resulting from this specification, the Commissioner may reject Operator's bid.

For purposes of this provision:

"Bundle" means to collect contributions from more than one source which are then delivered by one person to the Mayor or to his political fundraising committee.

"Other Contract" means any other agreement with the City of Chicago to which Operator is a party that is (i) formed under the authority of chapter 2-92 of the Municipal Code of Chicago; (ii) entered into for the purchase or lease of real or personal property; or (iii) for materials, supplies, equipment or services which are approved or authorized by the city council.

"Contribution" means a "political contribution" as defined in Chapter 2-156 of the Municipal Code of Chicago, as amended

26

"Political fundraising committee" means a "political fundraising committee" as defined in Chapter 2-156 of the Municipal code of Chicago, as amended.

### 7.9. Firms Owned or Operated by Individuals with Disabilities

The City encourages consultants to use Subcontractors that are firms owned or operated by individuals with disabilities, as defined by Section 2-92-586 of the Municipal Code of the City of Chicago, where not otherwise prohibited by federal or state law.

### 7.10. Deemed Inclusion

Provisions required by law, ordinances, rules, regulations, or executive orders to be inserted in this Agreement are deemed inserted in this Agreement whether or not they appear in this Agreement or, upon application by either party, this Agreement will be amended to make the insertion; however, in no event will the failure to insert the provisions before or after this Agreement is signed prevent its enforcement.

### 7.11. False Statements

(a)     1-21-010 False Statements

Any person who knowingly makes a false statement of material fact to the city in violation of any statute, ordinance or regulation, or who knowingly falsifies any statement of material fact made in connection with an application, report, affidavit, oath, or attestation, including a statement of material fact made in connection with a bid, proposal, contract or economic disclosure statement or affidavit, is liable to the city for a civil penalty of not less than $500.00 and not more than $1,000.00, plus up to three times the amount of damages which the city sustains because of the person's violation of this section. A person who violates this section shall also be liable for the city's litigation and collection costs and attorney's fees.

The penalties imposed by this section shall be in addition to any other penalty provided for in the municipal code. (Added Coun. J. 12-15-04, p. 39915, §1)

(b)     1-21-020 Aiding and abetting.

Any person who aids, abets, incites, compels or coerces the doing of any act prohibited by this chapter shall be liable to the city for the same penalties for the violation. (Added Coun. J. 12-15-04, p. 39915, §1)

(c)     1-21-030 Enforcement.

In addition to any other means authorized by law, the corporation counsel may enforce this chapter by instituting an action with the department of administrative hearings. (Added Coun. J. 12-15-04, p. 39915, §1)

27

## ARTICLE 8.     SPECIAL CONDITIONS

### 8.1.   Warranties and Representations

In connection with signing and carrying out this Agreement, Operator:

(a)     warrants that Operator is appropriately licensed under Illinois law to perform the Services required under this Agreement and will perform no Services for which a professional license is required by law and for which Operator is not appropriately licensed;

(b)     warrants it is financially solvent; it and each of its employees, agents and Subcontractors of any tier are competent to perform the Services required under this Agreement; and Operator is legally authorized to execute and perform or cause to be performed this Agreement under the terms and conditions stated in this Agreement;

(c)     warrants that it will not knowingly use the services of any ineligible contractor or Subcontractor for any purpose in the performance of its Services under this Agreement;

(d)     warrants that Operator and its Subcontractors are not in default at the time this Agreement is signed, and have not been deemed  by the Commissioner to have, within 5 years immediately preceding the date of this Agreement, been found to be in default on any contract awarded by the City ;

(e)     represents that it has carefully examined and analyzed the provisions and requirements of this Agreement; it understands the nature of the Services required; from its own analysis it has satisfied itself as to the nature of all things needed for the performance of this Agreement; this Agreement is feasible of performance in accordance with all of its provisions and requirements, and Operator warrants it can and will perform, or cause to be performed, the Services in strict accordance with the provisions and requirements of this Agreement;

(f)     represents that Operator and, to the best of its knowledge, its Subcontractors are not in violation of the provisions of 2-92-320 of the Municipal Code , and in connection with it, and additionally in connection with the Illinois Criminal Code, 720 ILCS 5/33E as amended, and the Illinois Municipal Code, 65 ILCS 5/11-42.1-1;

(g)     acknowledges that any certification, affidavit or acknowledgment made under oath in connection with this Agreement is made under penalty of perjury and, if false, is also cause for termination under Sections 9.2 and 9.3 of this Agreement; and

(h)     warrants that the System complies with all laws governing accessibility for the disabled as required by the Americans with Disabilities Act (ADA) or any such applicable laws and regulations and agrees that during the Term of the Agreement it will comply with all such laws governing accessibility; and

(i)     warrants and represents that neither Operator nor an Affiliate of Operator (as defined below) appears on the Specially Designated Nationals List, the  Denied Persons List,

28

the unverified List, the Entity List, or the Debarred List as maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or by the Bureau of Industry and Security of the U.S. Department of Commerce (or their successors), or on any other list of persons or entities with which the City may not do business under any applicable law, rule, regulation, order or judgment. "Affiliate of Operator" means a person or entity that directly (or indirectly through one or more intermediaries) controls, is controlled by or is under common control with Operator. A person or entity will be deemed to be controlled by another person or entity if it is controlled in any manner whatsoever that results in control in fact by that other person or entity (either acting individually or acting jointly or in concert with others) whether directly or indirectly and whether through share ownership, a trust, a contract or otherwise.

### 8.2. Ethics

(a)   In addition to the foregoing warranties and representations, Operator warrants:

(i)   no officer, agent or employee of the City is employed by Operator or has a financial interest directly or indirectly in this Agreement or the compensation to be paid under this Agreement except as may be permitted in writing by the Board of Ethics established under Chapter 2-156 of the Municipal Code .

(ii)   no payment, gratuity or offer of employment will be made in connection with this Agreement by or on behalf of any Subcontractors to Operator or higher tier Subcontractors or anyone associated with them, as an inducement for the award of a subcontract or order.

(b)   Operator further acknowledges that any Agreement entered into, negotiated or performed in violation of any of the provisions of Chapter 2-156 is voidable as to the City.

### 8.3. Joint and Several Liability

If Operator, or its successors or assigns, if any, is comprised of more than one individual or other legal entity (or a combination of them), then under this Agreement, each and without limitation every obligation or undertaking in this Agreement to be fulfilled or performed by Operator is the joint and several obligation or undertaking of each such individual or other legal entity.

### 8.4. Business Documents

At the request of the City, Operator must provide copies of its latest articles of incorporation, by-laws and resolutions, or partnership or joint venture agreement, as applicable.

### 8.5. Conflicts of Interest

(a)   No member of the governing body of the City or other unit of government and no other officer, employee or agent of the City or other unit of government who exercises any

29

functions or responsibilities in connection with the Services to which this Agreement pertains is permitted to have any personal interest, direct or indirect, in this Agreement. No member of or delegate to the Congress of the United States or the Illinois General Assembly and no alderman of the City or City employee is allowed to be admitted to any share or part of this Agreement or to any financial benefit to arise from it.

(b)     Operator represents that it, and to the best of its knowledge, its Subcontractors if any (Operator and Subcontractors will be collectively referred to in this Section 8.5 as **"Consulting Parties"**), presently have no direct or indirect interest and will not acquire any direct or indirect interest in any project or contract that would conflict in any manner or degree with the performance of its Services under this Agreement.

(c)     Upon the request of the City, Consulting Parties must disclose to the City their past client lists and the names of any clients with whom they have an ongoing relationship. Consulting Parties are not permitted to perform any Services for the City on applications or other documents submitted to the City by any of Consulting Parties' past or present clients. If Consulting Parties become aware of a conflict, they must immediately stop work on the assignment causing the conflict and notify the City.

(d)     Without limiting the foregoing, if the Consulting Parties assist the City in determining the advisability or feasibility of a project or in recommending, researching, preparing, drafting or issuing a request for proposals or bid specifications for a project, the Consulting Parties must not participate, directly or indirectly, as a prime, subcontractor or joint venturer in that project or in the preparation of a proposal or bid for that project during the term of this Agreement or afterwards. The Consulting Parties may, however, assist the City in reviewing the proposals or bids for the project if none of the Consulting Parties have a relationship with the persons or entities that submitted the proposals or bids for that project.

(e)     Further, Consulting Parties must not assign any person having any conflicting interest to perform any Services under this Agreement or have access to any confidential information, as described in Section 3.11 of this Agreement. If the City, by the Commissioner in his reasonable judgment, determines that any of Consulting Parties' services for others conflict with the Services that Consulting Parties are to render for the City under this Agreement, Consulting Parties must terminate such other services immediately upon request of the City.

(f)     Furthermore, if any federal funds are to be used to compensate or reimburse Operator under this Agreement, Operator represents that it is and will remain in compliance with federal restrictions on lobbying set forth in Section 319 of the Department of the Interior and Related Agencies Appropriations Act for Fiscal Year 1990, 31 U.S.C. §1352, and related rules and regulations set forth at 54 Fed. Reg. 52,309 ff. (1989), as amended. If federal funds are to be used, Operator must execute a Certification Regarding Lobbying, which is part of the EDS and incorporated by reference as if fully set forth here.

**8.6.     Non-Liability of Public Officials**

Operator and any assignee or Subcontractor of Operator must not charge any official, employee or agent of the City personally with any liability or expenses of defense or hold any official, employee or agent of the City personally liable to them under any term or provision of this Agreement or because of the City's execution, attempted execution or any breach of this Agreement.

## 8.7. EDS / Certification Regarding Suspension and Debarment

Operator certifies, as further evidenced in the EDS attached as Exhibit 5, by its acceptance of this Agreement that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from participation in this transaction by any federal department or agency. Operator further agrees by executing this Agreement that it will include this clause without modification in all lower tier transactions, solicitations, proposals, contracts and subcontracts. If Operator or any lower tier participant is unable to certify to this statement, it must attach an explanation to the Agreement.

**ARTICLE 9.     EVENTS OF DEFAULT, REMEDIES, TERMINATION, SUSPENSION AND RIGHT TO OFFSET**

### 9.1.   Events of Default Defined

The following constitute events of default:

(a)     Any material misrepresentation, whether negligent or willful and whether in the inducement or in the performance, made by Operator to the City.

(b)     Operator's failure to perform any of its obligations under this Agreement including the following:

(i)      Failure to perform the Services with sufficient personnel and equipment or with sufficient material to ensure the timely performance of the Services;

(ii)     Failure to have and maintain all professional licenses required by law to perform the Services;

(iii)    Failure to timely perform the Services;

(iv)    Failure to perform the Services in a manner reasonably satisfactory to the Commissioner or the Commissioner or inability to perform the Services satisfactorily as a result of insolvency, filing for bankruptcy or assignment for the benefit of creditors;

(v)     Failure to promptly re-perform, as required, within a reasonable time and at no cost to the City, Services that are rejected as erroneous or unsatisfactory;

(vi)    failure to provide Support or remedy any Software or Computer Hardware defect or malfunction or other failure of the Software or Computer Hardware to perform in accordance with the Software Documentation or Performance Specifications in Schedules 4 through 6, or other criteria described in this Agreement, for more than 5 calendar days.

(vii)   Discontinuance of the Services for reasons within Operator's reasonable control;

(viii)  Failure to comply with Section 7.1 in the performance of the Agreement;

(ix)    Failure promptly to update EDS(s) furnished in connection with this Agreement when the information or responses contained in it or them is no longer complete or accurate; and

(x)     Any other acts specifically stated in this Agreement as constituting an act of default.

32

(c)     Any change in ownership or control of Operator without the prior written approval of the Commissioner (when such prior approval is permissible by law), which approval the Commissioner will not unreasonably withhold.

(d)     Operator's default under any other agreement it may presently have or may enter into with the City for the duration of this Agreement.  Operator acknowledges that in the event of a default under this Agreement the City may also declare a default under any such other agreements.

(e)     Operator's violation of City ordinance(s) unrelated to performance under the Agreement such that, in the opinion of the Commissioner, it indicates a willful or reckless disregard for City laws and regulations.

(f)     Operator's failure to update its EDS to reflect any changes in information, including changes in ownership, and to provide it to the City as provided under Section 7.1(a).

### 9.2.    Remedies

(a)     Notices.  The occurrence of any event of default permits the City, at the City's sole option, to declare Operator in default.

If the Commissioner determines that an event of default is curable, the Commissioner may give the Operator an opportunity to cure the default within a certain period of time, which period of time may not exceed 30 days unless extended by the Commissioner; such cure period may be automatically extended for a reasonable period of time so long as Operator is diligently pursuing the remedy.  Whether to declare Operator in default is within the sole discretion of the Commissioner and neither that decision nor the factual basis for it is subject to review or challenge under the Disputes provision of this Agreement.

The Commissioner will give Operator written notice of the default, either in the form of a cure notice ("**Cure Notice**"), or, if no opportunity to cure will be granted, a default notice ("**Default Notice**").  If the Commissioner gives a Default Notice, he will also indicate any present intent he may have to terminate this Agreement, and the decision to terminate is final and effective upon giving the notice.  If the Commissioner decides not to terminate, this decision will not preclude him from later deciding to terminate the Agreement in a later notice, which will be final and effective upon the giving of the notice or on the date set forth in the notice, whichever is later.  The Commissioner may give a Default Notice if Operator fails to effect a cure within the cure period given in a Cure Notice.  When a Default Notice with intent to terminate is given as provided in this Section 9.2 and Article 11, Operator must discontinue any Services, unless otherwise directed in the notice, and deliver all materials accumulated in the performance of this Agreement, whether completed or in the process, to the City.

(b)     Exercise of Remedies.  After giving a Default Notice, the City may invoke any or all of the following remedies:

(i)      The right to take over and complete the Services, or any part of them, at Operator's expense, either directly or through others, and bill Operator for the reasonable cost of the Services, and Operator must pay the difference between the total amount of this bill and the amount the City would have paid Operator under the terms and conditions of this Agreement for the Services that were assumed by the City as agent for Operator under this Section 9.2;

(ii)      The right to terminate this Agreement;

(iii)      The right of specific performance, an injunction or any other appropriate equitable remedy;

(iv)      The right to money damages;

(v)      The right to withhold all or any part of Operator's compensation under this Agreement;

(vi)      The right to deem Operator non-responsible in future contracts to be awarded by the City;

(vii)      The right to declare default on any other contract or agreement Operator may have with the City.

(c)      City's Reservation of Rights.  If the Commissioner considers it to be in the City's best interests, he may elect not to declare default or to terminate this Agreement.  The parties acknowledge that this provision is solely for the benefit of the City and that if the City permits Operator to continue to provide the Services despite one or more events of default, Operator is in no way relieved of any of its responsibilities, duties or obligations under this Agreement, nor does the City waive or relinquish any of its rights.

(d)      Non-Exclusivity of Remedies.  The remedies under the terms of this Agreement are not intended to be exclusive of any other remedies provided, but each and every such remedy is cumulative and is in addition to any other remedies, existing now or later, at law, in equity or by statute.  No delay or omission to exercise any right or power accruing upon any event of default impairs any such right or power, nor is it a waiver of any event of default nor acquiescence in it, and every such right and power may be exercised from time to time and as often as the City considers expedient.

**9.3.    Early Termination**

(a)      In addition to termination under Sections 9.1 and 9.2 of this Agreement, the City may terminate this Agreement, or all or any portion of the Services to be performed under it, at any time by a notice in writing from the City to Operator. The City will give notice to Operator in accordance with the provisions of Article 11. The effective date of termination will be the date the notice is received by Operator or the date stated in the notice, whichever is later.  If the City elects to terminate this Agreement in full, all Services to be provided under it must cease and all

34

materials that may have been accumulated in performing this Agreement, whether completed or in the process, must be delivered to the City effective 10 days after the date the notice is considered received as provided under Article 11 of this Agreement (if no date is given) or upon the effective date stated in the notice.

(b)     After the notice is received, Operator must restrict its activities, and those of its Subcontractors, to winding down any reports, analyses, or other activities previously begun. No costs incurred after the effective date of the termination are allowed. Payment for any Services actually and satisfactorily performed before the effective date of the termination is on the same basis as set forth in Article 5, but if any compensation is described or provided for on the basis of a period longer than 10 days, then the compensation must be prorated accordingly. No amount of compensation, however, is permitted for anticipated profits on unperformed Services. The City and Operator shall negotiate payment for costs incurred by Operator solely for the purposes of performing the Services that are not recoverable due to the Early Termination; however, Operator must take all steps to mitigate any costs including but not limited to reletting or reselling any real or personal property of which the City does not wish to own or take over. The City and Operator must attempt to agree on the amount of compensation to be paid to Operator but if not agreed on, the dispute must be settled in accordance with Article 6 of this Agreement. The payment so made to Operator is in full settlement for all Services satisfactorily performed under this Agreement.

(c)     Operator must include in its contracts with Subcontractors an early termination provision in form and substance equivalent to this early termination provision to prevent claims against the City arising from termination of subcontracts after the early termination. Operator will not be entitled to make any early termination claims against the City resulting from any Subcontractor's claims against Operator or the City.

(d)     If the City's election to terminate this Agreement for default under Sections 9.1 and 9.2 is determined in a court of competent jurisdiction to have been wrongful, then in that case the termination is to be considered to be an early termination under this Section 9.3.

### 9.4.    Suspension

If the Commissioner declares that there is an event of emergency, the City may at any time request that Operator suspend its Services, or any part of them, by giving 15 days prior written notice to Operator or upon informal oral, or even no notice. Operator must mitigate any costs incurred after the effective date of such suspension. Operator must promptly resume its performance of the Services under the same terms and conditions as stated in this Agreement upon written notice by the Commissioner and such equitable extension of time as may be mutually agreed upon by the Commissioner and Operator when necessary for continuation or completion of Services. Any additional costs or expenses actually incurred by Operator as a result of the suspension period or for recommencing the Services must be treated in accordance with the compensation provisions under Article 5 of this Agreement.

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

### 9.5.    Right to Offset

(a)    In connection with Operator's performance under this Agreement, the City may offset any incremental costs and other damages the City incurs in any or all of the following circumstances:

(i)    if the City terminates this Agreement for default or any other reason resulting from Operator's performance or non-performance;

(ii)    if the City exercises any of its remedies under Section 9.2 of this Agreement;

(iii)    if the City has any credits due or has made any overpayments under this Agreement.

The City may offset these incremental costs and other damages by use of any payment due for Services completed before the City terminated this Agreement or before the City exercised any remedies.  If the amount offset is insufficient to cover those incremental costs and other damages, Operator is liable for and must promptly remit to the City the balance upon written demand for it.  This right to offset is in addition to and not a limitation of any other remedies available to the City.

(b)    As provided under 2-92-380 of the Municipal Code, the City may set off from Operator's compensation under this Agreement an amount equal to the amount of the *fines* and *penalties* for each outstanding *parking violation complaint* and the amount of any *debt* owed by Operator to the City as those italicized terms are defined in the Municipal Code.

(c)    In connection with any liquidated or unliquidated claims against Operator, and without breaching this Agreement, the City may set off a portion of the price or compensation due under this Agreement in an amount equal to the amount of any liquidated or unliquidated claims that the City has against Operator unrelated to this Agreement.  When the City's claims against Operator are finally adjudicated in a court of competent jurisdiction or otherwise resolved, the City will reimburse Operator to the extent of the amount the City has offset against this Agreement inconsistently with such determination or resolution.

## ARTICLE 10.    GENERAL CONDITIONS

### 10.1.  Entire Agreement

(a)    **General**

This Agreement, and the exhibits attached to it and incorporated in it, constitute the entire agreement between the parties and no other terms, conditions, warranties, inducements, considerations, promises or interpretations are implied or impressed upon this Agreement that are not addressed in this Agreement.

(b)    **No Collateral Agreements**

Operator acknowledges that, except only for those representations, statements or promises contained in this Agreement and any exhibits attached to it and incorporated by reference in it, no representation, statement or promise, oral or in writing, of any kind whatsoever, by the City, its officials, agents or employees, has induced Operator to enter into this Agreement or has been relied upon by Operator, including any with reference to:  (i) the meaning, correctness, suitability or completeness of any provisions or requirements of this Agreement; (ii) the nature of the Services to be performed; (iii) the nature, quantity, quality or volume of any materials, equipment, labor and other facilities needed for the performance of this Agreement; (iv) the general conditions which may in any way affect this Agreement or its performance; (v) the compensation provisions of this Agreement; or (vi) any other matters, whether similar to or different from those referred to in (i) through (vi) immediately above, affecting or having any connection with this Agreement, its negotiation, any discussions of its performance or those employed or connected or concerned with it.

(c)    **No Omissions**

Operator acknowledges that Operator was given ample opportunity and time and was requested by the City to review thoroughly all documents forming this Agreement before signing this Agreement in order that it might request inclusion in this Agreement of any statement, representation, promise or provision that it desired or on that it wished to place reliance. Operator did so review those documents, and either every such statement, representation, promise or provision has been included in this Agreement or else, if omitted, Operator relinquishes the benefit of any such omitted statement, representation, promise or provision and is willing to perform this Agreement in its entirety without claiming reliance on it or making any other claim on account of its omission.

### 10.2.  Counterparts

This Agreement is comprised of several identical counterparts, each to be fully signed by the parties and each to be considered an original having identical legal effect.

### 10.3. Changes, Modifications, and Amendments

No change, modification, or amendment of this Agreement, or any part hereof, is valid unless stipulated in writing and signed by the Mayor, Comptroller, and Commissioner of the City and the Operator. The City incurs no liability for Additional Services without a written amendment to this Agreement under this Section 10.3. This Section, 10.3, does not apply, however, to Agreement extensions governed by section 4.3, Agreement Extension Option.

### 10.4. Governing Law and Jurisdiction

This Agreement is governed as to performance and interpretation in accordance with the laws of the State of Illinois.

Operator irrevocably submits itself to the original jurisdiction of those courts located within the County of Cook, State of Illinois, with regard to any controversy arising out of, relating to, or in any way concerning the execution or performance of this Agreement. Service of process on Operator may be made, at the option of the City, either by registered or certified mail addressed to the applicable office as provided for in this Agreement, by registered or certified mail addressed to the office actually maintained by Operator, or by personal delivery on any officer, director, or managing or general agent of Operator. If any action is brought by Operator against the City concerning this Agreement, the action must be brought only in those courts located within the County of Cook, State of Illinois.

### 10.5. Severability

If any provision of this Agreement is held or deemed to be or is in fact invalid, illegal, inoperative or unenforceable as applied in any particular case in any jurisdiction or in all cases because it conflicts with any other provision or provisions of this Agreement or of any constitution, statute, ordinance, rule of law or public policy, or for any other reason, those circumstances do not have the effect of rendering the provision in question invalid, illegal, inoperative or unenforceable in any other case or circumstances, or of rendering any other provision or provisions in this Agreement invalid, illegal, inoperative or unenforceable to any extent whatsoever. The invalidity, illegality, inoperativeness or unenforceability of any one or more phrases, sentences, clauses or sections in this Agreement does not affect the remaining portions of this Agreement or any part of it.

### 10.6. Assigns

All of the terms and conditions of this Agreement are binding upon and inure to the benefit of the parties and their respective legal representatives, successors and assigns.

### 10.7. Cooperation

Operator must at all times cooperate fully with the City and act in the City's best interests. If this Agreement is terminated for any reason, or if it is to expire on its own terms,

Operator must make every effort to ensure an orderly transition to another provider of the Services, if any, orderly demobilization of its own operations in connection with the Services, uninterrupted provision of Services during any transition period and must otherwise comply with the reasonable requests and requirements of the Department in connection with the termination or expiration.

### 10.8. Waiver

Nothing in this Agreement authorizes the waiver of a requirement or condition contrary to law or ordinance or that would result in or promote the violation of any federal, state or local law or ordinance.

Whenever under this Agreement the City by a proper authority waives Operator's performance in any respect or waives a requirement or condition to either the City's or Operator's performance, the waiver so granted, whether express or implied, only applies to the particular instance and is not a waiver forever or for subsequent instances of the performance, requirement or condition. No such waiver is a modification of this Agreement regardless of the number of times the City may have waived the performance, requirement or condition. Such waivers must be provided to Operator in writing.

### 10.9. Independent Contractor

(a)     This Agreement is not intended to and does not constitute, create, give rise to, or otherwise recognize a joint venture, partnership, corporation or other formal business association or organization of any kind between Operator and the City. The rights and the obligations of the parties are only those set forth in this Agreement. Operator must perform under this Agreement as an independent contractor and not as a representative, employee, agent, or partner of the City.

(b)     This Agreement is between the City and an independent contractor and, if Operator is an individual, nothing provided for under this Agreement constitutes or implies an employer-employee relationship such that:

(i)     The City will not be liable under or by reason of this Agreement for the payment of any compensation award or damages in connection with the Operator performing the Services required under this Agreement.

(ii)     Operator is not entitled to membership in any City Pension Fund, Group Medical Insurance Program, Group Dental Program, Group Vision Care, Group Life Insurance Program, Deferred Income Program, vacation, sick leave, extended sick leave, or any other benefits ordinarily provided to individuals employed and paid through the regular payrolls of the City.

The City is not required to deduct or withhold any taxes, FICA or other deductions from any compensation provided to Operator.

39

(c)     Shakman Accord

(i)     The City is subject to the May 31, 2007 Order entitled "Agreed Settlement Order and Accord" (the Shakman Accord) and the June 24, 2011 "City of Chicago Hiring Plan" (the City Hiring Plan) entered in Shakman v. Democratic Organization of Cook County, Case No 69 C 2145 (United State District Court for the Northern District of Illinois). Among other things, the Shakman Accord and the City Hiring Plan prohibit the City from hiring persons as governmental employees in non-exempt positions on the basis of political reasons or factors.

(ii)    Operator is aware that City policy prohibits City employees from directing any individual to apply for a position with Operator, either as an employee or as a subcontractor, and from directing Operator to hire an individual as an employee or as a subcontractor. Accordingly, Operator must follow its own hiring and contracting procedures, without being influenced by City employees. Any and all personnel provided by Operator under this Agreement are employees or subcontractors of Operator, not employees of the City of Chicago. This Agreement is not intended to and does not constitute, create, give rise to, or otherwise recognize an employer-employee relationship of any kind between the City and any personnel provided by Operator.

(iii)   Operator will not condition, base, or knowingly prejudice or affect any term or aspect of the employment of any personnel provided under this Agreement, or offer employment to any individual to provide services under this Agreement, based upon or because of any political reason or factor, including, without limitation, any individual's political affiliation, membership in a political organization or party, political support or activity, political financial contributions, promises of such political support, activity or financial contributions, or such individual's political sponsorship or recommendation. For purposes of this Agreement, a political organization or party is an identifiable group or entity that has as its primary purpose the support of or opposition to candidates for elected public office. Individual political activities are the activities of individual persons in support of or in opposition to political organizations or parties or candidates for elected public office.

(iv)    In the event of any communication to Operator by a City employee or City official in violation of Section 10.9(c)(ii) above, or advocating a violation of Section 10.9(c)(iii) above, Operator will, as soon as is reasonably practicable, report such communication to the Hiring Oversight Section of the City's Office of the Inspector General (IGO), and also to the head of the relevant City Department utilizing services provided under this Agreement.  Operator will also cooperate with inquiries by IGO Hiring Oversight or the *Shakman* Monitor's Office related to the contract.

