# Exhibit C

SECTION 2. Article I, Section 2 of the Free-Floating Vehicle Provider Pilot Program, passed by the City Council on March 28, 2018, found at pages 74789 -- 74800 of the City Council *Journal of the Proceedings of the City Council of the City of Chicago* of that date (Article I, Section 2 being found on page 74790) is hereby amended as follows by adding the language underscored and by deleting the language struck through as follows:

The Commissioner of Transportation, taking into account the Recitals, is authorized to authorize by contract execution, permit, or otherwise, one free-floating vehicle provider to implement the Free-Floating Vehicle Provider Pilot Program as established in Chapter 9-103 of the Municipal Code of Chicago, and to enter into and execute all such other instruments and to perform any and all acts, including the allocation and expenditure of duly appropriated funds, as shall be necessary or advisable in connection with the implementation of such contract, including any renewals thereto, or other form of authorization. The term of the pilot program shall be from May 1, 2018, through December 31, 2018, provided, however, that if the City Council does not vote to terminate the pilot program by December 31, 2018, then the pilot program shall extend of its own accord in one-month increments until ~~June 30~~ December 31, 2019.

SECTION 3. This ordinance shall be in full force and effect upon passage and publication.

----

# AMENDMENT TO DIVVY BICYCLE SHARING SYSTEM AGREEMENT WITH MOTIVATE INTERNATIONAL, INC. TO EXPAND SYSTEM AND CREATE NEW SERVICE LEVEL.

[SO2019-1611]

The Committee on Pedestrian and Traffic Safety submitted the following report:

CHICAGO, April 10, 2019.

*To the President and Members of the City Council:*

Your Committee on Pedestrian and Traffic Safety, to which was referred a substitute ordinance which is an amendment to the City "Divvy" bicycle sharing system agreement with new operator, Motivate International, Inc., begs leave to recommend that Your Honorable Body do *Pass* the proposed substitute ordinance transmitted herewith.

99070                          JOURNAL--CITY COUNCIL--CHICAGO                          4/10/2019

This recommendation was concurred in by all members of the committee present, with no dissenting votes.

Respectfully submitted,

(Signed)    WALTER BURNETT, JR.,
*Chairman.*

On motion of Alderman Burnett, the said proposed substitute ordinance transmitted with the foregoing committee report was *Passed* by yeas and nays as follows:

*Yeas* -- Aldermen Moreno, Hopkins, Dowell, King, Hairston, Sawyer, Mitchell, Harris, Beale, Sadlowski Garza, Thompson, Cárdenas, Quinn, Burke, Lopez, Foulkes, D. Moore, Curtis, O'Shea, Brookins, Muñoz, Tabares, Scott, Burnett, Ervin, Taliaferro, Reboyras, Santiago, Waguespack, Mell, Austin, Ramirez-Rosa, Villegas, Sposato, Laurino, O'Connor, Napolitano, Reilly, Smith, Tunney, Arena, Cappleman, Pawar, Osterman, J. Moore, Silverstein -- 46.

*Nays* -- None.

Alderman Beale moved to reconsider the foregoing vote. The motion was lost.

The following is said ordinance as passed:

WHEREAS, The Chicago City Council passed an ordinance on April 18, 2012 granting the Commissioner of the Department of Transportation the authority to enter into an agreement (the "Agreement") with Alta Bicycle Share, Inc., now, through change of control and change of name, Motivate International, Inc. (the "Operator" or "Contractor") for the purchase and operation of a bicycle sharing system (the "Ordinance"); and

WHEREAS, Pursuant to the Ordinance, the City and Operator entered into the Agreement for the purchase and operation of a bicycle sharing system (the "System") on or about January 24, 2013; and

WHEREAS, Pursuant to the Agreement, the City paid the Operator to purchase, install and operate the System; and

WHEREAS, The City paid the Operator primarily from federal grant funding for the purchase and installation of the System, and rental fees paid by users primarily funds the current operation and maintenance of the System; and

WHEREAS, The System is currently composed of approximately 600 docking stations, 6,200 bicycles, and related equipment, all of which are owned by the City; and

WHEREAS, In connection with a software upgrade to the System, certain City-owned System Equipment will be replaced, and the City must dispose of such replaced City-owned System Equipment (namely station kiosks and controller boards) consistent with disposition instructions from the Federal Highway Administration; and

WHEREAS, Under the Agreement, the parties agreed to an operational profit/loss sharing formula that included performance incentives for the Operator, if there was a profit and the Operator achieved specified service levels; and

WHEREAS, The System has not turned an annual profit, and the parties have had to split losses based on the formula contained in the Agreement; and

WHEREAS, Pursuant to authority conferred by Section 2-32-055 of the Municipal Code, the Chief Financial Officer entered into contracts with one or more brokers for obtaining advertisers and sponsors of the System; and

WHEREAS, Pursuant to Section 2-32-055, the Chief Financial Officer did enter into an advertising agreement for the System Ad Panels, whose advertising agreement has expired, is being replaced by an agreement with Operator, on substantially the same terms, until amendment of the Agreement; and

WHEREAS, Pursuant to Section 2-32-055, the Chief Financial Officer did enter into a System sponsorship agreement with Blue Cross Blue Shield of Illinois ("BCBSIL"), whereby BCBSIL paid the City $12,600,000.00 over five years for the right to be the overall System sponsor; and

WHEREAS, The BCBSIL System sponsorship agreement expires on or about April 30, 2019; and

WHEREAS, On or about November 30, 2018, Operator was acquired by, and became an indirect wholly-owned subsidiary of, Lyft, Inc.; and

WHEREAS, The parties desire to amend the Agreement to, among other provisions, (i) dramatically expand the System in terms of size and technological sophistication, (ii) introduce into the system e-bicycles, dockless bicycles, bicycle hubs, electrified stations for charging and digital ad space and other equipment to run the System more effectively, (iii) place the financial burden of expansion (including all capital costs), operation, and maintenance of the System solely on Operator, (iv) create a stream of payments from Operator to the City that will more accurately represent the current market value of System sponsorship and advertising opportunities, (v) create new service level

agreements so that the City can maintain control over System quality, (vi) require Operator to manage and fund various related programs such as "Divvy for Everyone", a pilot program for adaptive bicycle sharing, and a summer youth jobs program and to focus hiring on individuals with barriers to employment including ex-offenders and veterans, (vii) grant the Operator exclusive rights to offer bicycle sharing on the public right-of-way, *(vii) grant the Operator, subject to City approval, the right to set fares and create new fare products, and (ix) grant the Operator the exclusive right to use the City trademark "Divvy" for bikeshare and related transportation solutions, if any (the "Amendment"); and

WHEREAS, A draft of the Amendment is attached as Exhibit A; now, therefore,

*It Is Ordained by the City Council of the City of Chicago*, as follows:

1. Incorporation Of Recitals. The recitals to this Ordinance are incorporated herein.

2. Authorization Of Amendment Of Agreement With Operator; Disposition Of Certain Equipment. The Commissioner, with the review and concurrence of the Chief Financial Officer is authorized to negotiate and enter into an amendment to the Agreement with the Operator, on substantially the terms as set forth on Exhibit A, with such changes and additional terms as are approved by the Commissioner, with the review and concurrence of the Chief Financial Officer. The Commissioner is further authorized to transfer or otherwise dispose of City-owned System equipment, consistent with fair market value and disposition instructions from the Federal Highway Administration. Nothing in this ordinance shall be construed in derogation of the authority granted to the Chief Financial Officer under Section 2-32-055 of the Municipal Code. Nothing in this ordinance shall be construed to grant authority to the Commissioner to enter into an agreement with Operator for the operation of scooters.

3. Revenues. All revenues generated from the System will be used to fund the expenses of the System and for any other Title 23 Federal-aid eligible transportation improvements or programs, or other purposes as may be approved by the federal funding source.

4. Effective Date. This Ordinance shall be effective upon its passage and approval.

---

\* Editor's Note: Numbering sequence error in original document.

Exhibit "A" referred to in this ordinance reads as follows:


*Exhibit "A".*
(To Ordinance)

*Amendment.*


This Amendment (the "Amendment") to that Operator Agreement, as previously amended, (the "Agreement"), dated as of January 24, 2013, by and between Motivate International, Inc., a Delaware corporation, formerly known as Alta Bicycle Share, Inc. (the "Operator" or "Contractor"), and the City of Chicago, a municipal corporation and home rule unit of local government existing under the Constitution of the State of Illinois, acting through its Department of Transportation and its Department of Finance, ("City") is entered into as of April _____, 2019 (the "Effective Date"), by and between the Operator and the City. The City and Operator agree as follows:


*Background Information.*


Whereas, The Chicago City Council passed an ordinance on April 18, 2012 granting the Commissioner of the Department of Transportation the authority to enter into the Agreement for the purchase and operation of a bicycle sharing system (the "Ordinance); and

Whereas, Pursuant to the Ordinance, the City and Operator entered into the Agreement for the purchase and operation of a bicycle sharing system (the "System"); and

Whereas, Operator entered into a subcontract for the purchase and supply of, among other items, bicycles, bicycle docking stations, kiosks and related hardware and software ("Supply Subcontract"); and

Whereas, Operator purchased, with approval of the City, certain System equipment under the Supply Subcontract, including the bicycles, docking stations, kiosks and other equipment for the System, all of which is owned by the City ("Equipment"), using primarily federal grant funding; and

Whereas, The System is currently composed of approximately 600 docking stations, 6,200 bicycles, and related equipment, all of which are owned by the City; and

Whereas, Under the Agreement, the parties agreed to an operational profit/loss sharing formula that included performance incentives for the Operator if there was a profit and the Operator achieved specified service levels; and

Whereas, The System has not turned an annual profit, and the parties have had to split losses based on the formula contained in the Agreement; and

Whereas, Pursuant to authority conferred by Section 2-32-055 of the Municipal Code, the Chief Financial Officer entered into contracts with one or more brokers for obtaining advertisers and sponsors of the System; and

Whereas, Pursuant to Section 2-32-055, the Chief Financial Officer entered into an advertising agreement for the System Ad Panels, which advertising agreement has expired but is being replaced by an agreement with Operator on substantially the same terms; and

Whereas, Pursuant to Section 2-32-055, the Chief Financial Officer did enter into a System sponsorship agreement with Blue Cross Blue Shield of Illinois ("BCBSIL"), whereby BCBSIL paid the City $12,600,000.00 over five years for the right to be the overall System sponsor; and

Whereas, The BCBSIL System sponsorship agreement expires on or about April 30, 2019; and

Whereas, On or about November 30, 2018, Operator was acquired by, and became an indirect wholly-owned subsidiary of, Lyft, Inc.; and

Whereas, The parties desire to amend the Agreement to, among other provisions, (i) dramatically expand the System in terms of size and technological sophistication, (ii) introduce into the system e-bicycles, dockless bicycles, bicycle hubs, electrified stations for charging and digital ad space, (iii) place the financial burden of expansion (including all capital costs), operations, and maintenance of the System solely on Operator, (iv) create a stream of payments from Operator to the City that will more accurately represent the current market value of System sponsorship and advertising opportunities, (v) create new service level agreements so that the City can maintain control over System quality, (vi) require Operator to manage and fund various related programs, including but not limited to "Divvy for Everyone", a pilot program for adaptive bicycle sharing, and a summer youth jobs program, (vii) grant the Operator exclusive rights to offer bicycle sharing on the public right-of-way, *(vii) grant the Operator, subject to City approval, the right to set fares and create new fare products, and (ix) grant the Operator the exclusive right to use the City trademark "Divvy" for bikeshare and related transportation solutions, if any;

Now, Therefore, In consideration of the mutual covenants, conditions and promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

---

* Editor's Note: Numbering sequence error in original document.

*Article 1.*

*Definitions.*

1.1 Definitions.

The following words and phrases have the following meanings for purposes of the Agreement. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Agreement:

"Bicycle" means the City Bicycles and the Operator Bicycles.

"Bicycle Hub" means any object or technology other than a Station used for the purpose of parking and locking a bicycle after a rental period such as no-tech bike corrals, and bike racks.

"City Bicycle" means a device propelled solely by human power, upon which a person may ride either on or astride a regular seat attached thereto, having two or more wheels in tandem, as further described in the Scope of Services, (Sub)Exhibit 1, Schedule 3 and previously purchased by Operator from PBSC with funds from the City under the Agreement.

"City Data" means all data recorded, gathered, or produced by the System, including but not limited to data pertaining to individual users, whether gathered through the website, social media, the Equipment, or customer service communications.

"City Equipment" means the physical components of the System paid for and owned by the City and provided by Operator through purchase from its subcontractor PBSC.

"City Stations" means the bicycle stations previously purchased by Operator from PBSC with funds from the City under the Agreement.

"Contract Year" means, as the case may be, (i) the 12-month period beginning on the Effective Date, (ii) each successive 12-month period during the term, and (iii) any period less than 12 months beginning the day after the second to last Contract Year and ending on the expiration or termination date of the Agreement.

"Divvy Marks" means the name Divvy, including as specified in Federal trademark registrations for "Divvy" (Registration Number 4802363) and "Divvy and Design" (Registration Number 4802362), both of which are owned by the City.

"E-Bicycle" means a Class 1 low-speed electric bicycle, as defined in Section 9-40-010 of the Municipal Code of Chicago.

"Equipment" means the City Equipment and the Operator Equipment.

"Hybrid Bicycle" means a bicycle that has both a Lock-To Capability and a Station Lock Capability.

"Lock-To Capability" means a bicycle mechanism for parking and locking the bicycle to a separate physical object, other than a Station.

"Operator Bicycle" means the bicycles that are purchased by Operator under this Amendment. Operator Bicycles are owned by the Operator.

"Operator Equipment" the physical components of the System, including without limitation Operator Bicycles, Operator Stations, and Bicycle Hubs, that are purchased by Operator under this Agreement. Operator Equipment is owned by the Operator.

"Operator Stations" means the bicycle stations that are purchased by Operator under this Agreement, including stations with electric charging capability and digital ad panels. Operator Stations are owned by the Operator.

"Ridership Revenue" means all revenue derived from fees paid by riders for use of the System, including subscription, rental, overage, surcharge, and lost bike fees.

"Service Level Agreements" or "SLAs" means the service level agreements as defined in (Sub)Exhibit 1.

"Services" as defined in the Agreement includes all the Operator obligations and services described in this Amendment.

"Station" means the City Stations and the Operator Stations.

"Station Lock Capability" means a bicycle mechanism for parking and locking the bicycle to a Station.

"Subcontractor" means any person or entity with whom Operator contracts to provide a material part of the Services.

1.2 Order Of Precedence.

In case of conflict or inconsistency between the terms of this Amendment and the terms of the Agreement, as previously amended, the terms of this Amendment take precedence. Except in the case of the case of conflict or inconsistency with this Amendment, the terms of the Agreement remain in full force and effect except as modified in this Amendment.

1.3  Incorporation Of (Sub)Exhibits.

The following attached Schedules and (Sub)Exhibits are made a part of this Agreement:

(Sub)Exhibit 1  --  Service Level Agreements

(Sub)Exhibit 2  --  Annual Payment Schedule

(Sub)Exhibit 3  --  System Branding and Graphics

(Sub)Exhibit 4  --  Economic Disclosure Statement and Affidavit

(Sub)Exhibit 5  --  Insurance Requirements and Evidence of Insurance

(Sub)Exhibit 6  --  List of Key Personnel

(Sub)Exhibit 7  --  Sexual Harassment Policy Affidavit (Section 2-92-612)

(Sub)Exhibit 8  --  Advertising Standards

*Article 2.*

*Duties And Responsibilities Of Parties*

2.1  Scope of Capital Investment System Expansion.

(a) Capital Investment. Operator must provide a minimum of $50,000,000.00 in capital investment in the System during the term. Operator agrees that $42,000,000.00 of such capital investment must be completed no later than 36 months after the Effective Date. All proposed investments exceeding a cumulative amount of $1,000,000.00 in a given calendar year, made after Lyft has satisfied the $50,000,000.00 commitment, described in the previous sentence, shall be subject to City approval, which may not be unreasonably withheld. Operator must provide the City with semi-annual reports on capital investments.

(b) System Expansion.

(i) Generally. The required capital investment described in Section 2.1(a) will primarily be for System expansion. The Operator must add Operator Bicycles and Operator Stations to the System. Such additions must be in accordance with the quantities and schedule set forth below ("Expansion Targets"). At the end of the schedule below the System will operate geographically in the entire City:

1. Within 12 months of the Effective Date, Operator must add 3,500 Operator Bicycles and 50 Operator Stations;

2. Within 24 months of the Effective Date, Operator must add 3,500 Operator Bicycles and 125 Operator Stations;

3. Within 36 months of the Effective Date, Operator must add 3,500 Operator Bicycles.

(ii) Bicycle Technology. Each Operator Bicycle must be both an E-Bicycle and a Hybrid Bicycle. If Operator wants to purchase and add a bicycle that is not both an E-Bicycle and a Hybrid Bicycle, Operator must seek City approval.

(iii) Electrification Of Certain Stations. Subject to City approval of Operator plans and any third party approvals, Operator will install some Operator Stations (or upgrade City Stations) to have electric charging capabilities ("Electrified Stations") such that by June 30, 2021 a minimum of 15 percent of all Stations in the System will be Electrified Stations. All Electrified Stations must have an attached digital ad panel. Operator is responsible for all capital and operating costs required in implementing Electrified Stations with digital ad panels.

(iv) Bicycle Hubs. In addition to adding a minimum of Stations as set forth above, the Operator must provide supplemental Bicycle Hubs.

(v) Operator Equipment Specifications. Operator must provide for City approval specifications for all Operator Equipment, which approval will not be unreasonably withheld.

(vi) New Station Location/Siting. All Station location, relocation, and siting is subject to City approval, applicable laws and regulations and otherwise performed in accordance with the Agreement. Operator must undertake all activities related to new Station location and siting as part of its capital investment in the System; provided, however, Operator must bear all costs the City incurs under the City parking concession agreement with Chicago Parking Meters LLC ("CPM") due to reduction in parking spaces covered by the CPM concession agreement, and such costs will not count as part of Operator's capital investment in the System. If Operator proposes a Station installation that results in the reduction of metered parking space subject to the CPM agreement, the City will use good faith efforts to offset the value of the lost spaces by adding new metered parking space(s) within the same area as the space(s) taken. In no event will City incur any costs or expenses involved in relocation of spaces.

(vii) Federal Requirements. Operator agrees to cooperate with the City, in any manner, with respect to state and federal grant requirements that are triggered in the course of System expansion and operation. Such cooperation extends to the

performance of any action necessary to effectuate compliance with such grant requirements, including executing agreements or amendments required by the compliance with the federal requirements and the direct or indirect payment of all costs, fees, and repayment of required amounts under state and federal regulations to the state or federal funding source, as applicable; provided, however, that if pursuant to this Section 2.1(b)(vii), Operator is required to make any payment of Ridership Revenue to City or any grantor, then Operator's Annual Payment shall be reduced by an amount equal to such payment of Ridership Revenue.

(viii) Subcontractor Approvals. All Subcontractors require approval of the City, not to be unreasonably withheld. Operator must not hire any Subcontractor or other Subcontractor that is debarred by the City.

