IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| SOCIAL BICYCLES LLC d/b/a JUMP,<br><br>      Plaintiff,<br><br>   v.<br><br>CITY OF CHICAGO DEPARTMENT OF TRANSPORTATION; CITY OF CHICAGO,<br><br>      Defendants. | Case No. 19-cv-05253<br><br>Hon. Joan H. Lefkow |

**MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED**

Roberta A. Kaplan
John C. Quinn
Benjamin D. White
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
bwhite@kaplanhecker.com

Leonard A. Gail
Suyash Agrawal
MASSEY & GAIL LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
(312) 283-1590
lgail@masseygail.com
sagrawal@masseygail.com

*Attorneys for Plaintiff Social Bicycles
LLC d/b/a JUMP*

The City's motion to dismiss rests on a nearly boundless assertion of the City's own authority. Indeed, the City would all but nullify state law in its attempt to defend the backroom exclusive bikeshare deal it struck with its favored private partner. The City's principal argument in favor of dismissal is that Illinois's competitive bidding rules simply do not apply to its multi-million-dollar public contract with a bikeshare operator—or to the secretly negotiated "amendment" that dramatically expanded that contract and made it exclusive—based on a laundry list of highly fact-dependent and inapposite exemptions. Moreover, the City contends that, as a "home rule" unit, it need not have concerned itself with any of those state law rules at all, even though it repeatedly represented to the public that it would. The City's conception of its own legal constraints is wrong. And the City's arguments in support of its position are pure *ipse dixit*. The City has not carried its burden to show that an exemption to state competitive bidding rules applies. And the home rule doctrine does not allow the bait-and-switch approach the City employs here. At bottom, the City cannot violate important statewide public procurement rules with impunity. The City's attempt to sweep this case under the rug before it starts should be roundly rejected.

## **BACKGROUND**

In 2011, then-Mayor Rahm Emanuel sought to establish a bikeshare system in the City of Chicago. Compl. ¶ 15. To do so, Mayor Emanuel decided to have a private vendor run the system rather than have the City operate it itself. Compl. ¶¶ 14–16. The City then issued a request for proposals "from firms or organizations experienced in establishing and operating large bicycle sharing systems and with expertise in purchasing, installing, and operating of a bicycle sharing system." Compl. ¶ 16. Throughout the RFP, the City repeatedly represented in writing that it would adhere to relevant state and local procurement laws. Compl. ¶¶ 20–21.

Three companies responded to the RFP. Compl. ¶ 22. Plaintiff did not respond to it, as it did not enter the public bikeshare market until years later. Compl. ¶ 28. Ultimately, an "Evaluation Committee" of City officials selected Alta Bicycle Share, Inc. to operate the program. Compl. ¶ 22. Alta was later renamed Motivate and was subsequently acquired by Lyft, Inc., Plaintiff's principal competitor. Compl. 27, 31.

In April 2012, the City Council passed an ordinance authorizing the CDOT Commissioner "to negotiate and enter into an agreement with [Alta]." Compl. ¶ 24. That ordinance announced the City's intent to "purchase and cause to be installed the System's infrastructure, including docking stations and bicycles, as well as appurtenant, informational signage and panels, and to procure the System's operation, marketing and maintenance." Compl. ¶ 24.

The City finalized its agreement with Alta on January 24, 2013 (the "Agreement"). Compl. ¶ 25. Echoing the April 2012 ordinance, the Agreement noted the City's "desire[] to purchase and implement a bicycle-sharing system" and stated that the "purpose of this Agreement is for Alta to provide, install, implement, operate and maintain a bike sharing System for use by the public." Compl. ¶ 25. The City was to initially purchase 3,000 bicycles and 301 docking stations, at a cost of $30 million to the City. Compl. ¶¶ 25–26. "Alta was shielded from the bulk of the risk because taxpayers funded all of [the] startup costs." Compl. ¶ 26. The program launched in June 2013, operating under the name "Divvy." Compl. ¶ 26.