## 10.10. Electronic Ordering and Invoices

The Operator shall cooperate in good faith with the City in implementing electronic ordering and invoicing, including but not limited to catalogs, purchase orders, releases, and invoices.  Operator shall accept electronic purchase orders and releases upon request of the

Commissioner. Operator shall provide the City electronic catalogs, copies of invoices and other electronic documents upon request. The electronic ordering and invoice documents shall be in a format specified by the City and transmitted by an electronic means specified by the City. Such electronic means may include, but are not limited to, disks, e-mail, EDI, FTP, web sites, and third party electronic services. The Commissioner reserves the right to change the document format and/or the means of transmission upon written notice to the Operator. Operator shall ensure that the essential information, as determined by the Commissioner, in the electronic document, corresponds to that information submitted by the Operator in its paper documents. The electronic documents shall be in addition to paper documents required by this contract, however, by written notice to the Operator, the Commissioner may deem any or all of the electronic ordering and invoice documents the official documents and/or eliminate the requirement for paper ordering and invoice documents.

### 10.11. Participation by Other Local Government Agencies

Other local government agencies may be eligible to participate in this agreement pursuant to the terms and conditions of this Contract if such agencies are authorized, by law or their governing bodies, to execute such purchases, and if such authorization is allowed by the City of Chicago's Commissioner, and if such purchases have no net adverse effect on the City of Chicago, and result in no diminished services from the Operator to the City's user departments pursuant to such purchases. Examples of such Local Government Agencies are: Board of Education, Chicago Park District, City Colleges of Chicago, Chicago Transit Authority, Chicago Housing Authority, Chicago Board of Elections, Metropolitan Pier and Exposition Authority (McCormick Place, Navy Pier), Cook County and the Municipal Courts. Said purchases shall be made upon the issuance of a purchase order directly from the Local Government Agency. The City will not be responsible for payment of any amounts owed by any other Local Government Agencies, and will have no liability for the acts or omissions of any other Local Government Agency.

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

## ARTICLE 11.  NOTICES

Notices provided for in this Agreement, unless provided for otherwise in this Agreement, must be given in writing and may be delivered personally or by placing in the United States mail, first class and certified, return receipt requested, with postage prepaid and addressed as follows:

| | |
|---|---|
| If to the City: | Department of Transportation<br>30 N LaSalle Street, 11th Floor<br>Chicago, Illinois 60602<br>Attention: Commissioner |
| With Copies to: | Department of Law<br>Room 600, City Hall<br>121 North LaSalle Street<br>Chicago, Illinois  60602<br>Attention:  Corporation Counsel |
| If to Operator: | Alta Bicycle Share<br>1410 Third Street<br>San Rafael, CA 94901<br>Attention: Michael Jones, CEO |

Changes in these addresses must be in writing and delivered in accordance with the provisions of this Article 11.  Notices delivered by mail are considered received three days after mailing in accordance with this Article 11.  Notices delivered personally are considered effective upon receipt.  Refusal to accept delivery has the same effect as receipt.

## ARTICLE 12.  AUTHORITY

Execution of this Agreement by Operator is authorized by a resolution of its Board of Directors, if a corporation, or similar governing document, and the signature(s) of each person signing on behalf of Operator have been made with complete and full authority to commit Operator to all terms and conditions of this Agreement, including each and every representation, certification and warranty contained in it, including   the representations, certifications and warranties collectively incorporated by reference in it.

*[Signature Pages, Exhibits and Schedules follow.]*

42

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

## CONTRACT SIGNATURE PAGE

Contract No.:                    **26459**

Specification No.:               **100320A**

Vendor Name:                  **ALTA BICYCLE SHARE, INC**

Total Amount (Value):       **65,000,000.00**

Fund Chargeable:            **Fund Numbers to be Identified By The City**

**(Consultant)**

By:

Its:                                 *CEO*

Attest:

State of *California*

County of *Marin*

This instrument was acknowledged before me on this *24* day of *Jan.*, 20*13*
by *Michael Jones* as President (or other authorized officer) and
_____ as Secretary of _____ (Corporation
Name).

_____ *Cano* _____ (Seal)

Notary Public Signature

Commission Expires: *Sep 1, 2016*

CITY OF CHICAGO                          *1/29/13*

Commissioner                              Date
*1st Dep.*

```
J. CANO
COMM. # 1990031
NOTARY PUBLIC-CALIFORNIA
MARIN COUNTY
My Comm. Expires SEP 1, 2016
```

43

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

Department of Transportation

**EXHIBIT 1**
**Scope of Services and Schedules**

The following is an overview of the Services that Operator must provide under the Agreement. All schedules to this Exhibit are fully incorporated by reference.

I.      **The System.**

The City and the Operator agree that the Operator will provide the System to the City, in accordance with the Performance Schedule in Exhibit 2, including the following:

A.  All components of the System listed in Schedule 1.

B.  All components of the Equipment that comprise the System are listed in Schedule 2.

C.  The technical and functional specifications for each item of Equipment are included in Schedule 3.

D.  All the Software to be included in the System listed in Schedule 4.

E.  The performance specifications for the Software are included in Schedule 5.

F.  The License Agreement(s) and warranties for the Software, between the City and Operator, is/are included in Schedule 6. The City shall have a perpetual, fully paid, irrevocable, right to use the Software, subject to the terms of the License Agreement.

G.  The warranties for the System as a whole are included in Schedule 7.

H.  The warranties for each element of the Equipment are contained in Schedule 8.

I.   The source code escrow Agreement, under which the Operator has placed the source code for the Software in Escrow with a trustee, pursuant to Section 3.6 of the Agreement, is included in Schedule 10.

II.     **Implementation of the System**

The City and the Operator agree that Operator will implement the System consistent with the following lists protocols and procedures:

A.  A protocol for the location, relocation or reapportionment, and resizing of Sites is specified in Schedule 11.

B.  The procedures for assembly of Bicycles and installation of Stations at Sites are set forth in Schedule 12.

Exhibit 1                                    Page 1

C.  The Operator will provide performance tests of the each element of the System and the System as a whole prior to installation in a manner set forth in Schedule 13. If the City determines that the System, or any Component thereof, fails the tests at that Site, Operator will promptly make such changes as are necessary to fix any problems, and will re-perform the tests for the City.  Such procedure will be repeated until the City accepts the System as performing within System Specifications at that Site.  If the City does not accept the System as performing within System Specifications at that Site, the Operator will provide a full refund to the City of any money that it has been paid for such System components, and this Agreement will terminate as to such Site.

D.  Ownership and risk of loss of the Equipment will pass to the City upon acceptance, and the Software license will not begin to run until acceptance pursuant to C, above. Warranties will only begin upon such acceptance.

E.  In any years subsequent to calendar year 2013, Operator will provide and install, at such Sites as are determined by the City, the Additional Equipment and Software, charging the City the prices identified in Schedule 2 for such items.  The ordering protocols, and time of installation from the date of the order, are as set forth in Schedule 14.

### III.    Start-Up Services and Launch

Prior to provision and installation of the relevant portion of the System, the Operator will perform various Start-Up Services, including the following:

A.  The Operator will develop and make operational, pursuant to the Schedule in Exhibit 2, a website, the performance specifications for which are described in Schedule 15.

B.  The Operator will perform such marketing services as are described in Schedule 16, to promote the bicycle sharing program.

C.  The Operator will staff, and make fully operational, a call-center, as described in Schedule 22.  The Operator will run the call center for the duration of the Agreement, from the Launch date described below.

### IV.    Operations, Support and Maintenance

A.  After acceptance of the relevant portion of the System to be provided by Operator in 2013, Operator will make the System at these Sites available for use by the public, pursuant to the Schedule in Exhibit 2.  The first date of operation shall be known as the "Launch" date.  Thereafter, the Operator will operate the System, in accordance with the Operating Standards, at all Sites at which it has been accepted for the duration of this Agreement.  All features of the System, which are described in the Agreement and in the Schedules, will be fully operational, and all warranties described herein shall apply.

B.  The Operator will obtain an agreement from each user a signed Bicycle Rental Agreement/ Use and Privacy Policy of the Operator, a sample form of which is attached

Exhibit 1                              Page 2

hereto as Schedule 17. This agreement will provide that the user will hold the City of Chicago and all entities on which the Sites are located, and all of their employees, officers, and agents, harmless from all liability as a result of the use of the System and the participation in the Bicycle Program.

C. The Operator will perform the procedures pertaining to operations and maintenance of the System after the Launch described in Schedule 18, including Station preventive maintenance and routine maintenance, Station monitoring and rebalancing procedures, all routine cleaning procedures of Stations, including graffiti removal, snow removal and all emergency and weather response protocols, Bicycle checking procedures, Bicycle preventive maintenance and routine maintenance (both in-Station and in-shop), the "break-fix" obligations for all System components, ongoing marketing obligations, customer service obligations, special events procedures and reporting obligations.

D. Terms relating to damaged, lost, and stolen bicycles are set forth in Schedule 19.

E. The calculation of System costs and System revenues; compensation arrangement for the operations, support and maintenance; and for Performance Incentive Payments are as set forth in Schedule 20 and Exhibit 3 and any attachments thereto.

F. The process for setting rates for bike rentals is set forth in Schedule 24.

**V.     Standards of Performance, and Liquidated Damages**

A. Attached as Schedule 20 are selected performance requirements of the Operator. The inclusion of these performance requirements in no way limits the Operator's other obligations elsewhere in the Agreement.

B. The Operator shall report on its performance and System asset management consistent with Schedule 21.

Attached as Schedule 23 are liquidated damages associated with various elements of Operator's performance. These liquidated damages are not in lieu of the City's other remedies for breach and default, as specified in the Agreement or available in equity or at law.

**VI.    Other**

A. Schedule 25 includes a list of Key Personnel that Alta has committed for the performance of this Agreement.

B. The Operator commits to working with the City and local non-profit organizations and/or bike shops or other entities to develop and implement an internship program.

Exhibit 1                                    Page 3

**SCHEDULE 1**

## Components of the System

Station

Bicycle

Bicycle Sharing System
Chicago Department of Transportation, Specification Number 100320A, PO Number 26459

**SCHEDULE 2**

## Components of the Equipment that Comprise the System

Bicycle

- PBSC Bicycle

Station

- Kiosk

- Docking Point

- Map Frame

- Technical Pavement

- Cables

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

**SCHEDULE 3**

## Technical and Functional Specifications of the Equipment

**KIOSK**



**DOCKING POINTS**



**List of Schedules**                    **Page 3**

Bicycle Sharing System
Chicago Department of Transportation, Specification Number 100320A, PO Number 26459



## CABLES

| Part | Description |
|------|-------------|
| Frame: | |
| Front fork: | |
| Head set: | |
| Wheels: | |
| Tyre: | |
| Inner tube: | |
| Handlebar: | |
| Grip: | |
| Brakes: | |
| Seat post: | |
| Saddle: | |
| Shifter: | |
| Additional protection: | |
| Light systems: | |
| GPS: | |
| Accessories: | |
| Standard Weight | |

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

## BICYCLE



## TECHNICAL PAVEMENT

## MAP FRAME/AD PANEL

## Specifications

## Illumination Standards



## Poster Information

## Illuminated Map Frame

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

**OVERALL DIMENSIONS / DIMENSIONS HORS TOUT**



WASHINGTON DC - POSTER MODULE



**The immediately foregoing drawings are intended to show key dimensions and designs. The final products may vary slightly but will be substantially identical.**

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*



List of Schedules                    Page 9

**Chicago Bicycle Specifications**



**The sole purpose of this drawing is to show the key dimensions.**

**SCHEDULES 4 and 5**

### Software Included In the System and Performance Specifications

The Software will be responsible for managing the entire bike-sharing solution. The Software includes all of the following:

1. Software BackEnd (SBE)

   - ████████████████████████████████████████
     ████████████████████████████████████████
   - ████████████████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████████████████
   - ████████████████████████████████████████
   - ████████████████████████████████████████
   - ████████████████████████████████████████
   - ████████████████████████████████████████

2. Test and Registration Program (TAR)

   - ████████████████████████████████████████

3. Firmware package (Component specific)

4. COTS product firmware upgrade

   - ████████████████████████████████████████

5. GPS application

   ████████████████████████████████████████

   - ████████████████████████████████████████
   - ████████████████████████████████████████
   - ████████████████████████████████████████

6. Server Components

████████████████████████████████████████████
████████████████████████████████████████████

- ██████████████████████████████████████████
  ██████████████████████████████████████████
- ██████████████████████████████████████████
- ██████████████████████████████████████████
- ██████████████████████████████████████████
- ██████████████████████████████████████████

7. Hosting Data Center

- ██████████████████████████████████████████
- ██████████████████████████████████████████
- ██████████████████████████████████████████

8. Test and Registration Program (TAR)

- ██████████████████████████████████████████

9. Bike Station

████████████████████████████████████████████
████████████████████████████████████████████

- ██████████████████████████████████████████
  ██████████████████████████████████████████
- ██████████████████████████████████████████

10. Firmware packages (component specific)

11. COTS products
- ██████████████████████████████████████████

12. Software update tool
- ██████████████████████████████████████████

## 13. Smart phone app



**Schedule 6 – Software Rights**

"Documentation" shall mean all documentation, written materials and technical and user manuals prepared by PBSC relating to the use and functioning of the Software.

"License Agreement" means the agreement between Alta and PBSC, which includes licensing and support provisions, for the licensing and support of the Software and pursuant to which Alta is authorized to sub-license the Software to the City and to provide Support.

"PBSC Software" shall have the definition assigned to it in Article 2 (Definitions) in the Agreement.

"Software" shall have the definition assigned to it in Article 2 (Definitions) in the Agreement.

"Software Fees" means the fees paid by the City for the license rights specified herein and Support of the Software. Software Fees are based on the number of Stations actually installed.

"Support" means the support and maintenance services provided by Alta (through PBSC) in connection with the use of PBSC Software on the System as specified in Section 2 of this Schedule 6 in accordance with the terms and conditions set forth in the support and maintenance sections of the License Agreement, which terms may not be changed without the City's consent.

"Upgrade" means new versions and/or releases and performance enhancements of the PBSC Software and related documentation that PBSC makes available to its customers.

1.      Sub-License Grant. In consideration of the Software Fees, Alta hereby grants, pursuant to rights obtained under the License Agreement, to City a revocable (solely under conditions specified herein), non-exclusive and non-transferable right to reproduce, operate, and use the Software for the sole purpose of operating the System.

2.      Software Support. In consideration of the Software Fees, Alta must provide the Support for the Software and provide the following services:

(a)      Service Obligation. Alta warrants that it shall maintain (through PBSC) the PBSC Software in good working order, keep it free from defects in material and workmanship, and remedy any failure of the Software to perform in accordance with this Agreement, the Documentation or the specifications in Schedules 4 and 5, or any other malfunction, defect or non-conformity in the Software. Alta will provide to the City (through PBSC) all bug fixes and maintenance releases PBSC provides for the PBSC Software. Alta must provide (through PBSC) technical support to resolve all issues as necessary. This service obligation is subject to the terms describing support and maintenance in the License Agreement, which terms may not be changed without the City's consent.

(b)      Upgrades. Alta must provide (through PBSC) all software Upgrades that PBSC provides for PBSC Software. Alta must provide (through PBSC) technical support to resolve all issues as necessary. This Upgrade obligation is subject to the terms describing support and maintenance in the License Agreement, which terms may not be changed without the City's consent.

(c) Custom Development. A custom modification of the Software made at the request of the City (other than for defects) will be billable at hourly rates to be agreed between the parties and PBSC.

3. Software Fees. 

4. Revocation of Sub-License. This Software Sub-License to the City is revocable during the Term if the City breaches Section 5 or 6 of this Schedule 6 or fails to make a timely payment to Alta of Software Fees (in accordance with the payment provisions specified in the Agreement) (or to PBSC if City then has a direct relationship with PBSC), when such breach or failure to pay is not cured within 30 days following Alta's (or, if City then has a direct relationship with PBSC, then PBSC's) written notice thereof to the City. For the purpose of this Section 4, the Software Sub-License may not be terminated for failure to timely pay Software Fees so long as the City has timely paid Alta the License Fees (or within the cure period specified above). If Alta fails to remit City's monthly payment of Software Fees to PBSC, PBSC must inform the City both in writing and by phone to the City's Project Manager. The City may elect to make overdue and future payments directly to PBSC. The City shall also have the right to cure Alta's failure when the next monthly invoice is due (but no longer than 60 days). Other than pursuant to this Section 4, the City Software Sub-License may not revoked for any reason.

5. Restrictions. Except as may be expressly (i) authorized under the Source Code Escrow Agreement or (ii) authorized in writing and in advance by PBSC, the City must not directly or indirectly:

(a) sell, lease, license, sublicense, loan, encumber, or otherwise transfer the Software, in whole or in part, to any 3rd party;

(b) decompile, disassemble, reverse engineer, or otherwise attempt to derive the source code of any portion of the Software;

(c) write or develop any derivative software or any other software program based on the Software, except with respect to any mobile application to be used by End-Users for the purpose of obtaining information related to the System, such as locating the stations and bicycles;

(d) make modifications, corrections, alterations, enhancements, or other additions to the Software;

(e) make the Software available to a third party by "bulletin boards", online services, remote dial-in or network, or telecommunication links of any kind; or

(f) use the Software or allow someone to use the Software other than for the System.

6.     Exclusivity.  During the Term of this Agreement, the City will not use purchase or license any software, other than the Software, with the System; provided, however, that this exclusivity will not apply in the event of (i) a material breach by Alta of its obligation to support the Software and such breach is not cured within 30 days of a written notice thereof from the City, and (ii) a release of the source code pursuant to the Source Code Escrow Agreement.  The exclusivity described herein shall not apply to any 3rd party that may create, develop, and sell to anyone, including the City and any End-User, any mobile application to be used by End-Users for the purpose of obtaining information related to the System such as locating the stations and bicycles.

7.     License Agreement Terms.  Alta represents and warrants that the License Agreement contains the following terms:

(a) The Software license to use rights and Support rights under the License Agreement will be assigned directly to the City upon request of the City, and City will obtain such rights directly from PBSC on terms identical to terms under Alta's Agreement with the City;

(b) PBSC must send to City any notices of potential or actual breach PBSC sends to Alta;

(c) PBSC must send to City any notices of termination PBSC sends to Alta;

(d) PBSC can not terminate the License Agreement, nor can it expire, unless PBSC first offers the City the right to obtain directly the Software license to use rights and Support rights on terms identical to terms under Alta's Agreement with the City.

8.     Source Code. The City acknowledges that it is not entitled to receive a copy of the source code of the PBSC Software save pursuant to the Source Code Escrow Agreement attached in Schedule 10 and executed by the parties.   Alta must make available the documentation and data feeds necessary to allow any 3rd party to create, develop, and sell to anyone, including the City and any End-User, any mobile application to be used by End-Users for the purpose of obtaining information related to the System, such as locating the stations and bicycles.

**SCHEDULES 7 and 8**

## System and Equipment Warranties

For all Equipment purchased, or otherwise acquired in accordance with the terms of this Agreement, Alta shall complete, submit to the seller and/or manufacturer, and retain copies of all documents required to maintain all sellers and manufacturer's warranties. Promptly upon the discovery by Alta, or receipt of a report by Alta, of any seller's or manufacturer's defect in the Equipment, Alta shall submit a warranty claim to the appropriate persons or entities and diligently pursue a claim therefore. Alta shall retain copies of such claims and all documents related thereto.

All Equipment shall be warranted by the manufacturer for a minimum of five (5) years from the date of purchase. Alta shall promptly comply with all recalls of Equipment, whether issued by a manufacturer, government agency, or other entity.

Alta shall, at all times, follow and strictly comply with the manufacturer's requirements, warranties, and recommendations for assembly, maintenance, storage, repair, and replacement of all Equipment.

Set forth below are the Warranty terms of the Equipment Manufacturer. Alta must diligently inspect all Equipment for any "Defects" during the warranty period for any piece of Equipment.

## WARRANTY DETAILS

This document serves the purpose of providing clear and concise guidelines in relation to transport and customs clearance costs in various situations that may result in the course of business transactions between Public Bike System Company and their client base. This document takes effect on September 19th 2011 for all new purchase orders received on or after this date, this document will take effect in 30 calendar days after September 19th 2011 for existing business.

### LIMITED WARRANTY

PBSC warrants that the Warranted Equipment will not be affected by any Defect for five (5) years from the shipping date of the Warranted Equipment (the "Equipment Warranty") provided that the Warranted Equipment is maintained in accordance with the Documentation. The Client acknowledges that certain parts of the System must be replaced periodically by the Client as specified in the maintenance Documentation through the Client's purchase of Spare Parts from PBSC and that the replacement or degradation of such parts is not covered by the Equipment Warranty. For greater clarity, the Equipment Warranty does not cover the Wear Parts.

Service must be provided by PBSC or a PBSC designated repair house or vendor. This limited warranty is valid only when the bike sharing system is used in the city in which it was purchased to operate in. Proof of original purchase date is required to obtain service under this limited warranty.

A **"Defect"** means a situation where the Warranted Equipment does not operate in accordance with the Specifications. A Defect (and the Equipment Warranty) does not cover:

(a) Wear Parts;

(b) malfunctions caused by the normal deterioration or wear-and-tear of parts;

(c) malfunctions caused by the interaction of the PBSC's supplied equipment with a device, component or part not included in the PBSC's supplied equipment such as, by way of example, the use of spare parts other than those supplied by PBSC;

(d) malfunctions caused by the use of the PBSC's supplied equipment in a way contrary to the Documentation;

(e) malfunctions in software components;

(f) cosmetic damage, including scratches, dents, chips or other damage to the finish of the Warranted Equipment, unless such damage is caused by PBSC's negligence or willful misconduct;

(g) Warranted Equipment with original model/serial numbers that have been removed, altered, or cannot be easily determined;

(h) malfunctions caused by unauthorized modifications made to the PBSC's supplied equipment;

(i)     malfunctions caused by the failure to maintain the PBSC's supplied equipment according to the Documentation; or

(j)     vandalism or any other abusive use;

(k)     expenses for travel and transportation for product service by an authorized PBSC servicer to remote areas where said servicer is not available.

Please consult the attached list to determine what parts of the PBSC bike share system are Warranted Parts and what parts are Wear Parts.

## REPLACEMENT PROCEDURE

**General:**

**Shipping Methods**. For shipments to be made by PBSC, PBSC reserves the right to choose the most economical transport method for shipping the Warranted Equipment and the replacement equipment. If an express delivery is required, PBSC shall be entitled to charge the additional fees paid for the express delivery plus a 15% administration fee.

**Protection**. For situations where equipment must be shipped to PBSC by the Client, the Client must ensure that the equipment is properly packaged so as not to be further damaged during transport. Damage or deterioration found to be caused by improper packaging shall not be covered by the Equipment Warranty.

**INCOTERMS**. All equipment shipped by PBSC is shipped EX WORKS Lachine according to INCOTERMS 2000.

**A) Transport responsibilities where the Client has place PO and purchased materials from PBSC**

1. All freight and customs costs related to the delivery of purchased equipment are the responsibility of the Client.

2. If the Client would like PBSC to handle transport, the related transport invoice will be invoiced back at cost plus 15% administration fee.

3. It is the responsibility of the Client to provide sufficient insurance coverage for the equipment being transported.

4. It is the responsibility of the Client to provide a customs broker for clearance if a border crossing is required.

5. If equipment should be delivered to the Client and they are found to be affected by a Defect and not a transport related damages, all costs associated with the shipping of the Warranted Equipment back to PBSC and replacement Equipment to the Client shall be the responsibility of PBSC if the Client requests a replacement within thirty (30) days of the receipt of the Warranted Equipment by the Client (the "Grace

Period"). If the Client requests a replacement after the end of the Grace Period, all costs associated with the shipping of the Warranted Equipment back to PBSC and replacement Equipment to the Client shall be the responsibility of the Client and charged by PBSC.

**B) Transport responsibilities where PBSC are returning equipment under the Equipment Warranty and within the Grace Period**

1. All freight costs related to the return of warranted equipment from PBSC to the Client are the responsibility of PBSC.

2. PBSC is responsible to provide the necessary shipping documentation so as not to delay the transport. If the Client's customs broker does not clear any shipment in a timely manner that results in holding charges to PBSC the Client will be billed a cost plus 15% administration fee.

**C) Transport and customs responsibilities where PBSC is returning equipment to the Client which are not under the Equipment Warranty**

1. All freight and customs costs related to the delivery of equipment found not to be affected by a Defect further to an Equipment Warranty request by the Client are the responsibility of the Client.

2. All costs related to the return of the equipment to the Client will be invoiced back to the client plus a 15% administration fee.

**D) Transport responsibilities where the Client is returning equipment to PBSC that are under the Equipment Warranty but outside of the Grace Period**

1. All freight costs related to the return of warranted equipment to PBSC are the responsibility of the Client

2. If the Client would like PBSC to handle transport, the related transport invoice will be invoiced back at a cost plus 15% administration fee.

3. It is the responsibility of the Client to assure the insurance coverage of the equipment being transported.

4. It is the responsibility of the Client to provide a customs broker for clearance if a border crossing is required.

5. It is the responsibility of the Client to provide proper documentation for the equipment being returned so as not to delay the delivery of the shipment, any holding charges billed to PBSC due to not providing proper documentation will be billed back to the Client at invoice plus 15% administration fee.

**E) Transport and customs responsibilities where clients are returning equipment to PBSC that are not warranted**

1. All freight and customs costs related to the return of non warranted equipment to PBSC are the responsibility of the Client.

2. If the Client would like PBSC to handle transport and or customs clearance, the related transport invoice will be invoiced back at a cost plus 15% administration fee.

3. It is the responsibility of the Client to assure the insurance coverage of the equipment being transported.

4. It is the responsibility of the Client to provide a customs broker for clearance if a border crossing is required.

5. It is the responsibility of the Client to provide proper documentation for the equipment being returned so as not to delay the delivery of the shipment, any holding charges billed to PBSC due to not providing proper documentation will be billed back to the Client at invoice plus 15% administration fee.

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

# PBSC Terminal CHICAGO Spares List

Rev 1_2011-09-16

**Terminal, Docking Point, Cables, Technical Platforms**

| | |
|---|---|
| PCBA | Limited Warranty |
| Electronic Cables | Limited Warranty |
| Hardware (Nuts and Bolts) | Wear Part |
| Mechanicals | Limited Warranty |
| Electronic Assemblies | Limited Warranty |
| Photovoltaic Components | Limited Warranty |
| Housings | Limited Warranty |
| Decals and Signage | Wear Part |
| Accumulator | Wear Part |
| Platform Components | Limited Warranty |
| Glass | Limited Warranty |
| Plastics | Wear Part |

## PBSC Docking Point Spares List

Rev 2_2011-09-16



*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

## PBSC Cycle vCHICAGO Spares List

Rev 1_2011-09-16



| PBSC P/N | PBSC Part Description | Warranty Comment |
|---|---|---|
| | | |

Bicycle Sharing System
Chicago Department of Transportation, Specification Number 100320A, PO Number 26459



| PBSC P/N | PBSC Part Description | Warranty Comment |
|---|---|---|

Bicycle Sharing System
Chicago Department of Transportation, Specification Number 100320A, PO Number 26459



*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*



List of Schedules        Page 27

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

**Map Frame, Tech Pavement, and Miscellaneous parts**



**SCHEDULE 9 - INTENTIONALLY OMITTED**

**SCHEDULE 10**

## Software and Intellectual Property Escrow

**See Attached**

**SCHEDULE 11**

### Station Location, Moving, and Resizing

It is the mutual objective of the City of Chicago and Alta Bicycle Share (ABS) to maximize usage and revenue of the bike share system. Demand estimates will be based on the ABS demand model, or a model approved by Alta and the City. Potential demand will be a high-priority criterion in the selection of stations and sizing stations. The City of Chicago will control the final site selection, relocation, and station size.

Alta is not responsible for any permit or City required fees/charges under this Section. The City shall be responsible for permit and City required fees/charges.