2.2 Operations, Maintenance, And Performance Requirements.

(a) Operation And Maintenance Costs. Operator will be solely responsible for all costs involved in operations, maintenance, and marketing, and capital replacement of the System in conformance with the procedures set forth in the Agreement.

(b) Performance Requirements. Operator must meet the Service Level Agreements set forth in (Sub)Exhibit 1 to ensure that the System and customer service are maintained at a high quality in terms of overall System usability and reliability, service coverage, equity and promotion of use and ridership growth.

(c) Liquidated Damages. Recurring failure to meet SLAs, subject to the cure periods set forth in (Sub)Exhibit 1, will result in liquidated damages and/or default on the Agreement; provided, however, that any failure to meet an SLA due to Operator's reasonable efforts to mitigate a safety issue or otherwise act in the best interest of the customers shall not give rise to liquidated damages, provided that Operator has notified the City of such mitigation efforts, in advance or as soon as practicable, and City has approved such efforts, which approval shall not be unreasonably withheld. If Operator determines that meeting SLAs may require additional Operator Bicycles, Operator Stations, or Bicycle Hubs, or operational or other capital expenditures, any such costs will be borne solely by Operator. The failure to meet SLAs shall result in liquidated damages to be paid in cash; however, at the City's sole discretion, in lieu of paying cash for liquidated damages for failure to meet SLAs, Operator may satisfy such obligation by increasing its total capital expenditure on the System by the amount of such damages. If City consents to Operator's increasing its total capital expenditure on the System as described above, Operator must separately track such capital expenditures on any such Equipment. In the event of expiration or early termination of the Agreement (i) the specific equipment so purchased will not be subject to City repayment, if any, or (ii) the City will receive a credit equal to the depreciated value of such expenditure.

2.3 Annual Payment.

(a) Amount. On June 30th of each year during the term, Operator must make an annual payment to the City ("Annual Payment"). The Annual Payment comprises the following three elements:

(i) $6,000,000.00, which payment will (i) increase by 4 percent each year, and (ii) shall be prorated for any Contract Year less than eight (8) months long on the basis which the number of days in such Contract Year bears to 365 (a schedule of the Annual Payment subject to this Subsection (i), (ii) and (iii) is set forth in (Sub)Exhibit 2, provided, however that the text of this Section 2.3 takes precedence over (Sub)Exhibit 2 in case of conflict);

(ii) the greater of (1) $1,500,000.00 or (2) 40 percent of net revenue generated in the most recently concluded Contract Year (if applicable) from third-party sponsorships and advertising, including branding or promotions on any System Equipment and any advertising on static and digital ad panels. In determining net revenue, Operator must take into account only (i) commercially reasonable subcontractor commissions and expenses, and (ii) the costs of installing and electrifying digital ad panels on Electrified Stations; and

(iii) 5 percent of annual Ridership Revenue collected in the most recently concluded Contract Year (if applicable) in excess of $20,000,000.00.

(b) Use Of Annual Payment. The parties acknowledge that all or a portion of the Annual Payment may be considered "program income" under federal grant requirements applicable to the federal grant funds used to purchase the existing equipment, and therefore would be required to be rolled back into the System, or other Title 23 Federal-aid eligible programs, or other purposes as may be approved by the funding source. Therefore, the City agrees to use the Annual Payment exclusively for transportation purposes, including, but not limited to the upkeep, maintenance and installation of bicycle infrastructure in the City of Chicago.

2.4 System Sponsorships, Promotions And Use Of Ad Panels.

(a) Sponsorships. Operator shall have the right to (i) broker third party promotion or sponsorships for the System, and (ii) subject to Section 2.3(a)(ii), collect and retain all revenues generated by such promotion or sponsorships. Any third party sponsorships for the System that last longer than 120 days will require the approval of the City. Dedicated sponsorships of any supportive programming for the Divvy system (e.g., Divvy for Everyone, adaptive bikes) will require approval of the City. Operator agrees to grant Blue Cross Blue Shield of Illinois the right of first refusal, for a period of 90 days from the Effective Date, to any third-party sponsorships of the System.

Case: 1:19-cv-05253 Document #: 22-3 Filed: 09/26/19 Page 14 of 90 PageID #:270

(b) Co-Promotions. Co-promotions to Divvy riders and members with third-party urban mobility options and services (e.g., taxi, ridesharing), including those operated by Lyft, require the approval of the City, which may be withheld for any reason.

(c) Use Of Ad Panels.

(i) Public Service Announcement Panels. Operator must make available to the City 5 percent of static ad panel faces and digital ad panel impressions for public service announcements, as provided by the City.

(ii) Lyft Branded Advertising Panels. Operator may use 20 percent of the static ad panel faces and digital ad panel impressions to promote Lyft's brand, including Lyft's commitment to sustainable and multi-modal transportation.

(iii) Third Party Advertising Panels. Operator must use commercially reasonable efforts to sell third-party advertising on 75 percent of the static ad panel faces and digital ad panel impressions. Any inventory of static ad panel faces and digital ad panel impressions not sold in a given period may be used to promote (1) Lyft's brand; (2) the System (e.g., Divvy presented by Lyft); (3) public art presented by Lyft; and (4) public service announcements. Operator must offer the City 25 percent of such unsold static ad panel faces and digital ad panel impressions for public service announcements.

(iv) Limitation On Lyft Branded Advertising. Notwithstanding the foregoing subsections (i) -- (iii), Operator may not populate more than 35 percent of all static ad panel faces and digital ad panel impressions with Lyft branded advertising. For the avoidance of doubt, advertising panels used for promotion of the System (e.g., Divvy presented by Lyft) and public art presented by the System shall not constitute Lyft branded advertising for the purposes of this limitation. In addition to the forgoing limitation, Operator may not use more than half of all Lyft branded advertising panels to promote a single line of Lyft business.

(v) Advertising Standards. All use of ad panels is subject to the Advertising Standards set forth on (Sub)Exhibit 8 and, in keeping with the focus of the ad panels used for public art, Lyft recognition is expected to be minimal and discreet and shall reflect the established System name, including "Divvy". Operator agrees that no ad panel use shall disparage or injure the reputation of public transportation in Chicago.

2.5  System Branding.

(a) System Name. Operator may establish a new System name, which must include the Divvy Marks, and the Divvy blue color must remain relatively dominant within the color scheme. Operator must submit all branding and graphic designs to the City for approval. The City must respond in a timely manner and its approval shall not be unreasonably withheld, taking into account practical considerations such as the need for Operator to have standardized national hardware platforms; provided, however, that if a brand other than "Divvy" alone or "Divvy" with "Lyft" is introduced, City has the right to reject for any reason. The City hereby approves the graphic designs attached hereto as (Sub)Exhibit 3.

(b) Exclusive Rights To Divvy Marks. The City hereby grants to Operator, for the term of the Agreement, the exclusive right to use the Divvy Marks for bicycle or other mobility programs. For the avoidance of doubt, the City agrees that it will not grant any right to use the Divvy Marks to any other mobility service providers during the term, including for use on scooters and other micro-mobility solutions. If, pursuant to some other agreement with the City or otherwise outside the terms of this Agreement, Operator is permitted, contracted or licensed to operate scooters and other micro-mobility solutions in the City, Operator will be granted the right to use the Divvy Marks for such operation.

2.6  Exclusive Right On The Public Right-Of-Way.

(a) Scope Of Exclusivity.

(i) Exclusive Right On Public Right-Of-Way. Subject to the terms and conditions of this Section 2.6, City agrees and acknowledges that, during the term of the Agreement, Operator will be the exclusive operator of bike sharing (be that docked, dockless, and/or electric bicycles) from the public right-of-way in the geographic areas of the City of Chicago that are covered by the System. City agrees that, during the term, it will not grant to any person or entity other than Operator a license or permit to offer bicycle rentals on the City's public right-of-way for any type of bicycle, including electric bicycles, docked bicycles, dockless bicycles and/or any combination or hybrid thereof.  Issuance by the City of a permit to offer bicycle rental services from the public way, to any entity other than Operator, is a breach of this Section 2.6(a)(i), for which the City will have a cure period of 10 business days from written notice from Operator. For the avoidance of doubt, the parties agree that the Operator's exclusive right to operate bicycle rental services on the public right-of-way is not violated by (i) any entity, including but not limited to the Chicago Park District, the Cook County Forest Preserve or any other private party, offering bicycle rental services that originate from their own property, or (ii) the parking of bicycles from other such rental systems by renters on the public right-of-way, unless any such bicycle so parked on the public right-of-way is capable of being rented, from the public right-of-way, for a new rental period, by a new customer. The parties agree that persons or entities displaying bicycles on the public right-of-way, with the intent to offer a staffed (i.e., non-self-service), service for round-trip (i.e., not point-to-point) bicycle rentals from adjacent private property, is not a violation of the exclusive right in this Section 2.6(a)(i).

(ii) Enforcement On Public Right-Of-Way. The City acknowledges that the operation by an entity of a bicycle rental business, from the public right-of-way, without a permit, is a violation by that entity of the City's Municipal Code. Upon notice from Operator of a violation of its exclusive rights set forth in this Section 2.6, (including, to the best of Operator's knowledge, the identity of entity committing such violation(s), and date, time and place of such violation(s)), the City will take enforcement measures against the violating party, as may be deemed appropriate considering the scope and frequency of

the violations, by the City in its reasonable discretion, including by way of issuing warnings, citations, cease and desist letters, or impoundment of bicycles. The parties agree that any disputes involving violations of exclusivity or the City enforcement efforts under this subsection 2.6(a)(ii) will be settled in accordance with Article 6 of the Agreement ("Disputes").

2.7  Ridership Revenue/Fare Products.

(a)  Ridership Revenue. Subject to any requirements under Section 2.1(b)(vii) and 2.3(a)(iii), all Ridership Revenue will be retained by Operator.

(b)  Rental Fees/Fare Products. City agrees that, subject to City approval rights listed in this Section 2.7(b), Operator may set rental fees for single rides, daily passes, annual passes and overage fees. Any increase greater than 10 percent in each calendar year requires approval of the City. City approval will be required for all new fare products, new fare policies and fees, including introducing additional surcharges for premium services such as E-Bikes. City's approval in each case shall be reasonably prompt and shall not be unreasonably withheld, taking into account the actual costs of delivering the service.

2.8  Integration Of System Data With Third Party Applications.

(a)  System Data Integration With Ventra System. Operator must initiate a program so that, subject to cooperation of the Chicago Transit Authority ("CTA"), by December 31, 2019, it will complete the integration of System data with the Ventra application in order to incorporate Bicycle availability, rental and unlock features and, subject to further cooperation of the CTA, by June 1, 2021 jointly offer with the CTA at least one fully integrated membership, pass or fare product, providing a seamless transit-bike product for Chicagoans.

(b)  System Data Integration With Lyft Application. Notwithstanding the foregoing and subject to third party integration commitments in Section 2.8(a), Operator may integrate the System data, and offer Bicycle availability and rental in, the Lyft mobile application, provided, however, that bicycle rental rates may not be discounted without City approval, which may be withheld for any reason.

(c)  Stand-Alone Divvy Application/Website. Operator must operate and maintain (i) the existing stand-alone Divvy website and social media activity and (ii) the existing stand-alone Divvy application for bicycle availability, rental, unlock features.

(d)  Third Party Applications. Upon request from a third party, Operator must work cooperatively, and in good faith, to enable such third party to integrate System data and enable purchase of rides at publicly available rates.

2.9  Operation Of Related Programs.

(a) Divvy For Everyone. Operator must manage, fund, and operate the Divvy for Everyone (D4E) program and continue to operate the Divvy Outreach Leaders program. Operator agrees to fund increased resources placed within expansion areas. Operator shall seek inclusion of ex-offenders into the D4E program. Operator must submit an annual budget, outreach plan, and scope of services for City approval.

(b) Adaptive Bicycle Sharing. Operator must develop a pilot adaptive bike sharing or rental program, based on reasonable feedback from surveys and focus groups with representatives of the disability community and affected partners, within six (6) to twelve (12) months after the Effective Date. Such program may (i) be a stand-alone program staffed by personnel that will facilitate rental of adaptive bicycles (i.e., non-self-service), (ii) use the Divvy Marks, and (iii) operate in coordination with third parties, such as bike stores or the Chicago Park District. The proposed pilot and any subsequent permanent program shall be developed with due regard to safety and geographic appropriateness and must include types of bicycles that meet the broadest needs of people with disabilities and training for rental personnel. Once the program(s) has been established, periodic status reports must be submitted to the Department of Transportation and the Mayor's Office for People with Disabilities. Proposals for the pilot and any permanent programs will be subject to the approval of the Commissioners of the Department of Transportation and the Mayor's Office for People with Disabilities, or their representatives. Such approvals may not be unreasonably withheld.

(c) Jobs Program. Operator must manage, fund, and operate jobs training programs, and shall seek inclusion of youth, ex-offenders and others with barriers to employment into all training and hiring programs. Operator will conduct these activities in coordination with community organizations. Operator has already established partnerships with Blackstone Bicycle Works, West Town Bikes, and Safer Foundation and commits to grow these partnerships and develop additional partnerships with similar organizations.

(d) Evanston System. Operator will be solely responsible for negotiating new terms, if any, with the City of Evanston regarding Evanston's bicycle sharing system.


2.10  Scooter And Other Micromobility Solutions.

If, subject to future actions by the City separate from this Agreement, the City elects to permit or otherwise allows any third party to conduct business operation(s) or otherwise offer rental services from the public way, of a specific Low-Speed Electric Mobility Device (as such term is defined in the Municipal Code of Chicago), for a cumulative duration longer than nine (9) months during the first eighty-four (84) months of the term of this amended Agreement, then the Operator may initiate, and the City shall undertake, good faith negotiations (as described below) not earlier than the completion of such cumulative nine (9) month period. The subject of the good faith negotiations shall be changes to the terms of the Agreement regarding the bikeshare System, if any, taking into account at

least the following: (i) documented impacts to System vehicle utilization from such new Low-Speed Electric Mobility Device; (ii) whether Operator has been meeting SLAs; and (iii) benefits that Operator has earned or intends to earn from participation in such a Low-Speed Electric Mobility Device operation in Chicago. Operator's planned investment in the System described in Section 2.1(a) and Operator's schedule for expansion of the System described in Section 2.1(b) may be tolled during such negotiations. The parties agree to use best efforts to complete such good faith negotiations in a timely manner within three (3) months of initiation of the negotiations, but in no event later than five (5) months, to ensure any such tolling is not indefinite. Tolling must cease upon successful completion of negotiations or, if unsuccessful, within five (5) months of initiation of negotiations.

2.11  Term And Termination.

(a) Term Of Performance. Section 4.1 of the Agreement is hereby deleted and replaced with this Amendment Section 2.11(a). On or about October 2, 2017, the Commissioner notified the Operator, pursuant to Section 4.3 of the Agreement, that she was exercising the City option to extend the initial term of the Agreement (ending January 23, 2018) for 60 months ("First Extension Period"). Therefore, the current end date of the term of this Agreement is January 23, 2023.

(b) Extension Periods. Section 4.3 of the Agreement is hereby deleted and replaced with this Amendment Section 2.11(b). The Agreement is subject to two 60-month extension periods beyond the First Extension Period (the "Second Extension Period" and the "Third Extension Period", respectively) contingent in each case upon (i) and (ii) below. As to the Second Extension Period, the City will give notice to Operator whether Operator has met conditions (i)(1) and (i)(2) below six months prior to the end of the First Extension Term ("Notification Date").

(i) for the Second Extension Period, the term of the Agreement will extend automatically, if the Operator (1) has met the Expansion Targets (as set forth in Section 2.1(b)(i)1 -- 3 of this Amendment), and (2) has achieved a rating of "meets expectations" in a substantial number of SLA categories (on a weighted average basis) over the 12 months prior to the Notification Date; if the Expansion Targets are not met or the Operator has not met the requisite number of "meets expectations" specified immediately above, the Second Extension Period may be exercised at the sole discretion of the City. If the Agreement is not otherwise extended pursuant to this Section 2.11(b)(i), the Agreement will expire at the end of the First Extension Period;

(ii) if the Agreement is extended for a Second Extension Period pursuant to Section 2.11(b)(i), the term of the Agreement may be extended for the Third Extension Period, upon (1) mutual agreement of the parties and (2) the approval of the City Council of Chicago. If (1) and (2) are not met, the Agreement will expire at the end of the Second Extension Period.

(c) Disposition Of Equipment Upon Expiration.

Upon expiration of the term of the Agreement, the City, at its sole discretion, may (i) require that some or all of the Equipment in the System be conveyed to the City for no payment; provided, however that any Operator Equipment acquired by the Operator, after Operator has met its obligation to make a $50,000,000.00 capital investment as required by Section 2.1(a), shall be subject to purchase by the City, at a mutually agreed price, based on the fair market value of such Operator Equipment, which price shall not exceed the depreciated value of the Operator Equipment, using a 104-month straight-line depreciation schedule, or (ii) require Operator to remove all the Equipment.

(d) Early Termination. Subsections (a) and (b) of Section 9.3 of the Agreement are hereby deleted and replaced with subsections (d)(i) and (d)(ii) of this Amendment Section 2.11(d).

(i) In addition to termination under Sections 9.1 and 9.2 of the Agreement, the City may terminate the Agreement at any time by a notice in writing from the City to Operator. The City will give notice to Contractor in accordance with the provisions of Article 11 of the Agreement. The effective date of termination will be the date the notice is received by Operator or the date stated in the notice, whichever is later. If the City elects to terminate this Agreement, all Services to be provided under it must cease as specified in the early termination notice. After the effective date of termination, a termination fee ("Termination Fee") must be paid within sixty (60) days of the final Appraisal (as defined below).

(ii) After the notice is received, Contractor must restrict its activities, and those of its Subcontractors, to winding down the performance of the Services. No costs incurred after the effective date of the termination are allowed, except as mutually agreed between the parties. If the City elects to terminate the Agreement for convenience in accordance with this Section 2.11(d), the City must pay to Operator as the Termination Fee the sum of: (1) the fair market value as of the date of such termination of any capital equipment expenditures incurred by Operator since the Effective Date; (2) the present value of reasonable lost profits of Operator from the notice of Termination through the Second Extension Period; (3) the unamortized amount (amortized on a straight line basis over a one-year period), as of the date of such termination, of the most recent Annual Payment; (4) the cost of any non-cancelable material and equipment that is not capable of use except in the performance of the terminated services; and (5) any termination costs or penalties under any third-party agreement related to the services, including any lease for real property. After such payment, the City, at its sole discretion, may either require that all Equipment in the System owned by the Operator be conveyed to the City for no payment, or require Operator to remove the Equipment.

(iii) The fair market value and present value of reasonable lost profits noted in Sections (ii)(1) and (ii)(2) above (the "Appraisal") shall be determined pursuant to a written appraisal by an independent third-party appraiser that is acceptable to the City and the Operator. If the parties fail to agree upon such a single appraiser within 30 days after a party requests the appointment thereof, then the City and the Operator shall each

appoint an independent third-party appraiser. Each party shall determine an Appraisal within 60 days after the request for each party to choose its own appraiser. The City's Appraisal and the Operator's Appraisal will be averaged, the result of which shall constitute the Appraisal. In the event, however, that the difference between the City's Appraisal and the Operator's Appraisal deviate by more than ten percent (10%) of the lowest value Appraisal, then both such appraisers shall be instructed to jointly select a nationally recognized independent third-party appraiser to make the final determination of the Appraisal within 30 days of completion of the City's Appraisal and Operator's Appraisal.