In 2018, prior to the expiration of the Agreement's five-year term, Lyft approached the CDOT Commissioner to seek a broadening of the Agreement. Compl. ¶ 32. Rather than start anew with a competitive procurement process, however, the parties negotiated out of public view what they ultimately presented as an "Amendment" to the Agreement. Compl. ¶¶ 32–34. The changes Lyft sought were "foundational and massive," including a dramatic expansion of the

services provided as well as a "sweeping exclusive right (which did not exist in the earlier agreement) that would lock out all of Motivate's competitors—including Plaintiff Social Bicycles LLC d/b/a JUMP ("JUMP")—from renting out any type of bicycle (*i.e.*, docked or dockless) on the streets of Chicago." Compl. ¶ 33. Thus, "the Amendment categorically transform[ed] what in essence was a discrete operational deal for a traditional docked bike rental program into a sprawling and exclusive arrangement that granted one company a monopoly over the offering of increasingly valuable bikeshare services on City streets." Compl. ¶ 38.

In March 2019, the Emanuel administration publicly announced its intent to enter into the Amendment and hastily scheduled a City Council vote on a new ordinance to approve the deal. Compl. ¶ 34. The proposed ordinance recognized that the Amendment would "dramatically expand the System in terms of size and technological sophistication." Compl. ¶ 34. Public reaction was "swift and damning." Compl. ¶ 39. Nevertheless, the City Council approved the Amendment on April 10, 2019, just weeks before Emanuel's term as Mayor came to an end. Compl. ¶ 41.[1]

## ARGUMENT

The City's sweeping and lawless assertions notwithstanding, the Complaint adequately alleges that, in entering into the Agreement (and its Amendment) without engaging in competitive bidding or any competitive process at all, Defendants violated the Illinois Municipal Purchasing Act ("MPA"), the Municipal Code of Chicago ("MCC"), and the federal and state constitutions.

---

[1] At the time of filing, Plaintiff was not in a position to know whether the City ultimately executed the Amendment. *See* Compl. ¶ 42. Defendants represent that the Amendment was executed on May 8, 2019 by and between the City of Chicago and Motivate International Inc. *See* Mot. at 4 (citing MTD Ex. D at 18). Plaintiff was surprised to learn this. The City of Chicago's Department of Procurement Services purports to provide on its website "access to vendor information, contracts and their associated modifications." https://webapps1.chicago.gov/vcsearch/home. The Alta Agreement is on the site. https://webapps1.chicago.gov/vcsearch/city/vendors/95554804H/contracts  But the amended agreement was not posted to the website following May 2019 nor does it appear to have been as of today.

**I.      DEFENDANTS VIOLATED THE MPA**

MPA § 8-10-3 requires most municipal contracts to be "let by free and open competitive bidding after advertisement." Defendants concede that in entering into the Agreement they did not comply with § 8-10-3. Mot. at 1. Rather, Defendants contend they were free to ignore that state law for two reasons: (i) the Agreement can be determined at the pleading stage to be exempt from competitive bidding pursuant to § 8-10-4; and (ii) Defendants need not have followed § 8-10-3 at all in light of the "home rule" doctrine. As set forth below, both contentions are misguided.

**A.      The Agreement Is Not Exempt from Competitive Bidding Requirements**

MPA § 8-10-4 exempts certain enumerated types of procurements from § 8-10-3's competitive bidding requirement. Defendants contend that the Agreement falls under three such exemptions. But they have not established (nor could they) that any of them actually apply here.[2]

**a.      The Agreement Is Not Subject to the "Professional Skill" Exemption**

Defendants contend they need not have engaged in competitive bidding as required by state law because the Agreement is a "contract[] 'for the services of individuals possessing a high degree of professional skill where the ability or fitness of the individual plays an important part.'" Mot. at 5 (quoting MPA § 8-10-4). Defendants simply assert—in a single sentence with no support—