(1)    Rental Site Location and Station Size

The Parties, working in good faith, shall determine the location for each Rental Site. Within 30 days of contract signing, the City shall provide Alta with a draft list of desired Rental Site locations ("Proposed Initial System Locations"). The initial list shall include proposed station sizes at all locations. Alta will review potential Rental Site locations developed by the City and use this information as part of its demand analysis and Rental Site location analysis.

Based on projected revenue and/or feasibility constraints, Alta will provide the City with the Draft Final List of Desired Rental Site Locations ("Draft Final List of Desired Rental Site Locations") within fifteen (15) days after Alta's receipt of the City's suggestions. Within 15 days after Alta's submittal of the Draft Final List of Desired Rental Site Locations, the City and Alta shall meet to mutually agree to the Final List of Rental Site locations and Station Sizes.

Stations will be on average no more than 1,500 feet from the nearest Station and no more than 3,000 feet from the nearest Station.

The Operator will determine whether the site provides sufficient solar power to operate a bikesharing station of the proposed size at the proposed location. If the site is not sufficient, the Operator will identify an alternate site in close proximity that will provide sufficient site and power.

(2)    Site Design

The City shall prepare all site designs and perform any construction/modification to proposed sites. The City may direct Alta to manage this work. Prior to performing any work, the Operator will prepare a proposed budget. The Operator will conduct this work on a reimbursable basis.

(3)    City's Obligation to Obtain Rental Sites; Permitting

With regard to each Proposed Initial System Location, it shall be the responsibility of the City to:
      (a) determine the ownership of or title to the underlying real estate;
      (b) verify whether the placement and use of a Rental Site are permissible under zoning and other applicable ordinances and regulations; and
      (c) obtain all permits and permissions necessary to place a Rental Site at such location.

Prior to performing work on any site of any proposed Rental Site, the City, at its sole cost and expense, shall obtain from the property owner(s) of public and private property, and from all applicable government entities, all rights and permissions to install, maintain, repair, replace,

remove, and use all Rental Sites and Equipment, and provide the services. Such rights and permissions further shall provide access by the public at large to the Rental Site(s) and Equipment located thereon.

No later than 30 days before System Go-Live date, the City shall provide Alta with a complete packet of permits, which include engineered diagrams to scale showing the location of the station, size of station, location of kiosk, for the Final List of Rental Site Locations.

(4)     Station Relocation or Resizing

Through the course of operating the System the Operator or the City may recognize the need to move a station or increase or decrease the size of a particular station in order to satisfy customer demand or for other reasons.  All moves and increases or decreases in size will be conducted on a quarterly basis or coordinated with installation of new equipment.

The City may request moving or resizing of up to 25 stations per year.  Any station moves over this number shall be charged at $2,000 per occurrence in the first year (through 2013) and at a reasonably increased price in subsequent years.  Any station relocations moved pursuant to the Station Grading process below shall not count toward the 25 station moves per year.  If a station is increased or decreased in size as part of an order of new equipment it will not count toward the 25 station moves per year.

The relocation and increase or decrease in station size will be informed but not bound by the following criteria:

**STATION GRADING**

A grading system will be implemented for all stations in the system.  The system is outlined below:

Two metrics are evaluated for a basic ranking of stations, Revenue and Ridership
   1. Revenue is the sum of: Casual memberships purchased, User fees incurred for trips starting and ending at the station
   2. Ridership would be total trips beginning and ending at the station

After the basic ranking of stations is done, each station would be given a grade (A, C or F) based on operational issues.  The grade is based on the following:
   • Times station visited for vandalism/graffiti issues
   • Rebalancing required
   • Accessibility by truck
   • Other confounding factors such as pedestrian traffic or safety

For the bottom 10% of the ranked stations, the grade is applied and the following actions are taken:
   • Any station in the bottom 10% with an F for a grade: immediately listed for relocation
   • Any station in the bottom 10% with a C:  the Operator and the City shall develop an action plan.   The action plan could be a relocation to a nearby but more applicable location, re-sizing or could also include surrounding it with more stations.  If such a station has a grade of C and remains in the bottom 10% for 2 consecutive quarters then it is listed for relocation

- Any station that is in the bottom 10% but has a grade of A shall be listed for relocation if it remains in the bottom 10% for 3 consecutive quarters

The City and Operator shall work together to determine whether a specific station should be altered or moved; stations shall not be removed in their entirety if it will result in non-contiguous areas of service.

**SCHEDULE 12**

## Procedures for Installation

**Startup Services**

Startup Services include the fixed cost items related to starting up the Chicago Bicycle Sharing System, including but not limited to:

- System naming and branding
- Pre-launch marketing program
- Website design
- Warehouse and vehicle acquisition
- Employee hiring and training
- Systems establishment

Prior to the installation of any station, City shall provide to the Operator a site design and permit. The Operator shall provide the City with a schedule of equipment to be installed on a weekly basis. The Operator shall provide a weekly report of equipment actually installed.

On a weekly basis, after submitting the weekly report of equipment installation to the City, and with City approval, the Operator shall provide electronic notification to members of the Chicago Bikeshare System.

**Installation Services**

Installation Services include items that vary on a per-dock basis related to installing the initial portion, as well as the expansion, of the Chicago Bicycle Sharing System, and include, but are not limited to:

- Equipment procurement
- Assistance with location planning
- Station assembly
- Bike assembly
- On-street station installation

## SCHEDULE 13

### Performance Testing Prior To Operation

**Pre-launch Performance Testing**

**Stations**
Prior to deployment, each station is programmed with a unique identification number, latitude and longitude and station name. Once these elements are programmed in the kiosk, it is connected through the cellular data network to the back end servers. System diagnosis tests are run to ensure the station is fully operational, these are performed from both the server side, and from the terminal user interface (TUI). These tests include but are not limited to the touch screen, card reader, printer and modem. Each kiosk must successfully pass all connection and diagnostics test before it can leave the warehouse for installation.

The kiosk is then connected to a series of docks to test bike activity. Bikes are rented and returned to ensure all stations are ready to operate on the street.

**Docks**
Bike docks are programmed electronically and then tested with a bike. Each dock must have a bike successfully inserted and removed before it can leave the warehouse for installation.

**Bikes**
Bikes are subject to quality and safety tests by mechanics. Once bikes have passed these tests, they will have their RFID chips programmed with a unique number. This process doubles as a physical test that the bike can be docked and un-docked. No bike will be deployed unless it has passed these tests and have been programmed.

**Credit Card Processing**
Transactions are initiated with multiple card types from a random sampling of kiosks and from the public website. Transaction flow is verified from card swipe to credit card processor to bank.

**Software**
Fail over and backup processes of the Software are tested to ensure proper functionality. All stations are checked to ensure that the physical data (number of docks, number of bikes, solar readings) matches what is being reported in the back end system and on the system maps.

**Web Site and Mobile App**
Account creation, editing, trip history and billing are testing by initiating accounts for all subscription types via the public website and initiating rentals with member key fobs. Public map on the web site and mobile app is tested against visual checks of the real time station inventory.

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

**SCHEDULE 14**

## System Expansion Protocols

At any time during the term of the agreement the City may elect to expand the System either through the purchase of new stations, expanded stations, or new bicycles. The City will first identify the location for new or expanded stations through the protocols established in Schedule 11.

The City must execute a purchase order to place an order for new equipment. This purchase order must have funding sources identified in order to be considered valid. Valid funding sources include any City funds, funds donated by 3rd parties, or funding held in escrow. Funding in escrow must not include funds due to the Operator for Performance Incentive Payments.

Upon receiving an order for equipment, the Operator has 18 weeks to install the equipment. The Operator will notify the City when the equipment has been received. If equipment is installed early the Operator will be eligible for a Performance Payment as described in Exhibit 3.

The City will provide the Operator notice of when and where the new equipment is to be installed. The Operator has one week from the time of notification to install the equipment. Provided the notification is more than one week away, this shall constitute the one week of notification.

**SCHEDULE 15**

## <u>Website Performance Specifications</u>

The Operator shall develop a website that can meet the following performance specifications:

Provide information on how to join and use the bikesharing program;

Provide for data security, such as but not limited to: financial data, user names, user addresses;

Real-time communication with stations to track bicycle and dock availability;

Access to all registration and travel data for the City and its designees;

Ability for the website to accept and/or allow users to change annual subscriptions and to automatically renew annual memberships;

Provide riders with video content on rider safety and bicycle infrastructure;

Personalized customer pages that provide information such as miles traveled, calories burned, and $CO_2$ saved.

This website must be fully operational prior to the launch of service.

**SCHEDULE 16**

### Pre-Launch Marketing Scope of Work

Alta will develop a creative brief for the "Naming" of the Chicago Bicycle Share System. Phase 1 will involve a brainstorming session with the City and key stakeholders to develop ideas for naming of the system. Alta will then issue names to the creative agency for further development and legal clearance. The City shall provide Alta with the selected service name, and all System-wide conditions related to the logo, color scheme, and any other branding information required by the City, including, without limitation, all such requirements set forth in the Sponsorship Agreements and/or the Grant Agreements as of that date.

Once a name has been determined, Alta will move to Phase 2 - Logo Design. With consideration of and while incorporating any City requirements, Alta will hold a design charette meeting with the City's decision makers wherein initial concepts and suggestions will be brainstormed and collected for the service name and color scheme. After that meeting, Alta will develop and deliver to the City up to three (3) draft brand concepts for a service name and color scheme (based on the design charette), logo, and any other branding elements relevant to the System. Of these individual concepts, the City will choose one for the design development. Using this choice, Alta will provide a maximum of two (2) revisions/modifications for review and approval by the City. The City shall approve, in writing, the chosen name, logo, color scheme, and branding. All branding information shall be the property of the City.

Following approval, Alta will develop brand standards and create design templates for all system elements, including but not limited to:

- Bike and station color scheme
- Keys
- Decals – kiosks, bikes, headers
- Pricing schematic
- Website
- Welcome kit – letterhead, letter, envelope, activation instructions
- Information cards and brochures for selling memberships
- Event kit – tent, signage, banners
- System Map design
- Station header layout
- Webpage layout
- Social media – Facebook and Twitter logo
- Bike Share System advertising posters to be displayed between selling periods

Alta will develop a marketing strategy that can be accomplished within the allocated budget, to be reviewed and approved by the City. Alta, within the allocated budget, will implement the City approved marketing strategy after approval. Alta shall not produce any marketing materials concerning the System without the prior written approval of the City project manager.

The marketing and communications plan includes, but is not restricted to:

- Announcement press conference
- Launch of demonstration project Web site and viral campaign

- Demonstration events and pre-membership campaign
- Launch event/press conference
- Membership advertisement campaign
- Sustaining PR/marketing campaign

Alta will execute the event plan to gain awareness, publicity and drive membership pre-sale sign up for the Chicago Bicycle Sharing System in the months leading up to the launch.

Alta will plan and execute a city wide launch event to create excitement around the bike share to be approved by the City no less than 30 days before the event.

Bike fender and basket decals, as well as advertising panels, are expected to be provided by sponsors and/or advertisers.

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

**SCHEDULE 17**

Prior to System launch, Alta will draft and the City will review and approve a Bicycle Rental Agreement in substantially the form and with similar content below. The Bicycle Rental Agreement will contain language that extends any and all indemnities and limitations of liability to the City. Terms and conditions and descriptions of the System (such as price) that are specific to the Chicago Bikeshare System are subject to change.

**Sample Use and Privacy Policy of the Operator Agreement**
**Bicycle Rental Agreement, Liability Waiver, and Release**

[       ] Bikeshare is a self-serve bicycle rental system ("<u>Service</u>"), established by the City of Chicago and managed by Alta Bicycle Share, Inc. ("<u>Alta</u>," "<u>Our</u>," or "<u>We</u>"). In consideration of your use of any Service, Alta requires that you ("Member ", "<u>You</u>", or "<u>Your</u>") agree to all terms and conditions in this Bicycle Rental Agreement, Liability Waiver, and Release ("<u>Agreement</u>"), which are intended to promote the safe use of [       ] Bikeshare[       ] Bikeshare bicycles, and which apply to all Registered Members and to all Casual Members, as defined below. In this Agreement, "Member" means and includes both Registered Members and Casual Members.

**Section 1.  Modifications to Agreement**

Alta reserves the right to unilaterally amend, modify, or change this Agreement, at any time and from time to time in its sole discretion, without notice and without Member's consent. By continuing to use any Service after any amendment, modification, or change, Member has agreed to be bound by all such amendments, modifications, and changes. Member must carefully review this Agreement on a regular basis to maintain awareness of all amendments, modifications, and changes. Whenever a change is made to this Agreement, Alta will post a notification on www. [       ]bikeshare.com ("Website").

**Section 2.  Term of Agreement**

The term of this Agreement begins when You first use any Service, and the term ends 10 years after Your last use of any Service; <u>provided</u>, <u>however</u>, that Your personal financial responsibility under Section 15 of this Agreement, titled Credit Card Matters, expires one year after the later of (i) Your last use of any Service, or (ii) the expiration of Your Membership. At any time and from time to time, and without Member's consent, Alta may unilaterally terminate Your right to use any Service, in Alta's sole discretion and without any notice or cause. This Agreement remains in full force and effect after any termination of Your right to use any Service.

**Section 3.  Service System**

The Service is comprised of [       ] Bikeshare[       ] Bikeshare bicycle stations ("<u>Stations</u>"), which include an automated pay station ("<u>Pay Station</u>"), and separate stands that allow the docking of [       ] Bikeshare[       ] Bikeshare bicycles ("<u>Bike Docks</u>"). The Stations are for the purposes of the renting, docking, and locking of [       ] Bikeshare bicycles, as well as the identification of the

Member. Under the Service, [       ] Bikeshare bicycles can be rented and returned to any Station.

### Section 4.  **Membership for Service**

Member may purchase a long-term membership for the Service ("Membership"), which can be for a period of either one year or 30 days ("Membership"). To purchase a Membership, Member must complete a registration form and create an account ("Account") at www._____bikeshare.com ("Website"), to become a Registered member ("Registered Member"). When a Member subscribes to the Service, Alta will charge the Registered Members's credit card the amount for the Membership, as described in Section 5. Once Registered Members's credit card payment clears, Alta will mail a system key to the mailing address listed by Registered Member. Member must activate the system key on the Website, under the "Member Login" heading, before using the Service for the first time. A Membership becomes valid and active once the system key is activated on the Website. The Membership allows Registered Member to use the Service without having to pay the $7 charge applicable to Casual 24-Hour Members or the $15 charge applicable to Casual 3-Day Members (definitions below); provided; however, that Registered Member must still pay the hourly rates as set forth in Section 7 for all trips in excess of 30 minutes. Within one year after a prior Membership expires, Registered Member may renew the Membership on the Website, under the "Member Login" heading. If the Membership is not renewed within this period of time, then Registered Member might need to (i) take certain actions to reactivate Registered Member's old Account, or (ii) create an entirely new Account for a new Membership. The Membership, and the personal identification number and system key related thereto, are non-transferable and may be terminated if Member breaches this Agreement, as decided by Alta in its sole discretion. If a Membership is terminated for any reason, then no refund is provided.

### Section 5.  **Registered Member Rates and Benefits**

A one-year Membership may be purchased for $75, and a 30-day Membership may be purchased for $25 (taxes are included). Member may purchase a Membership only by using a Visa or MasterCard credit card. On the 10th day of each month, the total amount of chargeable trips (i.e., those trips in excess of 30 minutes) will be charged to Registered Member's credit card. At the end of each month, Registered Member may access a statement of chargeable trips in PDF® format on the Website. If Registered Member has any claim or dispute regarding a chargeable trip, then Registered Member must, within 10 business days from the end of the prior month with the disputed claim, provide to Alta the corresponding trip number to identify the place and time the [       ] Bikeshare bicycle was rented and returned. The receipt, if any, indicating the date and time the [       ] Bikeshare bicycle was returned would be additional proof that the [       ] Bikeshare bicycle had been properly returned. Registered Member is encouraged to maintain all trip receipts.

### Section 6.  **Casual Membership Rates and Benefits**

If Member does not elect to purchase an Annual or 30-Day Membership and merely uses the Service for any time between 24-Hours and 3-Days, then Member is a Casual Member. A

Casual Member must pay a $7 flat fee for a 24-Hour Membership or $15 flat fee for a 3-Day Membership, plus additional hourly charges pursuant to the rates set forth in Section 7. When a Casual Member signs up to the Service at the Station, Alta will place a security hold on the Casual Member's credit card of $101; and that amount could remain on the Casual Member's credit card for an amount of time to be determined by the Member's bank's policies regarding holds. This hold will be placed on Casual Member's credit card for each bike rented. In this Agreement, "Member" also includes anyone who is a Casual Member.

## Section 7. Hourly Rates

In addition to the Registered and Casual Membership rates outlined in Sections 4 to 6, all Members are subject to hourly rates. The hourly rates are set forth in the chart below. So long as Member returns the [     ] Bikeshare bicycle to a Bike Dock within 30 minutes, no hourly charge applies. Member may remove another [     ] Bikeshare bicycle from a Bike Dock after returning the previous [     ] Bikeshare bicycle after a 15 second wait.

**Insert current approved Rate Chart

## Section 8. Availability of Service

Alta makes every effort to provide the Service for 365 days per year, but does not guarantee that the Service will be available at all times, as force majeure events or other circumstances might prevent Alta from providing the Service. Access to the Service also is conditioned on the availability of [     ] Bikeshare bicycles at each Station. Alta does not represent or warrant the availability of any Service or the availability of any [     ] Bikeshare bicycle at any Station. Member may use the Website to consult the inventory of [     ] Bikeshare bicycles available at a Station.

## Section 9. Directions for Using Service

## Section 9.1 Removing Bicycle.

Section 9.1(a) Removing Bicycle by Registered Member. Registered Member must insert their system key into the reader slot on the Bike Dock keyboard, to remove the [     ] Bikeshare bicycle from the Bike Dock. After the system key has been inserted into the reader slot, Registered Member has 15 seconds to remove the [     ] Bikeshare bicycle from the Bike Dock. The signal light remains yellow during the validation of Registered Member's system key, and the signal light turns green when the [     ] Bikeshare bicycle can be removed. Two sounds signals are also emitted. If the [     ] Bikeshare bicycle is not removed within 15 seconds, the Bike Dock locks and Registered Member must repeat the process described above.

Section 9.1(b) Removing Bicycle by Casual Member. A Casual Member must insert a credit card into the Pay Station and obtain a 5-digit code after completing the payment process. The Casual Member must then type the 5-digit code into the Bike Dock keyboard, to remove the [     ] Bikeshare bicycle from the Bike Dock. After the 5-digit code has been entered, the Casual Member has 15 seconds to remove the [     ] Bikeshare bicycle from the Bike Dock. The signal light remains yellow during the validation of the Casual Member's 5-digit

code, and the signal light turns green when the [      ] Bikeshare bicycle can be removed.  Two sounds signals are also emitted.  If the [      ] Bikeshare bicycle is not removed within 15 seconds, the Bike Dock locks and the Casual Member must repeat the process described above.  Each time a Casual Member would like to remove a new [      ] Bikeshare bicycle from a Bike Dock, Casual Member must insert a credit card into the Pay Station and obtain a new 5-digit code, to remove the next [      ] Bikeshare bicycle.  A Casual Member may remove up to two [      ] Bikeshare bicycles on each credit card account, and Casual Member will be charged for the use of two [      ] Bikeshare bicycles.

**Section 9.2  Returning Bicycle.**  To return the [      ] Bikeshare bicycle, Member must secure it into an available Bike Dock.  A sound signal is emitted, and the signal light turns yellow, then green, confirming that the [      ] Bikeshare bicycle has been properly secured to the Bike Dock. If the [      ] Bikeshare bicycle is not properly secured in the Bike Dock, then the signal light turns red, and a longer signal sound is emitted.  If the signal light turns red, Member must repeat the operation until the signal light turns green, and the [      ] Bikeshare bicycle is properly secured in the Bike Dock.  If the signal light does not turn green, Member must return the [      ] Bikeshare bicycle to another available Bike Dock.  If there is no available Bike Dock at the Station, then Members must push the "Time Credit" icon on the Pay Station screen under the "More Options" menu.  Registered Members must input the 7-digit code on the back of the system key or insert their key into the reader slot on the Pay Station and Casual Members must swipe their credit card at the Pay Station, to obtain an additional 15-minute credit in which to return the [      ] Bikeshare bicycle to another Station.  No fee is charged to Member for the additional 15-minute credit.  Member may immediately remove another [      ] Bikeshare bicycle from a Bike Dock.  Any [      ] Bikeshare bicycle that is not properly secured remains the sole responsibility of Member, and the hourly rates set forth in Section 4 will be charged until the [      ] Bikeshare bicycle is properly secured.

**Section 9.3   Obtaining Receipt.**  Member may print a receipt to confirm that the [      ] Bikeshare bicycle has been properly returned to the Bike Dock.  The date and time of return are indicated on the receipt, and the receipt may be used to dispute a chargeable trip.  To obtain a receipt, Member must push the "Rental Receipt" icon on the Pay Station screen under the "More Options" menu.  Registered Members must input the 7-digit code on the back of the system key or insert their system key into the reader slot on the Pay Station and Casual Members must swipe their credit card at the Pay Station.

**Section 9.4   Permitted Period of Continuous Use; Lost or Stolen Bicycle.**  Use of the Service is limited to a period of 24 consecutive hours ("Permitted Period of Continuous Use").  If Member maintains possession of the [      ] Bikeshare bicycle beyond the Permitted Period of Continuous Use, then the [      ] Bikeshare bicycle is deemed lost or stolen, Member's credit card will be charged a fee of $1,000, and a police report may be filed with local authorities.  Alta will attempt to contact the Member via telephone and email prior to charging the credit card, using the contact information provided by the Member upon subscribing, in an attempt to locate the [      ] Bikeshare bicycle.  The data generated by the Service's computer is conclusive evidence of the period of use of a [      ] Bikeshare bicycle by Member.  For any disappearance of a [      ] Bikeshare bicycle where Member will be held responsible, Member must report the

disappearance to Alta within 24 hours following the disappearance and must report the disappearance to the local police department within 48 hours. If Member promptly files a police report and forwards the police report to Alta, then Alta may, in its sole discretion, choose to charge the Member only a $30 service fee. Any use that exceeds the Permitted Period of Continuous Use is deemed a disappearance of the [      ] Bikeshare bicycle, until the [      ] Bikeshare bicycle is found or returned to a Bike Dock.

**Section 9.5    Lost or Damaged System Key.** If Member's system key has been lost or damaged, a replacement may be purchased by calling XXX-XXX-XXXX or by emailing customerservice@[        ]bikeshare.com and reporting that the system key has been lost or damaged. A replacement charge of $10 for the lost or damaged service key will be charged, and a replacement system key will be mailed to Member's mailing address of record.

### Section 10.  General Assumption of Risk by Member

Member agrees that riding a [      ] Bikeshare bicycle involves many obvious and not-so-obvious risks, dangers, and hazards, which may result in injury or death to Member or others, as well as damage to property, and that such risks, dangers, and hazards cannot always be predicted or avoided. Member agrees that such risks, dangers, and hazards are Member's sole responsibility. Member agrees that if Member's use of any Service causes injury or damage to another person or property, then Member may be liable for all resulting injuries, damages, and related costs. By choosing to ride a [      ] Bikeshare bicycle, Member assumes all responsibility for all related risks, dangers, and hazards, and Member agrees that Alta is not responsible for any injury, damage, or cost caused by Member with respect to any person or property, including the [      ] Bikeshare bicycle itself. Member is solely and fully responsible for the safe operation of the [      ] Bikeshare bicycle at all times. Member may need to take additional safety measures or precautions not specifically addressed in this Agreement.

### Section 11.  Prohibited Acts

Member must not ride a [      ] Bikeshare bicycle while carrying any briefcase, backpack, bag, or other item else, if it impedes Member's ability to operate a [      ] Bikeshare bicycle safely.

Member must not use any cellular telephone, text messaging device, portable music player, or other device that may distract Member from safely operating a [      ] Bikeshare bicycle; provided, however, that Member may use a cellular telephone only while employing an activated hands-free device that does not hinder Member 's ability to safely ride a [      ] Bikeshare bicycle.

Member must not operate a [      ] Bikeshare bicycle while under the influence of any alcohol, drugs, or other substance that may impair Member's ability to safely operate a [      ] Bikeshare bicycle.

Member must not carry a second person on a [      ] Bikeshare bicycle.

Member must not dock or lock any bicycle in any Station other than [      ] Bikeshare bicycles.

Member must not use any locking mechanism, other than the locking mechanism provided by Alta at the Bike Dock, to lock a [      ] Bikeshare bicycle to a Bike Dock.

Member must not violate any applicable federal, state, or local law, including those for bicycle riders.

Member must not dismantle or modify a [      ] Bikeshare bicycle in any way.  This rule does not apply to the use of the seat height adjustment feature on [      ] Bikeshare bicycles.

Member must not exceed the maximum weight limit for the [      ] Bikeshare bicycle (260 pounds) or the cargo carrier (17 pounds).

Member must not operate a [      ] Bikeshare bicycle in extreme weather conditions, including snow, hail, and electrical storms, which make it more dangerous to operate a [      ] Bikeshare bicycle.  Member is advised to adjust Member's riding behavior and braking distance to suit the weather conditions.

Member must not allow others to use a [      ] Bikeshare bicycle that Member has removed from a Bike Dock.  Member understands that when Member removes from a [      ] Bikeshare bicycle from a Bike Dock, it is to be used only by Member.  Member must not transfer Member's system key, 7-digit code on the system key, 5-digit code at the Pay Station or any other Account information to any other person.

### Section 12.  <u>Additional Member Obligations</u>

Member agrees that Member is a competent bicycle operator, is sufficiently fit to safely operate a [      ] Bikeshare bicycle, and has received medical clearances for such physical activity.  Like any physical activity, riding a [      ] Bikeshare bicycle may cause minor or major injuries or discomfort and may worsen or complicate underlying medical conditions or diseases.  By choosing to ride a [      ] Bikeshare bicycle, Member assumes all responsibility for all such injuries or other medical conditions.

Member agrees that bicycles are machines that may malfunction, even if the bicycle is properly maintained, and that such malfunction may cause injury.  Member agrees that before using a [      ] Bikeshare bicycle, Member must conduct a safety inspection of the [      ] Bikeshare bicycle, which includes inspecting the following: (i) proper tire pressure; (ii) trueness of the wheels; (iii) safe operation of all brakes and lights; (iv) proper attachment of the seat, pedals, and basket; (v) good condition of the frame; and (vi) any sign of damage, unusual or excessive wear, or other mechanical problem or maintenance need.  Member agrees not to ride the [      ] Bikeshare bicycle if Member notices any mechanical or other problem or safety issue, and Member agrees to promptly notify Alta of all problems and issues and to use a different [      ] Bikeshare bicycle.  Member agrees to press the "Faulty Bike" button within 1 minute of docking a [      ] Bikeshare bicycle that Member notices has any mechanical or other problem or safety issue.

Member agrees that Alta does not provide or maintain places where to ride [      ] Bikeshare bicycles, and that Alta does not guarantee that there will always be a safe place to ride a [      ] Bikeshare bicycle.  Roads, bicycle lanes, and bicycle routes may become dangerous due to

weather, traffic, or other hazards. Member must not use a [     ] Bikeshare bicycle for racing, riding off road, or any other use, besides safe operation on public or private roads or property and designated bicycle routes.

Member agrees that Alta is not a common carrier. Alternative means of public and private transportation are available to the general public and to Member individually, including public buses and light rail service, taxis, and pedestrian paths. Alta provides [     ] Bikeshare bicycles only as a convenience, and such rental availability is intended by Alta to be used only by those persons who are able and qualified to operate a [     ] Bikeshare bicycle on their own and who have agreed to all terms and conditions of this Agreement.