2.12  Key Personnel.

The parties hereby agree that the text of Section 3.9(c) is deleted and replaced with:

Operator must provide a List of Key Personnel within a reasonable period after the Effective Date. Key personnel are subject to City approval, which may not be unreasonably withheld. Operator must update its List of Key Personnel by notice lo the City when necessary to reflect the current personnel and the responsibility of each.

2.13  Events Of Default. The parties hereby agree that Section 9.1(b) of the Agreement is amended, in part, by adding the word "material" in the following manner:

(b) Operator's material failure to perform any of its obligations under this Agreement including the following:

No other change to Section 9.1(b) is intended by this Section 2.13.

The parties hereby agree that Section 9.1(d) of the Agreement is hereby deleted.

2.14  Cure Periods.

The parties hereby agree that Section 9.2(a) of the Agreement is deleted and replaced with the following:

(a)  Notices.  The occurrence of any event of default permits the City, at the City's sole option, to declare Operator in default.

The Commissioner will give the Operator an opportunity to cure the default, where such default is capable of cure, within a certain period of time, which period of time may be no less than 30 days and may be extended by the Commissioner; such cure period will be automatically extended for a reasonable period of time so long as Operator is diligently pursuing the remedy.

The Commissioner will give Operator written notice of the default, in the form of a cure notice ("Cure Notice"), subject to the time periods above. If Operator is unable to cure within Cure Period, the Commissioner may give a default notice ("Default Notice"). If the Commissioner gives a Default Notice, the Default Notice will also indicate any present intent the Commissioner may have to terminate this Agreement, and the decision to terminate is final and effective upon giving the notice. If the Commissioner decides not to terminate, this decision will not preclude him from later deciding to terminate the Agreement in a later notice, which will be final and effective upon the giving of the notice or on the date set forth in the notice, whichever is later. When a Default Notice with intent to terminate is given as provided in this Section 9.2 and Article II, Operator must discontinue any Services, unless otherwise directed in the notice, and deliver all materials accumulated in the performance of this Agreement, whether completed or in the process, to the City.

No other change to Section 9.2 is intended by this Section 2.14.


2.15   Notices.   Operator's address for the purposes of Article 11 of the Agreement is hereby amended to the following:

"Motivate International, Inc.
WeWork, in care of Liam O'Connor
360 West 31st Street, Floor 9
New York, New York 10001

with copies to:

Lyft, Inc.
Attention: LBS Legal
185 Berry Street, Suite 5000
San Francisco, California 94107"


2.16   Deletion Of Certain Provisions. In addition to the deletion of any provisions of the Agreement in accordance with the aforementioned terms of this Amendment, the following provisions of the Agreement are hereby deleted: Sections 3.2; (Sub)Exhibit 1, Article V; (Sub)Exhibit 1, Article VI, Section A; (Sub)Exhibit 1, Schedules 4, 5, 19, 20, 23, and 24; and (Sub)Exhibit 3; in Schedule 11, Section (4), second paragraph, the number "25" is hereby deleted and replaced with "35".

Acknowledgement. Operator has executed an on-line Economic Disclosure Statement (EDS) per Certificate of Filing and has provided an Insurance Certificate, which are attached to this Amendment as (Sub)Exhibit 4 and (Sub)Exhibit 5 respectively, and incorporated here by reference. The Contractor warrants and represents that such documents are accurate as of the date of execution of this Amendment. The terms of the Agreement remain in full force and effect except as modified in this Agreement.

4/10/2019        REPORTS OF COMMITTEES        99089

In Witness Whereof, The undersigned have executed this Amendment as of the Effective Date in counterparts or otherwise.

Operator:

Motivate International, Inc.

By: _____

Name: _____

Title: _____

City of Chicago:

Department of Transportation

By: _____

Name: _____

Title: _____

Department of Finance

By: _____

Name: _____

Title: _____

[(Sub)Exhibit 3 referred to in this Amendment to Operator
Agreement with Motivate International, Inc. printed
on page 99157 of this *Journal*.]


[(Sub)Exhibits 6 and 7 referred to in this Amendment to
Operator Agreement with Motivate International, Inc.
unavailable at time of printing.]

(Sub)Exhibits 1, 2, 4, 5 and 8 referred to in this Amendment to Operator Agreement with Motive International, Inc. read as follows:

*(Sub)Exhibit 1.*
(To Amendment To Operator Agreement
With Motivate International, Inc.)

*Service Level Agreements.*

The Operator and City have agreed on a number of Service Level Agreements ("SLAs"). On a monthly basis, the Operator will provide the City with a report on its performance against each SLA. If in any given month the Operator does not Meet Expectations for SLAs 1 through 11, and if in the subsequent month, the Operator still has not achieved Meets Expectations in such SLA, then a Liquidated Damage of $10,000 for each SLA 1 through SLA 3 and $5,000 for each SLA 4 through 11 shall be applied for each month, and that fine shall continue for each subsequent month where Meets Expectations has not been achieved in such SLA. However, once an SLA has not been met for the third month in a calendar year, the SLA will be applied immediately.

Meeting Expectations for SLAs 1 through 11 more than half of the time each such SLA is measured in the 12 months before the Notification Date (as defined in the Agreement) shall constitute achieving a rating of "Meets Expectations" in a substantial number of SLA categories:

1. Percentage Of Station Minutes With Sufficient Bikes: Percent of time Stations have Sufficient Bikes (as defined below) between the hours of 6:00 A.M. and 12:00 A.M. (Midnight) with no grace period. A Station has Sufficient Bikes if the number of Bicycles at that station, or within 400 meters of that station, is greater than or equal to 10 percent of the number of Docks at that Station rounded to the nearest whole number. Meets Expectations is achieving at least 95 percent.

2. Percentage Of Station Minutes With Sufficient Available Docks: Percent of time Stations have Sufficient Available Docks (as defined below) between the hours of 6:00 A.M. and 12:00 A.M. (Midnight) with no grace period. A Station has Sufficient Docks if the number of Docks at that Station, or within 400 meters of that station, is greater than or equal to 10 percent of the number of Docks at that Station rounded to the nearest whole number. Meets Expectations is achieving at least 95 percent.

3. Percentage Of Station Days Where Stations Full Or Empty > 24 Hours: Total number of 24-hour periods that a station has been full or empty, divided by the number of Station Days in the month. "Station Days" means the average number of stations in the system during the month times the number of days in such month. Meets Expectations is no greater than 3 percent.

4. Percentage Of Bike Fleet Deployed: Metric is only applied between the months of April and November. The percentage of Bicycles deployed shall be calculated by taking the number of Bicycles deployed on the street recorded on a daily basis ("Bicycles in Circulation"), divided by the Bicycle Fleet. "Bicycle Fleet" is the number of Bicycles purchased minus Missing Bicycles, Crashed Bicycles, Retired Bicycles (each as defined below), extra spare bicycles purchased and otherwise out of service Bicycles measured each day of the month and averaged over the month. E-Bikes that go dead with battery life are not considered to be Bicycles in Circulation. Meets Expectations is achieving at least 80 percent.

     a. "Missing Bicycles" means Bicycles that are otherwise in service but have not been docked at a Station in the last 24 hours. The process for replacement of missing bicycles shall be determined and mutually agreed upon by the Operator and the City.

     b. "Crashed Bicycles" means Bicycles that are not in service because they have been suspected of having been or reported as being in a crash.

     c. "Retired Bicycles" means Bicycles that are not in service because they have been damaged beyond repair, because they are undergoing extraordinary maintenance required to mitigate a safety issue with notice to the City, or because they have reached the end of their useful life.

5. Percentage Of Calls Answered (90 Seconds): Percent of calls that are answered within 90 seconds, as reported by the call center on a monthly basis. Meets Expectations is achieving at least 85 percent.

6. Percentage Of Dropped Calls: Meets Expectations is no greater than 5 percent.

7. Percentage Of Email Responded (24 Hours): Percent of emails that are responded to within 24 hours. Meets Expectations is achieving at least 95 percent.

8. Percentage Of Stations Inspected And Cleaned: Percentage of Stations that have been inspected within the last sixty (60) days measured each day of the month and averaged over the month. Meets Expectations is achieving at least 95 percent. Station Inspection shall include, but is not limited to, the following tasks:

     a. Use best efforts to clean all visible dirt, ink, paint, litter or any other substance on the Station;

     b. Check Kiosk functionality including transactions and communications;

     c. Check all communications systems including, but not limited to, the Kiosk-dock and the Kiosk-Central Computer System;

d.  Check each of the Docks' functionalities including, but not limited to, locking mechanism, cassette and keypad and bike charging functionality if present;

e.  Wipe down Station and all interfaces (screens, keypads, map and ad panels, etc.) with cleaner;

f.  Check physical Station connections.

9. Percentage Of Bikes Inspected: Percentage of available Bicycles that have been inspected within the last sixty (60) days measured each day of the month and averaged over the month. Meets Expectations is achieving at least 95 percent. During Bicycle inspection, the Operator shall, at a minimum, conduct the following checks, and repair or replace all necessary elements:

a.  Check tire pressure, and add air as may be needed, to recommended Pounds per Square Inch measurement;

b.  Check tightness of handlebars, headset bearings, and full handlebar range of motion (left to right);

c.  Check tightness of seat, seat post quick-release, and see that seat post moves freely in full range of motion (up and down);

d.  Check brake function (front and rear);

e.  Check grips for wear and brake levers for tightness and damage;

f.  Check bell for tightness and correct function;

g.  Check handlebar covers for damage and instruction stickers;

h.  Check front basket for tightness and damage, and check bungee cord for wear;

i.  Check for correct gears and shifter function;

j.  Check fenders (front and rear) for damage, and clean outside of fenders;

k.  Check tires (front and rear) for damage or wear;

l.  Check wheels (front and rear) for trueness, broken or bent spokes and hub or axle tightness;

m.  Check LED lights (front and rear) for function;

n.  Check reflectors on wheels, seat and basket, to if they are present, clean and undamaged;

o.  Check pedals and cranks for tightness;

p.  Lubricate and clean chain and check chain tensioner for correct function;

q.  Check kickstand for correct function;

r.  Brief test ride to ensure overall correct function of Bicycle including pedal assist function if present;

s.  Check function of onboard computer, GPS, communication equipment and other components; and

t.  Clean bicycle.

10. Percentage Of Bikes Refurbished: Percentage of available Bicycles that have been refurbished within the last 365 days. Refurbishment will include cleaning, retouching with paint, replace wear parts, and supplying with new stickers on an as-needed basis. Routine cleanings will be made to ensure the fleet is both optimally functional and attractive. Meets Expectations is achieving at least 95 percent.

11. Bicycle Coverage Metric: The percentage of days in the month that all Coverage Zones successfully meet their Coverage Target. Meets Expectations is achieving at least 90 percent.

a. Using the boundaries of the City of Chicago's official 77 Community Area definitions, the active Divvy service area will be divided into up to nine geographic areas called "Coverage Zones". Once a year, the parties agree to reassess the boundaries of the Coverage Zones. Each Coverage Zone will have its own "Coverage Target" based on the Coverage Zone's population according to official U.S. Census information. The initial Coverage Target for each Coverage Zone will be two bikes per 1,000 residents. The parties may mutually agree to change the Coverage Targets. The Operator will have an obligation to meet the Coverage Target at least once per day in each Coverage Zone.

12. Bike Parking: The number of times in a month the Operator fails to repark or otherwise remedy an improperly parked bicycle within two hours of receiving notification by the City or a member of the public. Meets Expectations is less than or equal to two instances per day on average over the month. If Meets Expectations is not met, a liquidated damage of $100 for every instance above the monthly target will be assessed. As this is a new type of operation and metric, the City agrees to not assess liquidated damages for this metric in excess of $12,000 per calendar year.

13. Ridership Targets For Economic Hardship Areas.

Five economic hardship areas ("EHA") have been established based on a variety of census and public health data.

Operator's performance will be assessed between May and October in each EHA individually based on (a) average daily rides per thousand residents ("RKR") recorded per month in that EHA and (b) Outreach Events (as defined below) in such EHA as follows:

1. If average daily RKR is ≥1.5 in a given month, Operator will earn one point for that month. A ride for purposes of this section will be defined as any trip (i) starting, (ii) ending, or *(ii) starting and ending in the EHA.

2. If Operator does not earn a point for a given EHA in a given month based on RKR as set forth in Section 1 above, then Operator will earn one point each time it satisfies the following conditions for such EHA in such month: (i) participating in or conducting at least five (5) Outreach Events (as defined below) in such EHA during the month and (ii) reporting to the City the following details regarding the Outreach Events:

-- Estimated number of people engaged at each event;

-- List of local partners/organizations engaged around hosting/promoting/ organizing each event at the local level;

-- Brief narrative on any specific community issues or conditions that may barriers to Divvy utilization by community members.

Partnership with existing community organizations on event activity is strongly encouraged.

"Outreach Events" are defined as:

-- Formal participation in an event hosted by a community organization, such as "tabling" and direct engagement, performing Divvy bike demonstrations, and/or providing Divvy bikes for a free group ride at another organization's event;

-- Hosting and publicizing a stand-alone free group bike ride;

-- Pop-up engagement at Divvy stations or hubs in which staff engage passersby, provide written literature, promotional items, information on the Divvy for Everyone program and/or kiosk and app demonstrations; and/or

-- Other creative approaches to supporting existing community efforts.

D4E enrollment activities are permitted and encouraged as part of the above event activities, but regularly scheduled D4E in-person enrollment shifts at partner organizations organization and service centers do not qualify as outreach events.

---

* Editor's Note: Numbering sequence error in original document.

Liquidated damages will be assessed at $5,000 for every point below 28 in an assessment period.

*(Sub)Exhibit 2.*
(To Amendment To Operator Agreement
With Motivate International, Inc.)

*Annual Payment Schedule.*

| Year | Annual Payment | Minimum Guarantee From Advertising/Sponsorship Sales* | TOTAL |
|------|---------------|-------------------------------------------------------|-------|
| 2019 | $ 6,000,000 | $ 1,500,000 | $ 7,500,000 |
| 2020 | $ 6,240,000 | $ 1,500,000 | $ 7,740,000 |
| 2021 | $ 6,489,600 | $ 1,500,000 | $ 7,989,600 |
| 2022 | $ 6,749,184 | $ 1,500,000 | $ 8,249,184 |
| 2023 | $ 7,019,151 | $ 1,500,000 | $ 8,519,151 |
| 2024 | $ 7,299,917 | $ 1,500,000 | $ 8,799,917 |
| 2025 | $ 7,591,914 | $ 1,500,000 | $ 9,091,914 |
| 2026 | $ 7,895,591 | $ 1,500,000 | $ 9,395,591 |
| 2027 | $ 8,211,414 | $ 1,500,000 | $ 9,711,414 |
| TOTAL: | $63,496,772 | $13,500,000 | $76,996,772 |
| Average Per Year: | $ 7,055,197 | $ 1,500,000 | $ 8,555,197 |

---

* Or 40 percent of net revenue generated in the most recently concluded Contract Year (if applicable) from third-party sponsorships and advertising, whichever is larger.

In addition, Operator will pay to City 5 percent of annual Ridership Revenue collected in Contract Year in excess of $20,000,000.00.

99096                    JOURNAL--CITY COUNCIL--CHICAGO                    4/10/2019

*(Sub)Exhibit 4.*
(To Amendment To Operator Agreement
With Motivate International, Inc.)

*Economic Disclosure Statements And Affidavits.*



CITY OF CHICAGO
ECONOMIC DISCLOSURE STATEMENT and AFFIDAVIT
Related to Contract/Amendment/Solicitation
EDS # 140508

## SECTION I -- GENERAL INFORMATION

A. Legal name of the Disclosing Party submitting the EDS:

Motivate International Inc.

Enter d/b/a if applicable:

The Disclosing Party submitting this EDS is:

the Applicant

B. Business address of the Disclosing Party:

185 Berry Street
Suite 5000
San Francisco, CA 94107
United States

C. Telephone:

929-383-3185

Fax:

Email:

lbs-legal@lyft.com

D. Name of contact person:

Mr. Liam O'Connor

E. Federal Employer Identification No. (if you have one):

F. Brief description of contract, transaction or other undertaking (referred to below as the "Matter") to which this EDS pertains:

Agreement between the City of Chicago and Motivate International Inc. for a Bicycle Sharing System

Which City agency or department is requesting this EDS?

DEPT OF TRANSPORTATION

Specification Number

100320A

Contract (PO) Number

26459

Revision Number

Release Number

User Department Project Number

## SECTION II -- DISCLOSURE OF OWNERSHIP INTERESTS

A. NATURE OF THE DISCLOSING PARTY

1. Indicate the nature of the Disclosing Party:

Privately held business corporation

Is the Disclosing Party incorporated or organized in the State of Illinois?

No

State or foreign country of incorporation or organization:

DE

Registered to do business in the State of Illinois as a foreign entity?

Yes

B. DISCLOSING PARTY IS A LEGAL ENTITY:

1.a.1 Does the Disclosing Party have any directors?

Yes

1.a.3 List below the full names and titles of all executive officers and all directors, if any, of the entity. Do not include any directors who have no power to select the entity's officers.

```
Officer/Director:    Mr. John Zimmer
Title:               President and Chief Executive Officer
Role:                Both
..............................................................................
Officer/Director:    Ms. Kristin Sverchek
Title:               Treasurer and Secretary
Role:                Both
..............................................................................
```

2. Ownership Information

Please provide ownership information concerning each person or entity that holds, or is anticipated to hold (see next paragraph), a direct or indirect beneficial interest in excess of 7.5% of the Applicant. Examples of such an interest include shares in a corporation, partnership interest in a partnership or joint venture, interest of a member or manager in a limited liability company, or interest of a beneficiary of a trust, estate, or other similar entity. Note: Each legal entity below may be required to submit an EDS on its own behalf.

Please disclose present owners below. Please disclose anticipated owners in an attachment submitted through the "Additional Info" tab. "Anticipated owner" means an individual or entity in existence at the time application for City action is made, which is not an applicant or owner at such time, but which the applicant expects to assume a legal status, within six months of the time the City action occurs, that would render such individual or entity an applicant or owner if they had held such legal status at the time application was made.

- Bikeshare Holdings, LLC - 100%
  - Lyft, Inc. - 100%
    - Rakuten, Inc. - 10.42%

Owner Details

| Name | Business Address |
|------|------------------|
| Bikeshare Holdings, LLC | 185 Berry Street Suite 5000 San Francisco, CA 94107 United States |
| Lyft, Inc. | 185 Berry Street Suite 5000 San Francisco, CA 94107 United States |
| Rakuten, Inc. | 1-14-1 Tamagawa, Setagaya-ku Tokyo, 158-0094 Japan |

## SECTION III -- INCOME OR COMPENSATION TO, OR OWNERSHIP BY, CITY ELECTED OFFICIALS

A. Has the Disclosing Party provided any income or compensation to any City elected official during the 12-month period preceding the date of this EDS?