---

[2] The MPA's structure makes plain that the party asserting a § 8-10-4 exemption to § 8-10-3's competitive bidding requirements carries the burden to establish that it applies. This is clear from longstanding authority from the Illinois Supreme Court, which provides that where, as here, the legislature lists out exemptions to a statutory clause in a "subsequent clause," the burden is on the party invoking that exemption to prove that they fit within it. *See People ex rel. Ill. Armory Bd.* v. *Kelly*, 16 N.E.2d 693, 694 (Ill. 1938) ("Where there is an exception in the enacting clause of a statute, the plaintiff, suing under it, must show that the defendant is not within the exception; *but if there be an exception in a subsequent clause, that is a matter of defense, and the other party must show it, to exempt himself from the penalty.*" (emphasis added) (quoting *Great W. R.R. Co.* v. *Hanks*, 36 Ill. 281, 284 (1865)); *see also Meacham* v. *Knolls Atomic Power Lab.*, 554 U.S. 84, 91 (2008) (discussing the "familiar principle that '[w]hen a proviso . . . carves an exception out of the body of a statute or contract those who set up such exception must prove it'" (quoting *Javierre* v. *Cent. Altagracia*, 217 U.S. 502, 508 (1910)); 2 Nichols Ill. Civ. Prac. § 27:101 ("plaintiff need not negate an exception in a subsequent clause").

4

that the Agreement is exempt because it is "for professional services involving a high degree of professional skill, namely the ability to establish and operate a Citywide bikeshare system," Mot. at 5, as if the City simply hired an attorney or an accountant. The argument is meritless.

Defendants misconstrue how the "professional skill" exemption really works.[3] The question is not whether, in a vacuum, a service contract requires some degree of professional skill, but whether, *because* it does so, the contract is not "adapted to award by competitive bidding." *Compass Health Care Plans* v. *Bd. of Educ.*, 617 N.E.2d 6, 8 (Ill. App. Ct. 1992). For example, in *Compass*, on a lengthy summary judgment record, the court rejected an HMO's contention that its contract for the provision of medical benefits to school system employees fit into the professional services exemption because the contracts at issue there did "not involve the type of professional skills *which would render them not adapted to competitive bidding*." *Id.* at 11-12 (emphasis added). Perhaps even closer to the facts here, in *O'Hare Express, Inc.* v. *City of Chicago*, 601 N.E.2d 846 (Ill. App. Ct. 1992), the court rejected the Chicago's contention that operating a shuttle bus service at O'Hare Airport is a professional service invoking the § 8-10-4 exemption. It held so because—following a jury trial—there was no "evidence in the record . . . that a shuttle bus service requires any particular degree of professional skill." *Id.* at 851.

Defendants have offered no explanation as to why the contracts here were not adapted to competitive bidding due to the "professional skill" of the operator. And the Complaint alleges the opposite. *See* Compl. ¶ 23. Indeed, cities around the country regularly award bikeshare contracts pursuant to competitive bidding.[4] This Court should not dismiss this case at this early juncture

---

[3] Defendants also misconstrue the nature of the Agreement, which (as discussed *infra*) is in the order of a *purchase* agreement rather than a *service* agreement.

[4] For example, Baltimore, MD issued a bikeshare contract pursuant to competitive bidding, which Motivate won by submitting the lowest bid. https://www.baltimorebrew.com/2015/10/22/top-bikeshare-operator-submits-low-bid-to-run-citys-proposed-program/. Other cities that have engaged competitive bidding for bikeshare programs include Los Angeles, CA, Detroit, MI, and Portland, OR.

5

based merely on Defendants' conclusory contention that their bikeshare program was one requiring "professional skill" that obviated any ability to engage in competitive bidding.

To be sure, in *Hassett Storage Warehouse, Inc.* v. *Bd. of Elec. Comm'rs*, 387 N.E.2d 785 (Ill. App. Ct. 1979), the court granted a motion to dismiss due to the professional skill exemption. But as noted in both *O'Hare Express* and *Compass*, *Hassett*'s facts were extreme and undisputed. The service performed in *Hassett*, the safekeeping of election equipment, required "near perfect performance under extreme time pressures," and the "failure of a contractor to perform his obligations properly could disenfranchise registered voters in an area and do irreparable damage to an election." *Id.* at 792; *see also O'Hare Express*, 601 N.E.2d at 852 (distinguishing *Hassett* and rejecting application of the professional skills exemption in light of the fact that "[v]iolation of airline passengers' constitutional rights is not a risk apparent here"); *Compass*, 617 N.E.2d at 8-9 ("[T]he time and performance pressures of ensuring the safe delivery of 1300 voting machines as well as registration binders, ballots and other voting materials to, from and among numerous polling places on each of six specific election days do not exist in the provision of HMO services."). And significantly, in *Hassett*, plaintiff's "complaint concede[d] the presence . . . of 'professional skill.'" 387 N.E.2d at 792; *see also O'Hare Express*, 601 N.E.2d at 851; *Compass*, 617 N.E.2d at 8. Here, we are far away from the unique (and undisputed) facts of *Hassett*.