Member must return the [     ] Bikeshare bicycle to a Station and must insert the [     ] Bikeshare bicycle into a Bike Dock, within 24 hours from the time the [     ] Bikeshare bicycle was originally removed from a Bike Dock. Member agrees that if the [     ] Bikeshare bicycle is not returned to a Station and inserted into a Bike Dock within 24 hours, then the [     ] Bikeshare bicycle is deemed missing or stolen, and Member does hereby authorize Alta to charge Member's credit card a $1,000 fee.

Member agrees that Alta may require Member to return a [     ] Bikeshare bicycle at any time.

Member agrees that access to the Service is denied to any person less than 16 years of age, whether or not accompanied by a parent or guardian. Minors who are at least 16 years of age may use the Service, but only if the Service is subscribed for by or under the responsibility of the minor's parent or guardian; and, the parent or guardian is fully liable for all injuries, damages, and costs caused by the minor's use of the Service.

Member must report all accidents and injuries involving a [     ] Bikeshare bicycle to the local authorities and to [     ] Bikeshare's Customer Service at 1-XXX-XXX-XXXX as soon as possible, but in no event later than 24 hours after the occurrence of the accident or injury.

Member agrees if Member is unable to report identifying information due to a medical emergency, Alta may, at its discretion, provide personal and contact information to the authorities upon their request.

### Section 13. <u>Additional Fees</u>

If the [     ] Bikeshare bicycle is not returned to a Bike Dock within the Permitted Period of Continuous Use, then Member will be charged a fee of $1,000. If the [     ] Bikeshare bicycle is returned to a Bike Dock damaged or in a state of disrepair, then Member will be charged a fee that is equal to the cost of repair. Such fees may be charged as soon as 24 hours after the [     ] Bikeshare bicycle is not returned or is returned in a damaged state. Alta will attempt to contact the Member via telephone and email before charging the Member's credit card, by using the contact information provided by the Member when subscribing to the Service.

### Section 14. <u>Helmets</u>

Wearing a Snell, CPSC, ANSI, or ASTM approved helmet, properly sized, fitted, and fastened, while cycling may protect against an injury, or may lessen the severity of an injury, caused by an impact to the head; however, bicycle helmets are not 100% effective, do not protect against all head injuries, and do not protect against other injuries. Although some state and local laws do not require bicycle riders to wear helmets, Alta recommends that all riders wear a Snell, CPSC, ANSI, or ASTM approved helmet that has been properly sized, fitted, and fastened, according to the manufacturer's instructions. Alta does not represent or warrant the quality or safety characteristics of any helmet, and Member agrees that Alta must not be held liable for any injury suffered by Member while using the Service, whether or not Member is wearing a helmet at the time of injury.

### Section 15.  Credit Card Matters

You must input a valid credit card number and expiration date before You will be allowed to use the Service, and You do hereby represent and warrant that You are authorized to use the credit card (Alta accepts only Visa or MasterCard).  You do hereby authorize Alta to charge Your credit card for all expenses incurred on Your Account, including all additional fees and repair charges.  If you dispute any charge on Your Account, then you must contact Alta within 10 days of Your receipt of Your statement containing the disputed charge.  Members have an on-going duty to update all changes relating to their credit card.  A $101 hold will be placed on Casual Member's credit card when a Casual Member signs up for the service at the Pay Station.  If a Casual Member removes another [     ] Bikeshare bicycle from a Bike Dock while the previous hold is still in effect, then an additional hold will not be placed on the Member's credit card.  If the [     ] Bikeshare bicycle is returned within the 24-hour maximum period of allowed use, then the hold may be released within ten days, depending on the Member's bank's policies regarding holds.  Alta uses www.authorize.net ("Processor") as Our transaction payment processor.  The transmission of data to Processor and the approval of a credit card should take less than 10 seconds; however, a credit card might not allow for an overcharge/overdraft, which means that a Member's transaction request could be denied.  All denials of a transaction by a Member's bank, all holds, and all other similar issues are the Member's sole responsibility and should be dealt with between the Member and his or her bank.  Alta takes reasonable steps to ensure that all data transmitted by Alta is done safely and privately; however, despite those steps, Alta cannot guarantee the complete security of all credit card and other data transmitted by Alta or Processor.  Please review the DISCLAIMERS and LIMITED LIABILITY sections set forth below, which are applicable to Member's use of the Service, including the transmission of credit card and other data.

### Section 16.  Termination

Member may terminate Member 's use of the Service at any time, and Member may cancel Member's Membership at any time; provided, however, that (i) no refund will be provided by Alta, (ii) the term of this Agreement continues in accordance with Section 2 of this Agreement, (iii) the hold may remain on Member's credit card account for up to 10 days, even if Member terminates Member 's use of the Service, and (iv) Member may still be charged any applicable additional fees in accordance with Section 13 of this Agreement.

### Section 17.  Choice of Law; Dispute Resolution

This Agreement is governed by, and must be construed and enforced in accordance with, the laws of the State of Illinois, excluding principles of conflicts of laws.  For every dispute regarding this Agreement:  (i) the prevailing party is entitled to its costs, expenses, and reasonable attorney fees (whether incurred at trial, on appeal, or otherwise) incurred in resolving or settling the dispute, in addition to all other damages or awards to which the party may be entitled; (ii) each party consents to the jurisdiction of the courts of the State of Illinois and agrees that those courts have personal jurisdiction over each party; (iii) venue must be in the State of Illinois; and (iv) the parties must submit the dispute to mandatory mediation held in the State of Illinois. Every mediation must be completed within 4 months of the date when the initial notice demanding mediation was provided by any party.  If, for any reason, the dispute is not resolved through mediation within the 4-month period, then the parties may continue seeking to resolve the dispute by use of any process, including litigation by trial.

### Section 18.  Waiver

No waiver of any breach of any provision of this Agreement is a waiver of any other breach or of any other provision of this Agreement.  The terms of this Agreement may be waived or amended only in writing and only by the party that is entitled to the benefits of the term being waived or amended.

### Section 19.  Cumulative Remedies

All rights and remedies granted under or referred to in this Agreement are cumulative and nonexclusive, and resort to one does not preclude resort to another or to any other right or remedy provided by law.

### Section 20.  Final Agreement

This Agreement contains the complete, final, and exclusive integrated agreement between the parties with respect to its subject matter.  This Agreement supersedes all other prior agreements, written or oral, relating to such subject matter.  At any time and from time to time, and without Member's consent, Alta may unilaterally amend, modify, or change this Agreement, in its sole discretion and without any notice or cause.  By continuing to use any Service after any amendment, modification, or change, Member has agreed to be bound by all such amendments, modifications, and changes.  Member must carefully review this Agreement on a regular basis to maintain awareness of all amendments, modifications, and changes.

### Section 21.  Representations

Each party ("Promising Party") represents and warrants to the other party that: (i) the Promising Party has the legal power and authority to enter into this Agreement and to undertake and perform all of its duties and obligations hereunder; (ii) there is no contract or other legal obligation that prevents the Promising Party from entering into this Agreement or from

undertaking or performing all of its duties and obligations hereunder; and (iv) this Agreement is the Promising Party's legally binding and fully enforceable agreement.

## Section 22.  Contract Interpretation

The headings in this Agreement do not affect the interpretation of this Agreement.  "<u>Or</u>" is not be exclusive in its meaning.  "<u>Including</u>" means "including, but not limited to." "<u>Herein</u>," "<u>hereunder</u>," and other similar terms refer to this Agreement as a whole and are not limited to the specific section on paragraph where they appear.  Plural terms refer to all members of the relevant class, and singular terms refer to one or more members of the relevant class.  All pronouns include the masculine, feminine, and neuter pronoun forms.  All schedules and exhibits referred to herein are hereby incorporated by reference.

## Section 23.  Notices

You may contact Alta by writing, calling, or emailing Alta at the street address, telephone number, and email address listed below:

Alta Bicycle Share, Inc.
711 SE Grand Ave.
Portland, OR  97214
Customer Service:  XXX-XXX-XXXX
customerservice@[ ]bikeshare.com

## Section 24.  Releases.

"<u>Claims</u>" means, collectively, any and all claims, injuries, demands, liabilities, disputes, causes of action (including statutory, contract, negligence, or other tort theories), proceedings, obligations, debts, liens, fines, charges, penalties, contracts, promises, costs, expenses (including  attorneys' fees, whether incurred at trial, on appeal, or otherwise), damages (including consequential, compensatory, or punitive damages), or losses (whether known, unknown, asserted, unasserted, fixed, conditional, or contingent) that arise from or relate to any Service, [     ] Bikeshare bicycle, Station, Bike Dock, or related information, including Member's use of any of the foregoing.  In exchange for being allowed to use any Service, [     ] Bikeshare bicycle, Station, Bike Dock, or related information, Member (acting for Member and for all of Member 's agents, affiliates, representatives, successors, heirs, and assigns) does hereby (i) fully and forever release and discharge Alta and all of its owners, officers, directors, affiliates, employees, agents, representatives, successors, and assigns (collectively, "<u>Alta and its Related Parties</u>") from all Claims that Member has or may have against Alta and its Related Parties, except for Claims caused by Alta's gross negligence or willful misconduct, and (ii) Member agrees to indemnify and hold harmless Alta and its Related Parties from and against all Claims, except for Claims caused by Alta's gross negligence or willful misconduct.  Such releases are intended to be general and complete releases of all Claims.  Alta and its Related Parties may plead such releases as a complete and sufficient defense to any Claim, as intended 3rd beneficiaries of such releases.

## Section 25.  DISCLAIMERS

YOU DO HEREBY ACKNOWLEDGE AND AGREE THAT YOUR USE OF ANY SERVICE, BICYCLE, STATION, BIKE DOCK, OR RELATED INFORMATION IS AT YOUR SOLE RISK. TO THE FULLEST EXTENT PERMITTED BY LAW, ALTA AND ITS RELATED PARTIES DISCLAIM ALL EXPRESS AND IMPLIED WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, COMPATIBILITY, SECURITY, ACCURACY, NONINFRINGEMENT, AND USEFULNESS, WITH RESPECT TO ANY SERVICE, BICYCLE, STATION, BIKE DOCK, OR RELATED INFORMATION, WHICH ARE ALL PROVIDED "<u>AS IS</u>" AND "<u>AS AVAILABLE</u>" (AND YOU RELY ON THEM SOLELY AT YOUR OWN RISK). WE DO NOT REPRESENT OR WARRANT THAT ANY SERVICE, BICYCLE, STATION, BIKE DOCK, OR RELATED INFORMATION WILL BE IN GOOD REPAIR OR ERROR-FREE, AND DELAYS, OMISSIONS, INTERRUPTIONS, OR INACCURACIES COULD EXIST IN ANY SERVICE, BICYCLE, STATION, BIKE DOCK, OR INFORMATION. YOU ASSUME FULL RESPONSIBILITY AND RISK OF LOSS FOR USING ANY SERVICE, BICYCLE, STATION, BIKE DOCK, OR RELATED INFORMATION, AND WE ARE NOT LIABLE FOR ANY CLAIM ATTRIBUTABLE TO ANY OF THE FOREGOING.

**Section 26. <u>LIMITED LIABILITY</u>**

YOU DO HEREBY ACKNOWLEDGE AND AGREE THAT ALTA AND ITS RELATED PARTIES ARE NOT RESPONSIBLE OR LIABLE FOR ANY CLAIM, INCLUDING THOSE THAT ARISE OUT OF OR RELATE TO (A) ANY RISK, DANGER, OR HAZARD DESCRIBED IN THIS AGREEMENT, (B) YOUR USE OF, OR INABILITY TO USE, ANY SERVICE, BICYCLE, STATION, BIKE DOCK, OR RELATED INFORMATION, (C) YOUR BREACH OF THIS AGREEMENT OR YOUR VIOLATION OF ANY LAW, (D) ANY NEGLIGENCE, MISCONDUCT, OR OTHER ACTION OR INACTION BY YOU, (E) YOUR FAILURE TO WEAR A BICYCLE HELMET WHILE USING A [        ] BIKESHARE BICYCLE, OR (F) ANY NEGLIGENCE, MISCONDUCT, OR OTHER ACTION OR INACTION OF ANY THIRD PARTY. YOU DO HEREBY WAIVE ALL CLAIMS WITH RESPECT TO ANY OF THE FOREGOING, INCLUDING THOSE BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STATUTORY, OR OTHER GROUNDS, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH CLAIMS. OUR TOTAL LIABILITY FOR ALL CLAIMS, INCLUDING THOSE BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STATUTORY, OR OTHER GROUNDS, IS LIMITED TO THE SUM OF $100. SOME JURISDICTIONS DO NOT ALLOW FOR LIMITED LIABILITY OR EXCLUSION OF IMPLIED WARRANTIES; AND, IF ANY OF THOSE LAWS APPLY TO YOU, THEN SOME OR ALL OF THE ABOVE DISCLAIMERS, EXCLUSIONS, OR LIMITATIONS MIGHT NOT APPLY TO YOU, AND YOU MIGHT HAVE ADDITIONAL RIGHTS.

**SCHEDULE 18**
## Standard Operations and Maintenance Procedures

Alta agrees to operate and maintain the System in accordance with standard operating procedures to be developed by Alta and approved by the City prior to the launch of the System (Chicago SOP). The Chicago SOP must document how the Operator intends to conduct day-to-day operations. Repeated failure to operate and maintain the System according to the Chicago SOP will be a default under this Agreement. Day to day operations include, but are not limited to, the following:

Station preventive maintenance and routine maintenance, station monitoring and rebalancing procedures, all routine cleaning procedures of Stations, including graffiti removal, snow removal and all emergency and weather response protocols, Bicycle checking procedures, Bicycle preventive maintenance and routine maintenance (both in-Station and in-shop), the "break-fix" obligations for all Equipment, ongoing marketing obligations, customer service obligations, special events procedures and reporting obligations.

In addition, the Chicago SOP should cover such events as inclement weathers, accidents, system failure, and other issues identified through coordination between the City and the Operator.

The Operator shall maintain a log of all maintenance, both preventive and routine, conducted on both bikes and stations. This maintenance log shall be maintained electronically and be made available to the City upon request.

The Chicago SOP which shall include but is not limited to the following table of contents:

**CONTENTS**
Introduction
Staffing Plan
Rebalancing Procedures
On-Street Bicycle Maintenance
In-Shop Bicycle Maintenance
Station Electronic Maintenance
Station and Bicycle Cleaning
Purchase Order and Warranty Procedures
Member Care Procedures
Reporting
Inclement Weather Practices
Special Events
Station Movement
Call Center
Technical Issue Response and Issue Tracking
Alta Bicycle Share Media Policy

Bicycle Sharing System
Chicago Department of Transportation, Specification Number 100320A, PO Number 26459

**SCHEDULE 19**

<u>**Lost, Stolen, and Damaged Bikes**</u>

For bikes not covered by the warranty, the City is responsible for the cost of replacement of bikes that are stolen or damaged beyond repair up to a number of bikes equal to 1% of the total number of bikes purchased by the City under this contract.  Operator must report to the City the loss of any bikes that are stolen or damaged beyond repair and in need of replacement within 24 hours; if Operator fails to timely report such loss it is responsible for the replacement of such bikes.

Notwithstanding the above, if any loss, theft, or damage is due to any Operator error, system error, equipment malfunction, or manufacturer defect the Operator is responsible for the replacement or equivalent cost of replacement of such bikes.

The Operator is responsible for replacement or equivalent cost of replacement of all bikes lost, stolen, or damaged beyond repair in excess of the 1% of the total number of bikes purchased by the City described above.

**SCHEDULE 20**

## Performance Requirements

If a Net Profit exists, the Operator shall be entitled to a Performance Incentive Payment ("PIP"), as provided herein. The PIP is calculated on an annual basis as part of the year end reconciliation.

The City has established eleven performance Benchmarks. Performance against these Benchmarks will be assessed in four categories: Fails to Meet Expectations, Meets Expectations, Exceeds Expectations, and Greatly Exceeds Expectations.

Eligibility for PIPs will be assessed on a monthly basis. On a monthly basis, the Operator will provide the City with a report on its performance against each Benchmark. Failure to report on a specific measure will be treated as a "Fails to Meet Expectations."

The Operator will not be eligible to receive PIPs if any one of the following scenarios occurs:

-   Receiving a "Fails to Meet Expectations" for 4 or more of the last 12 months in a single Benchmark.

-   Receiving a "Fails to Meet Expectations" a cumulative total of 12 or more instances in the last 12 months for all Benchmarks.

The amount of a PIP is based on how many "PIP Points" are generated in a given Operating Period.

Meeting each Benchmark on a monthly basis has a point value. These point values shall accrue each month and will be summed at the end of the year to calculate the PIP available to the Operator.

Achieving 80 PIP Points at the end of the Operating Period entitles the Operator to a PIP equal to 40% of Net Profits

Each incremental PIP Point that brings the total above 80 PIP Points and equal to or below 90 PIP Points at the end of the Operating Period increases the PIP by two percent. Each PIP Point that brings the total above 90 PIP Points at the end of the Operating Period increases the PIP by one percent.

Each incremental PIP Point that brings the total below 80 PIP Points decreases the PIP by one percent.

The total PIP Points are rounded to the nearest whole number at the end of the year.

In the event any Benchmark is permanently decreased it will require an adjustment of the performance payment schedule.

The Operator shall be required to meet the following standards of performance delineated in the table below:

Bicycle Sharing System

Chicago Department of Transportation, Specification Number 1493 VIA PO Number 76455

| | Fails to Meet Expectations | | Meets Expectations | | | Exceeds Expectations | | | Greatly Exceeds Expectations | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Standard | Monthly "PIP Point" Value | Standard | Monthly "PIP Point" Value | Maximum Annual "PIP Point" Value | Standard | Monthly "PIP Point" Value | Maximum Annual "PIP Point" Value | Standard | Monthly "PIP Point" Value | Maximum Annual "PIP Point" Value |
| Stations Full or Empty (3 Hours) | >30 | 0 | 30 | 0.1667 | 2.00 | 15 | 0.1695 | 2.0340 | 0 | 0.1725 | 2.0700 |
| Average Station Full (>15 Minutes) | >30 | 0 | 30 | 0.8333 | 10.00 | 20 | 0.9375 | 11.2500 | 10 | 1.0417 | 12.5000 |
| Station Full Specific Station | >50 | 0 | 50 | 0.8333 | 10.00 | 40 | 0.9375 | 11.2500 | 30 | 1.0417 | 12.5000 |
| Minimum # of Bikes Deployed | <90% | 0 | 90% | 0.6000 | 7.20 | 91% | 0.6500 | 7.8000 | 92% | 0.7000 | 8.4000 |
| % of Calls Answered (30 Seconds) | <90% | 0 | 90% | 0.8333 | 10.00 | 92% | 0.9375 | 11.2500 | 94% | 1.0417 | 12.5000 |
| % of Dropped Calls (Maximum) | <5% | 0 | 5% | 0.6667 | 8.00 | 3% | 0.7467 | 8.9600 | 1% | 0.8267 | 9.9200 |
| % of Email Responded (24 Hours) | <95% | 0 | 95% | 0.5000 | 6.00 | 98% | 0.5625 | 6.7500 | 99% | 0.6250 | 7.5000 |
| % of Memberships Mailed (24 Hours) | <95% | 0 | 95% | 0.4000 | 4.80 | 98% | 0.5000 | 6.0000 | 99% | 0.6000 | 7.2000 |
| % of Stations Cleaned (2 Weeks) | <95% | 0 | 95% | 0.7500 | 9.00 | 98% | 0.8400 | 10.0800 | 99% | 0.9300 | 11.1600 |
| % of Bikes Inspected (Month) | <95% | 0 | 95% | 0.5833 | 7.00 | 98% | 0.6563 | 7.8750 | 100% | 0.7292 | 8.7500 |
| % of Bikes Refurbished (Annual) | <95% | 0 | 95% | 0.5000 | 6.00 | 98% | 0.5625 | 6.7500 | 100% | 0.6250 | 7.5000 |
| | | 0 | | 6.6667 | 80.00 | | 7.50 | 90.00 | | 8.33 | 100.00 |
| | | | | | | | | | | | |
| Performance Payments (Maximum) | | 40% | | | | | | 60% | | | 70% |

Each month the City will calculate the PIP points accrued due to that month's performance. The monthly performance will be based on each individual benchmark and be assigned a PIP value based on performance against the above benchmarks.

For the purpose of calculating the PIP in Operating Periods under 12 months, PIP points accrued in that Operating Period will be converted to an annual rate by multiplying the average monthly PIP points for that period by 12.

During Operating Period 1 Failure to Meet Expectations on the benchmarks: Average Station Full, Station Full Specific Station, Minimum # of Bikes Deployed, and % of Calls Answered will not be levied if the Operator makes reasonable efforts to Meet Expectations.

The City, at its sole discretion, may elect to relax the "Minimum # of Bikes Deployed" to reflect the seasonal nature of customer demand and to lower operating costs, such a change would cause a "Meets Expectations" grade for the Minimum # of Bikes Deployed benchmark for that month.

### Performance Standards, Definitions

Performance standards will be reported on a monthly basis, based on the Operator's database. The Operator must report to the City if any metric is projected to not meet the Meets Expectations standard within 24 hours of its awareness or notification in writing thereof.

1. Station Full or Empty (3 hours): Stations are neither full nor empty for a period longer than three hours between the hours of 6AM and midnight. This metric is measured by the number of instances in which a station is full or empty for more than 3 hours.
2. Average Station Full (>15 Minutes): The number of times a station is full for longer than 15 minutes per month per station between the hours of 6AM and midnight divided by the total number of stations deployed.
3. Station Full Specific Station: The number of instances a specific station is full for longer than 15 minutes at any station in any month between the hours of 6AM and midnight.
4. Minimum # Bikes Deployed: The minimum number of bikes deployed shall be calculated by taking the number of bicycles on the street recorded on a daily basis (Bicycles in Circulation), divided by the Bicycle Fleet. Bicycle Fleet is the number of docks on the street divided by 1.7.
5. % of Calls Answered (30 Seconds): Percent of calls that are answered within 30 seconds, as reported by the call center on a monthly basis.
6. % of Dropped Calls (Maximum): Percent of calls that are dropped as reported by the call center.
7. % of Email Responded (24 Hours): Emails shall be responded to within 24 hours.

List of Schedules                    Page 55

8. % of Memberships Mailed (24 Hours): Membership packets will be placed in the mail within 24 hours during the business week, which includes 9AM Monday to 5PM Friday, excluding holidays.

9. % of Stations Cleaned (2 weeks): shall use its best efforts to clean all visible dirt, ink, paint, litter or any other substance on the Equipment every two weeks. Station Cleaning shall include, but is not limited to, the following tasks:

    a. Check Kiosk functionality including transactions and communications;
    b. Check all communications systems including, but not limited to, the Kiosk-dock and the Kiosk-Central Computer System;
    c. Check each of the Dock's functionality including but not limited to locking mechanism, cassette and keypad;
    d. Wipe down Station and all interfaces (screens, keypads, map and ad panels etc.) with cleaner; and
    e. Check physical Station connections

10. % of Bikes Inspected (Month):

    The Operator shall conduct Bicycle Maintenance at least once per Bicycle per calendar month. During Bicycle Maintenance, the Operator shall, at a minimum, conduct the following checks, and repair or replace all necessary elements:

    a. Check tire pressure, and add air as may be needed, to recommended Pounds per Square Inch measurement;
    b. Check tightness of handlebars, headset bearings, and full handlebar range of motion (left to right);
    c. Check tightness of seat, seat post quick-release, and see that seat post moves freely in full range of motion (up and down);
    d. Check brake function (front and rear);
    e. Check grips for wear and brake levers for tightness and damage;
    f. Check bell for tightness and correct function;
    g. Check handlebar covers for damage and instruction stickers;
    h. Check front basket for tightness and damage, and check bungee cord for wear;
    i. Check for correct gears and shifter function through all 3 gears;
    j. Check fenders (front and rear) for damage, and clean outside of fenders;
    k. Check tires (front and rear) for damage or wear;
    l. Check wheels (front and rear) for trueness, broken or bent spokes and hub or axle tightness;
    m. Check LED lights (front and rear) for function;
    n. Check reflectors on wheels, seat and basket, to if they are present, clean and undamaged;
    o. Check pedals and cranks for tightness;

p. Lubricate and clean chain and check chain tensioner for correct function;

q. Check kickstand for correct function;

r. Brief test ride to ensure overall correct function of Bicycle; and

s. Clean bicycle

% of Bikes Refurbished (Annual): Annually, the bikes will be cleaned, retouched with paint, and supplied with new stickers on an as-needed basis. Routine cleanings will be made to ensure the fleet is both optimally functional and attractive.

**SCHEDULE 21**

## Reporting Requirements and Asset Management

The Operator will be required to report information on a regular basis, as delineated below:

The Operator shall notify CDOT via email or traditional mail within 24 hours of its awareness of any bicycles stolen.

On a monthly basis, the operator shall provide final reports including the following:

Performance Metrics:

- Performance relative to metrics included in Schedule 20

Membership:

- YTD Count of active registered members by type at the end of the reporting month
- YTD Count of unique casual memberships initiated at the end of the reporting month
- Number of new members by type who signed up during the reporting month, by week/month
- Number of cancellations and/or expirations of registered members by type during the reporting month

Ridership:

- Trips per day by member type
- Total trips per month and YTD per member type
- Average number of trips per day of week and hour of the day for weekdays and weekends during the reporting month
- Average duration of trips by member type
- Average and total length of trips (Straight line distance) by member type
- Distribution of trip origin and destination by station

Environmental Impact

- Total and average calories burned per week/month by member type. Based on calculation using total and average trip durations.
- Carbon offset per week/month. Based on calculation using total miles traveled (straight line distance)
- Average carbon offset per member by type for the month. Based on " total members/total carbon offset"

Rebalancing Operations

- Number of bikes rebalanced per day

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

- Bikes in service per day
- List of full/empty instances (station, start time, end time, date)
- Count of full/empty instances per station by day/month
- Breakdown of full/empty instances by duration
- Percentage of time stations are Normal, Full, Empty
- Breakdown of additional time granted when stations were full

Station Maintenance Operations

- Number of active stations
- Count of station visits by technicians for normal maintenance
- List of all station malfunctions (station, start/end date/time, event)
- List of all dock malfunctions (station, start/end date/time, event)
- Percentage of time stations were available to provide rentals for all membership types by station
- System wide average for percentage of time stations were available to provide rentals for all membership types

Bicycle Maintenance Operations

- Count of bikes checked per day/month
- Count of bikes repaired per day/month
- Average time per repair
- Breakdown of repair types (minor, major, annual overhaul)
- Breakdown of the cause of repair needs (normal wear, crash, warranty failure, vandalism)

Incident Reporting

- List of all incidents (crash, vandalism, theft, police action) with dates and summary of outcomes
- Stolen/missing bike list and status

Customer Service Reporting

- Number of calls/emails received by call/email type and total
- Average time to answer call for the month and YTD
- Number of calls unanswered per day for the month
- Average time of call for the month and YTD
- First call resolution percentage for the month and YTD

Customer Outreach

- Web site analytics
- FB/twitter posts count and summary

List of Schedules                    Page 59

Financial Performance
- Operating costs and operating revenues
- Capital expenditures

The Operator shall prepare an annual report that provides annualized information on all the above relevant to the prior year's operations.

The Operator is also responsible for providing up-to-date records of all equipment purchased through this contract.

Where possible, Equipment will be tracked by serial number, and Operator will keep a comprehensive inventory.

The Operator will maintain an asset inventory identifying the location of each piece of equipment, with the exception of bicycles.