No

B. Does the Disclosing Party reasonably expect to provide any income or compensation to any City elected official during the 12-month period following the date of this EDS?

No

D. Does any City elected official or, to the best of the Disclosing Party's knowledge after reasonable inquiry, any City elected official's spouse or domestic partner, have a financial interest (as defined in Chapter 2-156 of the Municipal Code ("MCC")) in the Disclosing Party?

No

## SECTION IV -- DISCLOSURE OF SUBCONTRACTORS AND OTHER RETAINED PARTIES

The Disclosing Party must disclose the name and business address of each subcontractor, attorney, lobbyist (as defined in MCC Chapter 2-156), accountant, consultant and any other person or entity whom the Disclosing Party has retained or expects to retain in connection with the Matter, as well as the nature of the

relationship, and the total amount of the fees paid or estimated to be paid. The Disclosing Party is not required to disclose employees who are paid solely through the Disclosing Party's regular payroll.

If the Disclosing Party is uncertain whether a disclosure is required under this Section, the Disclosing Party must either ask the City whether disclosure is required or make the disclosure.

1. Has the Disclosing Party retained or does it anticipate retaining any legal entities in connection with the Matter?

Yes

2. List below the names of all legal entities which are retained parties.

| | |
|---|---|
| **Name:** | Motivate LLC |
| **Anticipated/ Retained:** | Retained |
| **Business Address:** | 220 36th Street, Suite 3A Brooklyn, NY 11232 United States |
| **Relationship:** | Subcontractor – non MWDBE |
| **Fees ($$ or %):** | Certain variable and fixed fees pursuant to that Master Services Agreement between the parties |
| **Estimated/Paid:** | Estimated |

3. Has the Disclosing Party retained or does it anticipate retaining any persons in connection with the Matter?

No

## SECTION V -- CERTIFICATIONS

A. COURT-ORDERED CHILD SUPPORT COMPLIANCE

Under MCC Section 2-92-415, substantial owners of business entities that contract with the City must remain in compliance with their child support obligations throughout the contract's term.

Has any person who directly or indirectly owns 10% or more of the Disclosing Party been declared in arrearage of any child support obligations by any Illinois court of competent jurisdiction?

No

**B. FURTHER CERTIFICATIONS**

1. [This certification applies only if the Matter is a contract being handled by the City's Department of Procurement Services.] In the 5-year period preceding the date of this EDS, neither the Disclosing Party nor any Affiliated Entity has engaged, in connection with the performance of any public contract, the services of an integrity monitor, independent private sector inspector general, or integrity compliance consultant (i.e. an individual or entity with legal, auditing, investigative, or other similar skills, designated by a public agency to help the agency monitor the activity of specified agency vendors as well as help the vendors reform their business practices so they can be considered for agency contracts in the future, or continue with a contract in progress).

I certify the above to be true

2. The Disclosing Party and its Affiliated Entities are not delinquent in the payment of any fine, fee, tax or other source of indebtedness owed to the City of Chicago, including, but not limited to, water and sewer charges, license fees, parking tickets, property taxes and sales taxes, nor is the Disclosing Party delinquent in the payment of any tax administered by the Illinois Department of Revenue.

I certify the above to be true

3. The Disclosing Party and, if the Disclosing Party is a legal entity, all of those persons or entities identified in Section II(B)(1) of this EDS:

     a. are not presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from any transactions by any federal, state or local unit of government;

     b. have not, during the 5 years before the date of this EDS, been convicted of a criminal offense, adjudged guilty, or had a civil judgment rendered against them in connection with: obtaining, attempting to obtain, or performing a public (federal, state or local) transaction or contract under a public transaction; a violation of federal or state antitrust statutes; fraud; embezzlement; theft; forgery; bribery; falsification or destruction of records; making false statements; or receiving stolen property;

     c. are not presently indicted for, or criminally or civilly charged by, a governmental entity (federal, state or local) with committing any of the offenses set forth in subparagraph (b) above;

     d. have not, during the 5 years before the date of this EDS, had one or more public transactions (federal, state or local) terminated for cause or default; and

     e. have not, during the 5 years before the date of this EDS, been convicted, adjudged guilty, or found liable in a civil proceeding, or in any criminal or civil action, including actions concerning environmental violations, instituted by the City or by the federal government, any state, or any other unit of local government.

I certify the above to be true

4. The Disclosing Party understands and shall comply with the applicable requirements of MCC Chapter 2-56 (Inspector General) and Chapter 2-156 (Governmental Ethics).

I certify the above to be true

5. Neither the Disclosing Party, nor any Contractor, nor any Affiliated Entity of either the Disclosing Party or any Contractor, nor any Agents have, during the 5 years before the date of this EDS, or, with respect to a Contractor, an Affiliated Entity, or an Affiliated Entity of a Contractor during the 5 years before the date of such Contractor's or Affiliated Entity's contract or engagement in connection with the Matter:

    a. bribed or attempted to bribe, or been convicted or adjudged guilty of bribery or attempting to bribe, a public officer or employee of the City, the State of Illinois, or any agency of the federal government or of any state or local government in the United States of America, in that officer's or employee's official capacity;

    b. agreed or colluded with other bidders or prospective bidders, or been a party to any such agreement, or been convicted or adjudged guilty of agreement or collusion among bidders or prospective bidders, in restraint of freedom of competition by agreement to bid a fixed price or otherwise; or

    c. made an admission of such conduct described in subparagraph (a) or (b) above that is a matter of record, but have not been prosecuted for such conduct; or

    d. violated the provisions referenced in MCC Subsection 2-92-320(a)(4)(Contracts Requiring a Base Wage); (a)(5)(Debarment Regulations); or (a)(6)(Minimum Wage Ordinance).

I certify the above to be true

6. Neither the Disclosing Party, nor any Affiliated Entity or Contractor, or any of their employees, officials, agents or partners, is barred from contracting with any unit of state or local government as a result of engaging in or being convicted of

    • bid-rigging in violation of 720 ILCS 5/33E-3;

    • bid-rotating in violation of 720 ILCS 5/33E-4; or

    • any similar offense of any state or of the United States of America that contains the same elements as the offense of bid-rigging or bid-rotating.

I certify the above to be true

7. Neither the Disclosing Party nor any Affiliated Entity is listed on a Sanctions List maintained by the United States Department of Commerce, State, or Treasury, or any successor federal agency.

I certify the above to be true

8. [FOR APPLICANT ONLY]

   i. Neither the Applicant nor any "controlling person" [see MCC Chapter 1-23, Article I for applicability and defined terms] of the Applicant is currently indicted or charged with, or has admitted guilt of, or has ever been convicted of, or placed under supervision for, any criminal offense involving actual, attempted, or conspiracy to commit bribery, theft, fraud, forgery, perjury, dishonesty or deceit against an officer or employee of the City or any "sister agency" ; and

   ii. the Applicant understands and acknowledges that compliance with Article I is a continuing requirement for doing business with the City.

NOTE: If MCC Chapter 1-23, Article I applies to the Applicant, that Article's permanent compliance timeframe supersedes 5-year compliance timeframes in this Section V.

I certify the above to be true

9. [FOR APPLICANT ONLY] The Applicant and its Affiliated Entities will not use, nor permit their subcontractors to use, any facility listed as having an active exclusion by the U.S. EPA on the federal System for Award Management ("SAM")

I certify the above to be true

10. [FOR APPLICANT ONLY] The Applicant will obtain from any contractors/subcontractors hired or to be hired in connection with the Matter certifications equal in form and substance to those in Certifications (2) and (9) above and will not, without the prior written consent of the City, use any such contractor/subcontractor that does not provide such certifications or that the Applicant has reason to believe has not provided or cannot provide truthful certifications.

I certify the above to be true

11. To the best of the Disclosing Party's knowledge after reasonable inquiry, the following is a complete list of all current employees of the Disclosing Party who were, at any time during the 12-month period preceding the date of this EDS, an employee, or elected or appointed official, of the City of Chicago.

None

12. To the best of the Disclosing Party's knowledge after reasonable inquiry, the following is a complete list of all gifts that the Disclosing Party has given or caused to be given, at any time during the 12-month period preceding the execution date of this EDS, to an employee, or elected or appointed official, of the City of Chicago.

For purposes of this statement, a "gift" does not include: (i) anything made generally available to City employees or to the general public, or (ii) food or drink provided in the course of official City business and having a retail value of less than $25 per recipient, or (iii) a political contribution otherwise duly reported as required by law.

None

C. CERTIFICATION OF STATUS AS FINANCIAL INSTITUTION

The Disclosing Party certifies, as defined in MCC Section 2-32-455(b), the Disclosing Party

is not a "financial institution"

D. CERTIFICATION REGARDING FINANCIAL INTEREST IN CITY BUSINESS

Any words or terms defined in MCC Chapter 2-156 have the same meanings if used in this Part D.

1. In accordance with MCC Section 2-156-110: To the best of the Disclosing Party's knowledge after reasonable inquiry, does any official or employee of the City have a financial interest in his or her own name or in the name of any other person or entity in the Matter?

No

E. CERTIFICATION REGARDING SLAVERY ERA BUSINESS

If the Disclosing Party cannot make this verification, the Disclosing Party must disclose all required information in the space provided below or in an attachment in the "Additional Info" tab. Failure to comply with these disclosure requirements may make any contract entered into with the City in connection with the Matter voidable by the City.

The Disclosing Party verifies that the Disclosing Party has searched any and all records of the Disclosing Party and any and all predecessor entities regarding records of investments or profits from slavery or slaveholder insurance policies during the slavery era (including insurance policies issued to slaveholders that provided coverage for damage to or injury or death of their slaves), and the Disclosing Party has found no such records.

I can make the above verification

## SECTION VI -- CERTIFICATIONS FOR FEDERALLY FUNDED MATTERS

Is the Matter federally funded? For the purposes of this Section VI, tax credits allocated by the City and proceeds of debt obligations of the City are not federal funding.

Yes

A. CERTIFICATION REGARDING LOBBYING

1.a Are there any persons who have made lobbying contacts on behalf of the Disclosing Party with respect to the Matter?

No

1.c. Are there any legal entities who have made lobbying contacts on behalf of the Disclosing Party with respect to the Matter?

No

2. The Disclosing Party has not spent and will not expend any federally appropriated funds to pay any person or entity listed in paragraph A(1) above for his or her lobbying activities or to pay any person or entity to influence or attempt to influence an officer or employee of any agency, as defined by applicable federal law, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress, in connection with the award of any federally funded contract, making any federally funded grant or loan, entering into any cooperative agreement, or to extend, continue, renew, amend, or modify any federally funded contract, grant, loan, or cooperative agreement.

I certify to the above.

3. The Disclosing Party will submit an updated certification at the end of each calendar quarter in which there occurs any event that materially affects the accuracy of the statements and information set forth in paragraphs A(1) and A(2) above.

I certify to the above.

4. The Disclosing Party certifies that either:

    i. it is not an organization described in section 501(c)(4) of the Internal Revenue Code of 1986 or

ii. it is an organization described in section 501(c)(4) of the Internal Revenue Code of 1986 but has not engaged and will not engage in "Lobbying Activities," as that term is defined in the Lobbying Disclosure Act of 1995, as amended.

I certify to the above.

5. If the Disclosing Party is the Applicant, the Disclosing Party must obtain certifications equal in form and substance to paragraphs A(1) through A(4) above from all subcontractors before it awards any subcontract and the Disclosing Party must maintain all such subcontractors' certifications for the duration of the Matter and must make such certifications promptly available to the City upon request.

I certify to the above.

B. CERTIFICATION REGARDING EQUAL EMPLOYMENT OPPORTUNITY

If the Matter is federally funded, federal regulations require the Applicant and all proposed subcontractors to submit the following information with their bids or in writing at the outset of negotiations.

1. Have you developed and do you have on file affirmative action programs pursuant to applicable federal regulations? (See 41 CFR Part 60-2.)

Not applicable because disclosing party has fewer than 50 employees

2. Have you filed with the Joint Reporting Committee, the Director of the Office of Federal Contract Compliance Programs, or the Equal Employment Opportunity Commission all reports due under the applicable filing requirements?

Yes

3. Have you participated in any previous contracts or subcontracts subject to the equal opportunity clause?

Yes

## SECTION VII - FURTHER ACKNOWLEDGMENTS AND CERTIFICATION

The Disclosing Party understands and agrees that:

A.  The certifications, disclosures, and acknowledgments contained in this EDS will become part of any contract or other agreement between the Applicant and the City in connection with the Matter, whether procurement, City assistance, or

4/10/2019 REPORTS OF COMMITTEES 99107

other City action, and are material inducements to the City's execution of any contract or taking other action with respect to the Matter. The Disclosing Party understands that it must comply with all statutes, ordinances, and regulations on which this EDS is based.

B. The City's Governmental Ethics Ordinance, MCC Chapter 2-156, imposes certain duties and obligations on persons or entities seeking City contracts, work, business, or transactions. The full text of this ordinance and a training program is available on line at www.cityofchicago.org/Ethics, and may also be obtained from the City's Board of Ethics, 740 N. Sedgwick St., Suite 500, Chicago, IL 60610, (312) 744-9660. The Disclosing Party must comply fully with this ordinance.

I acknowledge and consent to the above

The Disclosing Party understands and agrees that:

C. If the City determines that any information provided in this EDS is false, incomplete or inaccurate, any contract or other agreement in connection with which it is submitted may be rescinded or be void or voidable, and the City may pursue any remedies under the contract or agreement (if not rescinded or void), at law, or in equity, including terminating the Disclosing Party's participation in the Matter and/or declining to allow the Disclosing Party to participate in other City transactions. Remedies at law for a false statement of material fact may include incarceration and an award to the City of treble damages.

D. It is the City's policy to make this document available to the public on its Internet site and/or upon request. Some or all of the information provided in, and appended to, this EDS may be made publicly available on the Internet, in response to a Freedom of Information Act request, or otherwise. By completing and signing this EDS, the Disclosing Party waives and releases any possible rights or claims which it may have against the City in connection with the public release of information contained in this EDS and also authorizes the City to verify the accuracy of any information submitted in this EDS.

E. The information provided in this EDS must be kept current. In the event of changes, the Disclosing Party must supplement this EDS up to the time the City takes action on the Matter. If the Matter is a contract being handled by the City's Department of Procurement Services, the Disclosing Party must update this EDS as the contract requires. NOTE: With respect to Matters subject to MCC Article I of Chapter 1-23 (imposing PERMANENT INELIGIBILITY for certain specified offenses), the information provided herein regarding eligibility must be kept current for a longer period, as required by MCC Chapter 1-23 and Section 2-154-020.

I acknowledge and consent to the above

## APPENDIX A - FAMILIAL RELATIONSHIPS WITH ELECTED CITY OFFICIALS AND DEPARTMENT HEADS

This Appendix is to be completed only by (a) the Applicant, and (b) any legal entity which has a direct ownership interest in the Applicant exceeding 7.5%. It is not to be completed by any legal entity which has only an indirect ownership interest in the Applicant.

Under MCC Section 2-154-015, the Disclosing Party must disclose whether such Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof currently has a "familial relationship" with any elected city official or department head. A "familial relationship" exists if, as of the date this EDS is signed, the Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof is related to the mayor, any alderman, the city clerk, the city treasurer or any city department head as spouse or domestic partner or as any of the following, whether by blood or adoption: parent, child, brother or sister, aunt or uncle, niece or nephew, grandparent, grandchild, father-in-law, mother-in-law, son-in-law, daughter-in-law, stepfather or stepmother, stepson or stepdaughter, stepbrother or stepsister or half-brother or half-sister.

"Applicable Party" means (1) all corporate officers of the Disclosing Party, if the Disclosing Party is a corporation; all partners of the Disclosing Party, if the Disclosing Party is a general partnership; all general partners and limited partners of the Disclosing Party, if the Disclosing Party is a limited partnership; all managers, managing members and members of the Disclosing Party, if the Disclosing Party is a limited liability company; (2) all principal officers of the Disclosing Party; and (3) any person having more than a 7.5% ownership interest in the Disclosing Party. "Principal officers" means the president, chief operating officer, executive director, chief financial officer, treasurer or secretary of a legal entity or any person exercising similar authority.

Does the Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof currently have a "familial relationship" with an elected city official or department head?

No

## APPENDIX B - BUILDING CODE SCOFFLAW/PROBLEM LANDLORD CERTIFICATION

This Appendix is to be completed only by (a) the Applicant, and (b) any legal entity which has a direct ownership interest in the Applicant exceeding 7.5% (an "Owner"). It is not to be completed by any legal entity which has only an indirect ownership interest in the Applicant.

Pursuant to MCC Section 2-154-010, is the Applicant or any Owner identified as a building code scofflaw or problem landlord pursuant to MCC Section 2-92-416??

No

## APPENDIX C-PROHIBITION ON WAGE & SALARY HISTORY SCREENING

This Appendix is to be completed only by an Applicant that is completing this EDS as a "contractor" as defined in MCC Section 2-92-385. That section, which should be consulted (www.amlegal.com), generally covers a party to any agreement pursuant to which they: (i) receive City of Chicago funds in consideration for services, work or goods provided (including for legal or other professional services), or (ii) pay the City money for a license, grant or concession allowing them to conduct a business on City premises.

On behalf of an Applicant that is a contractor pursuant to MCC Section 2-92-385, I hereby certify that the Applicant is in compliance with MCC Section 2-92-385(b)(1) and (2), which prohibit: (i) screening job applicants based on their wage or salary history, or (ii) seeking job applicants&#39 wage or salary history from current or former employers. I also certify that the Applicant has adopted a policy that includes those prohibitions.

This certification shall serve as the affidavit required by MCC Section 2-92-385(c)(1).

Yes

## ADDITIONAL INFO

Please add any additional explanatory information here. If explanation is longer than 1000 characters, you may add an attachment below. Please note that your EDS, including all attachments, becomes available for public viewing upon contract award. Your attachments will be viewable "as is" without manual redaction by the City. You are responsible for redacting any non-public information from your documents before uploading.

List of vendor attachments uploaded by City staff

None.

List of attachments uploaded by vendor

None.

**CERTIFICATION**

Under penalty of perjury, the person signing below: (1) warrants that he/she is authorized to execute this EDS, and Appendices A and B (if applicable), on behalf of the Disclosing Party, and (2) warrants that all certifications and statements contained in this EDS, and Appendices A and B (if applicable), are true, accurate and complete as of the date furnished to the City. Submission of this form constitutes making the oath associated with notarization.

/s/ 03/11/2019
Mr. Liam O'Connor
Chief Procurement Officer
Motivate International Inc.

This is a printed copy of the Economic Disclosure Statement, the original of which is filed electronically with the City of Chicago. Any alterations must be made electronically, alterations on this printed copy are void and of no effect.