    b.  There Is No Exemption for Contracts "[A]warded [P]ursuant to City [O]rdinances"

Defendants' next claim a supposed exemption for contracts "awarded pursuant to City ordinances." Mot. at 5. But the MPA offers no such exemption. Rather, the relevant exemption

---

https://la.streetsblog.org/2015/01/08/metro-regional-bike-share-expected-to-open-in-downtown-l-a-in-2016/; https://shifttransit.net/news/mogo-detroits-first-public-bike-share-system-launches-service/; https://www.oregonlive.com/commuting/2019/09/portland-wants-at-least-half-of-biketown-fleet-to-be-e-bikes-eyes-significant-expansion.html.

6

provides that § 8-10-3 is not "applicable to the granting or issuance pursuant to powers conferred by laws, ordinances or resolutions, of franchises, licenses, permits or other authorizations by the corporate authorities of the municipality." By its plain terms, this provision does not apply here.

In seeking to shoehorn themselves into the exemption, Defendants contend the Agreements constitute the "granting or issuance . . . [of an] authorization." *See* Mot. at 5. Not so. The Agreements are bilateral commercial contracts negotiated between sophisticated parties—they are not "authorizations" under any reasonable or ordinary use of that term. *See Authorization*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Official permission to do something"); *see also Alvarez* v. *Pappas*, 890 N.E.2d 434, 228 (Ill. 2008) ("[S]tatutory language must be afforded its plain, ordinary, and popularly understood meaning."). And if (as the City suggests) the legislature wanted to exempt all contracts entered into by city ordinance, it could have said so—and it would have used the word "contract," a term that it used *nine* times in § 8-10-4 alone.

Defendants' argument also contravenes age-old canons of statutory construction. For one, *ejusdem generis* provides that "where general words follow particular and specific words in a statute the general words must be construed to include only things of the same kind as those indicated by the particular and specific words." *Brink's, Inc.* v. *Ill. Commerce Comm'n*, 439 N.E.2d 1, 3 (Ill. App. Ct. 1982) (quoting *Bullman* v. *City of Chicago*, 10 N.E.2d 961, 965 (Ill. 1937)); *see also People* v. *Davis*, 766 N.E.2d 641, 645 (Ill. 2002) ("[W]hen a statutory clause specifically describes several classes of persons or things and then includes 'other persons or things,' the word 'other' is interpreted as meaning 'other such like.'" (quoting *Farley* v. *Marion Power Shovel Co.*, 328 N.E.2d 318, 320 (Ill. 1975))). "The reason for the rule is that if the legislature had intended that the general words apply without restriction, it would have used only one compendious word." *Brinks*, 439 N.E.2d at 3 (quotation marks omitted). This principle

controls here. If the term "other authorizations" were to include any agreement between the city and a private party, there would have been no need to separately enumerate "franchises, licenses, [and] permits," which themselves would constitute "other authorizations" under that construction.[5]