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

**SCHEDULE 22**

## Call Center

The Operator shall provide all subscribers, and the public at large, a toll-free telephone number for the Operator's call center. The call center shall be in continuous operation twenty-four (24) hours per day, seven (7) days per week, three hundred sixty-five (365) days per year. Telephone answering time shall not exceed thirty (30) seconds. The time to transfer the call to a knowledgeable customer service representative (including hold time) shall not exceed an additional thirty (30) seconds. The percentage of issues resolved during the customer's first call shall be at least 70%. The Operator shall ensure that call center has operators that are fluent in English and Spanish for all persons who contact the call center. The operators at the call center shall be fully competent and knowledgeable to answer questions and provide information concerning, among other things, subscription process, billing, crashes, comments, complaints, malfunction problems, and location of Stations. The call center manager shall be knowledgeable about the Chicago region.

**SCHEDULE 23**

## Liquidated Damages

The Operator shall pay liquidated damages if it fails to deliver or perform in accordance with the standards established in this contract. "Delivered" is defined as assembled and installed, unless otherwise directed by the City.

The liquidated damage will not be assessed if the City is unprepared to install the station or directs the Operator not to install the station.

No liquidated damages shall be assessed if target dates are met within 4 weeks, or if the City commitment timelines are not met.

**Start Up Services and Launch**
Liquidated Damages equal to 1% of System Start-Up Fees (as defined in Exhibit 3) will be assessed against the Operator beginning on the 29th day after the agreed upon deadline for system Launch, as described in Exhibit 2 (19 weeks) and for each subsequent week thereafter that the Launch is delayed.

The acceptable time period for delivery is extended by the amount of time the City exceeds its agreed upon deliverables for system start up and launch.

**Operations, Support and Maintenance**
In the event that the System is shut down due to mechanical, Software, or Operator error for longer than 24 hours, the Operator will pay the City 1/365 of the cost of the prior year operating cost or, in the first year, the daily average cost for operations preceding the shutdown for each 24 hour period the system is shut down.

Liquidated damages are not covered by the "Loss Cap."

**Expansion**
For all equipment ordered after the initial purchase order that is installed later than described in Schedule 14 the Operator will be assessed Liquidated Damages equal to 1% of the purchase price of the equipment for each week the equipment is late.

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 160320A, PO Number 26459*

**SCHEDULE 24**

## Rate Schedule

During the Term of the contract, Operator may propose a rate structure and any changes thereto; the Commissioner or his designee shall have final approval over the bicycle rental rates.

Unless agreed upon by both parties, rates may not change by more than 10% for any individual rate change within 6 months of the last change. Unless agreed upon by both parties, usage fees must be in increments of $0.50 and changes in membership fees must be in increments of $1.

### 2013 Rate Schedule

Annual Membership:   $75

24-Hour Membership: $7

Unless otherwise approved by the parties, Alta shall charge the following usage fees during the Term (as calculated on a pre-tax basis):

For Annual members:

| | |
|---|---|
| First 30.00 minutes: | Free |
| 30.01-60.00 minutes: | $1.50 |
| 60.01-90.00 minutes: | $4.50 |
| 90.01-120.00 minutes: | $10.50 |
| 120.01-150.00 minutes: | $16.50 |
| 150.01-180.00 minutes: | $22.50 |
| 180.01-210.00 minutes: | $28.50 |
| 210.01-240.00 minutes: | $34.50 |
| 240.01-270.00 minutes: | $40.50 |
| 270.01-300.00 minutes: | $46.50 |

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

| | |
|---|---|
| 300.01-330.00 minutes: | $52.50 |
| 330.01-360.00 minutes: | $58.50 |
| >360 minutes: | $76.50 |

For short-term subscriptions (24 hours)

| | |
|---|---|
| First 30.00 minutes: | Free |
| 30.01-60.00 minutes: | $2.00 |
| 60.01-90.00 minutes: | $6.00 |
| 90.01-120.00 minutes: | $14.00 |
| 120.01-150.00 minutes: | $22.00 |
| 150.01-180.00 minutes: | $30.00 |
| 180.01-210.00 minutes: | $38.00 |
| 210.01-240.00 minutes: | $46.00 |
| 240.01-270.00 minutes: | $54.00 |
| 270.01-300.00 minutes: | $62.00 |
| 300.01-330.00 minutes: | $70.00 |
| 330.01-360.00 minutes: | $78.00 |
| >360 minutes: | $102.00 |

In the above schedule, each notation of "XX.XX minutes" refers to the number of minutes (the two-digit number before the period) and seconds (the two-digit number after the period) during which a bicycle is checked out.

List of Schedules                    Page 64

**SCHEDULE 25**

## Key Personnel

**General Manager** - (Kansas Waugh, FTE) will oversee marketing, hiring, general operations, client relations, and business growth, and communicate with the City of Chicago and its partners on all matters pertaining to the Chicago Bicycle Sharing System.

**Operations Manager** - (FTE, local hire), will oversee all day-to- day operations of Chicago Bicycle Sharing System Shift Managers (FTE, local hires), will assist on all aspects of launch and day-to-day operations and act as shift managers to cover when OM is not working.

**Bicycle Manager** - (FTE, local hire), will oversee assembly and maintenance of bicycles.

**Station Technician Manager** - (FTE, local hire), will maintain functionality and repair terminals.

**Administrative Manager** - (FTE, local hire), will aid in the management of accounting, finance, insurance.

**Marketing Manager** - will undertake all aspects of local marketing.

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

## EXHIBIT 2
## Performance Schedule



Exhibit 2                                    Page 1

### EXHIBIT 3
### COMPENSATION SCHEDULE

## I.    Definitions

**"Account"** means a segregated fund under the control of the City of Chicago into which the Operating Revenue is placed.

**"Additional Equipment"** means any Equipment other than the Initial Equipment purchased during the term of this Agreement.

**"Budget"** means, for each Operating Period, the schedule of projected expenses of Alta, by category and amount.

**"Cost Cap"** means the dollar figure that is 110% of the dollar figure that is the sum of all projected expenses in the Budget for that Operating Period.

**"Initial Equipment"** means the Equipment specified in Section II.A.1 of this Exhibit 3.

**"Initial Equipment Fee"** means the amount paid to Alta for the Initial Equipment, which is specified herein.

**"Installation Fee"** means the amount paid to Alta for the Installation Services specified in Schedule 12 to Exhibit 1.

**"Installation Services"** means those services specified in Schedule 12 to Exhibit 1.

**"Launch"** means the date on which paid rental service is available to the general public.

**"Loss Cap"** means, for Operating Period 3 through 6, and any contract extension periods, a dollar figure that is 10% of the dollar figure that is the sum of all projected expenses in the Budget for that Operating Period.

**"Net Loss"** means, for any Operating Period, the negative balance resulting from the difference between the Operating Revenue and the Operating Costs in a given Operating Period.

**"Net Profit"** means, for any Operating Period, the positive balance resulting from the difference between the total Operating Revenue and the Operating Costs in a given Operating Period.

**"Operating Costs"** means the actual costs, without markup, incurred by Alta in performing OSM.   Any costs incurred by Alta in excess of the Cost Cap will not be eligible for reimbursement and will be the responsibility of Alta.

**"Operating Period"** means the budgeted period in which Alta performs OSM (defined below) under the Agreement.   The first Operating Period under this Agreement shall be from the Launch Date to December 31, 2013.  The second, third, fourth and fifth Operating Periods will be calendar years 2014, 2015, 2016 and 2017, respectively.  The sixth Operating Period will be

Exhibit 3                          Page 1

from January 1, 2018 to the fifth anniversary of the execution of the Agreement by the City. If the City elects to extend the contract, the sixth Operating Period will be for the full calendar 2017. The final Operating period shall be from January 1 of that year until the anniversary of the execution of the agreement.

**"Operating Revenue"** means all revenue derived from fees paid by riders for use of the System, including subscription fees, rental fees, and overage fees.

**"OSM"** means all operations, support, and maintenance services Alta is obligated to perform under this Agreement.

**"Performance Requirements"** means the performance benchmarks used to determine whether PIPs are justified, subject to the terms of this Agreement.

**"PIP"** or **"Performance Incentive Payments"** means performance incentive payments payable under the terms of this Agreement.

**"Start-Up Fee"** means the amount paid to Alta for the services specified in Schedule 12 to Exhibit 1.

**"Start-Up Services"** means those services specified in Schedule 12 to Exhibit 1.

## II. Equipment, Start-Up and Installation Fees

**A.    Initial Equipment.** The City will issue a Purchase Order to Alta for the Initial Equipment within 5 business days after the Agreement is fully executed by both parties. Such Purchase Order will contain a release schedule that directs Alta to place orders for the Initial Equipment from its supplier at specified dates and in specified amounts ("Sub-Orders"). After Alta places a Sub-Order with its supplier in accordance with the terms of the release schedule in the Purchase Order, the City will become bound to purchase the portion of the Initial Equipment specified therein. If the City terminates the Agreement for any reason before any date for a Sub-Order, the City will not be bound to purchase that portion of the Initial Equipment that has not been ordered by Alta in accordance with the terms of the release schedule in the Purchase Order.

**1) Prices for Initial Equipment.**



Exhibit 3                                    Page 2

**2) Schedule for Invoicing.** Alta may invoice the City for the amount of the relevant Sub-Order according to the following schedule:

- Alta may invoice the City 10% of the cost of the Sub-Order on the order date specified in the release schedule or on the date Alta places the Sub-Order from its supplier if such date is later than that specified in the release schedule.

- Alta may invoice the City 60% of the cost of the Sub-Order when all Equipment in such Sub-Order has arrived in Chicago.

- Alta may invoice the City the remaining 30% of the cost of the Sub-Order when all the stations are installed.

- If the City has explicitly directed that the station not be installed, Alta may invoice the City the remaining 30% of the cost of the Sub-Order on the projected date of installment but no later than 2 weeks after arrival in Chicago.

**3) Additional Equipment.** The prices for any Additional Equipment set forth below are valid for Operating Periods 1 and 2, unless such prices are lowered in accordance with Section 5.2 of the Agreement.



| Individual Items and Parts Costs | |
|---|---|

Exhibit 3                                    Page 3



### B. Start-Up Services.

    **1)  Start-Up Fees.**  The City will pay Alta **$2,454,755.00** for the Start-Up Services.

    **2)  Schedule for Invoicing.** Alta may invoice the City for the Start-Up Services according to the following schedule:

- Alta may invoice the City 40% of the Total Start-Up Fees upon full execution of the Agreement by both parties.

- Alta may invoice the City 15% of the Total Start-Up Fees at the completion of the brand.

- Alta may invoice the City 25% of the Total Start-Up Fees at the completion of the website.

- Alta may invoice the City 20% of the Total Start-Up Fees at the completion of the Launch Event.

The City will pay Alta a 1% Performance Incentive Payment over the sum of the total Start-Up Fees if Alta is able to conduct the Launch 15 days or more before the date scheduled for Launch in Exhibit 2.

For all Additional Equipment ordered after the Initial Equipment, Alta will receive a Performance Incentive Payment equal to 1% of the price of the Equipment if Alta is able to install the Additional Equipment 15 days or more before the date scheduled for installation as described in Schedule 14 to Exhibit 1 (18 weeks).

### C. Initial Equipment Installation Services

    **1) Not to Exceed Pricing.** Alta must provide all Installation Services for no more than the following total prices:

**Total Initial Equipment Installation Costs**





Exhibit 3                    Page 4

**2) Monthly Invoicing.** Alta may invoice the City on a monthly basis for the actual cost of the Installation Services for each Station installed that is confirmed by Alta to be in working order upon installation. Pricing will be based on not-to-exceed figure of **$306.00** per dock installed in the relevant month. The not-to-exceed cost of installation services for the Initial Equipment is **$1,558,700.00.**

## III.    Operations

For any Operating Period, the parties will agree, in writing, upon a Budget for Operating Costs. **The agreed upon Budgets for the first and second Operating Periods are attached to this Exhibit.** For each Operating Period thereafter during the term, the parties shall agree upon a budget, no later than 60 calendar days before the end of the preceding Operating Period. Alta represents that there will be no duplication of costs among each of the various categories of Operating Costs, Installation Fees, Start-up Fees or Equipment Fees.

The Budget shall contain the categories of costs that are eligible for reimbursement, and each category shall contain a maximum cost for that category. Alta will not be reimbursed for any cost that is not within the categories in the Budget. If Alta is going to exceed the maximum amount for any category in the Budget by more than 10% or $100,000.00, whichever is less, it must first seek written approval by the City. Unless otherwise specified in such writing, the City's approval to exceed the maximum amount for any category does not act as approval to exceed the Cost Cap.

For any expansion of the System not contemplated in the original Operating Budget, the Operating Budget, Cost Cap, and Loss Cap will be adjusted. The adjustment will be proportional to the number of docks installed and the length of time each new dock is deployed relative to the number of docks in place when the budget was developed.

## A.    Deposit of Revenues

All Operating Revenues shall be deposited in the Account. All interest on the Account shall accrue to the City of Chicago. Any payments to Alta shall be from the Account (or other City accounts if there is not sufficient Operating Revenue to cover the invoice in a given month), but will require the written approval of the CDOT Commissioner or his designee, after evaluation of each invoice for payment submitted in accordance with the terms of the Agreement.

## B.    Monthly Reporting

During each Operating Period, Alta shall provide the City, within 45 days after the conclusion of each calendar month, a report, in writing, with sufficient detail and supporting documents, showing the year-to-date (as of the end of such month), operating Cost and Operating Revenue (with projected results for Net Profits or Net Loss, as the case may be), including at a minimum, (i) itemized actual Operating Costs incurred by Alta, (ii) the year-to-date total, by category in the Budget, of Operating Costs incurred, for which reimbursement has been sought, and (iii) the total year-to-date Operating Revenues. As reasonably requested by the City of Chicago, Alta will provide supporting documentation.

Exhibit 3                              Page 5

## C.    Payments to Alta for Operating Costs

### 1)    Monthly Invoices

Within **15 days** after the end of any month, Alta will submit an invoice to the City, for estimated Operating Costs incurred by Alta during that month.  The invoice shall include such other information as the Commissioner shall reasonably require to enable him to determine whether payments should be made under the terms of the Agreement.

Within **15 days** after receipt of the invoice, the Commissioner will notify Alta whether he agrees with the charges in the invoice, in whole or in part; if he disapproves a portion of it, he will provide a written explanation to Alta, and Alta may, to the extent Alta resolve the issue, revise and resubmit.  If the Commissioner consents to the invoice, he will, at the same time that he notifies Alta of approval, direct that the invoice be paid.

Invoices will be paid within 60 days after approval pursuant to the above process.

Unless otherwise specified, monthly Operating Costs will only be paid out of Operating Revenues in the Account.   If Operating Costs in any month exceed the balance in the Account (a "Shortfall"), the City will pay the Shortfall from other City accounts.

### 2)  Reconciliation and Reporting

Because Operating Costs and Operating Revenues are assessed on the basis of the Operating Period, Operating Costs will be funded on a monthly basis from funds in the Account, and reconciliation shall be conducted at the end of the Operating Period, as provided below. Alta shall be entitled to reimbursement for only those Operating Costs, up to the Cost Cap, actually incurred in performance of the OSM, provided that Alta is in compliance with the terms of this Agreement.

Within 45 days after the end of the Operating Period, Alta must provide a summary report, with such detail as the Commissioner may reasonably request, of (i) Operating Costs, (ii) Operating Revenues, (iii) whether there was a Net Profit or Net Loss, and the relevant total, (iv) the total amount of reimbursement to Alta in the Operating Period for OSM.  In addition, Alta shall include in the report a calculation of whether, based upon the terms of the Agreement, Alta is owed money for OSM, or whether Alta has been overpaid for OSM.  In the latter case, Alta shall include, with the report, payment in the amount of such overpayment.

The City will review the report, and, if it is accurate, and is supported by adequate documentation, will direct the Account agent, within 30 days of receipt of the report, to release funds to Alta for OSM, in the amount of the deficiency.

Exhibit 3                                    Page 6

*Bicycle Sharing System*
*Chicago Department of Transportation, Specification Number 100320A, PO Number 26459*

**3)  Sharing Of Net Profit and Net Loss**

Due to both the uncertainty in adoption rates inherent in the System, which is novel in Chicago in size and scope, and the City's strong desire that the System will operate self-sufficiently for the reasons stated herein, in Operating Periods 1 and 2, the City shall be responsible for 90% of any Net Loss in Operating Periods 1 and 2. Conversely, the City will be entitled to keep 90% of the Net Profit in Operating Period 1 and 2, even if Alta meets all Performance Requirements.

In all Operating Periods, Alta is responsible for all Operating Costs incurred above the Cost Cap.

In Operating Periods 3 through 6, and any extension periods, it is expected that Operating Revenues will be sufficient to cover all Operating Costs. In the event that Operating Costs exceed Operating Revenues, Alta will absorb these losses up to the Loss Cap.

Additionally, after the first and second Operating Periods, if Operating Costs significantly exceed the Operating Revenues, and such losses exceed the Loss Cap, the parties must undertake the following actions designed to decrease Operating Costs and ensure financial self-sufficiency while maintaining high quality service, in the following order:  (i) provided that they do not significantly impact performance standards, undertake actions that will lead to a decrease in Operating Costs, then (ii) if the foregoing actions do not prove fruitful, revise Performance Requirements and Incentive Payments for the Agreement and finally (iii) the parties may recalibrate the bike share system requirements and amend the Agreement to reduce costs and increase revenues with the aim of fiscal self-sustainability.

Any revisions affecting scope, performance standards, or compensation must be made by written amendment to the Agreement.

**4)  Incentive Payment Structure**

Incentive Payments will be paid to Alta, based upon Alta's meeting of defined Performance Requirements, as shown in Schedule 20. Incentive Payments will be paid only to the extent that Operating Revenues exceed Operating Costs. Incentive fees may not exceed 70% of such Net Profit.

Exhibit 3                                        Page 7

**EXHIBIT 4**
**SPECIAL CONDITIONS REGARDING DISADVANTAGED BUSINESS ENTERPRISE (DBE)**
**COMMITMENT AND SCHEDULES**

**Non-Discrimination.** The Contractor shall not discriminate on the basis of race, color, national origin, or sex in the performance of this Agreement. The Contractor shall carry out applicable requirements of 49 CFR part 26 in the award and administration of DOT-assisted contracts. Failure by the Contractor to carry out these requirements is a material breach of this Agreement, which may result in the termination of this Agreement or such other remedy as the City deems appropriate. **Note: The Contractor must include the provision set forth in the paragraph above in all of its subcontract agreements.**

**Compliance.** In the performance of this Agreement, including the procurement and lease of materials or equipment, Contractor must abide by the disadvantage business enterprise commitment requirements and all other requirements set forth in the Disadvantaged Business Enterprises Special Conditions set forth below. Contractor's completed Schedules C-1 and D-1 evidencing its compliance with this requirement are made a part of this Agreement, upon acceptance by the Chief Procurement Officer. Contractor must utilize disadvantaged business enterprises at the greater of the amounts listed in those Schedules C-1 and D-1 or the percentages listed therein as applied to all payments received from the City.

**DBE Financial Institutions.** Contractor is encouraged to utilize financial institutions owned and controlled by socially and economically disadvantaged individuals. Use of such institutions may be considered by the City as evidence of Contractor's willingness to do business with DBEs. Information about such institutions is available in the City of Chicago's DBE Program document as well as these Special Conditions Regarding Disadvantaged Business Enterprise Commitment, (See Section 12, *ADBE Financial Institutions*") and the Directory of Disadvantaged, Minority and Women-Owned Business Enterprises, copies of which are available at the City of Chicago, Bid and Bond Room, City Hall, Room 301, Chicago, IL 60602 or at the City of Chicago website: www.cityofchicago.org/purchasing.

1.    **Policy and Terms**

   A.    It is the policy of the City of Chicago that Disadvantaged Business Enterprises (DBE), as defined in 49 CFR Part 26, shall have the maximum feasible opportunity to participate fully in the performance of contracts financed under this agreement. Therefore the contractor shall not discriminate against any person or business on the basis of race, color, national origin, or sex, and shall take affirmative action to ensure that women and minority owned businesses shall have the maximum feasible opportunity to compete for and perform subcontracts for supplies or services.

   B.    Accordingly, the Contractor agrees to expend not less than the following percentages of the total contract price, if awarded, for contract participation by DBEs:

**DBE participation goal:  5%**

   C.  This commitment may be met by the prime Contractor's status as a DBE, or by a joint venture with one or more certified DBEs, or by subcontracting a portion of the work to one or more certified DBEs, or by the purchase of materials used in the performance of the contract from one or more certified DBEs, or by any combination of the foregoing. The Chief Procurement Officer also has the authority to review each proposed contract modification and amendment that by itself or aggregated with previous modification/amendment requests, increases the contract value by ten percent (10%) of the initial award or $50,000 whichever is greater for opportunities to increase participation of DBEs already involved in the contract.

2.    **Definitions**

DBE Special Conditions                    1

**SPECIAL CONDITIONS REGARDING DISADVANTAGED BUSINESS ENTERPRISE COMMITMENT - Professional Services**

A.　**"Disadvantaged Business Enterprise"** or **"DBE"** means a small business concern certified by the City of Chicago or by the Illinois Department of Transportation (IDOT) as a business owned and controlled by socially and economically disadvantaged individuals in accordance with United States Department of Transportation Regulations 49 CFR Part 26.

　　**Note:** For FHWA/IDOT funded projects only, DBE certification issued by IDOT is acceptable. A business that has been denied certification or decertified by IDOT will not be able to participate as a DBE prime contractor, subcontractor or joint venture partner on any City awarded contracts funded by the Federal Highway Administration or the Illinois Department of Transportation.
　　(Copies of the Regulations Governing Certification are available from the Department of Procurement Services, Room 301, 121 N. LaSalle Street, Chicago, Illinois 60602).

B.　**"Socially and Economically Disadvantaged Individuals"** means those individuals who are citizens of the United States (or lawfully admitted permanent residents) and who are Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, or Asian-Indian Americans or women and any other minorities or individuals found to be disadvantaged by the Small Business Administration pursuant to section 8(a) of the Small Business Act. The Chief Procurement Officer shall make a rebuttable presumption that individuals in the following groups are socially and economically disadvantaged. The Chief Procurement Officer also may determine, on a case-by-case basis, that individuals who are not a member of one of the following groups are socially and economically disadvantaged:

　　(1)　"Black Americans," which includes persons having origins in any of the Black racial groups of Africa;
　　(2)　"Hispanic Americans," which includes persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;
　　(3)　"Native Americans," which includes persons who are American Indians, Eskimos, Aleuts, or Native Hawaiians;
　　(4)　"Asian-Pacific Americans," which includes persons whose origins are from Japan, China, Taiwan, Korea, Vietnam, Laos, Cambodia, the Philippines, Samoa, Guam, the U.S. Trust Territories of the Pacific, and the Northern Marinas, Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Republic of the Marshall Islands, Federated States of Micronesia, Macao, Hong Kong, Fiji, Tonga, Kiribati, Tuvalu and Nauru;
　　(5)　"Asian-Indian Americans," which includes persons whose origins are from India, Pakistan, and Bangladesh, Sri Lanka, Bhutan, the Maldives Islands and Nepal;
　　(6)　"Women."

C.　**"Small Business Concern"** means a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto except that a small business concern shall not include any concern or group of concerns controlled by the same socially and economically disadvantaged individual or individuals which has annual average gross receipts in excess of $16.6 million over the previous three fiscal years.

D.　**"Directory"** means the Directory of Certified "Disadvantaged Business Enterprises" "Minority Business Enterprises" and "Women Business Enterprises" maintained and published by the Contract Compliance Administrator. The Directory identifies firms that have been certified as DBEs, and includes both the date of their last certification and the area of specialty in which they have been certified. Contractors are responsible for verifying the current certification status of all proposed DBE firms. (Copies of the

**SPECIAL CONDITIONS REGARDING DISADVANTAGED BUSINESS ENTERPRISE COMMITMENT - Professional Services**

Directory of Certified DBE/MBE/WBE Businesses are available in the Bid and Bond Room, Room 301, 121 N. LaSalle Street, Chicago, Illinois 60602).

E. **"Area of Specialty"** means the description of a DBE firm's business which has been determined by the Chief Procurement Officer to be most reflective of the DBE firm's claimed specialty or expertise. Each DBE letter of certification contains a description of the firm's Area of Specialty. This information is also contained in the Directory. Credit toward this contract's DBE participation goal shall be limited to the participation of firms performing within their certified Area of Specialty.

> **NOTICE:** The Department of Procurement Services does not make any representation concerning the ability of any DBE to perform work within their Area of Specialty. It is the responsibility of all Contractors to determine the capability and capacity of DBE firms to satisfactorily perform the work proposed.

F. **"Joint Venture"** means an association of two or more businesses to carry out a single business enterprise for profit, and for which purpose they combine their expertise, property, capital, efforts, skill and knowledge. Contractors may develop joint venture agreements as an instrument to provide participation by DBEs in contract work. A joint venture seeking to be credited for DBE participation may be formed among DBE firms or between DBE firm(s) and non-DBE firm(s).

A joint venture is eligible for DBE credit if the DBE partner(s) share in the ownership, control, management responsibilities, risks and profits of the joint venture, and are responsible for a clearly defined portion of work to be performed, in proportion with the DBE ownership percentage.

G. **"Contract Compliance Administrator"** means the officer appointed pursuant to Section 2-92-490 of the Municipal Code of Chicago.

3. **Third Party Challenges to Eligibility of DBE Firm**

Any third party may challenge the socially and economically disadvantaged status of any individual presumed to be socially and economically disadvantaged if that individual is an owner of a firm certified by or seeking certification from the City as a DBE (except an individual whose firm has a current 8(a) certification from the Small Business Administration). The challenge shall be made in writing to the City, and shall include all information available to the challenging party relevant to a determination of whether the challenged party is in fact socially and economically disadvantaged. The City will, during its determination of findings, notify the challenged party of the statements and identity of the challenging party, and will notify both parties in writing of the outcome. If the City determines first that there was not reasonable grounds presented in the challenge sufficient to justify an inquiry, then the City will notify the challenger that the proceedings are now terminated. During the pendency of any challenge, the presumption that the challenged party is a socially and economically disadvantaged individual shall remain in effect.

4. **Joint Ventures**

Bidders may develop joint venture agreements as an instrument to provide participation by DBEs in contract work. A joint venture seeking to be credited for DBE participation may be formed among DBE firms or between a DBE firm and a non-DBE firm.

A joint venture is eligible if, and only if, all of the following requirements are satisfied:

    i. the DBE venturer(s) share in the (1) ownership, (2) control, (3) management (4) risks and

Page 3

**SPECIAL CONDITIONS REGARDING DISADVANTAGED BUSINESS ENTERPRISE COMMITMENT - Professional Services**

      (5) profits of the joint venture in proportion with the DBE ownership percentage;

    ii.  the DBE venturer(s) is responsible for a clearly defined portion of work to be performed, in proportion with the DBE ownership percentage; and

    iii.  the DBE venturer(s) actually perform (with its own forces and using its own equipment) work equal to at least 50% of the value of its ownership of the joint venture.

For example, if the DBE is proposed as a 25% venturer on a $1,000,000 contract (or subcontract), the DBE must, in addition to its other joint venture responsibilities, perform work equal to at least $125,000 (or 50% of 25% of $1,000,000).

The Chief Procurement Officer will evaluate the proposed joint venture agreement, the Schedule B submitted on behalf of the proposed joint venture, and all related documents to determine whether these requirements have been satisfied. In addition, the Chief Procurement Officer shall consider the record of the joint venturers as joint venturers on City of Chicago contracts. The decision of the Chief Procurement Officer regarding the eligibility of the Joint Venture shall be final.