Case: 1:19-cv-05253 Document #: 22-3 Filed: 09/26/19 Page 44 of 90 PageID #:300



CITY OF CHICAGO
ECONOMIC DISCLOSURE STATEMENT and AFFIDAVIT
Related to Contract/Amendment/Solicitation
EDS # 140510

## SECTION I -- GENERAL INFORMATION

A. Legal name of the Disclosing Party submitting the EDS:

Bikeshare Holdings, LLC

Enter d/b/a if applicable:

The Disclosing Party submitting this EDS is:

a legal entity currently holding an interest in the Applicant

The Disclosing Party holds an interest in

Motive International Inc. and EDS is 140508

B. Business address of the Disclosing Party:

185 Berry Street
Suite 5000
San Francisco, CA 94107
United States

C. Telephone:

929-383-3185

Fax:

Email:

lbs-legal@lyft.com

D. Name of contact person:

Liam O'Connor

E. Federal Employer Identification No. (if you have one):

## SECTION II -- DISCLOSURE OF OWNERSHIP INTERESTS

A. NATURE OF THE DISCLOSING PARTY

1. Indicate the nature of the Disclosing Party:

Limited liability company

Is the Disclosing Party incorporated or organized in the State of Illinois?

No

State or foreign country of incorporation or organization:

DE

Registered to do business in the State of Illinois as a foreign entity?

No

B. DISCLOSING PARTY IS A LEGAL ENTITY:

1.a.2 Does the Disclosing Party have any officers?

Yes

1.a.4 List below the full names and titles of all executive officers of the entity.

| Officer: | John Zimmer |
|---|---|
| Title: | President and Chief Executive Officer |
| Role: | Officer |
| Officer: | Kristin Sverchek |
| Title: | Treasurer and Secretary |
| Role: | Officer |

B. CERTIFICATION REGARDING CONTROLLING INTEREST

1.b.1 Are there any individuals who directly or indirectly control the day-to-day management of the Disclosing Party as a general partner, managing member, manager, or other capacity?

No

1.b.3 Are there any legal entities that directly or indirectly control the day-to-day management of the Disclosing Party as a general partner, managing member, manager, or other capacity?

Yes

1.b.4 List all legal entities that function as general partners, managing members, managers, and any others who directly or indirectly control the day-to-day management of the Disclosing Party. Each legal entity listed below must submit an EDS on its own behalf.

| | |
|---|---|
| **Name:** | Lyft, Inc. |
| **Title:** | Member |
| **Business Address:** | 185 Berry Street |
| | Suite 5000 |
| | San Francisco, 94107 United States |

2. Ownership Information

Please confirm ownership information concerning each person or entity that having a direct or indirect beneficial interest in excess of 7.5% of the Disclosing Party (your entity). Examples of such an interest include shares in a corporation, partnership interest in a partnership or joint venture, interest of a member or manager in a limited lability company, or interest of a beneficiary of a trust, estate, or other similar entity. Note: Each legal entity below may be required to submit an EDS on its own behalf.

As reported by the Disclosing Party, the immediate owner(s) of the Disclosing Party is/are listed below:

- Lyft, Inc. - 100%

Owner Details

| Name | Business Address |
|---|---|
| Lyft, Inc. | 185 Berry Street |
| | Suite 5000 |
| | San Francisco, CA 94107 |

United States

## SECTION III -- INCOME OR COMPENSATION TO, OR OWNERSHIP BY, CITY ELECTED OFFICIALS

A. Has the Disclosing Party provided any income or compensation to any City elected official during the 12-month period preceding the date of this EDS?

No

B. Does the Disclosing Party reasonably expect to provide any income or compensation to any City elected official during the 12-month period following the date of this EDS?

No

D. Does any City elected official or, to the best of the Disclosing Party's knowledge after reasonable inquiry, any City elected official's spouse or domestic partner, have a financial interest (as defined in Chapter 2-156 of the Municipal Code ("MCC")) in the Disclosing Party?

No

## SECTION V -- CERTIFICATIONS

A. COURT-ORDERED CHILD SUPPORT COMPLIANCE

Under MCC Section 2-92-415, substantial owners of business entities that contract with the City must remain in compliance with their child support obligations throughout the contract's term.

Has any person who directly or indirectly owns 10% or more of the Disclosing Party been declared in arrearage of any child support obligations by any Illinois court of competent jurisdiction?

No

B. FURTHER CERTIFICATIONS

1. [This certification applies only if the Matter is a contract being handled by the City's Department of Procurement Services.] In the 5-year period preceding the date of this EDS, neither the Disclosing Party nor any Affiliated Entity has engaged, in connection with the performance of any public contract, the services of an integrity monitor, independent private sector inspector general, or integrity compliance consultant (i.e. an individual or entity with legal, auditing, investigative, or other

similar skills, designated by a public agency to help the agency monitor the activity of specified agency vendors as well as help the vendors reform their business practices so they can be considered for agency contracts in the future, or continue with a contract in progress). ⁄

I certify the above to be true

2. The Disclosing Party and its Affiliated Entities are not delinquent in the payment of any fine, fee, tax or other source of indebtedness owed to the City of Chicago, including, but not limited to, water and sewer charges, license fees, parking tickets, property taxes and sales taxes, nor is the Disclosing Party delinquent in the payment of any tax administered by the Illinois Department of Revenue.

I certify the above to be true

3. The Disclosing Party and, if the Disclosing Party is a legal entity, all of those persons or entities identified in Section II(B)(1) of this EDS:

  a. are not presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from any transactions by any federal, state or local unit of government;
  b. have not, during the 5 years before the date of this EDS, been convicted of a criminal offense, adjudged guilty, or had a civil judgment rendered against them in connection with: obtaining, attempting to obtain, or performing a public (federal, state or local) transaction or contract under a public transaction; a violation of federal or state antitrust statutes; fraud; embezzlement; theft; forgery; bribery; falsification or destruction of records; making false statements; or receiving stolen property;
  c. are not presently indicted for, or criminally or civilly charged by, a governmental entity (federal, state or local) with committing any of the offenses set forth in subparagraph (b) above;
  d. have not, during the 5 years before the date of this EDS, had one or more public transactions (federal, state or local) terminated for cause or default; and
  e. have not, during the 5 years before the date of this EDS, been convicted, adjudged guilty, or found liable in a civil proceeding, or in any criminal or civil action, including actions concerning environmental violations, instituted by the City or by the federal government, any state, or any other unit of local government.

I certify the above to be true

4. The Disclosing Party understands and shall comply with the applicable requirements of MCC Chapter 2-56 (Inspector General) and Chapter 2-156 (Governmental Ethics).

I certify the above to be true

5. Neither the Disclosing Party, nor any <u>Contractor</u>, nor any <u>Affiliated Entity</u> of either the Disclosing Party or any <u>Contractor</u>, nor any <u>Agents</u> have, during the 5 years before the date of this EDS, or, with respect to a <u>Contractor</u>, an <u>Affiliated Entity</u>, or an <u>Affiliated Entity</u> of a <u>Contractor</u> during the 5 years before the date of such <u>Contractor's</u> or <u>Affiliated Entity's</u> contract or engagement in connection with the Matter:

   a. bribed or attempted to bribe, or been convicted or adjudged guilty of bribery or attempting to bribe, a public officer or employee of the City, the State of Illinois, or any agency of the federal government or of any state or local government in the United States of America, in that officer's or employee's official capacity;
   b. agreed or colluded with other bidders or prospective bidders, or been a party to any such agreement, or been convicted or adjudged guilty of agreement or collusion among bidders or prospective bidders, in restraint of freedom of competition by agreement to bid a fixed price or otherwise; or
   c. made an admission of such conduct described in subparagraph (a) or (b) above that is a matter of record, but have not been prosecuted for such conduct; or
   d. violated the provisions referenced in <u>MCC Subsection 2-92-320(a)(4)(Contracts Requiring a Base Wage); (a)(5)(Debarment Regulations); or (a)(6)(Minimum Wage Ordinance)</u>.

I certify the above to be true

6. Neither the Disclosing Party, nor any <u>Affiliated Entity</u> or <u>Contractor</u>, or any of their employees, officials, <u>agents</u> or partners, is barred from contracting with any unit of state or local government as a result of engaging in or being convicted of

   • bid-rigging in violation of <u>720 ILCS 5/33E-3</u>;
   • bid-rotating in violation of <u>720 ILCS 5/33E-4</u>; or
   • any similar offense of any state or of the United States of America that contains the same elements as the offense of bid-rigging or bid-rotating.

I certify the above to be true

7. Neither the Disclosing Party nor any <u>Affiliated Entity</u> is listed on a Sanctions List maintained by the United States Department of Commerce, State, or Treasury, or any successor federal agency.

I certify the above to be true

8. [FOR APPLICANT ONLY]

   i. Neither the Applicant nor any "controlling person" [<u>see MCC Chapter 1-23, Article I</u> for applicability and defined terms] of the Applicant is currently indicted or charged with, or has admitted guilt of, or has ever been convicted of, or placed under supervision for, any criminal offense involving actual, attempted,

or conspiracy to commit bribery, theft, fraud, forgery, perjury, dishonesty or
deceit against an officer or employee of the City or any "sister agency" ; and
ii. the Applicant understands and acknowledges that compliance with Article I is a
continuing requirement for doing business with the City.

NOTE: If MCC Chapter 1-23, Article I applies to the Applicant, that Article's
permanent compliance timeframe supersedes 5-year compliance timeframes in this
Section V.

Not applicable because disclosing party is not the Applicant

11. To the best of the Disclosing Party's knowledge after reasonable inquiry, the
following is a complete list of all current employees of the Disclosing Party who
were, at any time during the 12-month period preceding the date of this EDS, an
employee, or elected or appointed official, of the City of Chicago.

None

12. To the best of the Disclosing Party's knowledge after reasonable inquiry, the
following is a complete list of all gifts that the Disclosing Party has given or caused
to be given, at any time during the 12-month period preceding the execution date
of this EDS, to an employee, or elected or appointed official, of the City of Chicago.
For purposes of this statement, a "gift" does not include: (i) anything made generally
available to City employees or to the general public, or (ii) food or drink provided
in the course of official City business and having a retail value of less than $25 per
recipient, or (iii) a political contribution otherwise duly reported as required by law.

None

C. CERTIFICATION OF STATUS AS FINANCIAL INSTITUTION

The Disclosing Party certifies, as defined in MCC Section 2-32-455(b), the
Disclosing Party

is not a "financial institution"

E. CERTIFICATION REGARDING SLAVERY ERA BUSINESS

If the Disclosing Party cannot make this verification, the Disclosing Party must
disclose all required information in the space provided below or in an attachment in
the "Additional Info" tab. Failure to comply with these disclosure requirements may
make any contract entered into with the City in connection with the Matter voidable
by the City.

The Disclosing Party verifies that the Disclosing Party has searched any and all
records of the Disclosing Party and any and all predecessor entities regarding
records of investments or profits from slavery or slaveholder insurance policies

during the slavery era (including insurance policies issued to slaveholders that provided coverage for damage to or injury or death of their slaves), and the Disclosing Party has found no such records.

I can make the above verification

## SECTION VII - FURTHER ACKNOWLEDGMENTS AND CERTIFICATION

The Disclosing Party understands and agrees that:

A.   The certifications, disclosures, and acknowledgments contained in this EDS will become part of any contract or other agreement between the Applicant and the City in connection with the Matter, whether procurement, City assistance, or other City action, and are material inducements to the City's execution of any contract or taking other action with respect to the Matter. The Disclosing Party understands that it must comply with all statutes, ordinances, and regulations on which this EDS is based.

B.   The City's Governmental Ethics Ordinance, MCC Chapter 2-156, imposes certain duties and obligations on persons or entities seeking City contracts, work, business, or transactions. The full text of this ordinance and a training program is available on line at www.cityofchicago.org/Ethics, and may also be obtained from the City's Board of Ethics, 740 N. Sedgwick St., Suite 500, Chicago, IL 60610, (312) 744-9660. The Disclosing Party must comply fully with this ordinance.

I acknowledge and consent to the above

The Disclosing Party understands and agrees that:

C.   If the City determines that any information provided in this EDS is false, incomplete or inaccurate, any contract or other agreement in connection with which it is submitted may be rescinded or be void or voidable, and the City may pursue any remedies under the contract or agreement (if not rescinded or void), at law, or in equity, including terminating the Disclosing Party's participation in the Matter and/or declining to allow the Disclosing Party to participate in other City transactions. Remedies at law for a false statement of material fact may include incarceration and an award to the City of treble damages.

D.   It is the City's policy to make this document available to the public on its Internet site and/or upon request. Some or all of the information provided in, and appended to, this EDS may be made publicly available on the Internet, in response to a Freedom of Information Act request, or otherwise. By completing and signing this EDS, the Disclosing Party waives and releases any possible rights or claims which it may have against the City in connection with the public

release of information contained in this EDS and also authorizes the City to verify the accuracy of any information submitted in this EDS.

E. The information provided in this EDS must be kept current. In the event of changes, the Disclosing Party must supplement this EDS up to the time the City takes action on the Matter. If the Matter is a contract being handled by the City's Department of Procurement Services, the Disclosing Party must update this EDS as the contract requires. NOTE: With respect to Matters subject to MCC Article I of Chapter 1-23 (imposing PERMANENT INELIGIBILITY for certain specified offenses), the information provided herein regarding eligibility must be kept current for a longer period, as required by MCC Chapter 1-23 and Section 2-154-020.

I acknowledge and consent to the above

## APPENDIX A - FAMILIAL RELATIONSHIPS WITH ELECTED CITY OFFICIALS AND DEPARTMENT HEADS

This Appendix is to be completed only by (a) the Applicant, and (b) any legal entity which has a direct ownership interest in the Applicant exceeding 7.5%. It is not to be completed by any legal entity which has only an indirect ownership interest in the Applicant.

Under MCC Section 2-154-015, the Disclosing Party must disclose whether such Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof currently has a "familial relationship" with any elected city official or department head. A "familial relationship" exists if, as of the date this EDS is signed, the Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof is related to the mayor, any alderman, the city clerk, the city treasurer or any city department head as spouse or domestic partner or as any of the following, whether by blood or adoption: parent, child, brother or sister, aunt or uncle, niece or nephew, grandparent, grandchild, father-in-law, mother-in-law, son-in-law, daughter-in-law, stepfather or stepmother, stepson or stepdaughter, stepbrother or stepsister or half-brother or half-sister.

"Applicable Party" means (1) all corporate officers of the Disclosing Party, if the Disclosing Party is a corporation; all partners of the Disclosing Party, if the Disclosing Party is a general partnership; all general partners and limited partners of the Disclosing Party, if the Disclosing Party is a limited partnership; all managers, managing members and members of the Disclosing Party, if the Disclosing Party is a limited liability company; (2) all principal officers of the Disclosing Party; and (3) any person having more than a 7.5% ownership interest in the Disclosing Party. "Principal officers" means the president, chief operating officer, executive director, chief financial officer, treasurer or secretary of a legal entity or any person exercising similar authority.

Does the Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof currently have a "familial relationship" with an elected city official or department head?

No

## APPENDIX B - BUILDING CODE SCOFFLAW/PROBLEM LANDLORD CERTIFICATION

This Appendix is to be completed only by (a) the Applicant, and (b) any legal entity which has a direct ownership interest in the Applicant exceeding 7.5% (an "Owner"). It is not to be completed by any legal entity which has only an indirect ownership interest in the Applicant.

Pursuant to MCC Section 2-154-010, is the Applicant or any Owner identified as a building code scofflaw or problem landlord pursuant to MCC Section 2-92-416??

No

## ADDITIONAL INFO

Please add any additional explanatory information here. If explanation is longer than 1000 characters, you may add an attachment below. Please note that your EDS, including all attachments, becomes available for public viewing upon contract award. Your attachments will be viewable "as is" without manual redaction by the City. You are responsible for redacting any non-public information from your documents before uploading.

List of attachments uploaded by vendor

None.

## CERTIFICATION

Under penalty of perjury, the person signing below: (1) warrants that he/she is authorized to execute this EDS, and Appendices A and B (if applicable), on behalf of the Disclosing Party, and (2) warrants that all certifications and statements contained in this EDS, and Appendices A and B (if applicable), are true, accurate and complete as of the date furnished to the City. Submission of this form constitutes making the oath associated with notarization.

/s/ 03/11/2019
Liam O'Connor
Chief Procurement Officer

Bikeshare Holdings, LLC

This is a printed copy of the Economic Disclosure Statement, the original of which
is filed electronically with the City of Chicago. Any alterations must be made
electronically, alterations on this printed copy are void and of no effect.



CITY OF CHICAGO
ECONOMIC DISCLOSURE STATEMENT and AFFIDAVIT
Related to Contract/Amendment/Solicitation
EDS # 140511

## SECTION I -- GENERAL INFORMATION

A. Legal name of the Disclosing Party submitting the EDS:

Lyft, Inc.

Enter d/b/a if applicable:

The Disclosing Party submitting this EDS is:

a legal entity currently holding an interest in the Applicant

The Disclosing Party holds an interest in

Motivate International Inc. and EDS is 140508

B. Business address of the Disclosing Party:

185 Berry Street
Suite 5000
San Francisco; CA 94107
United States

C. Telephone:

929-383-3185

Fax:

Email:

lbs-legal@lyft.com

D. Name of contact person:

Liam O'Connor

E. Federal Employer Identification No. (if you have one):

## SECTION II -- DISCLOSURE OF OWNERSHIP INTERESTS

A. NATURE OF THE DISCLOSING PARTY

1. Indicate the nature of the Disclosing Party:

Privately held business corporation

Is the Disclosing Party incorporated or organized in the State of Illinois?

Yes

B. DISCLOSING PARTY IS A LEGAL ENTITY:

1.a.1 Does the Disclosing Party have any directors?

Yes

1.a.3 List below the full names and titles of all executive officers and all directors, if any, of the entity. Do not include any directors who have no power to select the entity's officers.

| Officer/Director: | Logan Green |
| Title: | CEO |
| Role: | Both |
| Officer/Director: | John Zimmer |
| Title: | President |
| Role: | Both |
| Officer/Director: | Brian Roberts |
| Title: | CFO |
| Role: | Officer |
| Officer/Director: | Kristin Sverchek |
| Title: | Secretary |
| Role: | Officer |

```
------------------------------------------------------------------
Officer/Director:    Matthew Reagan
Title:               Assistant Secretary
Role:                Officer
------------------------------------------------------------------
Officer/Director:    Sean Aggarwal
Title:               Director
Role:                Director
------------------------------------------------------------------
Officer/Director:    Ann Miura-Ko
Title:               Director
Role:                Director
------------------------------------------------------------------
Officer/Director:    Ben Horowitz
Title:               Director
Role:                Director
------------------------------------------------------------------
Officer/Director:    Hiroshi Mikitani
Title:               Director
Role:                Director
------------------------------------------------------------------
Officer/Director:    Jonathan Christodoro
Title:               Director
Role:                Director
------------------------------------------------------------------
Officer/Director:    Maggie Wilderotter
Title:               Director
Role:                Director
------------------------------------------------------------------
Officer/Director:    Valerie Jarrett
Title:               Director
Role:                Director
------------------------------------------------------------------
Officer/Director:    David Lawee
Title:               Director
Role:                Director
------------------------------------------------------------------
```

2. Ownership Information

Please confirm ownership information concerning each person or entity that having a direct or indirect beneficial interest in excess of 7.5% of the Disclosing Party (your entity). Examples of such an interest include shares in a corporation, partnership interest in a partnership or joint venture, interest of a member or manager in a limited

lability company, or interest of a beneficiary of a trust, estate, or other similar entity. Note: Each legal entity below may be required to submit an EDS on its own behalf.