Because the language of the statute evinces no intent on the part of the legislature to exempt from competitive bidding all contracts entered into pursuant to a city law, it is unsurprising that Defendants point to no authority to support their interpretation. Indeed, the only case addressing the provision cuts squarely against Defendants' reading. In *People ex rel. Adamowski* v. *Daley*, 159 N.E.2d 18 (Ill. App. Ct. 1959), similar to here, the Chicago City Council passed an ordinance expressly authorizing the City Comptroller to enter into an agreement (on behalf of the city) with the Hertz Corporation. The contract was to allow Hertz to lease space at Midway Airport to operate a car rental service. Notably, it gave Hertz the "exclusive right to advertise and solicit automobile rental business" at Midway. *Id.* at 19. Subsequently, again as here, the City Council authorized an amendment to that agreement, which "extend[ed] the term of the lease to March 31, 1962, increas[ed] the annual minimum compensation, insert[ed] a cancellation clause, and, except as amended, affirm[ed] and continu[ed] all of the terms and provisions of the 'Airport Lease.'" *Id.* Despite the two authorizations by the City Council, the court recognized that the "contract and the amendment were entered into and executed without competitive bidding." *Id.* "The issue [was] whether the transaction violate[d] the provisions of the Municipal Purchasing Act." *Id.*

---

[5] Defendants' argument also conflicts with the related canon of *noscitur a sociis*, "*i.e.*, a word is known by the company it keeps." *Corbett* v. *County of Lake*, 104 N.E.3d 389, 397 (Ill. 2017) (quotation marks omitted) (quoting *People* v. *Gaytan*, 32 N.E.3d 641, 649 (Ill. 2015)). This canon "is particularly useful when construing one term in a list, in order to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to legislative acts." *Id.* (quotation marks and alterations omitted). But that is precisely what Defendants seek to do here. They contend that use of the term "authorizations" in the relevant sentence broadly exempts from the competitive bidding rules any and all contracts entered into pursuant to an ordinance.

Rather than dismiss the case because the agreement was entered into pursuant to City ordinances, the court assessed in detail the *separate* exemption for contracts in which the "municipality is the recipient of money." *Id.* at 21. And this was only after addressing the effect of legislative amendments to the competitive bidding statute and specifically noting that the exemption related to the "granting or issuance pursuant to powers conferred by laws" was added to the statute in 1949. *Id.* at 19-20. Of course, had the court thought state law exempted from competitive bidding all contracts entered into pursuant to city ordinances, it surely would have said so in *Adamowski*. Its silence on the issue speaks volumes.

    c.    **The Exemption for Contracts in Which the City Is "the [R]ecepient of [M]oney" Does Not Apply Here**

Defendants' third and final attempt to exempt the Agreements from the MPA's competitive bidding requirement asserts that "the municipality is the recipient of money." Mot. at 5 (quoting MPA § 8-10-4). In support, they point to the Agreement's revenue-sharing provision and argue that the Agreement "involve[s] the payment of money to the City." Mot. at 5. Specifically, Defendants point to the Agreement's initial "Compensation Schedule," which provided that "the City will be entitled to keep 90% of the Net Profit in Operating Period 1 and 2." MTD Ex. B, Ex. 3 § III(C)(3). Because the contract might involve the payment of *any* money to the City, Defendants contend, the contract is exempt from competitive bidding. This argument ignores the substance of the Agreement and the Amendment and fails.

To conclude that a municipality is "***the*** recipient of money" pursuant to § 8-10-4 whenever a contract even theoretically allows it to receive *any* money is an overreaching and untenable interpretation of the MPA that is inconsistent with its animating principles. Indeed, it would have this exemption swallow the rule by letting a municipality escape the state's competitive bidding rules by simply including a *de minimis* revenue-sharing component of even just $1—or less—in

9

any contract. This case proves the point. The Agreement had money flow to the City only if there were a "Net Profit." *See* MTD Ex. B, Ex. 3 § III(C)(3). But the Divvy system has never turned a profit. Compl. ¶ 27. Defendants are thus constrained to argue that it was the *theoretical* ability for the City to someday receive money under the contract that removed the entire arrangement from the state's competitive bidding process. That cannot be what the legislature intended.

Rather, the "the recipient of money" exemption is best read as simply reflecting the MPA's binary distinction between City-as-buyer vs. City-as-seller, a distinction that is front-and-center in the statute. Indeed, § 8-10-3 itself provides that different rules are triggered under the MPA when the municipality "expend[s]" money vs. when it "receive[s]" money. Specifically, contracts "shall be let by free and open competitive bidding after advertisement, to the lowest responsible bidder, or in the appropriate instance, to the highest responsible bidder, *depending upon whether such municipality is to expend or to receive money*." MPA § 8-10-3 (emphasis added).