**Note: Credit for participation by DBEs in joint venture with non-DBEs does not require a minimum participation of 51% in venture ownership and control on the part of the DBE. A junior ownership interest only in the venture by the DBE can be credited toward the contract DBE goal in a *pro rata* fashion (as indicated Section 5. below, *"Counting DBE Participation Toward the Contract Goal"*).**

**NOTICE: The City requires that, whenever a joint venture is proposed as the prime contractor, each joint venturer must separately sign the proposal to the City, in the following execution pages: TO BE EXECUTED BY A CORPORATION; TO BE EXECUTED BY A PARTNERSHIP; and/or TO BE EXECUTED BY A SOLE PROPRIETOR, as applicable.**

5.    <u>Counting DBE Participation Toward the Contract Goals</u>

    A.    The inclusion of any DBE in the Contractor's DBE Utilization Plan shall not conclusively establish the Contractor's right to full DBE credit for that firm's participation in the contract.

    B.    The Chief Procurement Officer reserves the right to deny or limit DBE credit to the Contractor where any DBE is found to be engaged in substantial subcontracting or pass-through activities with others. In this regard, a Contractor may count toward its DBE goal only expenditures to firms that perform a commercially useful function. A firm is considered to perform a commercially useful function when it is responsible for the performance of a clearly defined and distinct element of work and is carrying out its responsibilities by actually performing, managing, and supervising the work involved. To determine whether a firm is performing a commercially useful function, the Chief Procurement Officer shall evaluate the amount of work subcontracted, industry practices, and other relevant factors. The amount of DBE participation credit shall be based upon an analysis by the Chief Procurement Officer of the specific duties that will be performed by the DBE. Each DBE shall be expected to perform all of the work contemplated for it by any subcontract or agreement through the use of its own employees and equipment.

    C.    Credit for the participation of DBE firms as joint venture partners shall be based upon a detailed analysis of the duties, responsibilities and risks undertaken by the DBE as specified by the joint venture's executed joint venture agreement. The Chief Procurement Officer reserves the right to deny or limit DBE credit to the Contractor where any DBE joint venture partner is found to have duties, responsibilities, risks of loss and management control over the joint venture that is not commensurate with or in proportion to its joint venture ownership.

SPECIAL CONDITIONS REGARDING DISADVANTAGED BUSINESS ENTERPRISE COMMITMENT - Professional Services

6. **Procedure to Determine Compliance with Contract Requirements**

The following Schedules and described documents constitute the Contractor's DBE proposal, and **must be submitted together with its proposal at the time of bid opening or submission of proposals**, unless stated otherwise:

A. **Schedule B: Affidavit of DBE/Non-DBE Joint Venture**
Where the Contractor's DBE proposal includes the participation of any DBE as a joint venturer prime or subcontractor, The Contractor's must submit, together with its bid or proposal, a Schedule B: Affidavit of DBE/Non-DBE Joint Venture, with an attached copy of the joint venture agreement proposed among the parties.

B. **Schedule C-1: Letter of Intent from DBE to Perform as Subconsultant / Subcontractor / Supplier**
A Schedule C-1, executed by the DBE firm (or Joint Venture Subcontractor) must be submitted by the Contractor for each DBE included on their Schedule D-1 Utilization Plan and must accurately detail the work to be performed by the DBE firm and the agreed rates and prices to be paid.

C. **Schedule D-1: Affidavit of DBE Goal Implementation Plan**
Contractor must submit, prior to contract award, a completed **Schedule D-1** committing them to the utilization of each listed DBE firm. Except in cases where the Contractor has received a complete waiver of the DBE goals in accordance with Section 7. below, "*Grant of Relief for Consultants: Waiver of DBE Goal,*" the Contractor must commit to expend a specific percentage of the total dollar value of the contract with each DBE firm included on its **Schedule D-1**. The total dollar commitment to proposed DBE firms must *at least* equal the DBE goal. All commitments made by the Contractor's **Schedule D-1** must conform to those presented in the submitted **Schedule C-1s**.

D. **Schedule F: Report of Subcontractor/Subconsultant Solicitations**
All Bidders/Proposers must submit, together with their bid/proposal, a completed Schedule F report containing information on all subcontractors, DBEs and non-DBEs, solicited for participation in the contract. The Schedule F shall include the following subcontractor/subconsultant information:
Contractor name; Address; Contact person; DBE status; Type of work solicited

E. **Letters of Certification**
A copy of each proposed DBE firm's current Letter of Certification from the City of Chicago or the Illinois Unified Certification Program must be submitted with the proposal (RFQ or RFP). All Letters of Certification are dated and are valid for one year from date of issue by the City or IDOT. All Letters of Certification issued by the City of Chicago or IDOT include a statement of the DBE firm's Area of Specialty. The DBE firm's scope of work, as detailed by their **Schedule C-1** must conform to their certified Area of Specialty.

F. **Joint Venture Agreements**
If the Contractor's DBE proposal includes the participation of DBE firm(s) as joint venturers on any tier (either as the Contractor or as a subcontractor), Contractor must provide a copy of the joint venture agreement in addition to a completed **Schedule B**. In order to demonstrate the DBE partner's share in the ownership, control, management responsibilities, risks and profits of the joint venture, the proposed joint venture agreement must include *specific details* related to: (1) contributions of capital and equipment; (2) work responsibilities or other performance to be undertaken by the DBE firm; (3) the commitment of management, supervisory and operations personnel employed by the DBE to be dedicated to the performance of the contract. The joint venture agreement must also clearly define each partner's authority to contractually obligate the joint venture; the distribution of funds received from each partner; each

**SPECIAL CONDITIONS REGARDING DISADVANTAGED BUSINESS ENTERPRISE COMMITMENT - Professional Services**

partner's authority to expend joint venture funds (e.g. check signing authority) and the details of each partner's joint venture responsibilities.

7.   **Grant of Relief for Contractors:   Waiver of DBE Goal**

The following Regulations set forth the standards to be used in determining whether or not a reduction or waiver of the DBE commitment goals of a particular contract is appropriate. If a bidder or proposer determines that it is unable to meet the DBE percentage on a City of Chicago contract, a written request for the reduction or waiver of the commitment must be included in the bid or proposal.

The written request for reduction or waiver from the commitment must be in the form of a signed petition for grant of relief from the DBE percentages submitted on the bidder/proposer's letterhead, and must demonstrate that all required efforts as set forth in this document were taken to secure eligible Disadvantaged Business Enterprises to meet the commitments. The Chief Procurement Officer or designee shall determine whether the request for the reduction or waiver will be granted.

Bidders/proposers will be considered responsive to the terms and conditions of these Regulations if a waiver or reduction request and proof of notification to an assist agency is submitted at the time of bid/proposal opening. Once the bids/proposals have been opened, the lowest responsive and responsible bidder so deemed by the Chief Procurement Officer or authorized designee will have no more than fourteen (14) calendar days to submit to the Department of Procurement Services complete documentation that adequately addresses the conditions for waiver or reduction described herein. Failure to submit documentation sufficient to support the waiver or reduction request will cause the bid/proposal to be found non-responsive by the Chief Procurement Officer, and the bid/proposal will be rejected. In such cases the remedies to be taken by the Chief Procurement Officer, in his discretion, may include, but are not limited to, forfeiture of bid deposit; negotiating with the next lowest bidder/proposer; or readvertising the bid/proposal. All bidders/proposers are encouraged to submit all required documents at the time of bid opening to expedite the contract award.

A.   **Direct Participation**

Each of the following elements must be present in order to determine whether or not such a reduction or waiver is appropriate.

(1)   Bidder/proposer has documented the unsuccessful solicitation for either subcontractors or joint venture partners of DBE firms in an appropriately certified work category to perform any direct work identified or related to the advertised bid/proposal.   Direct participation involves subcontracting a portion of the goods/services specifically required in the bid/proposal.   Documentation must include but is not necessarily limited to:

(a)   A detailed statement of efforts to identify and select portions of work identified in the bid solicitation for subcontracting to certified DBE firms;

(b)   A listing of all DBE firms contacted that includes:
  (i)   Names, address and telephone numbers of DBE firms solicited;
  (ii)   Date and time of contact;
  (iii)   Method of contact (written, telephone, facsimile transmittal, etc.)
  (iv)   Name of the person contacted.

(c)   Copies of letters or any other evidence of mailing that substantiates outreach to DBE vendors that includes:
  (i)   Project identification and location;
  (ii)   Classification/commodity of work items for which quotations were sought;
  (iii)   Date, item and location for acceptance of subcontractor bid

**SPECIAL CONDITIONS REGARDING DISADVANTAGED BUSINESS ENTERPRISE COMMITMENT - Professional Services**

proposals;

(iv) Detailed statement which summarizes direct negotiations with appropriate DBE firms for specific portions of the work and indicates why negotiations were unsuccessful;

(v) Affirmation that good faith efforts have been demonstrated by choosing subcontracting opportunities likely to achieve DBE goals by not imposing any limiting conditions which were not mandatory for all subcontractors; or denying the benefits ordinarily conferred on DBE subcontractors for the type of work that was solicited.

OR

(2) Subcontractor participation will be deemed excessively costly when the DBE subcontractor proposal exceeds the average price quoted by more than fifteen percent (15%). In order to establish that a subcontracts' quote is excessively costly, the bidder/proposer must provide the following information:

(a) A detailed statement of the work identified for DBE participation for which the bidder/proposer asserts the DBE quote(s) were excessively costly (in excess of 15% higher).

(i) A listing of all potential subcontractors contacted for a quotation on that work item;

(ii) Prices quoted for the subcontract in question by all such potential subcontractors for that work item.

(b) Other documentation which demonstrates to the satisfaction of the Chief Procurement Officer that the DBE proposals are excessively costly, even though not in excess of 15% higher than the average price quoted. This determination will be based on factors that include, but are not limited to the following:

(i) The City's estimate for the work under a specific subcontract;

(ii) The bidder/proposer's own estimate for the work under the subcontract;

(iii) An average of the bona fide prices quoted for the subcontract;

(iv) Demonstrated increase in other contract costs as a result of subcontracting to the DBE or other firm.

(v) The City reserves the right to modify this procedure when deemed appropriate.

B. **Assist Agency Participation**

Every waiver and/or reduction request must include evidence that the bidder/proposer has provided timely notice of the need for subcontractors to an appropriate association/assist agency representative of the DBE business community.

The notice requirement of this Section will be satisfied if a bidder/proposer contacts at least one of the associations on Attachment A to these Regulations when the prime contractor seeks a waiver or reduction in the utilization goals. Attachment B to these Regulations provides the letter format that a prime contractor may use. Proof of notification prior to bid submittal (e.g. certified mail receipt or facsimile transmittal receipt) will be required for any bid/proposal submitted to be deemed responsive on the date of bid opening. If deemed appropriate, the Chief Procurement Officer or Contract Compliance Administrator may contact the assist agency for verification of notification.

C. **Impracticability**

(1) If the Chief Procurement Officer determines that a lesser DBE percentage standard is appropriate with respect to a particular contract subject to competitive bidding prior to the bid solicitations for such contract, bid specifications shall include a statement of such revised standard.

SPECIAL CONDITIONS REGARDING DISADVANTAGED BUSINESS ENTERPRISE COMMITMENT - Professional Services

(2) The requirements set forth in these Regulations shall not apply where the Chief Procurement Officer determines that DBE subcontractor participation is impracticable.

This may occur whenever the Chief Procurement Officer determines that for reasons of time, need, industry practices or standards not previously known by the Procurement Services administrator, or such other extreme circumstances as may be deemed appropriate, such a Waiver is in the best interests of the City. This determination may be made in connection with a particular contract, whether before the contract is let for bid, during the bid or award process, before or during negotiation of the contract, or during the performance of the contract.

For all notifications required to be made by bidders/proposers, in situations where the Chief Procurement Officer has determined that time is of the essence, documented telephone contact may be substituted for letter contact.

## 8. Reporting Requirements During the Term of the Contract

A. The Contractor shall, within thirty days of receiving the awarded contract, execute formal contracts or purchase orders with the DBE firms included in their approved Schedule D Utilization Plan. These written agreements shall be made available to the Chief Procurement Officer within 30 days upon execution.

B. During the term of the contract, the Contractor shall submit regular "DBE Utilization Reports," a copy of which is attached. The frequency with which these reports are to be submitted will be determined by the Chief Procurement Officer, but in no case will reports be required less often than on a quarterly basis. In the absence of written notice from the Chief Procurement Officer, the Contractor's first "DBE Utilization Report" will be due ninety (90) days after the date of contract award, and reports will be due quarterly thereafter.

C. "DBE Utilization Reports" are to be submitted directly to: Department of Procurement Services, Office of Vendor Relations, City Hall, Room 403, 121 N. LaSalle Street, Chicago, Illinois 60602.

## 9. DBE Substitutions

A. Arbitrary changes by the Contractor of the commitments earlier certified in the **Schedule D-1** are prohibited. Further, after once entering into each approved DBE subagreement, the Contractor shall thereafter neither terminate the subagreement, nor reduce the scope of the work to be performed by the DBE, nor decrease the price to the DBE, without in each instance receiving the prior written approval of the Chief Procurement Officer.

B. In some cases, however, it may become necessary to substitute a new DBE in order to actually fulfill the DBE requirements. In such cases, the Chief Procurement Officer must be given reasons justifying the release by the City of prior specific DBE commitments established in the Contractor's Schedule D Utilization Plan. The substitution procedure will be as follows:

(a) The Contractor must notify the Chief Procurement Officer immediately in writing of an apparent necessity to reduce or terminate a DBE subcontract and to propose a substitute firm for some phase of work, if needed in order to sustain the fulfillment of the DBE contract goals.

(b) The Contractor's notification should include the specific reasons for the proposed

**SPECIAL CONDITIONS REGARDING DISADVANTAGED BUSINESS ENTERPRISE COMMITMENT - Professional Services**

substitution. Stated reasons which would be acceptable include any of the following examples: A previously committed DBE was found not to be able to perform, or not to be able to perform on time; a committed DBE was found not to be able to produce acceptable work; a committed DBE was discovered later to be not bona fide; a DBE previously committed at a given price later demands an unreasonable escalation of price.

The Contractor's position in these cases must be fully explained and supported with adequate documentation. Stated reasons which will not be acceptable include: A replacement firm has been recruited to perform the same work under terms more advantageous to the Contractor; issues about performance by the committed DBE were disputed (unless every reasonable effort has already been taken to have the issues resolved or mediated satisfactorily); a DBE has requested reasonable price escalation which may be justified due to unforeseen circumstances.

(c)    The Contractor's notification should include the name, address, and principal official of any proposed substitute DBE and the dollar value and scope of work of the proposed subcontract. Attached should be all the same DBE affidavits and documents, which are required of Contractors, as enumerated above in Section 6., "Procedure to Determine Compliance with Contract Requirements."

(d)    The City will evaluate the submitted documentation, and respond within 15 working days to the request for approval of a substitution. The response may be in the form of requesting more information, or requesting an interview to clarify or mediate the problem. In the case of an expressed emergency need to receive the necessary decision for the sake of job progress, the City will instead respond as soon as practicable.

(e)    Actual substitution of a replacement DBE to fulfill contract requirements should not be made before City approval is given for the substitute DBE. Once notified of City approval, the substitute DBE subcontract must be executed within five working days, and a copy of the DBE subcontract with signatures of both parties to the agreement should be submitted immediately to the City.

C.    The City will not approve extra payment for escalated costs incurred by the Contractor when a substitution of subcontractors becomes necessary for the Contractor in order to comply with DBE contract requirements.

D.    After award of contract, no relief of the DBE requirements will be granted by the City except in exceptional circumstances. Requests for complete or partial waiver or the DBE requirements of this contract must be made in writing, stating all details of the request, the circumstances, and any additional relevant information. The request must be accompanied by a record of all efforts taken by the Contractor to locate specific firms, solicit DBE proposals, seek assistance from technical assistance agencies, etc., (as outlined in Section 6. above, "Grant of Relief for Consultants: Waiver of DBE Goal").

E.    In a case where an enterprise under contract was previously considered to be a DBE but is later found not to be, or whose work is found not to be creditable toward DBE goals fully as planned, the City will consider the following special criteria in evaluating a waiver request:

(1)    Whether the Contractor was reasonable in believing the enterprise was a DBE or that eligibility or "counting" standards were not being violated;

(2)    The adequacy of unsuccessful efforts taken to obtain a substitute DBE (as outlined in Section 6. above, "*Grant of Relief for Consultants: Waiver of DBE*

**SPECIAL CONDITIONS REGARDING DISADVANTAGED BUSINESS ENTERPRISE COMMITMENT - Professional Services**

*Goal*").

F.     The Chief Procurement Officer has sole authority regarding all matters of DBE compliance, including the granting of waivers or other relief to Contractors.

## 10.     Non-Compliance

A.     The following constitutes a material breach of this contract and shall entitle the City to declare a default, terminate the contract and exercise those remedies provided for in the contract, at law or in equity:

(1)     failure to satisfy the DBE percentages required by the contract; and

(2)     the contractor or subcontractor is disqualified as a DBE, such status was a factor in contract award, and was misrepresented by the contractor.

B.     In the event that the contractor is determined not to have been involved in any misrepresentation of the status of the disqualified subcontractor or supplier, the contractor shall discharge the disqualified subcontractor or supplier and, if possible, identify and engage a qualified DBE as its replacement. Furthermore, continued eligibility to enter into future contracting arrangements with the City may be jeopardized as a result of non-compliance. Payments due to the contractor may be withheld until corrective action is taken.

C.     When the contract requirements are completed, in the event that the City has determined that the contractor was not compliant in the fulfillment of the required DBE goals, and a grant of relief of the requirements was not obtained, the City will thereby be damaged in the failure to provide the benefit of participation to DBEs to the degree set forth in this Special Condition. Therefore, in such case of non-compliance, the City will deduct as liquidated damages cumulative amounts computed as follows:

For each one percent (or fraction thereof) of shortfall toward the DBE goals, one percent of the base bid for this contract shall be surrendered by the Contractor to the City of Chicago in payment as liquidated damages.

## 11.     Record Keeping

The Contractor shall maintain records of all relevant data with respect to the utilization of DBEs, retaining these records for a period of at least five years after final acceptance of the work. Full access to these records shall be granted to the City of Chicago, Federal or State authorities in this project, the U.S. Department of Justice, or any duly authorized representatives thereof.

## 12.     DBE Financial Institutions

The City of Chicago currently has no certified DBE financial institutions. However, there are several local financial institutions owned and operated by minorities or women, many of which are currently certified with the City as MBEs and/or WBEs.

MBE and/or WBE Certified Institutions:
Community Bank of Lawndale
Highland Bank
Pan American Bank
Seaway National Bank

Minority and/or Female Owned Institutions:
Banco Popular
First Commercial Bank

Illinois Federal Savings Bank

## 13.    **Assistance Agencies**

Small business guaranteed loans; surety bond guarantees; 8 (a) certification:

**U.S. Small Business Administration**
500 W. Madison Street, Suite 1250
Chicago, Illinois  60601
Attention:  Robert Conner
(312) 353-4528

**S.B.A. -Bond Guarantee Program /Surety Bonds**
500 W. Madison Street, Suite 1250
Chicago, Illinois 60601
Attention: Gary Peele
(312) 353-7331

**S.B.A. - Procurement Assistance**
500 W. Madison Street, Suite 1250
Chicago, Illinois   60601
Attention:  Robert P. Murphy, Assistant Regional Administrator
(312) 353-4503

Project information; general DBE information; Directory of local and out-of-state construction and design DBEs:

**City of Chicago**
Department of Procurement Services
City Hall-Room 403
Chicago, Illinois   60602
Attention:  Supplier Diversity
(312) 744-4900

City of Chicago Web site:
www.cityofchicago.org/procurement

Information on DBE availability in the manufacturing, sales or supplies, and related fields (direct assistance from 42 regional affiliates located throughout the U.S.):

National Minority Suppliers
Development Council, Inc.
1040 Avenue of the Americas - 2nd Floor
New York, New York   10018
Attention: Harriet R. Michel
(212) 944-2430

Chicago Minority Business Development Council
11 South LaSalle Street - Suite 850
Chicago, Illinois   60603
Attention: Tracye Smith
(312) 755-8880

**SCHEDULE B:**
**Affidavit of DBE/Non-DBE Joint Venture**
(FTA, FHWA and FAA Funded Contracts)

Note: If all joint venturers are DBEs, a written joint venture agreement between the DBE venturers may be submitted in lieu of this form.  In all proposed joint ventures, each DBE venturer must submit a copy of its current Letter of Certification.

ALL INFORMATION REQUESTED BY THIS SCHEDULE MUST BE ANSWERED IN THE SPACES PROVIDED.  DO NOT REFER TO YOUR JOINT VENTURE AGREEMENT EXCEPT TO EXPAND ON ANSWERS PROVIDED ON THIS FORM.  IF ADDITIONAL SPACE IS REQUIRED, ADDITIONAL SHEETS MAY BE ATTACHED.

I.      Name of joint venture:_____
        Address of joint venture:_____
        _____
        Phone number of joint venture:_____

II.     Identify each non-DBE venturer(s):_____
        Name of Firm: _____
        Address: _____
        _____
        Phone:     _____
        Contact person for matters concerning DBE compliance: _____

III.    Identify each non-DBE venturer(s):_____
        Name of Firm: _____
        Address: _____
        _____
        Phone:     _____
        Contact person for matters concerning DBE compliance: _____

IV.     Describe the role(s) of the DBE venturer(s) in the joint venture:
        _____
        _____
        _____
        _____

V.      Attach a copy of the joint venture agreement.  In order to demonstrate the DBE venturer's share in the ownership, control, management responsibilities, risks and profits of the joint venture, the proposed joint venture agreement must include specific details related to:  (1) the contributions of capital and equipment; (2) work items to be performed by the DBE's own forces; (3) work items to be performed under the supervision of the DBE venturer; and (4) the commitment of management, supervisory and operative personnel employed by the DBE to be dedicated to the performance of the project.

VI.     Ownership of the Joint Venture.
        A.      What are the percentage(s) of DBE ownership of the joint venture?
                DBE ownership percentage(s)_____
                Non-DBE ownership percentage(s) _____

        B.      Specify DBE percentages for each of the following (provide narrative descriptions and other details as applicable):
                1.      Profit and loss sharing:

                2.      Capital contributions:
                        (a)     Dollar amounts of initial contribution: _____
                        (b)     Dollar amounts of anticipated on-going contributions:_____

                3.      Contributions of equipment (specify types and quantities of  equipment to be provided by each venturer):

Page 12

_____
_____
_____

    4.   Other applicable ownership interests, including ownership options or other agreements  which restrict or limit ownership and/or control:_____
_____

    5.   Provide copies of <u>all</u> written agreements between venturers concerning this project.

    6.   Identify each current City of Chicago contract (and each contract completed during the past two (2) years) by a joint venture of two or more firms participating in this joint venture:
_____
_____

VII.   <u>Control of and Participation in the Joint Venture.</u>  Identify by name and firm those individuals who are, or will be, responsible for, and have the authority to engage in the following management functions and policy decisions. (indicate any limitations to their authority such as dollar limits and co-signatory requirements.):

    A.   Joint venture check signing:
_____
_____
_____

    B.   Authority to enter contracts on behalf of the joint venture:
_____
_____
_____

    C.   Signing, co-signing and/or collateralizing loans:
_____
_____
_____

    D.   Acquisition of lines of credit:
_____
_____
_____

    E.   Acquisition and indemnification of payment and performance bonds:
_____
_____
_____

    F.   Negotiating and signing labor agreements:
_____
_____
_____

    G.   Management of contract performance.  (identify by name and firm only):
       1.   Supervision of field operations: _____
       2.   Major purchases:_____
       3.   Estimating:_____
       4.   Engineering:_____

VIII.  Financial Controls of joint venture:

A. Which firm and/or individual will be responsible for keeping the books of account?

_____

B. Identify the "managing partner", if any, and describe the means and measure of their compensation:

_____
_____
_____

C. What authority does each venturer have to commit or obligate the other to insurance and bonding companies, financing institutions, suppliers, subcontractors, and/or other parties participating in the performance of this contract or the work of this project?

_____
_____
_____

IX. State the approximate number of operative personnel (by trade) needed to perform the joint venture's work under this contract. Indicate whether they will be employees of the non-DBE firm, the DBE firm, or the joint venture.

| Trade | Non-DBE Firm (number of employees) | DBE (number of employees) | Joint Venture (number of employees) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Note: If any personnel proposed for this project will be employees of the joint venture:
   A. Are any proposed joint venture employees currently employed by either venturer?
      Currently employed by non-DBE (number) _____ Currently employed by DBE _____

   B. Identify by name and firm the individual who will be responsible for hiring joint venture employees:

   _____

   C. Which venturer will be responsible for the preparation of joint venture payrolls:

   _____

X. Please state any material facts of additional information pertinent to the control and structure of this joint venture.

_____
_____
_____
_____
_____
_____
_____

   Attach additional sheets as needed

The undersigned affirms that the foregoing statements are correct and include all material information necessary to identify and explain the terms and operations of our joint venture and the intended participation of each venturer in the undertaking. Further, the undersigned covenant and agree to provide to the City current, complete and accurate information regarding actual joint venture work and the payment therefore, and any proposed changes in any provision of the joint venture agreement, and to permit the audit and examination of the books, records and files of the joint venture, or those of each venturer relevant to the joint venture by authorized representatives of the City or the Federal funding agency.

Any material misrepresentation will be grounds for terminating any contract which may be awarded and for initiating action under federal or state laws concerning false statements.

Note: If there are any changes in the information submitted after filing this Schedule B and before the completion of the joint venture's work on the project, the joint venture must inform the City of Chicago, either directly or through the prime contractor if the joint venture is a subcontractor.

| | |
|---|---|
| _____ | _____ |
| Name of DBE Partner Firm | Name of Non-DBE Partner Firm |
| _____ | _____ |
| Signature of Affiant | Signature of Affiant |
| _____ | _____ |
| Name and Title of Affiant | Name and Title of Affiant |
| _____ | _____ |
| Date | Date |

On this _____ day of _____ , 20 ____, the above-signed officers

_____,
(names of affiants)
personally appeared and, known to me to be the persons described in the foregoing Affidavit, acknowledged that they executed the same in the capacity therein stated and for the purpose therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


Signature of Notary Public

My Commission Expire: _____

(SEAL)

**DBE Professional Services (FTA/FHWA/FAA) SCHEDULE B Rev. 9/10/02 (dlh)**



**CHICAGO TRANSIT AUTHORITY**

567 West Lake Street
Chicago, Illinois 60661-1498
TEL 312 664-7200
www.transitchicago.com

November 7, 2012

Taz Wilson
AltaStaff, LLC DBA AltaStaff, LLC
19 S LaSalle St, Suite 800
Chicago, IL 60603-1404

Dear Taz Wilson:

**The Chicago Transit Authority** has reviewed your annual No Change Affidavit and supporting documentation and is pleased to inform you that your firm continues to meet the Disadvantaged Business Enterprise (DBE) program certification eligibility standards set forth in 49 CFR Part 26. Your next No Change Affidavit, or Continued Eligibility Affidavit, is due **February 17, 2013**. Notification will be sent to you sixty (60) days prior to this date.

This certification allows your firm to participate as a DBE in the Illinois Unified Certification Program (IL UCP). The participating agencies include the Illinois Department of Transportation, the City of Chicago, the Chicago Transit Authority, Metra and Pace.

If there is any change in circumstances during the course of your five-year certification period that affect your ability to meet size, disadvantaged status, ownership, or control requirements or any material change in the information provided in your initial application, you <u>must</u> provide written notification to this agency within thirty (30) days of the occurrence of the change. Failure to provide this information is a ground for denial of certification based on failure to cooperate pursuant to 49 CFR 26.109(c).