As reported by the Disclosing Party, the immediate owner(s) of the Disclosing Party is/are listed below:

  • Rakuten, Inc. - 10.42%

Owner Details

Name              Business Address
Rakuten, Inc.      1-14-1 Tamagawa, Setagaya-ku
                  Tokyo, 158-0094
                  Japan

## SECTION III -- INCOME OR COMPENSATION TO, OR OWNERSHIP BY, CITY ELECTED OFFICIALS

A. Has the Disclosing Party provided any income or compensation to any City elected official during the 12-month period preceding the date of this EDS?

No

B. Does the Disclosing Party reasonably expect to provide any income or compensation to any City elected official during the 12-month period following the date of this EDS?

No

D. Does any City elected official or, to the best of the Disclosing Party's knowledge after reasonable inquiry, any City elected official's spouse or domestic partner, have a financial interest (as defined in Chapter 2-156 of the Municipal Code ("MCC")) in the Disclosing Party?

No

## SECTION V -- CERTIFICATIONS

A. COURT-ORDERED CHILD SUPPORT COMPLIANCE

Under MCC Section 2-92-415, substantial owners of business entities that contract with the City must remain in compliance with their child support obligations throughout the contract's term.

Has any person who directly or indirectly owns 10% or more of the Disclosing Party been declared in arrearage of any child support obligations by any Illinois court of competent jurisdiction?

No

## B. FURTHER CERTIFICATIONS

1. [This certification applies only if the Matter is a contract being handled by the City's Department of Procurement Services.] In the 5-year period preceding the date of this EDS, neither the Disclosing Party nor any Affiliated Entity has engaged, in connection with the performance of any public contract, the services of an integrity monitor, independent private sector inspector general, or integrity compliance consultant (i.e. an individual or entity with legal, auditing, investigative, or other similar skills, designated by a public agency to help the agency monitor the activity of specified agency vendors as well as help the vendors reform their business practices so they can be considered for agency contracts in the future, or continue with a contract in progress).

I certify the above to be true

2. The Disclosing Party and its Affiliated Entities are not delinquent in the payment of any fine, fee, tax or other source of indebtedness owed to the City of Chicago, including, but not limited to, water and sewer charges, license fees, parking tickets, property taxes and sales taxes, nor is the Disclosing Party delinquent in the payment of any tax administered by the Illinois Department of Revenue.

I certify the above to be true

3. The Disclosing Party and, if the Disclosing Party is a legal entity, all of those persons or entities identified in Section II(B)(1) of this EDS:

   a. are not presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from any transactions by any federal, state or local unit of government;
   b. have not, during the 5 years before the date of this EDS, been convicted of a criminal offense, adjudged guilty, or had a civil judgment rendered against them in connection with: obtaining, attempting to obtain, or performing a public (federal, state or local) transaction or contract under a public transaction; a violation of federal or state antitrust statutes; fraud; embezzlement; theft; forgery; bribery; falsification or destruction of records; making false statements; or receiving stolen property;
   c. are not presently indicted for, or criminally or civilly charged by, a governmental entity (federal, state or local) with committing any of the offenses set forth in subparagraph (b) above;

    d.  have not, during the 5 years before the date of this EDS, had one or more public transactions (federal, state or local) terminated for cause or default; and

    e.  have not, during the 5 years before the date of this EDS, been convicted, adjudged guilty, or found liable in a civil proceeding, or in any criminal or civil action, including actions concerning environmental violations, instituted by the City or by the federal government, any state, or any other unit of local government.

`I certify the above to be true`

4. The Disclosing Party understands and shall comply with the applicable requirements of MCC Chapter 2-56 (Inspector General) and Chapter 2-156 (Governmental Ethics).

`I certify the above to be true`

5. Neither the Disclosing Party, nor any Contractor, nor any Affiliated Entity of either the Disclosing Party or any Contractor, nor any Agents have, during the 5 years before the date of this EDS, or, with respect to a Contractor, an Affiliated Entity, or an Affiliated Entity of a Contractor during the 5 years before the date of such Contractor's or Affiliated Entity's contract or engagement in connection with the Matter:

    a.  bribed or attempted to bribe, or been convicted or adjudged guilty of bribery or attempting to bribe, a public officer or employee of the City, the State of Illinois, or any agency of the federal government or of any state or local government in the United States of America, in that officer's or employee's official capacity;

    b.  agreed or colluded with other bidders or prospective bidders, or been a party to any such agreement, or been convicted or adjudged guilty of agreement or collusion among bidders or prospective bidders, in restraint of freedom of competition by agreement to bid a fixed price or otherwise; or

    c.  made an admission of such conduct described in subparagraph (a) or (b) above that is a matter of record, but have not been prosecuted for such conduct; or

    d.  violated the provisions referenced in MCC Subsection 2-92-320(a)(4)(Contracts Requiring a Base Wage); (a)(5)(Debarment Regulations); or (a)(6)(Minimum Wage Ordinance).

`I certify the above to be true`

6. Neither the Disclosing Party, nor any Affiliated Entity or Contractor, or any of their employees, officials, agents or partners, is barred from contracting with any unit of state or local government as a result of engaging in or being convicted of

    •  bid-rigging in violation of 720 ILCS 5/33E-3;

    •  bid-rotating in violation of 720 ILCS 5/33E-4; or

- any similar offense of any state or of the United States of America that contains the same elements as the offense of bid-rigging or bid-rotating.

```
I certify the above to be true
```

7. Neither the Disclosing Party nor any Affiliated Entity is listed on a Sanctions List maintained by the United States Department of Commerce, State, or Treasury, or any successor federal agency.

```
I certify the above to be true
```

8. [FOR APPLICANT ONLY]

   i. Neither the Applicant nor any "controlling person" [see MCC Chapter 1-23, Article I for applicability and defined terms] of the Applicant is currently indicted or charged with, or has admitted guilt of, or has ever been convicted of, or placed under supervision for, any criminal offense involving actual, attempted, or conspiracy to commit bribery, theft, fraud, forgery, perjury, dishonesty or deceit against an officer or employee of the City or any "sister agency" ; and
   ii. the Applicant understands and acknowledges that compliance with Article I is a continuing requirement for doing business with the City.

NOTE: If MCC Chapter 1-23, Article I applies to the Applicant, that Article's permanent compliance timeframe supersedes 5-year compliance timeframes in this Section V.

```
Not applicable because disclosing party is not the Applicant
```

11. To the best of the Disclosing Party's knowledge after reasonable inquiry, the following is a complete list of all current employees of the Disclosing Party who were, at any time during the 12-month period preceding the date of this EDS, an employee, or elected or appointed official, of the City of Chicago.

```
None
```

12. To the best of the Disclosing Party's knowledge after reasonable inquiry, the following is a complete list of all gifts that the Disclosing Party has given or caused to be given, at any time during the 12-month period preceding the execution date of this EDS, to an employee, or elected or appointed official, of the City of Chicago. For purposes of this statement, a "gift" does not include: (i) anything made generally available to City employees or to the general public, or (ii) food or drink provided in the course of official City business and having a retail value of less than $25 per recipient, or (iii) a political contribution otherwise duly reported as required by law.

```
None
```

C. CERTIFICATION OF STATUS AS FINANCIAL INSTITUTION

The Disclosing Party certifies, as defined in MCC Section 2-32-455(b), the Disclosing Party

```
is not a "financial institution"
```

E. CERTIFICATION REGARDING SLAVERY ERA BUSINESS

If the Disclosing Party cannot make this verification, the Disclosing Party must disclose all required information in the space provided below or in an attachment in the "Additional Info" tab. Failure to comply with these disclosure requirements may make any contract entered into with the City in connection with the Matter voidable by the City.

The Disclosing Party verifies that the Disclosing Party has searched any and all records of the Disclosing Party and any and all predecessor entities regarding records of investments or profits from slavery or slaveholder insurance policies during the slavery era (including insurance policies issued to slaveholders that provided coverage for damage to or injury or death of their slaves), and the Disclosing Party has found no such records.

```
I can make the above verification
```

## SECTION VII - FURTHER ACKNOWLEDGMENTS AND CERTIFICATION

The Disclosing Party understands and agrees that:

A. The certifications, disclosures, and acknowledgments contained in this EDS will become part of any contract or other agreement between the Applicant and the City in connection with the Matter, whether procurement, City assistance, or other City action, and are material inducements to the City's execution of any contract or taking other action with respect to the Matter. The Disclosing Party understands that it must comply with all statutes, ordinances, and regulations on which this EDS is based.

B. The City's Governmental Ethics Ordinance, MCC Chapter 2-156, imposes certain duties and obligations on persons or entities seeking City contracts, work, business, or transactions. The full text of this ordinance and a training program is available on line at www.cityofchicago.org/Ethics, and may also be obtained from the City's Board of Ethics, 740 N. Sedgwick St., Suite 500, Chicago, IL 60610, (312) 744-9660. The Disclosing Party must comply fully with this ordinance.

```
1 acknowledge and consent to the above
```

The Disclosing Party understands and agrees that:

C. If the City determines that any information provided in this EDS is false, incomplete or inaccurate, any contract or other agreement in connection with which it is submitted may be rescinded or be void or voidable, and the City may pursue any remedies under the contract or agreement (if not rescinded or void), at law, or in equity, including terminating the Disclosing Party's participation in the Matter and/or declining to allow the Disclosing Party to participate in other City transactions. Remedies at law for a false statement of material fact may include incarceration and an award to the City of treble damages.

D. It is the City's policy to make this document available to the public on its Internet site and/or upon request. Some or all of the information provided in, and appended to, this EDS may be made publicly available on the Internet, in response to a Freedom of Information Act request, or otherwise. By completing and signing this EDS, the Disclosing Party waives and releases any possible rights or claims which it may have against the City in connection with the public release of information contained in this EDS and also authorizes the City to verify the accuracy of any information submitted in this EDS.

E. The information provided in this EDS must be kept current. In the event of changes, the Disclosing Party must supplement this EDS up to the time the City takes action on the Matter. If the Matter is a contract being handled by the City's Department of Procurement Services, the Disclosing Party must update this EDS as the contract requires. NOTE: With respect to Matters subject to MCC Article I of Chapter 1-23 (imposing PERMANENT INELIGIBILITY for certain specified offenses), the information provided herein regarding eligibility must be kept current for a longer period, as required by MCC Chapter 1-23 and Section 2-154-020.

I acknowledge and consent to the above

## APPENDIX A - FAMILIAL RELATIONSHIPS WITH ELECTED CITY OFFICIALS AND DEPARTMENT HEADS

This Appendix is to be completed only by (a) the Applicant, and (b) any legal entity which has a direct ownership interest in the Applicant exceeding 7.5%. It is not to be completed by any legal entity which has only an indirect ownership interest in the Applicant.

Under MCC Section 2-154-015, the Disclosing Party must disclose whether such Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof currently has a "familial relationship" with any elected city official or department head. A "familial relationship" exists if, as of the date this EDS is signed, the Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof is related to the mayor, any alderman, the city clerk, the city treasurer or any city department head as spouse or domestic partner or as any of the following, whether by blood or adoption: parent, child, brother or sister, aunt or uncle, niece

or nephew, grandparent, grandchild, father-in-law, mother-in-law, son-in-law, daughter-in-law, stepfather or stepmother, stepson or stepdaughter, stepbrother or stepsister or half-brother or half-sister.

"Applicable Party" means (1) all corporate officers of the Disclosing Party, if the Disclosing Party is a corporation; all partners of the Disclosing Party, if the Disclosing Party is a general partnership; all general partners and limited partners of the Disclosing Party, if the Disclosing Party is a limited partnership; all managers, managing members and members of the Disclosing Party, if the Disclosing Party is a limited liability company; (2) all principal officers of the Disclosing Party; and (3) any person having more than a 7.5% ownership interest in the Disclosing Party. "Principal officers" means the president, chief operating officer, executive director, chief financial officer, treasurer or secretary of a legal entity or any person exercising similar authority.

Does the Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof currently have a "familial relationship" with an elected city official or department head?

N/A because the Disclosing Party is neither the Applicant nor has a direct ownership interest

## APPENDIX B - BUILDING CODE SCOFFLAW/PROBLEM LANDLORD CERTIFICATION

This Appendix is to be completed only by (a) the Applicant, and (b) any legal entity which has a direct ownership interest in the Applicant exceeding 7.5% (an "Owner"). It is not to be completed by any legal entity which has only an indirect ownership interest in the Applicant.

Pursuant to MCC Section 2-154-010, is the Applicant or any Owner identified as a building code scofflaw or problem landlord pursuant to MCC Section 2-92-416??

N/A because the Disclosing party is neither the Applicant nor has a direct ownership interest.

## ADDITIONAL INFO

Please add any additional explanatory information here. If explanation is longer than 1000 characters, you may add an attachment below. Please note that your EDS, including all attachments, becomes available for public viewing upon contract award. Your attachments will be viewable "as is" without manual redaction by the City. You are responsible for redacting any non-public information from your documents before uploading.

99132                    JOURNAL--CITY COUNCIL--CHICAGO                    4/10/2019

Disclosure of retained parties in connection with the
Matter: Retained; John Dunn and Patrick Carey; McGuire Woods
Consulting LLC; 77 W. Wacker Drive, Suite 4100, Chicago, IL
606011-1818; lobbyist; $54,000 paid, $6,000 per month ongoing
estimated.

List of attachments uploaded by vendor

None.

**CERTIFICATION**

Under penalty of perjury, the person signing below: (1) warrants that he/she is
authorized to execute this EDS, and Appendices A and B (if applicable), on behalf of
the Disclosing Party, and (2) warrants that all certifications and statements contained
in this EDS, and Appendices A and B (if applicable), are true, accurate and complete
as of the date furnished to the City. Submission of this form constitutes making the
oath associated with notarization.

/s/ 03/11/2019
Liam O'Connor
Chief Procurement Officer
Lyft, Inc.

This is a printed copy of the Economic Disclosure Statement, the original of which
is filed electronically with the City of Chicago. Any alterations must be made
electronically, alterations on this printed copy are void and of no effect.

4/10/2019        REPORTS OF COMMITTEES        99133

**CITY OF CHICAGO**
**ECONOMIC DISCLOSURE STATEMENT**
**AND AFFIDAVIT**

**SECTION I -- GENERAL INFORMATION**

A. Legal name of the Disclosing Party submitting this EDS. Include d/b/a/ if applicable:

_Rakuten Inc._

**Check ONE of the following three boxes:**

Indicate whether the Disclosing Party submitting this EDS is:

    1. [ ] the Applicant.
       OR
    2. [X] a legal entity currently holding, or anticipated to hold within six months after City action on the contract, transaction or other undertaking to which this EDS pertains (referred to below as the "Matter"), a direct or indirect interest in excess of 7.5% in the Applicant. State the Applicant's legal name: _Motivate International Inc_
       OR
    3. [ ] a legal entity with a direct or indirect right of control of the Applicant (see Section II(B)(1))
State the legal name of the entity in which the Disclosing Party holds a right of control:

B. Business address of the Disclosing Party: _Rakuten Crimson House_
_1-14-1 Tamagawa, Setagaya-ku, Tokyo_
_158-0094_

C. Telephone: _+81-50-5817-3311_ Fax: _+81-3-6670-5250_ Email: _eiichi.kaga@rakuten.com_

D. Name of contact person: _Eiichi Kaga_

E. Federal Employer Identification No. (if you have one): _____

F. Brief description of the Matter to which this EDS pertains. (Include project number and location of property, if applicable):

_Agreement between the City of chicago and Motivate International Inc for_
_a Bicycle Sharing System_

G. Which City agency or department is requesting this EDS? _CDOT_

If the Matter is a contract being handled by the City's Department of Procurement Services, please complete the following:

Specification # _100320A_      and Contract # _26459_

Ver.2018-1

**SECTION II -- DISCLOSURE OF OWNERSHIP INTERESTS**

**A. NATURE OF THE DISCLOSING PARTY**

1. Indicate the nature of the Disclosing Party:

| | |
|---|---|
| [ ] Person | [ ] Limited liability company |
| [X] Publicly registered business corporation | [ ] Limited liability partnership |
| [ ] Privately held business corporation | [ ] Joint venture |
| [ ] Sole proprietorship | [ ] Not-for-profit corporation |
| [ ] General partnership | (Is the not-for-profit corporation also a 501(c)(3))? |
| [ ] Limited partnership | [ ] Yes          [ ] No |
| [ ] Trust | [ ] Other (please specify) |

2. For legal entities, the state (or foreign country) of incorporation or organization, if applicable:

_Japan_

3. For legal entities not organized in the State of Illinois: Has the organization registered to do business in the State of Illinois as a foreign entity?

[ ] Yes          [X] No          [ ] Organized in Illinois

**B. IF THE DISCLOSING PARTY IS A LEGAL ENTITY:**

1. List below the full names and titles, if applicable, of: (i) all executive officers and all directors of the entity; (ii) **for not-for-profit corporations**, all members, if any, which are legal entities (if there are no such members, write "no members which are legal entities"); (iii) **for trusts, estates or other similar entities**, the trustee, executor, administrator, or similarly situated party; (iv) **for general or limited partnerships, limited liability companies, limited liability partnerships or joint ventures**, each general partner, managing member, manager or any other person or legal entity that directly or indirectly controls the day-to-day management of the Applicant.

**NOTE:** Each legal entity listed below must submit an EDS on its own behalf.

| Name | Title |
|---|---|
| Hiroshi Mikitani | Representative Director, Chairman President and CEO |
| Masayuki Hosaka | Representative Director and vice chairman |

_(Please See attached list of directors and officers)_

2. Please provide the following information concerning each person or legal entity having a direct or indirect, current or prospective (i.e. within 6 months after City action) beneficial interest (including ownership) in excess of 7.5% of the Applicant. Examples of such an interest include shares in a corporation, partnership interest in a partnership or joint venture, interest of a member or manager in a

limited liability company, or interest of a beneficiary of a trust, estate or other similar entity. If none, state "None."

*None*

**NOTE:** Each legal entity listed below may be required to submit an EDS on its own behalf.

| Name | Business Address | Percentage Interest in the Applicant |
|------|------------------|--------------------------------------|
|      |                  |                                      |
|      |                  |                                      |

## SECTION III -- INCOME OR COMPENSATION TO, OR OWNERSHIP BY, CITY ELECTED OFFICIALS

Has the Disclosing Party provided any income or compensation to any City elected official during the 12-month period preceding the date of this EDS?      [ ] Yes    [X] No

Does the Disclosing Party reasonably expect to provide any income or compensation to any City elected official during the 12-month period following the date of this EDS?    [ ] Yes    [X] No

If "yes" to either of the above, please identify below the name(s) of such City elected official(s) and describe such income or compensation:

Does any City elected official or, to the best of the Disclosing Party's knowledge after reasonable inquiry, any City elected official's spouse or domestic partner, have a financial interest (as defined in Chapter 2-156 of the Municipal Code of Chicago ("MCC")) in the Disclosing Party?
    [ ] Yes    [X] No

If "yes," please identify below the name(s) of such City elected official(s) and/or spouse(s)/domestic partner(s) and describe the financial interest(s). ·

## SECTION IV -- DISCLOSURE OF SUBCONTRACTORS AND OTHER RETAINED PARTIES

The Disclosing Party must disclose the name and business address of each subcontractor, attorney, lobbyist (as defined in MCC Chapter 2-156), accountant, consultant and any other person or entity whom the Disclosing Party has retained or expects to retain in connection with the Matter, as well as the nature of the relationship, and the total amount of the fees paid or estimated to be paid. The Disclosing Party is not required to disclose employees who are paid solely through the Disclosing Party's regular payroll. If the Disclosing Party is uncertain whether a disclosure is required under this Section, the Disclosing Party must either ask the City whether disclosure is required or make the disclosure.