Here, the arrangement is one in which the City is best construed as the party "expend[ing]" money. Surely the City would not contend that it would have awarded the Agreement to the *highest* bidder. And the contract language itself made plain that the City was intended to be the buyer rather than the seller. Indeed, the initial RFP, ordinance, and resulting agreement each discuss the City as being the "purchase[r]" of the bikeshare system. Compl. ¶ 24 ("[T]he City intended 'to purchase and cause to be installed the System's infrastructure . . . .'"); ¶ 25 (discussing the City's "desire[] to purchase and implement a bicycle-sharing system"); ¶ 25 ("contemplat[ing] the City's initial purchase of 3,000 bicycles and 301 docking stations."); *see also* ¶ 26 ("Alta was shielded from the bulk of the risk because taxpayers funded all of Divvy's startup costs.").

**B.    Defendants Cannot Hide Behind the "Home Rule" Doctrine**

Article VII, § 6(a) of the Illinois Constitution provides that a "home rule unit," such as Chicago, "may exercise any power and perform any function pertaining to its government and

10

affairs." "If the legislature intends to limit . . . the exercise of home rule powers, [a] statute must contain an express statement to that effect." *Palm* v. *2800 Lake Shore Drive Condo. Ass'n*, 988 N.E.2d 75, 81 (Ill. 2013). Because the MPA does not expressly limit the exercise of home rule powers, "home rule units *ordinarily* are not required to engage in competitive bidding." *Keefe-Shea Joint Venture* v. *City of Evanston*, 773 N.E.2d 1155, 1165 (Ill. App. Ct. 2002) (emphasis added); *see also Am. Health Care Providers, Inc.* v. *County of Cook*, 638 N.E.2d 772 (Ill. App. Ct. 1994). But critically, that rule does not apply where, as here, the home rule unit first commits itself to be bound by those rules when it solicits a procurement. *Keefe-Shea*, 773 N.E.2d at 1162-63. For example, in *Keefe-Shea*, the court rejected the City of Evanston's argument that it was not required to follow state competitive bidding rules pursuant to the home rule doctrine because Evanston had previously "agreed to be bound by the [state bidding] rules and regulations." 773 N.E.2d at 1163.

In fact, in *General Electric Co.* v. *County of Cook*, No. 00-cv-6587, 2001 WL 417321 (N.D. Ill. Mar. 5, 2001), the court distinguished the principal authority Defendants invoke here—*see* Mot. at 6 (citing *American Health Care*)—on precisely this basis. In *General Electric*, the court rejected Cook County's argument that the home rule doctrine allowed it to circumvent state law competitive bidding requirements because its advertisement seeking bids incorporated the requirements of the competitive bidding ordinance. *See id.* at *34 ("In this case, unlike *American Health Care*, the County expressly incorporated the requirements of its ordinances, including the competitive bidding ordinance, as part of the advertised requirements of the bids."). This principal defeats the City's argument for dismissal here.

Here, in multiple ways, Defendants demonstrated a "commitment to comply with state and local public contracting laws." Compl. ¶ 20. For one, the RFP was issued by the Department of

11

Procurement Services, *see* Compl. ¶ 16, and, pursuant to MCC § 2-92-010, that department is headed by the "chief procurement officer whose appointment, powers, functions, duties and obligations are provided for by the [MPA]." Consequently, the RFP was issued by a department that was obligated by city law to follow state law competitive bidding rules. Defendants cannot now claim they were entitled to ignore those rules. *See Gen. Elec.*, 2001 WL 417321, at *34.

Further, Defendants conspicuously ignore Plaintiff's allegations that the RFP documented Defendants' commitment to constrain themselves by various state laws, including procurement rules. For example, § 8.2 of the RFP contained the City's acknowledgement that it would use "procurement method[s] available under the Municipal Purchasing Act and the Municipal Code of Chicago, to obtain the Services described here." Compl. ¶ 20. The complaint also identifies several other examples of the City plainly representing through the 2011 RFP that it was constrained by—and intended to follow—state and local public contracting laws. *See* Compl. ¶¶ 21a–21c.