The Directory is used by prime contractors/consultants, as well as other agencies, to solicit participation of DBE firms. The Directory can be accessed on the Internet at (agency web site address). Your firm's name will appear in the IL UCP DBE Directory under the following category name(s):

NAICS-561320: TEMPORARY EMPLOYMENT SERVICES
NAICS-561320: TEMPORARY STAFFING SERVICES

TEMPORARY STAFFING SERVICES

Your participation on contracts will only be credited toward DBE contract goals when you perform in your firm's approved area(s) of specialty. Credit for participation in an area outside your specialty requires prior approval (verification of resources, expertise, and corresponding support documentation, etc.).

Sincerely,

Omar Brown
General Manager
Diversity Programs



**CHICAGO TRANSIT AUTHORITY**

567 West Lake Street
Chicago, Illinois 60661-1498
TEL 312 664-7200
www.transitchicago.com

October 28, 2012

John Rico
Rico Computers Enterprises, Inc.
161 North Clark Street, Suite 4700
Chicago, IL 60601-3201

Dear John Rico:

The Chicago Transit Authority has reviewed your Continued DBE Eligibility Affidavit and supporting documentation and is pleased to inform you that your firm continues to meet the Disadvantaged Business Enterprise (DBE) program certification eligibility standards set forth in 49 CFR Part 26. Your next Continued Eligibility Affidavit is due March 15, 2013. Notification will be sent to you sixty (60) days prior to this date.

This certification allows your firm to participate as a DBE in the Illinois Unified Certification Program (IL UCP). The participating agencies include the Illinois Department of Transportation, the City of Chicago, the Chicago Transit Authority, Metra and Pace.

If there is any change in circumstances during the course of your five-year certification period that affect your ability to meet size, disadvantaged status, ownership, or control requirements or any material change in the information provided in your initial application, you <u>must</u> provide written notification to this agency within thirty (30) days of the occurrence of the change. Failure to provide this information is a ground for denial of certification based on failure to cooperate pursuant to 49 CFR 26.109(c).

The Directory is used by prime contractors/consultants, as well as other agencies, to solicit participation of DBE firms. The Directory can be accessed on the Internet at https://cta.dbesystem.com. Your firm's name will appear in the IL UCP DBE Directory under the following category name(s):

NAICS-541512: INFORMATION MANAGEMENT COMPUTER SYSTEMS INTEGRATION DESIGN SERVICES
NAICS-541513: FACILITIES (I.E., CLIENTS' FACILITIES) SUPPORT SERVICES, COMPUTER SYSTEMS OR DATA PROCESSING
NAICS-541611: ADMINISTRATIVE AND GENERAL MANAGEMENT CONSULTING SERVICES
NAICS-561499: ALL OTHER BUSINESS SUPPORT SERVICES

Your participation on contracts will only be credited toward DBE contract goals when you perform in your firm's approved area(s) of specialty. Credit for participation in an area outside your specialty requires prior approval (verification of resources, expertise, and corresponding support documentation, etc.).

Please direct all inquiries and any questions to this agency at **312-681-2601**.

Sincerely,

Qmar Brown
General Manager
Diversity Programs



DEPARTMENT OF PROCUREMENT SERVICES

**MAR 14 2012**          CITY OF CHICAGO

Marilyn K Jones
Consolidated Printing Company Inc.
5942 North Northwest Highway
Chicago, IL 60631-2664

Dear Marilyn K Jones:

We are pleased to inform you that Consolidated Printing Company Inc. continued eligibility for certification as a Disadvantaged Business Enterprise (DBE) with the City of Chicago has been granted. Re-validation of certification is required by April 1, 2013.

It is mandatory under Federal Regulation 49 CFR Part 26 and 23 that all Disadvantaged Business Enterprise (DBE) firms, upon completing their fifth fiscal year of certification, must re-validate with its host agency. Since the City of Chicago is your host agency, we will send you a copy of the new **"Continued Eligibility Affidavit"** for your convenience when it is due at the end of your term.

*Please note that you must include a copy of your most current Corporate Federal Tax Returns, Personal Net Worth Statement (PNW), and the Continued Eligibility Affidavit with supporting documentation.* Failure to file this Affidavit will result in the removal of your certification.

You must also notify the Certification Unit of any changes in ownership or control of your firm or any other matters or facts affecting your firm's eligibility for certification. The City may commence actions to remove your firm's eligibility if you fail to notify us of any changes in ownership, management or control, or otherwise fail to cooperate with the City in any inquiry or investigation. Removal of eligibility procedures may also be commenced if your firm is found to be involved in bidding or contractual irregularities.

Consolidated Printing Company Inc. will appear in the Illinois Certification Program (IL UCP) DBE Directory under the area(s) of specialty listed below. The Directory can be accessed via the internet at http://www.dot.state.il.us/ucp/ucp.html.

**NAICS-323110: OFFSET PRINTING (EXCEPT BOOKS, MANIFOLD BUSINESS FORMS, PRINTING GREY GOODS)**
**NAICS-323110: PRINTING (COMMERCIAL AND LITHOGRAPHIC)**
**NAICS-323119: OTHER COMMERCIAL PRINTING**

**Commercial Printing**

**Consolidated Printing Company Inc.**　　　　MAR 26 2012　　　　**Page 2**

Your firm's participation on City contracts will be credited only toward DBE/ACDBE goals in your area(s) of specialty. While your participation on City contracts is not limited to your specialty, credit toward Disadvantaged Business Enterprise (DBE) goals will be given only for work done in a specialty category.

Thank you for your continued interest in the City's Disadvantaged Business Enterprise (DBE) Program.

Sincerely,

Jamie Rhee
Chief Procurement Officer

JR/sb

(Rev. 6/06)

## SCHEDULE C-1
### Letter of Intent from DBE to Perform
### as Subconsultant/Subcontractor/Supplier

Name of Project: _____

Specification No. _____

From:_____
               (Name of DBE Firm)

To:_____and the City of Chicago:
         (Name of Prime Consultant/Contractor)

The DBE status of the undersigned is confirmed by the attached letter of Certification from the City of Chicago dated_____
_____.

The undersigned is prepared to provide the following described services or supply the following described goods in connection with the above named project/contract:

_____
_____
_____
_____

The above described services or goods are offered for the following price and described terms of payment:

_____
_____
_____
_____

If more space is needed to fully describe the DBE firm's proposed scope of work and/or payment schedule, attach additional sheets.

Conditioned upon your execution of a contract with the City of Chicago, the undersigned will enter into a formal written agreement for the above work with you as a Prime Consultant/Contractor, and will do so within (3) three working days of receipt of a signed contract from the City of Chicago.


_____
(Signature of President, Owner or Authorized Agent)


_____
Name /Title  (Print)


_____
Date


_____
Phone

Page 16

**SCHEDULE D-1**
**Affidavit of DBE Goal Implementation Plan**

Project Name: _____

Specification No.: _____

State of_____

County (City) of_____

I HEREBY DECLARE AND AFFIRM that I am the duly authorized representative of:

_____
Name of Prime Consultant/Contractor

and that I have personally reviewed the material and facts set forth herein describing our proposed plan to achieve the DBE goal of this contract.

All DBE firms included in this plan have been certified as such by the City of Chicago (Letters of Certification attached).

I.      **DBE Prime Consultant/Contractor**.  If prime consultant is a certified DBE firm, attach copy of City of Chicago Letter of Certification.

II.     **DBEs as Joint Venturers**.  If prime consultant is a joint venture and one or more joint venture partners are certified DBEs, attach copies of Letters of Certification and a copy of Joint Venture Agreement clearly describing the role of the DBE firm(s) and its ownership interest in the joint venture.

III.    **DBE Subconsultants**.  Complete for each DBE subconsultant/subcontractor/supplier.

   1.   Name of DBE:  _____

        Address:_____

        Contact Person:_____Phone:_____

        Dollar Amount of Participation $ _____Percent of Participation: _____%

   2.   Name of DBE:  _____

        Address:_____

        Contact Person:_____Phone:_____

        Dollar Amount of Participation $_____Percent of Participation: _____%

   3.   Name of DBE:  _____

        Address:_____

        Contact Person:_____Phone:_____

        Dollar Amount of Participation $_____Percent of Participation: _____%

   4.   Attach additional sheets as needed.

**IV.** **Summary of DBE Proposal:**

| DBE Firm Name | Dollar Amount of Participation | Percent Amount of participation |
|---|---|---|
| _____ | $_____ | _____% |
| _____ | $_____ | _____% |
| _____ | $_____ | _____% |
| _____ | $_____ | _____% |
| _____ | $_____ | _____% |
| **Total DBE Participation:** | $_____ | _____% |

To the best of my knowledge, information and belief, the facts and representations contained in this Schedule are true, and no material facts have been omitted.

The contractor designates the following person as their DBE Liaison Officer:

Name: _____     Phone Number:_____

I do solemnly declare and affirm under penalties of perjury that the contents of the foregoing document are true and correct and that I am authorized, on behalf of the contractor, to make this affidavit.

_____
Signature of Affiant (Date)

State of_____

County of _____

This instrument was acknowledged before me on _____(date)
by_____(name of Affiant)
as_____
_____(title of Affiant)
of_____
_____(name of party on behalf of whom
this instrument was executed).

(Seal)                                    _____
Signature of Notary Public

Page 18

**SCHEDULE F: Report of Subcontractor Solicitations**
**FHWA, FTA and FAA Funded Contracts**

Project Name:_____
Specification #:_____

I,_____on behalf of_____
     (Name of reporter)                        (Prime contractor)

have either personally solicited, or permitted a duly authorized representative of this firm to solicit, work for this contract from the following subcontractors which comprise all DBE <u>and</u> non-DBE subcontractors who bid or quoted price information on this contract:

Name of Subcontractor_____
Address of Subcontractor_____
Contact Person _____
Status: DBE Certified? ☐Yes ☐No
Type of Work Solicited_____
Years in Business (if available)_____
Annual Gross Receipts (if available)_____

Name of Subcontractor_____
Address of Subcontractor_____
Contact Person _____
Status: DBE Certified? ☐Yes ☐No
Type of Work Solicited_____
Years in Business (if available)_____
Annual Gross Receipts (if available)_____

Name of Subcontractor_____
Address of Subcontractor_____
Contact Person _____
Status: DBE Certified? ☐Yes ☐No
Type of Work Solicited_____
Years in Business (if available)_____
Annual Gross Receipts (if available)_____

Name of Subcontractor_____
Address of Subcontractor_____
Contact Person _____
Status: DBE Certified? ☐Yes ☐No
Type of Work Solicited_____
Years in Business (if available)_____
Annual Gross Receipts (if available)_____

## DBE UTILIZATION REPORT

Utilization Report No. _____ Specification No. _____

Contract No. _____

Project Name: _____

STATE OF: _____ )

COUNTY (CITY) OF: _____ )

In connection with the above-captioned contract:

I HEREBY DECLARE AND AFFIRM that I am the _____
(Title - Print or Type )

and duly authorized representative of _____
(Name of Prime Consultant /Contractor - Print or Type )

_____ ( _____ ) _____
(Address of Prime Consultant/Contractor)        (Phone)

*and that the following Minority and Women Business Enterprises have been contracted with, and have furnished, or are furnishing and preparing materials for, and rendering services stated in the contract agreement.*

*The following Schedule accurately reflects the value of each MBE/WBE sub-agreement and the amounts of money paid to each to date.*

| MBE/WBE FIRM NAME | GOODS/SERVICES PROVIDED | AMOUNT OF CONTRACT | AMOUNT PAID TO-DATE |
|---|---|---|---|
| _____ | _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ |

Total MBE: $ _____

Total WBE: $ _____

## DBE UTILIZATION REPORT

*I do solemnly declare and affirm under the penalties of perjury that the contents of the foregoing document are true and correct, and that I am authorized, on behalf of the contractor, to make this affidavit.*

Name of Contractor: _____
(Print or Type)

Signature: _____
(Signature of affiant)

Name of Affiant: _____
(Print or Type)

Date: _____
(Print or Type)

State of _____

County (City) of _____

This instrument was acknowledged before me on_____(date)

by_____(name/s of person/s)

as _____(type of authority, e.g., officer, trustee, etc.)

of_____(name of party on behalf of whom instrument was
executed).

_____
Signature of Notary Public

(Seal)

**EXHIBIT 6**
**INSURANCE REQUIREMENTS AND EVIDENCE OF INSURANCE**

PROFESSIONAL SERVICES INSURANCE REQUIREMENTS

Chicago Department of Transportation

The Purchase, Installation and Operation of a Bicycle Sharing System in the City of Chicago
Specification No.:  100320-A

The Contractor must provide and maintain at Contractor's own expense, until Contract completion and during the time period following completion if Contractor is required to perform any additional work, the insurance coverages and requirements specified below, insuring all operations related to the Contract.

## A.      INSURANCE TO BE PROVIDED

1)     <u>Workers Compensation and Employers Liability</u>

Workers Compensation Insurance, as prescribed by applicable law covering all employees who are to provide work under this Contract and Employers Liability coverage with limits of not less than <u>$500,000</u> each accident, illness or disease.

2)     <u>Commercial General Liability</u> (Primary and Umbrella)

Commercial General Liability Insurance or equivalent with limits of not less than <u>$5,000,000</u> per occurrence for bodily injury, personal injury, and property damage liability.  Coverages must include the following:  All premises and operations, products/completed operations explosion, collapse, underground, separation of insureds, defense, and contractual liability (not to include Endorsement CG 21 39 or equivalent).  The City of Chicago is to be named as an additional insured on a primary, non-contributory basis for any liability arising directly or indirectly from the work.

Subcontractors performing work for the Contractor must maintain limits of not less than <u>$1,000,000</u> with the same terms herein.

3)     <u>Automobile Liability</u> (Primary and Umbrella)

When any motor vehicles (owned, non-owned and hired) are used in connection with work to be performed, the Contractor must provide Automobile Liability Insurance with limits of not less than <u>$2,000,000</u> per occurrence for bodily injury and property damage.  The City of Chicago is to be named as an additional insured on a primary, non-contributory basis.

Subcontractors performing work for the Contractor must maintain limits of not less than <u>$1,000,000</u> with the same terms herein.

4)     <u>Property All Risk</u>

The Contractor must maintain All Risk Property Insurance at full replacement cost covering all loss, damage or destruction to the machinery, equipment, bicycles, stations and/or any facility/property (if applicable) including improvements and betterments.  The City of Chicago is to be named as an additional insured and loss payee.

The Contractor is responsible for all loss or damage to City property and to personal property of

Contractor (including bicycles, materials, equipment, stations, fixtures and contents) that are part of this Contact.

5)    Professional Liability

When any architects, engineers, EDP professionals, project managers/ administrators or other professional consultants perform work in connection with this Contract, Professional Liability Insurance covering acts, errors, or omissions must be maintained with limits of not less than $1,000,000. When policies are renewed or replaced, the policy retroactive date must coincide with, or precede, start of work on the Contract. A claims-made policy which is not renewed or replaced must have an extended reporting period of two (2) years.

6)    Valuable Papers

When any plans, designs, drawings, specifications, media, data, reports, records and any other documents are produced or used under this Contract, Valuable Papers Insurance must be maintained in an amount to insure against any loss whatsoever, and must have limits sufficient to pay for the re-creation and reconstruction of such records.

7)    Blanket Crime

The Contractor must provide Blanket Crime coverage covering all persons handling funds under this Contract, against loss by dishonesty, robbery, burglary, theft, destruction, or disappearance, computer fraud, credit card forgery, and other related crime risks. The policy limit must be written to cover losses in the amount of maximum monies collected, received and in the possession of Contractor at any given time.

## B.    ADDITIONAL REQUIREMENTS

The Contractor must furnish the City of Chicago, Department of Transportation, 30 North LaSalle Street, 11th Floor 60602, original Certificates of Insurance, or such similar evidence, to be in force on the date of this Contract, and Renewal Certificates of Insurance, or such similar evidence, if the coverages have an expiration or renewal date occurring during the term of this Contract. The Contractor must submit evidence of insurance on the City of Chicago Insurance Certificate Form (copy attached) or equivalent prior to Contract award. The receipt of any certificate does not constitute agreement by the City that the insurance requirements in the Contract have been fully met or that the insurance policies indicated on the certificate are in compliance with all Contract requirements. The failure of the City to obtain certificates or other insurance evidence from Contractor is not a waiver by the City of any requirements for the Contractor to obtain and maintain the specified coverages. The Contractor must advise all insurers of the Contract provisions regarding insurance. Non-conforming insurance does not relieve Contractor of the obligation to provide insurance as specified herein. Nonfulfillment of the insurance conditions may constitute a violation of the Contract, and the City retains the right to stop work until proper evidence of insurance is provided, or the Contract may be terminated.

The Contractor must provide for 60 days prior written notice to be given to the City in the event coverage is substantially changed, canceled, or non-renewed.

Any deductibles or self insured retentions on referenced insurance coverages must be borne by Contractor.

The Contractor hereby waives and agrees to require their insurers to waive their rights of subrogation against

the City of Chicago, its employees, elected officials, agents, or representatives.

The coverages and limits furnished by Contractor in no way limit the Contractor's liabilities and responsibilities specified within the Contract or by law.

Any insurance or self insurance programs maintained by the City of Chicago do not contribute with insurance provided by the Contractor under the Contract.

The required insurance to be carried is not limited by any limitations expressed in the indemnification language in this Contract or any limitation placed on the indemnity in this Contract given as a matter of law.

If Contractor is a joint venture or limited liability company, the insurance policies must name the joint venture or limited liability company as a named insured.

The Contractor must require all subcontractors to provide the insurance required herein, or Contractor may provide the coverages for subcontractors. All subcontractors are subject to the same insurance requirements of Contractor unless otherwise specified in this Contract.

If Contractor or subcontractor desires additional coverages, the party desiring the additional coverages is responsible for the acquisition and cost.

Notwithstanding any provision in the Contract to the contrary, the City of Chicago Risk Management Department maintains the right to modify, delete, alter or change these requirements.

| | |
|---|---|
| Client#: 834037 | **ALTABICY** |

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 11/02/2012

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Karen Barry | | |
|---|---|---|---|
| USI Northwest 700 NE Multnomah, Suite 1300 Portland, OR 97232 503 224-8390 | PHONE (A/C, No, Ext): 503 224-8390 | | FAX (A/C, No): 610 362-8130 |
| | E-MAIL ADDRESS: karen.barry@usi.biz | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A: Federal Insurance Company | | 20281 |
| INSURED Alta Bicycle Share, Inc. 711 SE Grand Avenue Portland, OR 97214 | INSURER B: Starr Indemnity & Liability Co. | | 38318 |
| | INSURER C: Hartford Underwriters Insurance | | 30104 |
| | INSURER D: Hanover Insurance Company | | 22292 |
| | INSURER E: Great Northern Insurance Co. | | 20303 |
| | INSURER F: | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY CLAIMS-MADE X OCCUR X $10,000 deductible | | | 35847987 | 04/09/2012 | 04/09/2013 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $1,000,000 |
| | | | | | | | MED EXP (Any one person) | $Excluded |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $Included |
| | | | | | | | | $ |
| E | **AUTOMOBILE LIABILITY** X ANY AUTO ALL OWNED AUTOS SCHEDULED AUTOS X HIRED AUTOS X NON-OWNED AUTOS | | | 73575155 | 04/13/2012 | 04/09/2013 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| B | **UMBRELLA LIAB** X OCCUR X **EXCESS LIAB** CLAIMS-MADE | | | SISCSEL017767812 | 04/09/2012 | 04/09/2013 | EACH OCCURRENCE | $5,000,000 |
| | | | | | | | AGGREGATE | $5,000,000 |
| A | 0 DED RETENTION $none | | | 93643184 | 04/09/2012 | 04/09/2013 | Excess Liab. | $5,000,000 |
| C | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y/N Y (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | 52WECDQ9277 | 07/19/2012 | 07/19/2013 | X WC STATU- TORY LIMITS OTH- ER | |
| | | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| D | **Property/Equip. Floater (All Risk Replacement Cost** | | | IH29496899 | 03/26/2012 | 03/26/2013 | $5,000,000 Limit $1,000 ded., except $5,000 ded Theft/Vandal | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
The City of Chicago is included as an Additional Insured for General Liability as required by written contract or agreement, per attached form #80-02-2367. Coverage to Additional Insured is provided on a Primary and Non-Contributing basis, and Waiver of Subrogation is provided as agreed by written contract or agreement. City of Chicago is included as an Additional Insured and Loss Payee as respects to Machinery, Equipment, Bicycles, Stations, and facility property, including improvements and betterments. Valuable Papers coverage with a limit of $50,000 is provided by Property/Equipment Floater policy.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Chicago, c/o CDOT 30 N LaSalle Street, 11th Floor Chicago, IL 60602 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE *Mike Seabaugh* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)   1 of 1   The ACORD name and logo are registered marks of ACORD
#S8149673/M7865297

KXBJT

| Client#: 834037 | | ALTABICY |
|---|---|---|

**ACORD**™ **CERTIFICATE OF LIABILITY INSURANCE**

DATE (MM/DD/YYYY)
11/02/2012

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Karen Barry |
|---|---|
| USI Northwest | PHONE (A/C, No, Ext): 503 224-8390 — FAX (A/C, No): 610 362-8130 |
| 700 NE Multnomah, Suite 1300 | E-MAIL ADDRESS: 503-299-4340 |
| Portland, OR 97232 | |
| 503 224-8390 | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED | INSURER A : Scottsdale Insurance Company | 41297 |
| Alta Bicycle Share, Inc. | INSURER B : Federal Insurance Company | 20281 |
| 711 SE Grand Avenue | INSURER C : | |
| Portland, OR 97214 | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

**COVERAGES** CERTIFICATE NUMBER: REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | CLAIMS-MADE ☐ OCCUR | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | | | GENERAL AGGREGATE | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | **UMBRELLA LIAB** ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | **EXCESS LIAB** ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N | | | | | | ☐ WC STATU-TORY LIMITS ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | N / A | | | | | E.L. EACH ACCIDENT | $ |
| | (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liab | | | EKS3065906 | 05/26/2012 | 05/26/2013 | $1,000,000 ea claim/agg $10,000 retention | |
| B | Crime | | | 82218652 | 05/26/2012 | 05/26/2013 | $200,000 limit | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
The City of Chicago is included as an Additional Insured for General Liability as required by written contract or agreement, per attached form #80-02-2367. Coverage to Additional Insured is provided on a Primary and Non-Contributing basis, and Waiver of Subrogation is provided as agreed by written contract or agreement. City of Chicago is included as an Additional Insured and Loss Payee as respects to Machinery, Equipment, Bicycles, Stations, and facility property, including improvements and betterments. Valuable Papers coverage with a limit of $50,000 is provided by Property/Equipment Floater policy.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Chicago, c/o CDOT 30 N LaSalle Street, 11th Floor Chicago, IL 60602 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE *Mike Seabaugh* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)    1 of 1    The ACORD name and logo are registered marks of ACORD
#S8149692/M8149680                                                          KXBJT



**CHUBB**

## *Liability Insurance*

### *Endorsement*

| | |
|---|---|
| *Policy Period* | APRIL 9, 2012  TO  APRIL 9, 2013 |
| *Effective Date* | APRIL 9, 2012 |
| *Policy Number* | 3584-79-87 PTL |
| *Insured* | ALTA BICYCLE SHARE INC |
| *Name of Company* | FEDERAL INSURANCE COMPANY |
| *Date Issued* | APRIL 19, 2012 |

This Endorsement applies to the following forms:

GENERAL LIABILITY

Under Who Is An Insured, the following provision is added.

### Who Is An Insured

**Additional Insured -
Scheduled Person
Or Organization**

Persons or organizations shown in the Schedule are **insureds**; but they are **insureds** only if you are obligated pursuant to a contract or agreement to provide them with such insurance as is afforded by this policy.

However, the person or organization is an **insured** only:

- if and then only to the extent the person or organization is described in the Schedule;
- to the extent such contract or agreement requires the person or organization to be afforded status as an **insured**;
- for activities that did not occur, in whole or in part, before the execution of the contract or agreement; and
- with respect to damages, loss, cost or expense for injury or damage to which this insurance applies.

No person or organization is an **insured** under this provision:

- that is more specifically identified under any other provision of the Who Is An Insured section (regardless of any limitation applicable thereto).
- with respect to any assumption of liability (of another person or organization) by them in a contract or agreement. This limitation does not apply to the liability for damages, loss, cost or expense for injury or damage, to which this insurance applies, that the person or organization would have in the absence of such contract or agreement.



### Liability Endorsement
(continued)

Under Conditions, the following provision is added to the condition titled Other Insurance.

### Conditions

Other Insurance –
Primary, Noncontributory
Insurance – Scheduled
Person Or Organization

If you are obligated, pursuant to a contract or agreement, to provide the person or organization shown in the Schedule with primary insurance such as is afforded by this policy, then in such case this insurance is primary and we will not seek contribution from insurance available to such person or organization.

---

### Schedule

Persons or organizations that you are obligated, pursuant to a contract or agreement, to provide with such insurance as if afforded by this policy.

All other terms and conditions remain unchanged.

Authorized Representative 

Named Insured: _____

Address: _____

(Number and Street)

_____

(City) _____ (State) _____ (ZIP) _____

Specification #: _____ RFQ #: _____

Project Name #: _____

Purchase Order #: _____

| Description of Operation/Location | |
|---|---|

The insurance policies and endorsements indicated below have been issued to the designated named insured with the policy limits as set forth herein covering the operation described within the Contract involving the named insured and the City of Chicago. The Contractor agrees that in the event of cancellation, non-renewal or material change in any of the indicated policies, the Contractor will provide at least sixty (60) days prior written notice of such change to the City of Chicago at the address shown on this Certificate. This certificate is issued to the City of Chicago in consideration of the Contract entered into with the named insured, and it is mutually understood that the City of Chicago relies on this certificate as a basis for continuing such agreement with the named insured:

| Type of Insurance | Insurer Name | Policy Number | Expiration Date | Limits of Liability All Limits in Thousands |
|---|---|---|---|---|
| General Liability<br>[ ] Claims made [ ] Occurrence<br>[ ] Premises-Operations<br>[ ] Explosion/Collapse Underground<br>[ ] Products/Completed-Operations<br>[ ] Blanket Contractual<br>[ ] Broad Form Property Damage<br>[ ] Independent Contractors<br>[ ] Personal Injury<br>[ ] Pollution | | | | CSL Per Occurrence $ _____<br><br>General Aggregate $ _____<br><br>Products/Completed Operations Aggregate $ _____ |
| Automobile Liability | | | | CSL Per Occurrence $ _____ |
| [ ] Excess Liability<br>[ ] Umbrella Liability | | | | Each Occurrence $ _____ |
| Worker's Compensation and Employer's Liability | | | | Statutory/Illinois Employers Liability $ _____ |
| Builders Risk/Course of Construction | | | | Amount of Contract |
| Professional Liability | | | | $ _____ |
| Owner Contractors Protective | | | | $ _____ |
| Other | | | | $ _____ |

a) Each Insurance policy required by this agreement, excepting policies for worker's compensation and professional liability, will read: "The City of Chicago is an additional insured as respects operations and activities of, or on behalf of the named insured, performed under contract with or permit from the City of Chicago." As respects General Liability, the ISO form # CG 20 10 07 04 meets this stated requirement.

b) The General, Automobile and Excess/Umbrella Liability Policies described provide for severability of Interest (cross liability) applicable to the named insured and the City.

c) Workers Compensation and Property Insurers shall waive all rights of subrogation against the City of Chicago.

d) The receipt of this certificate by the City does not constitute agreement by the City that the insurance requirements in the Contract have been fully met, or that the insurance policies indicated by this certificate are in compliance with all contract requirements.

| Name and Address of Certificate Holder and Recipient of Notice | Signature of Authorized Rep. _____ |
|---|---|
| Certificate Holder/Additional Insured | Agency/Company: _____ |
| City of Chicago<br>Department of Procurement Services<br>121 N. LaSalle St., #403<br>Chicago, IL 60602 | Address: _____<br><br>Telephone: _____ |

**For City use only**

Name of City Department requesting certificate: (Using Dept.): _____

Address: _____ ZIP Code: _____

Attention: _____

**EXHIBIT 7**

**CONTRACTUAL REQUIREMENTS RELATED TO HIPAA**

The terms below that are capitalized and in bold have the same meanings as set forth in the Health Insurance Portability and Accountability Act. *See* 45 CFR parts 160 and 164.