Ver.2018-1

99136          JOURNAL--CITY COUNCIL--CHICAGO          4/10/2019

| Name (indicate whether retained or anticipated to be retained) | Business Address | Relationship to Disclosing Party (subcontractor, attorney, lobbyist, etc.) | Fees (indicate whether paid or estimated.) NOTE: "hourly rate" or "t.b.d." is not an acceptable response. |
|---|---|---|---|
| | | | |
| | | | |

(Add sheets if necessary)

[ ] Check here if the Disclosing Party has not retained, nor expects to retain, any such persons or entities.

**SECTION V -- CERTIFICATIONS**

**A. COURT-ORDERED CHILD SUPPORT COMPLIANCE**

Under MCC Section 2-92-415, substantial owners of business entities that contract with the City must remain in compliance with their child support obligations throughout the contract's term.

Has any person who directly or indirectly owns 10% or more of the Disclosing Party been declared in arrearage on any child support obligations by any Illinois court of competent jurisdiction?

[ ] Yes    [X] No    [ ] No person directly or indirectly owns 10% or more of the Disclosing Party.

If "Yes," has the person entered into a court-approved agreement for payment of all support owed and is the person in compliance with that agreement?

[ ] Yes    [ ] No

**B. FURTHER CERTIFICATIONS**

1. [This paragraph 1 applies only if the Matter is a contract being handled by the City's Department of Procurement Services.] In the 5-year period preceding the date of this EDS, neither the Disclosing Party nor any Affiliated Entity [see definition in (5) below] has engaged, in connection with the performance of any public contract, the services of an integrity monitor, independent private sector inspector general, or integrity compliance consultant (i.e., an individual or entity with legal, auditing, investigative, or other similar skills, designated by a public agency to help the agency monitor the activity of specified agency vendors as well as help the vendors reform their business practices so they can be considered for agency contracts in the future, or continue with a contract in progress).

*I Certify the above to be true*

2. The Disclosing Party and its Affiliated Entities are not delinquent in the payment of any fine, fee, tax or other source of indebtedness owed to the City of Chicago, including, but not limited to, water and sewer charges, license fees, parking tickets, property taxes and sales taxes, nor is the Disclosing Party delinquent in the payment of any tax administered by the Illinois Department of Revenue.

*I Certify the above to be true*

Ver.2018-1

3. The Disclosing Party and, if the Disclosing Party is a legal entity, all of those persons or entities identified in Section II(B)(1) of this EDS:

a. are not presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from any transactions by any federal, state or local unit of government;

*I Certify the above to be true*

b. have not, during the 5 years before the date of this EDS, been convicted of a criminal offense, adjudged guilty, or had a civil judgment rendered against them in connection with: obtaining, attempting to obtain, or performing a public (federal, state or local) transaction or contract under a public transaction; a violation of federal or state antitrust statutes; fraud; embezzlement; theft; forgery; bribery; falsification or destruction of records; making false statements; or receiving stolen property;

*I Certify the above to be true*

c. are not presently indicted for, or criminally or civilly charged by, a governmental entity (federal, state or local) with committing any of the offenses set forth in subparagraph (b) above;

*I Certify the above to be true*

d. have not, during the 5 years before the date of this EDS, had one or more public transactions (federal, state or local) terminated for cause or default; and

*I Certify the above to be true*

e. have not, during the 5 years before the date of this EDS, been convicted, adjudged guilty, or found liable in a civil proceeding, or in any criminal or civil action, including actions concerning environmental violations, instituted by the City or by the federal government, any state, or any other unit of local government.

*I Certify the above to be true*

4. The Disclosing Party understands and shall comply with the applicable requirements of MCC Chapters 2-56 (Inspector General) and 2-156 (Governmental Ethics).

*I Certify the above to be true*

5. Certifications (5), (6) and (7) concern:
   • the Disclosing Party;
   • any "Contractor" (meaning any contractor or subcontractor used by the Disclosing Party in connection with the Matter, including but not limited to all persons or legal entities disclosed under Section IV, "Disclosure of Subcontractors and Other Retained Parties");
   • any "Affiliated Entity" (meaning a person or entity that, directly or indirectly: controls the Disclosing Party, is controlled by the Disclosing Party, or is, with the Disclosing Party, under common control of another person or entity). Indicia of control include, without limitation: interlocking management or ownership; identity of interests among family members, shared facilities and equipment; common use of employees; or organization of a business entity following the ineligibility of a business entity to do business with federal or state or local government, including the City; using substantially the same management, ownership, or principals as the ineligible entity. With respect to Contractors, the term Affiliated Entity means a person or entity that directly or indirectly controls the Contractor, is controlled by it, or, with the Contractor, is under common control of another person or entity;
   • any responsible official of the Disclosing Party, any Contractor or any Affiliated Entity or any other official, agent or employee of the Disclosing Party, any Contractor or any Affiliated Entity, acting pursuant to the direction or authorization of a responsible official of the Disclosing Party, any Contractor or any Affiliated Entity (collectively "Agents").

Ver.2018-1

Neither the Disclosing Party, nor any Contractor, nor any Affiliated Entity of either the Disclosing Party or any Contractor, nor any Agents have, during the 5 years before the date of this EDS, or, with respect to a Contractor, an Affiliated Entity, or an Affiliated Entity of a Contractor during the 5 years before the date of such Contractor's or Affiliated Entity's contract or engagement in connection with the Matter:

a.  bribed or attempted to bribe, or been convicted or adjudged guilty of bribery or attempting to bribe, a public officer or employee of the City, the State of Illinois, or any agency of the federal government or of any state or local government in the United States of America, in that officer's or employee's official capacity;

  *I Certify above to be true*

b.  agreed or colluded with other bidders or prospective bidders, or been a party to any such agreement, or been convicted or adjudged guilty of agreement or collusion among bidders or prospective bidders, in restraint of freedom of competition by agreement to bid a fixed price or otherwise; or

  *I Certify above to be true*

c.  made an admission of such conduct described in subparagraph (a) or (b) above that is a matter of record, but have not been prosecuted for such conduct; or

  *I Certify above to be true*

d.  violated the provisions referenced in MCC Subsection 2-92-320(a)(4)(Contracts Requiring a Base Wage); (a)(5)(Debarment Regulations); or (a)(6)(Minimum Wage Ordinance).

  *I Certify above to be true*

6.  Neither the Disclosing Party, nor any Affiliated Entity or Contractor, or any of their employees, officials, agents or partners, is barred from contracting with any unit of state or local government as a result of engaging in or being convicted of (1) bid-rigging in violation of 720 ILCS 5/33E-3; (2) bid-rotating in violation of 720 ILCS 5/33E-4; or (3) any similar offense of any state or of the United States of America that contains the same elements as the offense of bid-rigging or bid-rotating.

  *I Certify above to be true*

7.  Neither the Disclosing Party nor any Affiliated Entity is listed on a Sanctions List maintained by the United States Department of Commerce, State, or Treasury, or any successor federal agency.

  *I Certify above to be true*

8.  [FOR APPLICANT ONLY] (i) Neither the Applicant nor any "controlling person" [see MCC Chapter 1-23, Article I for applicability and defined terms] of the Applicant is currently indicted or charged with, or has admitted guilt of, or has ever been convicted of, or placed under supervision for, any criminal offense involving actual, attempted, or conspiracy to commit bribery, theft, fraud, forgery, perjury, dishonesty or deceit against an officer or employee of the City or any "sister agency"; and (ii) the Applicant understands and acknowledges that compliance with Article I is a continuing requirement for doing business with the City.  NOTE: If MCC Chapter 1-23, Article I applies to the Applicant, that Article's permanent compliance timeframe supersedes 5-year compliance timeframes in this Section V.

9.  [FOR APPLICANT ONLY] The Applicant and its Affiliated Entities will not use, nor permit their subcontractors to use, any facility listed as having an active exclusion by the U.S. EPA on the federal System for Award Management ("SAM").

10.  [FOR APPLICANT ONLY] The Applicant will obtain from any contractors/subcontractors hired or to be hired in connection with the Matter certifications equal in form and substance to those in Certifications (2) and (9) above and will not, without the prior written consent of the City, use any such

Ver.2018-1

contractor/subcontractor that does not provide such certifications or that the Applicant has reason to believe has not provided or cannot provide truthful certifications.

11.  If the Disclosing Party is unable to certify to any of the above statements in this Part B (Further Certifications), the Disclosing Party must explain below:

_____

_____

_____

If the letters "NA," the word "None," or no response appears on the lines above, it will be conclusively presumed that the Disclosing Party certified to the above statements.

12. To the best of the Disclosing Party's knowledge after reasonable inquiry, the following is a complete list of all current employees of the Disclosing Party who were, at any time during the 12-month period preceding the date of this EDS, an employee, or elected or appointed official, of the City of Chicago (if none, indicate with "N/A" or "none").      N/A

_____

_____

_____

13. To the best of the Disclosing Party's knowledge after reasonable inquiry, the following is a complete list of all gifts that the Disclosing Party has given or caused to be given, at any time during the 12-month period preceding the execution date of this EDS, to an employee, or elected or appointed official, of the City of Chicago.  For purposes of this statement, a "gift" does not include: (i) anything made generally available to City employees or to the general public, or (ii) food or drink provided in the course of official City business and having a retail value of less than $25 per recipient, or (iii) a political contribution otherwise duly reported as required by law (if none, indicate with "N/A" or "none").  As to any gift listed below, please also list the name of the City recipient.      N/A

_____

_____

_____

C. CERTIFICATION OF STATUS AS FINANCIAL INSTITUTION

1.  The Disclosing Party certifies that the Disclosing Party (check one)
    [ ] is    [X] is not

    a "financial institution" as defined in MCC Section 2-32-455(b).

2.  If the Disclosing Party IS a financial institution, then the Disclosing Party pledges:

"We are not and will not become a predatory lender as defined in MCC Chapter 2-32. We further pledge that none of our affiliates is, and none of them will become, a predatory lender as defined in MCC Chapter 2-32. We understand that becoming a predatory lender or becoming an affiliate of a predatory lender may result in the loss of the privilege of doing business with the City."

Ver.2018-1

If the Disclosing Party is unable to make this pledge because it or any of its affiliates (as defined in MCC Section 2-32-455(b)) is a predatory lender within the meaning of MCC Chapter 2-32, explain here (attach additional pages if necessary):

_____

_____

If the letters "NA," the word "None," or no response appears on the lines above, it will be conclusively presumed that the Disclosing Party certified to the above statements.

D. CERTIFICATION REGARDING FINANCIAL INTEREST IN CITY BUSINESS

Any words or terms defined in MCC Chapter 2-156 have the same meanings if used in this Part D.

1. In accordance with MCC Section 2-156-110: To the best of the Disclosing Party's knowledge after reasonable inquiry, does any official or employee of the City have a financial interest in his or her own name or in the name of any other person or entity in the Matter?

[ ] Yes                [X] No

NOTE: If you checked "Yes" to Item D(1), proceed to Items D(2) and D(3). If you checked "No" to Item D(1), skip Items D(2) and D(3) and proceed to Part E.

2. Unless sold pursuant to a process of competitive bidding, or otherwise permitted, no City elected official or employee shall have a financial interest in his or her own name or in the name of any other person or entity in the purchase of any property that (i) belongs to the City, or (ii) is sold for taxes or assessments, or (iii) is sold by virtue of legal process at the suit of the City (collectively, "City Property Sale"). Compensation for property taken pursuant to the City's eminent domain power does not constitute a financial interest within the meaning of this Part D.

Does the Matter involve a City Property Sale?

[ ] Yes                [ ] No.

3. If you checked "Yes" to Item D(1), provide the names and business addresses of the City officials or employees having such financial interest and identify the nature of the financial interest:

| Name | Business Address | Nature of Financial Interest |
|------|------------------|------------------------------|
|      |                  |                              |
|      |                  |                              |
|      |                  |                              |

4. The Disclosing Party further certifies that no prohibited financial interest in the Matter will be acquired by any City official or employee.

Ver.2018-1

### E. CERTIFICATION REGARDING SLAVERY ERA BUSINESS

Please check either (1) or (2) below. If the Disclosing Party checks (2), the Disclosing Party must disclose below or in an attachment to this EDS all information required by (2). Failure to comply with these disclosure requirements may make any contract entered into with the City in connection with the Matter voidable by the City.

X 1. The Disclosing Party verifies that the Disclosing Party has searched any and all records of the Disclosing Party and any and all predecessor entities regarding records of investments or profits from slavery or slaveholder insurance policies during the slavery era (including insurance policies issued to slaveholders that provided coverage for damage to or injury or death of their slaves), and the Disclosing Party has found no such records.

____ 2. The Disclosing Party verifies that, as a result of conducting the search in step (1) above, the Disclosing Party has found records of investments or profits from slavery or slaveholder insurance policies. The Disclosing Party verifies that the following constitutes full disclosure of all such records, including the names of any and all slaves or slaveholders described in those records:

_____

_____

_____

### SECTION VI -- CERTIFICATIONS FOR FEDERALLY FUNDED MATTERS

**NOTE: If the Matter is federally funded,** complete this Section VI. **If the Matter is not federally funded,** proceed to Section VII. For purposes of this Section VI, tax credits allocated by the City and proceeds of debt obligations of the City are not federal funding.

### A. CERTIFICATION REGARDING LOBBYING

1. List below the names of all persons or entities registered under the federal Lobbying Disclosure Act of 1995, as amended, who have made lobbying contacts on behalf of the Disclosing Party with respect to the Matter: (Add sheets if necessary):

_____

_____

_____

(If no explanation appears or begins on the lines above, or if the letters "NA" or if the word "None" appear, it will be conclusively presumed that the Disclosing Party means that NO persons or entities registered under the Lobbying Disclosure Act of 1995, as amended, have made lobbying contacts on behalf of the Disclosing Party with respect to the Matter.)

2. The Disclosing Party has not spent and will not expend any federally appropriated funds to pay any person or entity listed in paragraph A(1) above for his or her lobbying activities or to pay any person or entity to influence or attempt to influence an officer or employee of any agency, as defined by applicable federal law, a member of Congress, an officer or employee of Congress, or an employee
Ver.2018-1

99142          JOURNAL--CITY COUNCIL--CHICAGO          4/10/2019

of a member of Congress, in connection with the award of any federally funded contract, making any federally funded grant or loan, entering into any cooperative agreement, or to extend, continue, renew, amend, or modify any federally funded contract, grant, loan, or cooperative agreement.

*I Certify the above to be true*

3.  The Disclosing Party will submit an updated certification at the end of each calendar quarter in which there occurs any event that materially affects the accuracy of the statements and information set forth in paragraphs A(1) and A(2) above.

*I Certify the above to be true*

4.  The Disclosing Party certifies that either: (i) it is not an organization described in section 501(c)(4) of the Internal Revenue Code of 1986; or (ii) it is an organization described in section 501(c)(4) of the Internal Revenue Code of 1986 but has not engaged and will not engage in "Lobbying Activities," as that term is defined in the Lobbying Disclosure Act of 1995, as amended.

*I Certify the above to be true*

5.  If the Disclosing Party is the Applicant, the Disclosing Party must obtain certifications equal in form and substance to paragraphs A(1) through A(4) above from all subcontractors before it awards any subcontract and the Disclosing Party must maintain all such subcontractors' certifications for the duration of the Matter and must make such certifications promptly available to the City upon request.

*I Certify the above to be true*

**B. CERTIFICATION REGARDING EQUAL EMPLOYMENT OPPORTUNITY**

If the Matter is federally funded, federal regulations require the Applicant and all proposed subcontractors to submit the following information with their bids or in writing at the outset of negotiations.

Is the Disclosing Party the Applicant?
[ ] Yes          [X] No

If "Yes," answer the three questions below:

1.  Have you developed and do you have on file affirmative action programs pursuant to applicable federal regulations?  (See 41 CFR Part 60-2.)
[ ] Yes          [ ] No

2.  Have you filed with the Joint Reporting Committee, the Director of the Office of Federal Contract Compliance Programs, or the Equal Employment Opportunity Commission all reports due under the applicable filing requirements?
[ ] Yes          [ ] No          [ ] Reports not required

3.  Have you participated in any previous contracts or subcontracts subject to the equal opportunity clause?
[ ] Yes          [ ] No

If you checked "No" to question (1) or (2) above, please provide an explanation:

_____

_____

Ver.2018-1

**SECTION VII -- FURTHER ACKNOWLEDGMENTS AND CERTIFICATION**

The Disclosing Party understands and agrees that:

A. The certifications, disclosures, and acknowledgments contained in this EDS will become part of any contract or other agreement between the Applicant and the City in connection with the Matter, whether procurement, City assistance, or other City action, and are material inducements to the City's execution of any contract or taking other action with respect to the Matter. The Disclosing Party understands that it must comply with all statutes, ordinances, and regulations on which this EDS is based.

*I acknowledge and consent to the above*

B. The City's Governmental Ethics Ordinance, MCC Chapter 2-156, imposes certain duties and obligations on persons or entities seeking City contracts, work, business, or transactions. The full text of this ordinance and a training program is available on line at www.cityofchicago.org/Ethics, and may also be obtained from the City's Board of Ethics, 740 N. Sedgwick St., Suite 500, Chicago, IL 60610, (312) 744-9660. The Disclosing Party must comply fully with this ordinance.

*I acknowledge and consent to the above*

C. If the City determines that any information provided in this EDS is false, incomplete or inaccurate, any contract or other agreement in connection with which it is submitted may be rescinded or be void or voidable, and the City may pursue any remedies under the contract or agreement (if not rescinded or void), at law, or in equity, including terminating the Disclosing Party's participation in the Matter and/or declining to allow the Disclosing Party to participate in other City transactions. Remedies at law for a false statement of material fact may include incarceration and an award to the City of treble damages.

*I acknowledge and consent to the above*

D. It is the City's policy to make this document available to the public on its Internet site and/or upon request. Some or all of the information provided in, and appended to, this EDS may be made publicly available on the Internet, in response to a Freedom of Information Act request, or otherwise. By completing and signing this EDS, the Disclosing Party waives and releases any possible rights or claims which it may have against the City in connection with the public release of information contained in this EDS and also authorizes the City to verify the accuracy of any information submitted in this EDS.