In sum, by issuing an RFP through an entity required by law to follow state procurement rules, and by explicitly representing that they would follow those rules within the RFP itself, Defendants cannot now assert that the home rule doctrine allows them to ignore those very rules.

## II. THE COMPLAINT HAS PROPERLY PLEADED ITS OTHER CLAIMS

The Complaint also states a claim under MCC § 2-92-615, which provides that: "When the chief procurement officer determines in writing that the use of competitive sealed bidding is either not practicable or not advantageous to the city, she may enter into contracts through competitive sealed proposals." Defendants argue this provision does not apply because it was the City, not the chief procurement officer, that entered into the contracts at issue." Mot. at 7. That argument is a red herring—the very article of the MCC that establishes both the Department of Procurement Services and the position of the chief procurement officer mandates that "[a]ll contracts . . . shall

12

be taken in the name of, and run to, the city." MCC § 2-92-050. Defendants are thus wrong that § 2-92-615 only governs contracts "entered into or awarded by the CPO," *which is a legal impossibility*. Mot. at 7. Moreover, it is obvious that the CPO had a fundamental role in the execution of the Agreement. *See* Compl. ¶¶ 16, 18, 22.[6]

Despite Defendants' claims to the contrary, Plaintiff has also stated a claim under the federal and state constitutions.[7] And Defendants concede that their arguments against Plaintiff's declaratory judgment claim depend on the dismissal of Plaintiff's other counts.

### III. DEFENDANTS' STANDING AND STATUTE OF LIMITATIONS ARGUMENTS FUNDAMENTALLY MISCONSTRUE PLAINTIFF'S CLAIMS

Defendants contend that Plaintiff lacks standing "[w]ith respect to the 2013 Agreement," because Plaintiff did not allege "that it would have bid for—or won—the contract if the City had employed the MPA's competitive bidding procedures." Mot. at 10. Defendants thus argue that Plaintiff "has failed to establish that it has any injury traceable to the City's actions in connection

---

[6] In addition, Defendants err in arguing that the contract could not have violated § 2-92-615 because it was entered into pursuant to an ordinance passed after § 2-92-615 was enacted. *See* Mot. at 7. As discussed *supra* at 4–12, the authorizations of the Agreements were inconsistent with state law and are therefore void. *See Treadway* v. *City of Rockford*, 182 N.E.2d 219, 224 (Ill. 1962).

[7] Defendants mischaracterize Plaintiff's substantive due process claims. "Substantive due process bars arbitrary or wrongful government actions." *Ortega* v. *Shelton*, No. 17-cv-01091, 2018 WL 1336092, at *7 (S.D. Ill. Mar. 15, 2018). The "wrongful government action" here is not just failure to engage in competitive procurement. It is the failure to competitively bid a contract so that the mayor could select his favored partner (which offered by far the costliest proposal, Compl. ¶ 22), and then, in secret, massively expanding that deal on his way out of office without any open competitive process by portraying the new arrangement as nothing but an "amendment" of the earlier one (and then hide the amendment by failing to post it publicly). Despite Defendants' conclusory assertions to the contrary, Plaintiff alleged facts tending to show that there was in fact no rational basis for this approach. *See* Compl. ¶ 39. Indeed, now-Mayor Lori Lightfoot herself stated that the deal "seemingly came out of nowhere without proper vetting and transparency," and is "precisely the style of governance that we have to move away from." Compl. ¶ 39a. Such unexplained governmental favoritism may state a substantive due process claim. *See Zaintz* v. *City of Albuquerque*, 739 F. Supp. 1462, 1470–71 (D.N.M. 1990); *see also Merrifield* v. *Lockyer*, 547 F.3d 978, 991 n.15 (9th Cir. 2008)

with that agreement." *Id.* In the alternative, Defendants argue that "[a]ny challenge to the 2013 Agreement is also time-barred." Mot. at 10. These arguments misconstrue Plaintiff's complaint.