1.  Operator must not use or further disclose Protected Health Information ("PHI") other than as permitted or required by this Agreement or as Required by Law. (http://www.hhs.gov/ocr/hipaa/)

2.  Operator must use appropriate safeguards to prevent the use or disclosure of PHI other than as provided for in this Agreement.

3.  Operator must mitigate to the extent practicable any harmful effect that is known to Operator of a use or disclosure of PHI by Operator in violation of the requirements of this Agreement.

4.  Operator must report any use or disclosure of the PHI not provided for by this Agreement to the City.

5.  Operator must ensure that any agent, including a subcontractor, to whom it provides PHI received from, or created or received by Operator on behalf of the City agrees to the same restrictions and conditions that apply through this Agreement to Operator with respect to such information.

6.  If the Operator has PHI in a Designated Record Set then Operator must provide access, at the request of the City, and in the time and manner designated by the City, to PHI in a Designated Record Set, to City or, as directed by City, to an Individual in order to meet the requirements under 45 CFR 164.524.

7.  If the Operator has PHI in a Designated Record Set then Operator must make any amendments to PHI in a Designated Record Set that the City directs or agrees to pursuant to 45 CFR 164.526 at the request of City or an Individual, and in the time and manner designated by City.

8.  Operator must make internal practices, books and records relating to the use and disclosure of PHI received from, or created or received by Operator on behalf of, City available to the City, or at the request of the City to the Secretary, in a time and manner designated by the City or the Secretary, for purposes of the Secretary determining City's compliance with the Privacy Rule.

9.  Operator must document the disclosure of PHI and information relating to such disclosures as would be required for City to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR 164.528.

10. Operator must provide to City or an Individual, in time and manner designated by City, information collected which relates to the disclosure of PHI, to permit City to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR 164.528.

11. Operator must either return all PHI to the City or destroy it, at the City's option, upon termination or expiration of this Agreement.

12. Operator must implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic health information that it creates, receives, maintains, or transmits on behalf of the City as required by 45 CFR part 164.

13. Operator must ensure that any agent, including a subcontractor, to whom it provides such information agrees to implement reasonable and appropriate safeguards to protect it.

14. Operator must report to the City any security incident of which it becomes aware.

**EXHIBIT 8**
**PUBLIC WORKS PROVISIONS**

**A.   Public Work Indemnity**
   **1)**   Operator must protect, defend, indemnify, and hold the City, its officers, officials, representatives, and employees (collectively the "Indemnitees"), harmless from and against any and all claims, damages, demands, injury or death, in consequence of,  arising out of or being in any way connected with Operator's performance with respect to any public work construction under this Agreement except for matters shown by final judgment to have been caused by or attributable to the negligence of Indemnitees. This indemnification obligation is effective to the maximum extent permitted by applicable law.   This indemnity extends to all legal costs, including attorney fees, costs, liens, judgments, settlements, penalties, professional fees, and other expenses incurred by the City, including fines and penalties imposed by public bodies, and the reasonable settlement of such claims. This indemnification obligation is not limited by any amount of insurance required under this Agreement. Further, the indemnification obligation contained in this section will survive the expiration or termination of this Agreement.

   **2)**   Operator will be solely responsible for the defense of any and all claims, demands,  or suits against Indemnitees, including claims by  Operator's employees, subcontractors, agents, or servants even though the claimant may allege that the Indemnitees were in charge of the construction of the public work or alleged negligence on the part of Indemnitees.  The City will have the right, at its sole option, to participate in the defense of any such suit, without relieving Operator of its obligations under this section.

   **3)**   "Injury" or "damage" as these words are used in this section will be construed to include injury or damage consequent upon the failure of or use or misuse by Operator, its Subcontractors, agents, servants, or employees, of any scaffolding, hoist cranes, stays, ladders, supports, rigging, blocking or any and all other kinds of items of equipment, whether or not they are owned, furnished, or loaned by the Indemnitees.

   **4)**   Operator must promptly provide, or cause to be provided, to the Commissioner and City Corporation Counsel copies of all notices that Operator may receive of any claims, actions, or suits that may be given or filed in connection with Operators performance or the performance of any Subcontractor and for which the Indemnitees are entitled to indemnification under this Agreement and to give the Indemnitees authority, information and assistance for the defense of any claim or action.

**B.   Prevailing Wage Rates**
   In accordance with 820 ILCS 130/1 et seq., in the performance of the work, Operator is fully responsible for paying not less than the prevailing rate of wages as determined by the Illinois Department of Labor, which must be paid to all laborers, mechanics, and other workers performing public works under this Agreement.  These wage rates are also the prevailing wage rates for the City of Chicago, as determined by the Department.  If the Illinois Department of Labor revises the prevailing rate of hourly wages to be paid for the work before completion of the Project, the revised rate applies to this Agreement from the effective date of the revision.  If federal wage provisions apply, such provisions will supersede this provision.

**C.   Multi-Project Labor Agreement (PLA)**
   The City has entered into the PLA with various trades regarding projects as described in

1

the PLA. A copy of the PLA, with appendices, may also be found on the City's website at http://www.cityofchicago.org/PLA. Operator acknowledges familiarity with the requirements of the PLA and its applicability to any Work under this Agreement, and shall comply in all respects with the PLA.

**D.** **Emissions Reduction (Section 2-92-595 of the Chicago Municipal Code)**

For contracts for construction work of $2,000,000 or more, the following applies:

a) The Operator must comply with the Clean Diesel Contracting Ordinance, Section 2-92-595 of the Municipal Code of Chicago.

b) The Operator and any Subcontractor(s) must utilize Ultra Low Sulfur Diesel Fuel (ULSD) for any heavy-duty diesel-powered vehicle, non-road vehicle or non-road equipment used in the performance of the Contract.

c) The Operator and any Subcontractor(s) must minimize idling of motor vehicles and non-road vehicles used in the performance of the Contract during periods of inactivity, and must comply with the anti-idling requirements imposed by any applicable federal, state, or local law.

d) The City may conduct an audit of the Operator or inspect any vehicle or equipment used in the performance of the Contract to ensure compliance with the requirements specified above. In the event that Operator or any Subcontractor fails to utilize ULSD or fails to minimize idling or comply with anti-idling requirements, Operator will be subject to liquidated damages of $5,000 per day for each violation and each day of noncompliance will be a separate violation; provided, however, the damages will not exceed $50,000 for any one vehicle or piece of equipment, as specified in Section 2-92-595(e) of the Municipal Code of Chicago. Such liquidated damages are imposed not as a penalty but as an estimate of the damages that the City will sustain from delay in completion of the project and inspection and inspection and other enforcement costs, as well as the resultant damages to the public health of its citizens, which damages by their nature are not capable of precise proof. The City is authorized to withhold and deduct from monies otherwise payable to the contractor the amount of liquidated damages due to the City.

e) Operator understands that pursuant to Section 2-92-595(e)(6) of the Municipal Code of Chicago, any person knowingly making a false statement of material fact to any City department with respect to compliance with the contract provisions specified in Section 2-92-595(e) of the Municipal Code of Chicago may be fined not less than $1,000 or more than $5,000 for each statement.

2

**EXHIBIT 9**
**Federal Provisions**

Operator acknowledges that it will be subject to all applicable contractual provisions and certification documents required by the funding source if federal grant funds are used. Such contractual provisions may include, but are not limited to, the following:

## A.    EQUAL EMPLOYMENT OPPORTUNITY

During the performance of this Agreement, Operator:

**1)**    Will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. Operator will take affirmative action to ensure that applicants are employed and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action must include employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation and selection for training, including apprenticeship. Operator must post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

**2)**    Will, in all solicitations or advertisements for employees placed by Operator or on Operator's behalf state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

**3)**    Will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and must post copies of the notice in conspicuous places available to employees and applicants for employment.

**4)**    Will comply with all provisions of Executive Order No. 11246 or September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

**5)**    Will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to Operator's books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulation, and orders.

**6)**    In the event of Operator's noncompliance with the nondiscrimination clause of this Contract or with any of such rules, regulations, or orders, this Contract may be canceled, terminated, or suspended in whole or in part and Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as

1

provided in Executive Order No, 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

**7)** Operator will include the provisions of the above Paragraphs 1) through 6) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that the provisions will be binding upon each subcontractor or vendor. Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance. If, however, Operator becomes involved in, or are threatened with, litigation with a subcontractor or vendor as a result of such direction by the federal government contracting agency, Operator may request the United States to enter into such litigation to protect the interests of the United States.

## B. OTHER FEDERAL PROVISIONS

### 1) Interest of Members of or Delegates to the United States Congress
In accordance with 41 USC 22, Operator will not admit any member of or delegate to the United States Congress to any share or part of the Contract or any benefit derived therefrom.

### 2) False or Fraudulent Statements and Claims
**a)** Operator recognizes that the requirements of the Program Fraud Civil Remedies Act of 1986, as amended, 49 USC 3081 et seq. and U.S. DOT regulations, Program Fraud Civil Remedies, 49 CFR Part 31, apply to actions pertaining to the Contract. Accordingly, by signing the Contract, Operator certifies or affirms the truthfulness and accuracy of any statement Operator has made, Operator makes, or Operator may make pertaining to the Contract, including any invoice for Operator's services. In addition to other penalties that may be applicable, Operator also acknowledges that if Operator makes a false, fictitious, or fraudulent claim, statement, submission, or certification, the federal government reserves the right to impose the penalties of the Program Fraud Civil Remedies Act of 1986, as amended, on Operator to the extent the federal government deems appropriate.

**b)** Operator also acknowledges that if Operator makes a false, fictitious, or fraudulent claim, statement, submission, or certification to the City or federal government in connection with an urbanized area formula project financed with federal assistance authorized by 49 USC 5307, the Government reserves the right to impose on Operator the penalties of 18 USC 1001 and 49 USC 5307(n)(1), to the extent the federal government deems appropriate.

### 3) Federal Interest in Patents
**a)** **General.** If any invention, improvement, or discovery of Operator is conceived or first actually reduced to practice in the course of or under the Agreement, and that invention, improvement, or discovery is patentable under the laws of the Unites States of America or any foreign country, Operator must notify City immediately and provide a detailed report.

**b)** **Federal Rights.** Unless the federal government later makes a contrary determination in writing, the rights and responsibilities of the City, Operator, and the federal government pertaining to that invention, improvement, or discovery will be determined in accordance with applicable federal laws and regulations, including any waiver of them; and

2

irrespective of Operator's status or the status of any Subcontractor at any tier (e.g., a large business, small business, non-profit organization, institution of higher education, individual), Operator will transmit to the federal government those rights due the federal government in any invention resulting from the Contract.

**4)     Federal Interest in Data and Copyrights**

   **a)     Definition**
   The term "subject data" used in this Section means recorded information, whether or not copyrighted, that is delivered or specified to be delivered under the Agreement.  Examples include computer software, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identifications, and related information. The term "subject data" does not include financial reports, cost analyses, and similar information incidental to Agreement administration.

   **b)     Federal Restrictions**
   The following restrictions apply to all subject data first produced in the performance of the Agreement.  Except as provided in the Agreement and except for Operator's own internal use, Operator may not publish or publicly reproduce subject data in whole or in part, or in any manner or form, nor may Operator authorize others to do so, without the written consent of the City and the federal government, until such time as the federal government may have either released or approved the release of such data to the public.

   **c)     Federal Rights in Data and Copyrights**
   In accordance with subparts 34 and 36 of the Common Rule, the City and the federal government reserve a royalty-free, non-exclusive and irrevocable license to reproduce, publish, or otherwise use, and to authorize others to use, for City or federal government purposes, the types of subject data described below.  Without the copyright owner's consent, the City and federal government may not extend their license to other parties.

        (1)     Any subject data developed under the Contract or subagreement financed by a federal Grant Agreement or Cooperative Agreement, whether or not a copyright has been obtained; and

        (2)     Any rights of copyright in which Operator purchase ownership with federal assistance.

**5)     No Exclusionary or Discriminatory Specifications**
   Apart from inconsistent requirements imposed by federal statute or regulations, Operator will comply with the requirements of 49 USC 5323(h)(2) by refraining from using any federal assistance to support subcontracts procured using exclusionary   or discriminatory specifications.

**6)     Cargo Preference - Use of United States Flag Vessels**
   Operator must comply with U.S. Maritime Administration regulations, "Cargo-Preference - U.S. Flag Vessels," 49 CFR Part 381, and include the clauses required by those regulations, modified as necessary to identify the affected parties, in each subcontract or sub-agreement involving equipment, materials, or commodities suitable for transport by ocean vessel.

   3

**7)      Fly America**

Operator must comply with 49 USC Section 40118, and related regulations at 41 CFR Part 301-10, regarding use of United States air carriers, and included clauses requiring Operator's Subcontractors to comply with the requirements of 49 USC Section 40118, and related regulations at 4 CFR Part 52, in all of Operator's subcontracts.

**8)      No Federal Government Obligations to Third Parties**

Absent the federal government's express written consent, the federal government is not subject to any obligations or liabilities to any contractor or any other person not a party to the Grant Agreement or Cooperative Agreement between the City and the federal government, which is a source of funds for this Contract. Notwithstanding any concurrence provided by the federal government in or approval of any solicitation, agreement, or contract, the federal government continues to have no obligations or liabilities to any party, including Operator.

**9)      Allowable Costs**

Notwithstanding any compensation provision to the contrary, Operator compensation under this Contract is limited to those amounts that are allowable and allocable to the Contract in accordance with OMB Circular A-87 and the regulations in 49 CFR Part 18. To the extent that an audit reveals that Operator have received payment in excess of such amounts, the City may offset such excess payments against any future payments due to Operator and, if no future payments are due or if future payments are less than such excess, Operator must promptly refund the amount of the excess payments to the City.

**10)     Contract Work Hours and Safety Standards Act**

If applicable according to their terms, Operator must comply and assure compliance with sections 102 and 107 of the Contract Work Hours and Safety Standards Act, as amended, 40 USC 327 through 333, and implementing U.S. DOL regulations, "Labor Standards Provisions Applicable to Contracts Governing Federally Financed and Assisted Construction" (also Labor Standards Provisions Applicable to Non-construction Contracts Subject to the Contract Work Hours and Safety Standards Act), 29 CFR Part 5; and U.S. DOL regulations, "Safety and Health Regulations for Construction", 29 CFR Part 1926. In addition to other requirements that may apply:

**a)**      In accordance with sections of the Contract Work Hours and Safety Standards Act, as amended, 40 USC 327 through 332, Operator must assure that, for the Contract, the wages of every mechanic and laborer will be computed on the basis of a standard work week of 40 hours, and that each worker will be compensated for Work exceeding the standard work week at a rate of not less than 1.5 times the basic rate of pay for all hours worked in excess of 40 hours in the work week. Determinations pertaining to these requirements will be made in accordance with applicable U.S. DOL regulations, "Labor Standards Provisions Applicable to Contracts Governing Federally Financed and Assisted Construction" (also Labor Standards Provisions Applicable to Non-Construction Contracts Subject to the Contract Work Hours and Safety Standards Act), 29 CFR Part 5.

**b)**      In accordance with section 107 of the Contract Work Hours and Safety Standards Act, as amended, 40 USC 333, Operator must assure that no laborer or mechanic working on a construction contract is required to work in surroundings or under working conditions that are unsanitary, hazardous, or dangerous to his or her health and safety, as

4

determined in accordance with US DOL regulations, "Safety and Health Regulations for Construction," 29 CFR Part 1926.

## 11)    Seismic Safety

If this Contract is for the construction of a building or an addition thereto, Operator must apply the requirements of US DOT regulations applicable to seismic safety requirements for US DOT assisted construction projects at 49 CFR Part 41, (specifically, 49 CFR 41.120), and any implementing guidance the federal government may issue, to the construction of any new building and to additions to any existing building.

## 12)    Buy America

Operator must ensure that any Work performed under this Contract complies with the "Buy America" regulations of the FHWA, as set forth in 23 CFR Part 635.410, which generally require that all manufacturing processes for steel and iron products to be incorporated in a construction project occur in the United States.

## 13)    Buy America Certification

The Operator agrees to comply with all statutes and regulations that provide that Federal funds may not be obligated unless steel, iron, and manufactured products used in federally funded projects are produced in the United States, unless a waiver has been granted or the product is subject to a general waiver. General waivers are listed in 49 CFR 661.7, and include microcomputer equipment, software, and small purchases (currently less than $100,000) made with capital, operating, or planning funds.

## 14)    Audit and Inspection

The Operator agrees to permit the Secretary of Transportation ("Secretary") and the Comptroller General of the United States, or their authorized representatives, to inspect all Project work, materials, payrolls, and other data, and to audit the books, records, and accounts of the Operator and its subcontractors pertaining to the Project. The Operator agrees to require each third party contractor whose contract award is not based on competitive bidding procedures as defined by the Secretary to permit the Secretary of Transportation and the Comptroller General of the United States, or their duly authorized representatives, to inspect all work, materials, payrolls, and other data and records involving that contract, and to audit the books, records, and accounts involving that contract as it affects the Project.

**15)    Certification Regarding Lobbying**
Operator certifies that it will comply with 6 CFR Part 9, and other applicable regulations, including the following:

Operator certifies that no federal appropriated funds have been paid or will be paid, by or on behalf of Operator, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any federal agreement, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal agreement, grant, loan or cooperative agreement.

If any funds, other than federal appropriated funds, have been paid or will be paid to any person for influencing or attempting to influence any of the above persons in connection with the Agreement, the undersigned must also complete and submit federal form LLL, "Disclosure Form to Report Lobbying", in accordance with its instructions.

If there are any indirect costs associated with the Agreement, total lobbying costs must be separately identified in the indirect cost rate proposal, and thereafter treated as other unallowable activity costs.

Operator must include the language of this certification in any contracts with its Subcontractors. All Subcontractors are also subject to certification and disclosure.

This certification is a material representation of fact upon which reliance was placed to enter into this transaction and is a prerequisite for this transaction, pursuant to 31 U.S.C. Section 1352 (1989). Any person who fails to file the required certifications are subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

**16)    Debarment, Suspension, and Other Responsibility Matters**
As required by Executive Order 12549 its implementing regulations, as applicable, the Operator certifies that it and its principals:

(i)     are not presently debarred, suspended, proposed for debarment, declared ineligible, sentenced to a denial of federal benefits by a state or federal court, or voluntarily excluded from covered transactions by an federal department or agency;

(ii)    have not within a three year period preceding this application been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (federal, state, or local) transaction or contract under a public transaction; violation of federal or state antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(iii)   are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (federal, state, or local) with commission of any of the offenses enumerated in paragraph (1)(b) of this certification; and

6

(iv)    have not within a three year period preceding this application had one or more public transactions (federal, state, or local) terminated for cause or default.

If Operator is unable to certify to any of the statements in this Section, Operator must attach an explanation.

This certification is a material representation of fact upon which reliance was placed to enter into this transaction and is a prerequisite for this transaction.

**17)    International Anti-Boycott**
Operator certifies that neither it nor any substantially-owned affiliated company is participating or will participate in an international boycott in violation of the provisions of the U.S. Export Administration Act of 1979 or the regulations of the U.S. Department of Commerce promulgated thereunder.

**18)    Liability**
The FHWA and City assume no liability for actions of Operator under the Agreement, including, but not limited to, the negligent acts and omissions of Operator's agents, employees, and Subcontractors in their performance of the Operator's duties as described under the Agreement.    To the extent allowed by law, Operator agrees to hold harmless the FHWA and City against any and all liability, loss, damage, cost or expenses, including attorneys fees, arising from the intentional torts, negligence, or breach of the Agreement by Operator, with the exception of acts performed in conformance with an explicit, written directive of the FHWA and City, unless such actions are covered by indemnities stated elsewhere in the Agreement between the parties.

**19)    Records and Site Visits**
Operator shall, upon request, grant access to the City and/or FHWA and the Comptroller General of the United States, or any of their duly authorized representatives to any books, documents, papers, and records of the Operator which are directly pertinent to this Agreement for the purpose of making audit, examination, excerpts and transcriptions.    Operator must maintain all such books, documents, papers, and records for a period of three years after City makes final payment and all other pending matters are closed.    Operator acknowledges that, if applicable, it will comply with any and all reporting requirements under applicable regulations.

**20)    Drug Free Certification**
Operator shall comply with the federal Drug-Free Workplace Act of 1988, 41 USC §701, 44 CFR Part 17.    The Drug Free Workplace Act requires that Operator shall not be entitled to receive any monies hereunder unless Operator has certified that Operator will provide a drug free workplace.    False certification or violation of the certification may result in sanctions including, but not limited to, suspension of contract or grant payments, termination of the agreement and debarment of contracting or grant opportunities with the City or State for at least one (1) year but not more than five (5) years.    Operator certifies and agrees that it will provide a drug free workplace by:

(a)    Publishing a statement:

7

(1)    Notifying employees that the unlawful manufacture, distribution, dispensing, possession or use of a controlled substance, including cannabis, is prohibited in the Operator's workplace.

(2)    Specifying the actions that will be taken against employees for violations of such prohibition.

(3)    Notifying the employee that, as a condition of employment on such contract or grant, the employee will:

    (A)    abide by the terms of the statement, and

    (B)    notify the employer of any criminal drug statute conviction for a violation occurring in the workplace no later than five (5) days after such conviction.

(b)    Establishing a drug free awareness program to inform employees about:

(1)    the dangers of drug abuse in the workplace;

(2)    the Operator's policy of maintaining a drug free workplace;

(3)    any available drug counseling, rehabilitation, and employee assistance programs; and

(4)    the penalties that may be imposed upon an employee for drug violations.

(c)    Providing a copy of the statement required by subparagraph (s) to each employee engaged in the contract or grant and to post the statement in a prominent place in the workplace.

(d)    Notifying the contracting or granting Agency within ten (10) days after receiving notice under part (B) of paragraph (3) of subsection (a) above from an employee or otherwise receiving actual notice of such conviction.

(e)    Imposing a sanction on, or requiring the satisfactory participation in a drug abuse assistance or rehabilitation program by, any employee who is so convicted, as required by section 5 of the Drug Free Workplace Act.

(f)    Assisting employees in selecting a course of action in the event drug counseling, treatment, and rehabilitation is required and indicating that a trained referral team is in place.

(g)    making a good faith effort to continue to maintain a drug free workplace through implementation of the Drug Free Workplace Act.

## 21)    Copeland Anti-Kickback

To the extent applicable, Operator must comply with the Copeland "Anti-Kickback" Act (18 U.S.C. 874) as supplemented in Department of Labor regulations (29 CFR part 3)

8

**22)   Davis-Bacon**

To the extent applicable, Operator must comply with the Davis-Bacon Act (40 U.S.C. 276a to 276a–7) as supplemented by Department of Labor regulations (29 CFR part 5).  The current wage determination is incorporated by reference: http://www.wdol.gov/wdol/scafiles/davisbacon/IL9.dvb

**23)   Compliance with Law and Regulations**

Operator must comply with all applicable provisions of FHWA regulations, and all state and local laws, ordinances and executive orders relating to the Agreement, including, but not limited to: Provisions of 49 CFR applicable to grants and cooperative agreements, including Parts relating to Administrative Review Procedures and Nondiscrimination. Executive Order 11246 of September 24, 1965, entitled "Equal Employment Opportunity," as amended by Executive Order 11375 of October 13, 1967, and as supplemented in Department of Labor regulations (41 CFR chapter 60)Title VI of the Civil Rights Act of 1964, as amended; Section 504 of the Rehabilitation Act of 1973, as amended; the Americans with Disabilities Act (ADA) (1990); the Age Discrimination Act of 1975; Sections 102 and 107 of Contract Work Hours and Safety Standards Act  (40 USC 327-333) as supplemented by 29 CFR part 5; all applicable standards, orders, or requirements issued under section 306 of the Clean Air Act (42 U.S.C. 7401 et seq.), the Federal Water Pollution Control Act (33 USC 1251 et seq.), section 508 of the Clean Water Act (33 U.S.C 1368), Executive Order 11738, and Environmental Protection Agency regulations (40 CFR part 15); all applicable provisions of federal Environmental and Historic Preservation regulations; all mandatory standards and policies relating to energy efficiency that are contained in the Illinois energy conservation plan issued in compliance with the Energy Policy and Conservation Act (Pub. L. 94-163, 89 Stat. 871).  Information National Historic Preservation Act of 1966, 16 U.S.C. §470 et seq. and Executive Order 11593; Archeological and Historical Preservation Act of 1966, 16 U.S.C. 569a 1 et seq.; Historical and Archeological Data Preservation Act of 1960, as amended, 16 U.S.C. §469 et seq.; the Illinois Procurement Code, 30 ILCS 500 et seq.  Operator certifies that its facilities are not listed and are not under consideration for listing on the U.S. Environmental Protection Agency's list of Violating Facilities.

9

**EXHIBIT 10**
**CONTRACTOR'S PROPOSAL**

**Operating Period 1**



| | Jun | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|
| **Personnel** | | | | | | | | |
| Corporate Management | $ | | | | | | | |
| Indirect Labor | $ | | | | | | | |
| Direct Labor | $ | | | | | | | |
| Legal | $ | | | | | | | |
| Travel | $ | | | | | | | |
| **Operations Equipment** | | | | | | | | |
| Vehicles | $ | | | | | | | |
| Fuel | $ | | | | | | | |
| Vehicle Maintenance | $ | | | | | | | |
| Spare Parts | $ | | | | | | | |
| Shipping/Freight | $ | | | | | | | |
| Operating Equipment | $ | | | | | | | |
| IT Equipment | $ | | | | | | | |
| Safety Equipment | $ | | | | | | | |
| Equipment Repair & Maintenance | $ | | | | | | | |
| Operating Supplies | $ | | | | | | | |
| **Communications** | | | | | | | | |
| Station Cellular Communications | $ | | | | | | | |
| Employee Communications (Phone, internet) | $ | | | | | | | |
| Station Technical Support (PBSC) | $ | | | | | | | |
| Call Center (PBSC) | $ | | | | | | | |
| **Facilities** | | | | | | | | |
| Rent | | | | | | | | |
| Utilities | | | | | | | | |
| Facilities Supplies | | | | | | | | |
| **Marketing** | | | | | | | | |
| Marketing Agency | $ | | | | | | | |
| PR | $ | | | | | | | |
| Materials | $ | | | | | | | |
| Membership Fulfillment | $ | | | | | | | |
| **Insurance** | | | | | | | | |
| Various | $ | | | | | | | |
| | $ | | | | | | | |



Operating Period 2

**Personnel**
Corporate Management
Indirect Labor
Direct Labor

Legal

Travel

**Operations Equipment**
Vehicles
Fuel
Vehicle Maintenance

Spare Parts
Shipping/Freight

Operating Equipment
IT Equipment
Safety Equipment
Equipment Repair & Maintenance

Operating Supplies

**Communications**
Vehicle Cellular Communications
Employee Communications (Phone, Internet)
Station Technical Support (PBSC)
Call Center (PBSC)

**Facilities**
Rent
Utilities
Facilities Supplies

**Marketing**
Marketing Agency
PR
Materials
Membership Fulfillment

**Insurance**
Various

| | Jan | Feb | March | April | May | Jun | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|