*I acknowledge and consent to the above*

E. The information provided in this EDS must be kept current. In the event of changes, the Disclosing Party must supplement this EDS up to the time the City takes action on the Matter. If the Matter is a contract being handled by the City's Department of Procurement Services, the Disclosing Party must update this EDS as the contract requires. **NOTE:** With respect to Matters subject to MCC Chapter 1-23, Article I (imposing **PERMANENT INELIGIBILITY** for certain specified offenses), the information provided herein regarding eligibility must be kept current for a longer period, as required by MCC Chapter 1-23 and Section 2-154-020.

*I acknowledge and consent to the above*

Ver.2018-1

99144　　　　　　　JOURNAL--CITY COUNCIL--CHICAGO　　　　　4/10/2019

**CERTIFICATION**

Under penalty of perjury, the person signing below: (1) warrants that he/she is authorized to execute this EDS, and all applicable Appendices, on behalf of the Disclosing Party, and (2) warrants that all certifications and statements contained in this EDS, and all applicable Appendices, are true, accurate and complete as of the date furnished to the City.

_Rakuten, Inc._

(Print or type exact legal name of Disclosing Party)

By: _____

(Sign here)

_Kenji Hirose_

(Print or type name of person signing)

_Group Executive Vice President and Chief Financial Officer_

(Print or type title of person signing)

Signed and sworn to before me on (date) _____,

at _____ County, _____ (state).

_____
　　　Notary Public

Commission expires: _____

Ver.2018-1

**CITY OF CHICAGO**
**ECONOMIC DISCLOSURE STATEMENT AND AFFIDAVIT**
**APPENDIX A**

**FAMILIAL RELATIONSHIPS WITH ELECTED CITY OFFICIALS**
**AND DEPARTMENT HEADS**

This Appendix is to be completed only by (a) the Applicant, and (b) any legal entity which has a direct ownership interest in the Applicant exceeding 7.5%. It is not to be completed by any legal entity which has only an indirect ownership interest in the Applicant.

Under MCC Section 2-154-015, the Disclosing Party must disclose whether such Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof currently has a "familial relationship" with any elected city official or department head. A "familial relationship" exists if, as of the date this EDS is signed, the Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof is related to the mayor, any alderman, the city clerk, the city treasurer or any city department head as spouse or domestic partner or as any of the following, whether by blood or adoption: parent, child, brother or sister, aunt or uncle, niece or nephew, grandparent, grandchild, father-in-law, mother-in-law, son-in-law, daughter-in-law, stepfather or stepmother, stepson or stepdaughter, stepbrother or stepsister or half-brother or half-sister.

"Applicable Party" means (1) all executive officers of the Disclosing Party listed in Section II.B.1.a., if the Disclosing Party is a corporation; all partners of the Disclosing Party, if the Disclosing Party is a general partnership; all general partners and limited partners of the Disclosing Party, if the Disclosing Party is a limited partnership; all managers, managing members and members of the Disclosing Party, if the Disclosing Party is a limited liability company; (2) all principal officers of the Disclosing Party; and (3) any person having more than a 7.5% ownership interest in the Disclosing Party. "Principal officers" means the president, chief operating officer, executive director, chief financial officer, treasurer or secretary of a legal entity or any person exercising similar authority.

Does the Disclosing Party or any "Applicable Party" or any Spouse or Domestic Partner thereof currently have a "familial relationship" with an elected city official or department head?

[ ] Yes          [ ] No

If yes, please identify below (1) the name and title of such person, (2) the name of the legal entity to which such person is connected; (3) the name and title of the elected city official or department head to whom such person has a familial relationship, and (4) the precise nature of such familial relationship.

_____

_____

_____

Ver.2018-1

CITY OF CHICAGO
ECONOMIC DISCLOSURE STATEMENT AND AFFIDAVIT
APPENDIX B

BUILDING CODE SCOFFLAW/PROBLEM LANDLORD CERTIFICATION

This Appendix is to be completed only by (a) the Applicant, and (b) any legal entity which has a direct ownership interest in the Applicant exceeding 7.5% (an "Owner"). It is not to be completed by any legal entity which has only an indirect ownership interest in the Applicant.

1.  Pursuant to MCC Section 2-154-010, is the Applicant or any Owner identified as a building code scofflaw or problem landlord pursuant to MCC Section 2-92-416?

     [  ] Yes                    [  ] No

2.  If the Applicant is a legal entity publicly traded on any exchange, is any officer or director of the Applicant identified as a building code scofflaw or problem landlord pursuant to MCC Section 2-92-416?

     [  ] Yes                    [  ] No          [  ] The Applicant is not publicly traded on any exchange.

3.  If yes to (1) or (2) above, please identify below the name of each person or legal entity identified as a building code scofflaw or problem landlord and the address of each building or buildings to which the pertinent code violations apply.

     _____
     _____
     _____

Ver.2018-1

4/10/2019        REPORTS OF COMMITTEES        99147

**CITY OF CHICAGO**
**ECONOMIC DISCLOSURE STATEMENT AND AFFIDAVIT**
**APPENDIX C**

**PROHIBITION ON WAGE & SALARY HISTORY SCREENING - CERTIFICATION**

This Appendix is to be completed only by an Applicant that is completing this EDS as a "contractor" as defined in MCC Section 2-92-385. That section, which should be consulted (www.amlegal.com), generally covers a party to any agreement pursuant to which they: (i) receive City of Chicago funds in consideration for services, work or goods provided (including for legal or other professional services), or (ii) pay the City money for a license, grant or concession allowing them to conduct a business on City premises.

On behalf of an Applicant that is a contractor pursuant to MCC Section 2-92-385, I hereby certify that the Applicant is in compliance with MCC Section 2-92-385(b)(1) and (2), which prohibit: (i) screening job applicants based on their wage or salary history, or (ii) seeking job applicants' wage or salary history from current or former employers. I also certify that the Applicant has adopted a policy that includes those prohibitions.

[ ] Yes

[ ] No

[ ] N/A – I am not an Applicant that is a "contractor" as defined in MCC Section 2-92-385.

This certification shall serve as the affidavit required by MCC Section 2-92-385(c)(1).

If you checked "no" to the above, please explain.

_____

_____

_____

_____

Ver.2018-1

Rakuten

## Management Team

As of February 12, 2019

### Board of Directors

Representative Director,
Chairman,
President and CEO
**Hiroshi Mikitani**

Representative Director
and Vice Chairman
**Masayuki Hosaka**

Director
**Charles B. Baxter**

Director
**Ken Kutaragi** [1][2]

Director
**Takashi Mitachi** [1][2]

Director
**Jun Murai** [1][2]

Director
**Youngme Moon** [1][2]

### Company Auditors

Company Auditor (Full-time)
**Takahide Uchida** [3]

Company Auditor
**Takeo Hirata** [2][3]

Company Auditor (Full-time)

4/10/2019                    REPORTS OF COMMITTEES                         99149

Masahide Hiramoto
*2*3

Company Auditor
**Katsuyuki Yamaguchi** *3

*1   Outside directors stipulated under Companies Act of Japan
*2   Independent Director specified by the regulations of Tokyo Stock Exchange, Inc.
*3   Outside auditors stipulated under Companies Act of Japan

## Management Team

| | |
|---|---|
| Representative Director, Chairman, President and CEO<br>Internet Services Segment Leader | **Hiroshi Mikitani** |
| Representative Director and Vice Chairman<br>FinTech Segment Leader<br>President of FinTech Group Company | **Masayuki Hosaka** |
| Group Executive Vice President<br>President of Communications & Energy Company | **Yoshihisa Yamada** |
| Group Executive Vice President<br>CIO & CISO<br>(Chief Information Officer & Chief Information Security Officer)<br>Senior Vice President of Communications & Energy Company | **Yasufumi Hirai** |
| Group Executive Vice President<br>COO (Chief Operating Officer)<br>Senior Director of Group Company Division | **Kentaro Hyakuno** |
| Group Executive Vice President<br>CRO (Chief Revenue Officer)<br>President of Media & Sports Company<br>Senior Director of Marketing Division<br>Senior Director of Technology Division | **Makoto Arima** |
| Group Executive Vice President<br>President of Commerce Company | **Kazunori Takeda** |
| Group Executive Vice President<br>CFO (Chief Financial Officer) | **Kenji Hirose** |

JOURNAL--CITY COUNCIL--CHICAGO

| | |
|---|---|
| Group Managing Executive Officer<br>CPO (Chief People Officer) | Masatada Kobayashi |
| Group Managing Executive Officer<br>Senior Director of Operation Division | Akio Sugihara |
| Group Managing Executive Officer<br>Senior Director of Group Company Division<br>Senior Vice President of Investment & Incubation<br>Company<br>Office Manager of CEO Office | Koji Ando |
| Group Managing Executive Officer<br>Representative Director and President of Rakuten<br>Securities, Inc. | Yuji Kusunoki |
| Group Managing Executive Officer<br>CTO (Chief Technology Officer) of Technology<br>Division | Terje Marthinussen |
| Group Managing Executive Officer<br>Representative Director and President of Rakuten<br>Bank, Ltd. | Hiroyuki Nagai |
| Group Managing Executive Officer<br>President of Investment & Incubation Company<br>Head of Asia RHO | Hiroshi Takasawa |
| Group Managing Executive Officer<br>CMO (Chief Marketing Officer)<br>Senior Vice President of Commerce Company | Naho Kono |
| Group Managing Executive Officer<br>CDO (Chief Data Officer) of Technology Division | Takuya Kitagawa |

**Related Information**

**Corporate Governance**

Corporate governance policy of Rakuten, Inc., including our basic policy, compliance, risk management and information security

› LEARN MORE

**Shareholders' Meeting**

The latest shareholders' meeting information of Rakuten, Inc. Reports from previous meetings are also available

› LEARN MORE

**Our Businesses**

A list of Rakuten Group's major businesses and brands all over the world

› LEARN MORE

*(Sub)Exhibit 5.*
(To Amendment To Operator Agreement
With Motivate International, Inc.)

*Insurance Requirements And Evidence Of Insurance.*

The Contractor must provide and maintain at Contractor's own expense, until Contract completion and during the time period following completion if Contractor is required to perform any additional work, the insurance coverages and requirements specified below, insuring all operations related to the Contract.

A. Insurance To Be Provided.

1)  Workers' Compensation And Employers Liability.

    Workers' Compensation Insurance, as prescribed by applicable law covering all employees who are to provide work under this Contract and Employers Liability coverage with limits of not less than $500,000 each accident, illness or disease.

2)  Commercial General Liability (Primary And Umbrella).

    Commercial General Liability Insurance or equivalent with limits of not less than $5,000,000 per occurrence for bodily injury, personal injury, and property damage liability. Coverages must include the following: all premises and operations, products/completed operations explosion, collapse, underground, separation of insureds, defense, and contractual liability (not to include Endorsement CG 21 39 or equivalent). The City of Chicago is to be named as an additional insured on a primary, non-contributory basis for any liability arising directly or indirectly from the work.

    Subcontractors performing work for the Contractor must maintain limits of not less than $1,000,000 with the same terms herein.

3)  Automobile Liability (Primary And Umbrella).

    When any motor vehicles (owned, non-owned and hired) are used in connection with work to be performed, the Contractor must provide Automobile Liability Insurance with limits of not less than $2,000,000 per occurrence for bodily injury and property damage. The City of Chicago is to be named as an additional insured on a primary, non-contributory basis.

    Subcontractors performing work for the Contractor must maintain limits of not less than $1,000,000 with the same terms herein.

4)  Property All Risk.

The Contractor must maintain All Risk Property Insurance at full replacement cost covering all loss, damage or destruction to the machinery, equipment, bicycles, stations and/or any facility/property (if applicable) including improvements and betterments. The City of Chicago is to be named as an additional insured and loss payee.

The Contractor is responsible for all loss or damage to City property and to personal property of Contractor (including bicycles, materials, equipment, stations, fixtures and contents) that are part of this Contract.

5)  Professional Liability.

When any architects, engineers, EDP professionals, project managers/ administrators or other professional consultants perform work in connection with this Contract, Professional Liability Insurance covering acts, errors, or omissions must be maintained with limits of not less than $1,000,000. When policies are renewed or replaced, the policy retroactive date must coincide with, or precede, start of work on the Contract. A claims-made policy which is not renewed or replaced must have an extended reporting period of two (2) years.

6)  Valuable Papers.

When any plans, designs, drawings, specifications, media, data, reports, records and any other documents are produced or used under this Contract, Valuable Papers Insurance must be maintained in an amount to insure against any loss whatsoever, and must have limits enough to pay for the recreation and reconstruction of such records.

7)  Blanket Crime.

The Contractor must provide Blanket Crime coverage covering all persons handling funds under this Contract, against loss by dishonesty, robbery, burglary, theft, destruction, or disappearance, computer fraud, credit card forgery, and other related crime risks. The policy limit must be written to cover losses in the amount of maximum monies collected, received and in the possession of Contractor at any given time.

B.  Additional Requirements.

The Contractor must furnish the City of Chicago, Department of Transportation, 30 North LaSalle Street, 11th Floor 60602, original Certificates of Insurance, or such similar evidence, to be in force on the date of this Contract, and Renewal Certificates of Insurance, or such similar evidence, if the coverages have an expiration or renewal date occurring during the term of this Contract. The Contractor must submit evidence of insurance on the City of Chicago Insurance Certificate Form (copy attached) or equivalent prior to Contract award. The receipt of any certificate does not constitute agreement by the City that the insurance requirements in the Contract have been fully met or that the insurance policies indicated on the certificate follow all Contract requirements. The failure of the City to obtain certificates or other insurance evidence from Contractor is not a waiver by the City of any requirements for the Contractor to obtain and maintain the specified coverages. The Contractor must advise all insurers of the Contract provisions regarding insurance. Nonconforming insurance does not relieve Contractor of the obligation to provide insurance as specified herein. Nonfulfillment of the insurance conditions may constitute a violation of the Contract, and the City retains the right to stop work until proper evidence of insurance is provided, or the Contract may be terminated.

The Contractor must provide for 60 days prior written notice to be given to the City in the event coverage is substantially changed, canceled, or non-renewed.

Any deductibles or self-insured retentions on referenced insurance coverages must be borne by Contractor.

The Contractor hereby waives and agrees to require their insurers to waive their rights of subrogation against the City of Chicago, its employees, elected officials, agents, or representatives.

The coverages and limits furnished by Contractor in no way limit the Contractor's liabilities and responsibilities specified within the Contract or by law.

Any insurance or self-insurance programs maintained by the City of Chicago do not contribute with insurance provided by the Contractor under the Contract.

The required insurance to be carried is not limited by any limitations expressed in the indemnification language in this Contract or any limitation placed on the indemnity in this Contract given as a matter of law.

If Contractor is a joint venture or limited liability company, the insurance policies must name the joint venture or limited liability company as a named insured.

The Contractor must require all subcontractors to provide the insurance required herein, or Contractor may provide the coverages for subcontractors. All subcontractors are subject to the same insurance requirements of Contractor unless otherwise specified in this Contract.

If Contractor or subcontractor desires additional coverages, the party desiring the additional coverages is responsible for the acquisition and cost.

Notwithstanding any provision in the Contract to the contrary, the City of Chicago Risk Management Department maintains the right to modify, delete, alter or change these requirements.


*(Sub)Exhibit 8.*
*(To Amendment To Operator Agreement*
*With Motivate International, Inc.)*

*Advertising Standards.*


The City of Chicago ("City") recognizes that there are opportunities to realize revenues to be used for the public benefit through the marketing of City Assets, including the display of advertising and/or promotional materials thereon. Pursuant to the authority granted in Section 2-32-055 of the Chicago Municipal Code, the Chief Financial Officer ("CFO") of the City of Chicago adopts these rules in relation to the display of advertising and/or promotional materials on certain City Assets.

These rules are intended to:

-- identify the types of advertising and/or promotional materials that are eligible for display on City Assets to which these rules apply;

-- ensure that the rules for accepting advertising and/or promotional materials for display on certain City Assets are consistently enforced;

-- maintain and enhance the City's reputation and public image by avoiding advertising and promotional displays on certain City Assets that are offensive or controversial, or are not consistent with the City's image, policies, values, or mission;

-- maximize revenue for the City of Chicago.

In making City Assets available for marketing, including the display of advertising and/or promotional materials, the City is acting to generate revenues and not to create a public forum or a limited public forum for dissemination, debate or discussion of public issues. The display of advertising or promotional materials on City Assets pursuant to said marketing efforts does not imply any City endorsement of any product or service advertised, or messages displayed.

Definitions.

The term "Assets" has the same meaning as in Section 2-32-055 of the Chicago Municipal Code.

The terms "nudity", "sexual conduct", and "sexual excitement" have the same meanings herein as in 720 ILCS 5/11-21(a)(2011) and as such law may be amended, modified or supplemented.

The term "obscene" has the meaning set forth in 720 ILCS 5/11-20(b)(2011) and as such law may be amended, modified or supplemented.

Limitations Upon Advertisements And Promotional Materials.

Advertisements and/or promotional materials displayed on City Assets pursuant to the authority granted by the Section 2-32-055 of the Chicago Municipal Code shall comply with the following rules:

Advertising or promotional materials displayed on City Assets may not contain material or information that:

1. is false, misleading, or deceptive;

2. is libelous or defamatory;

3. promotes unlawful or illegal products, services or activities;

4. infringes on any copyright, trade or service mark, patent, trade secret or other intellectual property right of any person or entity;

5. implies or declares an endorsement by the City of Chicago of any product, service or activity, except upon the written consent of the City of Chicago;

6. is obscene, pornographic, or sexually-explicit material, including, but not limited to, the depiction of nudity, sexual conduct, or sexual excitement;

7.  promotes or depicts tobacco or tobacco-products, or their use, or advertises entities whose business is substantially derived from the sale of tobacco or tobacco products;

8.  promotes or depicts alcoholic beverages or the use of alcoholic beverages if such advertisement or promotional material is within a 500-foot radius of a school up through the level of high school, a house of worship or a playground (other than a playground located adjacent to a linear park that is more than one mile in length and is located within the public way);

9.  promotes or appears to promote or depict firearms or their use, or advertises entities whose business is substantially derived from the sale of firearms;

10. supports or opposes a political message, or a public issue or cause;

11. advocates imminent lawlessness or violent action, or contains graphic depictions of violence;

12. supports or opposes a religion or religious denomination, creed, tenet or belief, atheism or agnosticism, or that contains a religious message, symbol or endorsement.


The foregoing rules apply to marketing initiatives undertaken pursuant to Section 2-32-055 of the Chicago Municipal Code for the display of advertising or promotional materials on City Assets that are not public forums. Advertisements and/or promotional materials displayed pursuant to a contract or agreement with the City entered into prior to the effective date of Section 2-32-055 of the Chicago Municipal Code are not affected hereby.

Nothing herein limits the City's right to enter into a sponsorship agreement with any person or entity engaged in the business of manufacturing or selling alcoholic beverages, or an agreement for "pouring rights" or for the sale or distribution of alcoholic beverages on City property or at City events.


Reservation Of Rights.

The City reserves the right, subject to any contractual obligations, to alter these rules, including the right to set additional limitations on advertising and/or promotional materials that may be displayed on City Assets subject to these rules, or to ban the display of advertising and/or promotional materials thereon entirely.

*(Sub)Exhibit 3.*
(To Amendment To Operator Agreement
With Motivate International, Inc.)

*System Branding And Graphics.*