It is axiomatic that where a party is precluded from participating in a procurement process, it has standing to challenge the resulting agreement. *See Aramark Corr. Servs., LLC* v. *Cty of Cook*, No. 12-cv-6148, 2012 WL 3961341, at *5 (N.D. Ill. Sept. 10, 2012) (under Illinois law, there exists a "right to participate in a fair bidding process," and the "alleged violation of this right is sufficient to confer standing" (quotation marks omitted)); *see also I.C.S. Ill.* v. *Waste Mgmt. of Ill.*, 931 N.E.2d 318, 327 (Ill. App. Ct. 2010) (a prerequisite for standing to challenge a government contract is that the plaintiff "bid on the [] contract *or was restrained or precluded from doing so*" (emphasis added)). Plaintiff was deprived of a right to bid for the Amendment and it thus has standing, and that standing includes the right to attack the initial formation of the Agreement in 2013 because it was the City's choices at that time that later precluded Plaintiff from competing for the Amendment. This is so because Defendants structured their sweeping sweetheart deal in 2019 as an "Amendment" and not a separate contract. Indeed, the City drafted its so-called "Amendment" so that "the terms of the Agreement remain in full force." MTD Ex. D § 1.2. It was thus the initial failure to follow competitive bidding laws that locked Plaintiffs out of bidding for the 2019 Amendment. Therefore, because of the City's own choices, there is only one Agreement. Yet that Agreement is *void ab initio*. *See 1550 MP Rd. LLC* v. *Teamsters Loc. Union No. 700*, 131 N.E.3d 99, 107 (Ill. 2019) ("[W]here a municipality exceeds its statutory authority in entering into a contract, the municipality's act is *ultra vires*, and the resulting contract is void *ab initio*.").

Alternatively, even if the Agreement and Amendment were truly separate contracts, Defendants would have been required to reengage the procurement laws in order to enter into the

14

second agreement, which they admittedly did not do. *See Young* v. *Vill. of Glen Ellyn*, 458 N.E.2d 1137, 1140 (Ill. App. Ct. 1983) (where "the Village was bound by the . . . ordinance to let the garbage collection contract only on a competitive bidding basis and in accordance with the terms of its bidding proposal . . . changes or modifications of the terms of the contract entered into with the successful bidder could act to invalidate the contract."). Thus, Plaintiff has standing whether the bikeshare deal at issue is seen as a unified whole (as the contracting parties expressly agreed) or whether the Court accepts Defendants' newfound contention that these are separate contracts.

Relatedly, Plaintiff's claims are timely. Plaintiff was injured when it was prevented from bidding for the deal that came out of the 2019 "Amendment." Compl. ¶¶ 30, 40. Chicago engaged in the backdoor negotiation that resulted in that Amendment in late 2018 through 2019. And it is axiomatic that "a statute of limitations begins to run at the moment of a plaintiff's injury." *Axe v. Norfolk S. Ry. Co.*, 972 N.E.2d 243, 246 (Ill. App. Ct. 2012).

Indeed, if the law were such that, on these facts, Plaintiff lacks standing or its claims are untimely, it would lead to anomalous results in circumstances similar to but even more extreme than here. For example, the mayor could direct an agency to enter a *de minimis* $100 contract with her friend with no competitive process, wait out the limitations period, and then "amend" the contract to make it worth $10,000,000. Under Defendants' view, there would be no one capable of challenging that amendment for failure to comply with competitive bidding laws. But that is precisely why procurement laws bar the amendment of competitively procured contracts beyond the scope of the initial proposal without invalidating the contract and engaging a new competitive process. *See Young*, 458 N.E.2d at 1140. This court should reject Defendants' fanciful contention that because it styled the new agreement as an "Amendment" to the old one, only the parties that were capable of challenging the previous agreement may challenge the new one.

15

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss should be denied.

Dated: October 18, 2019

/s/ Leonard A. Gail
Leonard A. Gail
Suyash Agrawal

MASSEY & GAIL LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
(312) 283-1590
lgail@masseygail.com
sagrawal@masseygail.com

Respectfully submitted,

/s/ Roberta A. Kaplan
Roberta A. Kaplan
John C. Quinn
Benjamin D. White

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
bwhite@kaplanhecker.com

*Attorneys for Plaintiff Social Bicycles LLC d/b/a JUMP*

16