**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **SOCIAL BICYCLES LLC d/b/a JUMP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 19-cv-05253** |
| **v.** | ) | |
| | ) | **Hon. Joan H. Lefkow** |
| **CITY OF CHICAGO DEPARTMENT** | ) | |
| **OF TRANSPORTATION; CITY OF** | ) | |
| **CHICAGO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**
**PLAINTIFF'S COMPLAINT**

## INTRODUCTION

Plaintiff challenges the City's longstanding contractual relationship with the partner it selected to design and operate one of the City's signature initiatives: the Divvy bikeshare system. That relationship began in 2013, when the City entered into an Agreement with a firm selected through an open and public RFP process that began two years earlier. And the relationship continues today under a 2019 Amendment to the Agreement. Both the Agreement and Amendment were authorized by City Council ordinances. This sophisticated six-year partnership has included locating hundreds of integrated docking stations throughout the City, and perfecting numerous technological functionalities, such as allowing users to walk up and pay for bikes on the spot at particular docking stations, or to become subscribers and immediately access bikes at any station. Users can also "monitor the availability of nearby bikes using GPS" and "unlock access to and pay for those bikes directly from their smartphone." Compl. ¶ 11.

Plaintiff seeks to undo all of this on the theory that the arrangement was unlawful from the outset because, back in 2011, the City decided to use an RFP to select its partner for this highly specialized transportation system rather than use competitive bidding, with award to the lowest responsible bidder. That low-bid process is often used when a municipality is simply purchasing a commodity that can be specified in advance, and Plaintiff claims that it was required here by section 8-10-3 of the Illinois Municipal Purchasing Act ("MPA"), 65 ILCS 5/8-10-3. Plaintiff challenges the use of an RFP even though Plaintiff did not exist at the time, and so could not have participated anyway. Indeed, Plaintiff's closest nexus to the project seems to be only that Plaintiff was recently acquired by Uber Technologies, Inc., the primary competitor of the parent company (Lyft) of the City's bikeshare partner.

Regardless, Plaintiff fails to state a claim for violation of the MPA. Plaintiff concedes that contracting for bikesharing service is a matter within the City's home rule authority, and that the MPA does not preempt that authority – authority which the City exercised here by enacting the ordinances authorizing the bikeshare contracts. Accordingly, MPA section 8-10-3 did not bind the City with respect to the Agreement or the Amendment, and those contracts are thus not invalid for failure to follow it. Plaintiff argues that the City was nonetheless bound to follow section 8-10-3 because the City stated in the 2011 RFP that it would follow a lowest responsible bidder process. But the plain language of the RFP makes clear that the City said no such thing. Indeed, Plaintiff admits that the City retained full authority and discretion to select the firm of its choice. Moreover, even if the City had said it would follow section 8-10-3's bidding requirements, a municipality's own statement is not a directive from the General Assembly requiring adherence to the statute, and thus the City's statement would not give rise to a claim for violation of the MPA. Finally, Plaintiff's MPA claim fails for the separate reason that, even if the City did not have home rule authority to eschew the MPA's bidding requirements with respect to the contracts at issue, the MPA's own terms contain various exceptions to section 8-10-3's lowest responsible bidder standard, three of which apply here. Contrary to Plaintiff's response, the applicability of these exceptions can be – and routinely is – decided on motions to dismiss. Here, Plaintiff's allegations, coupled with the judicially-noticeable RFP, contract terms, and ordinances, show that the exceptions apply as a matter of law.

As to Plaintiff's other two claims – that the City violated a provision of its own Municipal Code, and that the City violated due process – Plaintiff mounts only the most cursory defense. Rightly so: The claims lack all merit, as the City need not follow preexisting ordinances when it authorizes contracts pursuant to newly-enacted ordinances, and the kind of

municipal contracting here falls wholly outside the fundamental liberties protected by substantive due process.  This lawsuit should therefore be dismissed with prejudice.

I.     **Count I Fails To State A Claim For Violation Of Section 8-10-3 Of The MPA.**

      A.     **As a home rule unit, the City is not required to follow the MPA.**

As the City explained in its Memorandum, it did not need to follow the MPA's requirement in section 8-10-3 that contracts "shall be let by free and open competitive bidding after advertisement, to the lowest responsible bidder," because, due to the City's home rule authority, which it exercised here by approving the Agreement and Amendment by ordinance, it was not bound to follow section 8-10-3.   A home rule unit of local government, like the City, may take actions that do not follow a state statute so long as (1) the action pertains to the unit's government and affairs and (2) the state statute has not specifically and expressly preempted home rule authority over the action.   And Illinois courts have determined that the manner of procuring contracts pertains to a home rule unit's government and affairs, and the Illinois legislature has not preempted home rule authority over that subject.  *See* Dkt. 22 at 5-6.

Plaintiff does not dispute either of these tenets of Illinois home rule doctrine, and they are the only two inquiries necessary to decide whether the City had to follow MPA section 8-10-3 here.  Because the City was not bound to follow section 8-10-3, the contracts are not invalid for failure to follow that section's "lowest responsible bidder" standard.  Indeed, *Keefe-Shea Joint Venture v. City of Evanston*, 332 Ill. App. 3d 163 (2002), a case cited by Plaintiff, took pains to reiterate the long-established point that "home rule units are ordinarily not required to engage in competitive bidding."  *Id.* at 176 (citing *American Health Care Providers, Inc. v. County of Cook*, 265 Ill. App. 3d 919 (1994)).  *See also Hassett Storage Warehouse, Inc. v. Bd. of Election Comm'rs for City of Chicago*, 69 Ill. App. 3d 972, 981 (1979).

Plaintiff's sole argument for why the City was bound to follow section 8-10-3 here is that the City, through the 2011 RFP, committed itself to be bound by the MPA's competitive bidding procedures. Dkt. 29 at 11. This argument does not withstand scrutiny, for two reasons.

First, the City never promised to follow the MPA's bidding requirements – as shown by Plaintiff's own allegations, as well as the plain terms of the RFP. Plaintiff admits that, far from promising selection based on lowest responsible bidder, "the RFP made clear that the CDOT Commissioner was ultimately granted full authority to select whichever proposal she or he desired, irrespective of the Evaluation Committee's recommendation," and that "the *only limitation* on the CDOT Commissioner's power to select the vendor that would operate the City's bikeshare program was that the execution of a contract by the CDOT Commissioner must be authorized by City Council." Compl. ¶ 19 (internal quotations omitted) (emphasis added). *See also* Ex. A hereto (RFP) § VII (City could terminate negotiations with selected respondent and negotiate with other respondents); *id.* (City not obligated to enter into contract with any respondent).[1] Further, and as Plaintiff itself admits, *see* Compl. ¶ 18, the RFP made clear that cost was just one of *nine* evaluation criteria that would be considered. *See* Ex. A (RFP) § 6.2.[2]

---

[1] The Court may take judicial notice of the RFP, which is referred to in the Complaint, and is a government document that is a matter of public record on the City's website at: https://www.chicago.gov/content/dam/city/depts/dps/ContractAdministration/Specs/2011/Spec100320A.pdf. *See Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003); *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977).

[2] Indeed, the idea that an RFP would promise award to the lowest responsible bidder is a non-sequitur, because, by definition, an RFP is used when a government body wishes to consider factors other than lowest cost. RFPs are used when, as here, a project involves a number of planning and design variables requiring a high degree of expertise that the government body wishes to take into account and negotiate. In such a case, the project specifications cannot be resolved in advance and published in a bid invitation, such that responding firms need only to state their price for providing the service, and the government body need only identify the responsible bidder with the lowest cost. *See* United States Department of Transportation, Federal Transit Administration, *Best Practices Procurement & Lessons Learned Manual*, (October 2016), §§ 3.4.5, 3.4.7-8 available at: https://www.transit.dot.gov/sites/fta.dot.gov/files/docs/funding/procurement/8286/fta-best-practices-procurement-and-lessons-learned-manual-2016.pdf. An "important advantage" of RFPs is that they

Unsurprisingly, then, Plaintiff does not and cannot point to language in the RFP promising contract award pursuant to MPA section 8-10-3.  Plaintiff selectively quotes a portion of RFP section 8.2, but the sentence, in full, states:  "If no Respondent is selected through this RFP process, *then* the [CPO] *may* utilize any other procurement method available under the [MPA] and the Municipal Code of Chicago, to obtain the Services described here."  (Emphasis added).  Far from saying that the City would use the MPA's lowest responsible bidder standard, the sentence merely says that the City "may" use any number of other procurement methods, not limited to those in the MPA, *if – first –* no firm were selected in response to the RFP.  If anything, this provision reaffirms that the RFP itself was not following the MPA.

Next, Plaintiff summarily refers to a smattering of RFP provisions cited in the Complaint, without explaining how those provisions amount to a promise to follow section 8-10-3.  *See* Dkt. 29 at 12; Compl. ¶ 21.  And they do not.  RFP section 4.2(F) simply explains that a submittal fee was not required because the estimated dollar value of the contract did not exceed $10,000,000.00.   And by stating that a fee is required "for each competitively bid contract *and each request for proposal*" where value does exceed that amount, it expressly recognizes that an RFP process is distinct from competitive bidding.  (Emphasis added).

Similarly, RFP section 5.3.3 required responding entities to submit an economic disclosure statement if they had certain economic associations.  Rather than list in the RFP all of those associations, the provision simply references, for sake of simplicity, section 8-10-8.5 of the MPA and Chapter 2-154 of the MCC, two provisions where various economic associations had already been exhaustively listed.  Incorporating these lists by reference in no way amounts to a

---

"allow the recipient to choose the winning proposal on the basis of factors other than price alone" and "make[] tradeoffs between price and technical factors in determining the best overall value to the agency."  *Id.* § 3.4.7.  In contrast, the lowest bidder method "does not allow the recipients to evaluate the merits of technical proposals and to pay more for a higher quality product."  *Id.* § 3.4.5.

promise that the City would follow section 8-10-3 bidding.  Likewise, RFP section 5.3.2 simply requires applicants to show evidence of their ability to obtain a performance bond and cites 30 ILCS 550/1, *et seq.*, which is the Illinois Public Construction Bond Act, not the MPA.

Finally, Plaintiff notes that the RFP was issued by the Department of Procurement Services, and that, per City ordinance, the "appointment, powers, functions, duties and obligations" of that department's head, the Chief Procurement Officer ("CPO") "are provided for by the MPA."  Dkt. 29 at 12 (citing MCC § 2-92-010).  In the first place, this ordinance language about the general powers of the CPO is not a promise in a particular bid document that the City would follow the MPA's lowest responsible bidder standard, nor does it usurp the City Council's authority to enact ordinances providing otherwise.  More fundamentally, section 2-92-010 does not even apply to the RFP on its own terms, for, as the RFP made clear, the Commissioner of the City's Department of Transportation, and not the CPO, selected the firm in response to the RFP. *See* Ex. A, at § VII.  Thus, the CPO's authority under City ordinance is irrelevant.

Plaintiff's "the City promised" argument fails for all of these reasons, but also because, as a matter of Illinois home rule doctrine, whether the City was bound to follow MPA section 8-10-3 turns on whether the *state legislature*, in text of the state statute itself, has required cities to comply with the statute.  *See supra* at 3.  Thus, in *DMS Pharmaceutical Group v. County of Cook*, 345 Ill. App. 3d 430 (2004), a case cited by the City, but ignored by Plaintiff, the court rejected a claim that Cook County violated state statutory bidding requirements even where it had *an ordinance* requiring competitive bidding, because the General Assembly had not preempted home rule authority.  *See id.* at 440.  *See also Chicago Aviation Partners, Duty Free Americas, Inc. v. City of Chicago*, 2012 Ill App (1st) 112332-U, ¶ 16 (rejecting claim that City violated various MPA sections, including section 8-10-3, because "none of those sections include

the language needed to make the statutes apply to home rule units"), attached as Exhibit B.
Accordingly, even if the City had promised to award the contract to the lowest responsible bidder
(and it did not), its failure to do so would not amount to a violation of the MPA.[3]

Plaintiff cites *Keefe-Shea*, but that case addressed whether denial of the right to
participate in a fair bidding process constituted irreparable harm for purposes of a preliminary
injunction analysis. And the court concluded that fair bidding concerns were properly part of
that analysis because the city had "agreed to be bound" by state bidding procedures "in order to
receive" a loan from a state agency. 332 Ill. App. 3d at 172-73. Here, the issue is not irreparable
harm, but whether Plaintiff has a claim on the merits, nor is there any allegation that the City
agreed to follow the MPA here in order to receive a loan from another entity. Plaintiff also cites
*General Electric Co. v. County of Cook*, 2001 WL 417321 (N.D. Ill. Mar. 5, 2001), but there, the
bid document expressly stated that the contract "is a competitively bid public contract of Cook
County government, subject to laws and ordinances governing public contracts." *See id.* at *34.
Further, the county did not enact an ordinance "decid[ing] to forego" that process but rather
approved the bid document as part of the contract. *Id.* at *35. Here, in contrast, the City did not
make an express statement in the RFP that it would follow competitive bidding for this project,
much less double-down on it by adopting the statement as part of the City Council ordinance
authorizing the contract. As explained above, the RFP's provisions indicate that a lowest bidder
standard would not be used, and a City Council ordinance authorized the contract that resulted.

---

[3]  Indeed, it would not give rise even to a claim that the City violated the RFP, because the 2012
ordinance authorized a contract with the partner ultimately selected as a result of the RFP. Because the
2012 ordinance precludes claims that the City violated procurement requirements contained in prior
municipal ordinances, *see* Dkt. 22 at 7-8; *infra*, Part II, it necessarily follows that the 2012 ordinance
likewise precludes a claim based on alleged statements made in a mere bidding document. *See also*
*Chicago Aviation Partners*, 2012 Ill App (1st) 112332-U, ¶ 15.

Neither of these cases holds that a statement in an RFP divests a municipality it of its home rule authority to pursue procurement methods other than those required by the MPA.

In sum, because the City retained its full authority to exercise its home rule power and pursue the procurement method of its choice, it was not obligated to follow MPA section 8-10-3. Count I can and should be dismissed for this reason alone, without needing to address whether the MPA's exceptions (in section 8-10-4) to section 8-10-3 apply here.

### B. The City satisfies the MPA's exceptions to section 8-10-3's lowest responsible bidder requirement.

Should the Court conclude that the City's *home rule authority* did not allow it to deviate from MPA section 8-10-3 here, Count I would still fail because the MPA's *own terms* – its own exceptions to section 8-10-3 – provided the City with authority to do so. Those exceptions are set forth in MPA section 8-10-4, which should be read broadly, as "a statute requiring bids is 'restrictive' and should not be extended beyond the language used." *Hassett Storage*, 69 Ill. App. 3d at 981. As discussed below, the City satisfies three of the enumerated exceptions.

The first exception is for contracts for services involving "a high degree of professional skill where the ability or fitness of the individual plays an important part." As the RFP explained, the City was seeking to establish "the largest bicycle sharing system in the United States," which "must be efficiently managed, and carefully maintained." Ex. A hereto, § 1.1. The RFP thus sought firms that were "experienced in establishing and operating large bicycle sharing systems and with expertise in purchasing, installing, and operating a bicycle sharing system." Compl. ¶ 16. *See also* Ex. A hereto, § 1.1. The RFP further explained that the system "must be simple, robust, reliable, and designed for both sidewalk and street installation;" that bicycles "must be evenly and regularly distributed" across the system; and that the system contain technology that would allow subscribers via the Internet to "immediately access"

8

bicycles at any terminal, as well as allow walk-up users to register and pay for a bicycle. Ex. A hereto, Exhibit 1 thereto, § I.A, D. The RFP thus required respondents to "provide a coherent, well thought out plan describing, in detail," how they would address 137 specific system features in each of the following areas: (a) business plan, (b) planning, (c) performance metrics, (d) station, (e) bicycle, (f) terminal, (g) hub, (h) operations, maintenance and rebalancing, (i) customer service, (j) marketing, (k) website, and (l) legal. Ex. A hereto, Exhibit 1 thereto at § II.A-L. These provisions make clear that respondents' level of professional skill and expertise was a paramount concern. Requiring the City to select a firm simply because it offered the lowest cost would have been nonsensical.[4]

Plaintiff, for its part, does not advance an argument, much less one based on the governing project documents, as to why the City does not satisfy the professional skill exception.[5] Instead, Plaintiff simply posits that the question cannot be decided on a motion to dismiss. This is wrong. Courts routinely hold on motions to dismiss that the exception applies, and resolve the issue by looking at the plain terms of the complaint and the governing contract documents. *See Hassett Storage*, 69 Ill. App. 3d at 982 ("Defendants properly raised by motions

---

[4]  Plaintiff argues that, as to the professional skill exception, the City must show not only that the program entailed a high degree of professional skill, but also, independently, that the contract was not adaptable to award by competitive bidding. Dkt. 29 at 5. That is wrong. The "such as" language in the first sentence of section 8-10-4 shows that satisfaction of the enumerated example is enough. Regardless, for all the reasons discussed in Part I.B of this brief (including the discussion of the second and third exceptions in section 8-10-4 that apply here) award to the lowest bidder would not have been a sensible method for awarding a bikeshare system contract, and thus the contracts were not adapted to award by competitive bidding.

[5]  Plaintiff asserts that "cities around the country regularly award bikeshare contracts pursuant to competitive bidding," citing programs in Baltimore, Los Angeles, Detroit, and Portland, Oregon. Dkt. 29 at 5. Setting aside that Plaintiff may not amend its Complaint through a response to a motion to dismiss, *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011), these examples support *the City's* position, as none were awarded to the lowest responsible bidder based on price alone. Plaintiff is asking the Court to impose a bidding practice that is not only ill-suited for the bikeshare system at issue here, but also not used in other cities.

9

to dismiss the point that pursuant to the complaint allegations and supporting exhibits, the contract was exempt from the statute's operation [due to the professional skill exception] as a matter of law," and court dismissed claim on that basis). *See also DMS*, 345 Ill. App. 3d at 437, 445 (affirming motion to dismiss on basis that professional skill exception in county bidding ordinance applied); *American Health Care Providers*, 265 Ill. App. 3d at 931-32 (same). Courts granted motions to dismiss in these cases not because the "facts were extreme," Dkt. 29 at 6, but because the complaint and contract documents supported the exemption. So too here: The terms of the RFP and Plaintiff's allegations, as well as the contracts themselves, *see* Dkt. 22 at 5, make clear that, as a matter of law, establishing a City-wide bikeshare system integrated by Internet technology required a sufficiently high degree of professional skill such that the City was not required to award the contract based on lowest cost.[6] These judicially-noticeable government documents are incorporated by reference into the Complaint and are proper to consider at this stage. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *supra*, n.1.

The second section 8-10-4 exception that applies is for "the granting or issuance pursuant to powers conferred by . . . ordinances . . . of franchises, licenses, permits or other authorizations by the corporate authorities of the municipality." As the City explained, both the Agreement and the Amendment were specifically authorized by the 2012 and 2019 ordinances, respectively. Plaintiff argues that the exception does not apply because it does not specifically state that it applies to "contracts" entered into pursuant to ordinance. This crabbed reading of the exception ignores that, as noted above, the statute should be construed to give municipalities the greatest latitude to depart from a lowest responsible bidder standard. The important point is that the

---

[6] Plaintiff argues that because it alleged in the Complaint that the City never contended that the contracts were not adapted to competitive bidding, the Court cannot determine the question at this stage. Dkt. 29. at 5. There is no requirement that a City incant "this contract is not adapted to competitive bidding" in order fall under section 8-10-4; the exception applies based on the nature of the contract itself.

exception applies to "franchises, licenses, permits or other authorizations" conferred by ordinance, and the contracts authorized by ordinance here contain an array of licenses, permits, and other authorizations. A core feature of the program was that the City would grant "permits" to the selected firm to install the bikeshare docking stations on the public way. *See* Dkt. 22-1, § 3. *See also* Dkt. 22-2 at 91-93 (Agreement, Schedule 11, Station Location, Moving and Resizing). In addition, the City granted authorizations to collect revenue generated from the program and to deposit that revenue into an account controlled by the City. *See id.* at 131 (Agreement, Ex. 3 therero, § III Operations). The 2019 Amendment includes additional authorizations, such as granting the operator an exclusive "permit to offer bicycle rental services from the public way," and the right to use the Divvy trademark. Dkt. 22-4, §§ 2.5, 2.6. These, and many other authorizations, are an integral element of the bikeshare program. The fact that they are bound up with other terms addressing technical specifications or cost and profit sharing does not make them any less germane under section 8-10-4. The MPA does not require municipalities to cede use of the public way to the lowest bidder simply because a contract includes other provisions in addition to the authorizations described above.[7]

A third exception is for contracts or transactions entered into by a municipality "pursuant to which the municipality is the recipient of money," unless the transaction involves "the sale or lease of personal property." Here, because the bikeshare system was novel, costs and revenue could not easily be predicted, and a cost sharing structure was necessary. The Agreement thus provided that during the first year, the City would be responsible for 90% of net losses but would conversely receive 90% of net profits. *See* Dkt. 22-2 at 133 (Agreement, Ex. 3 thereto, § III(C)(3)). And the Amendment requires annual fixed payments to the City of $6,000,000, which

---

[7] Plaintiff cites *People ex rel. Adamowski v. Daley*, 22 Ill. App.2d 87 (1959), but that case did not address, much less hold, that the "pursuant to ordinance" exception did not apply in that case. Instead, in upheld dismissal of the complaint based on the "receipt of money" exemption.

increases by 4% each year; the greater of $1,500,000 or 40% of net operating revenue; and 5% of net ridership revenue in excess of $20,000,000. Dkt. 22-4 at 8 (Amendment, § 2.3 Annual Payment). It thus requires, at a minimum, an annual payment of $7,500,000 to the City. These components constitute payment of money to the City for something other than the sale or lease of personal property. Plaintiff argues that a municipality cannot be allowed to "escape [§ 8-10-3] simply by including a de minimis revenue-sharing component" in a contract, Dkt. 29 at 9, but these core revenue sharing provisions are far from de minimis. Plaintiff also argues that the program did not turn a profit. But that backward-looking approach would lead to the absurd result that applicability of the exception could be determined only *after* contract performance, rather than at the time of solicitation, which is when the parties would need to know whether to follow section 8-10-3.

In sum, even if the City lacked home rule authority to deviate from the MPA here, it did not need to follow section 8-10-3 because the contracts meet three of the MPA's own exceptions to the lowest responsible bidder standard. Count I fails for this independent reason.

## II. Count II Fails To State A Claim For Violation Of MCC Section 2-92-615.

Count II alleges that the Agreement and Amendment are invalid because the City did not follow one of its ordinances – MCC § 2-29-615 – which requires the CPO to follow certain contracting procedures. As the City explained, however, the Agreement and Amendment were authorized by City Council ordinances, and, as a matter of Illinois law, the decision of a legislative body cannot be invalidated simply because it may conflict with an earlier ordinance enacted by that body. *See* Dkt. 22 at 7-8 (citing *Landmarks Preservation Council of Illinois v. City of Chicago*, 125 Ill. 2d 164, 179 (1988)). *See also American Health Care Providers*, 265 Ill. App. 3d at 930-31. Fundamentally, Count II poses the question whether the Agreement and

12

Amendment are valid as a matter of City law, and the City Council's specific ordinances authorizing those agreements control on that question. *See* Dkt. 22 at 7-8. Plaintiff has no response to this point, and Count II should be dismissed for this reason alone.[8]

Further, Count II fails on its own terms because MCC section 2-29-615 applies only to contracts entered into by the CPO, and the Agreement and Amendment here were entered into by the Commissioner of CDOT. Plaintiff's only response is that MCC section 2-92-050 states that "[a]ll contracts and bonds shall be taken in the name of, and run to, the city." Dkt. 29 at 12-13. This observation does not help. The fact that City contracts are in the name of, and benefit, the City says nothing about which particular City official is authorized to sign contracts on the City's behalf. Section 2-92-050 in no way precludes the City Council from authorizing the Commissioner of CDOT, rather than the CPO, as the official to sign a particular contract. Nor does it require the CDOT Commissioner to follow procedures, like those in section 2-29-615, expressly limited by their terms to the CPO. For this reason, too, Count II should be dismissed.

## III.  Count III Fails To State A Claim For Violation Of Due Process.

Plaintiff's entire defense of its claims in Count III that the City violated federal and Illinois due process is relegated to a footnote. *See* Dkt. 29 at 13 n.7. Plaintiff argues that the City violated substantive due process because the contracts resulted from "governmental favoritism" toward former Mayor Emanuel's "favored partner." *Id.* Putting aside the fact that

---

[8] Instead, Plaintiff argues, in a footnote, *see* Dkt. 29 at 13 n.6, that the City Council's specific ordinances are not entitled to effect because they are void for failure to comply with *state* law – the MPA. But as explained above, the MPA does not preempt the City's exercise of home rule power here. Further, Count II (as well as the Complaint's Prayer for Relief) does not seek invalidation of the ordinances; they seek invalidation only of the contracts. Therefore, even if the Agreement and Amendment were held unlawful under state law, the ordinances would still stand as valid expressions of the City Council's intent as to which City official was authorized to enter into the contracts and would thus trump MCC § 2-29-615. MPA section 8-10-3's lowest responsible bidder requirement speaks only to the *manner* in which a contract is awarded. It does not address the power of the City Council to authorize an official other than the CPO to enter into a particular contract.

Plaintiff did not even exist at the time of the 2011 RFP, and so cannot claim that improper favoritism is why it did not receive the contract, alleged favoritism toward a company does not fall within the very narrow protections of substantive due process. Put simply, courts do not evaluate the "fairness" or "wisdom" of economic decisions made by the government. *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993). Government bodies often makes decisions that "advance [one industry participant's] economic interest," something that a competitor will undoubtedly view as unfair. *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 108 (2003). Those decisions are permissible under due process, as the Seventh Circuit, as well as other courts, have long made clear. *See id. See also Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 287-88 (2d Cir. 2015) ("Whether the results [of economic favoritism] are wise or terrible is not for us to say, as favoritism of this sort is certainly rational in the constitutional sense."); *Pontarelli v. City of Chicago*, 929 F.2d 339, 341 (7th Cir. 1991) (discussing Supreme Court decisions upholding "protectionist, anticompetitive" legislation under rational basis); *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir. 1988) (a "desire to protect existing owners of office buildings from new competition . . . does not state a claim of denial of substantive due process"). Further, as the City has explained, its decisions are supported by a rational basis. *See* Dkt. 22 at 9.[9] Count III should therefore be dismissed.

---

[9] Plaintiff argues that the City's rational basis is "conclusory" and that Plaintiff has "alleged facts tending to show" that there was no rational basis. Dkt. 29 at 13 n.7. But it is not necessary for the City to supply developed facts; facts can be merely "conceivable," and may be "based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 313-15. Likewise, Plaintiff's burden is not to "tend" to show a lack of rational basis, but to "negative every conceivable basis which might support" the City's decision. *Id.* at 315. Plaintiff's allegations that a few people voiced concerns about the timing of the Amendment and the decision to pursue an amendment of the original Agreement, rather than reopen the bikeshare system to a new round of bidding, *see* Compl. ¶ 39, fall far short of the mark. These process critiques do not negate the rational basis put forth by the City – namely, that it was reasonable for the City to choose to enhance its existing bikesharing program by expanding its agreement with its existing partner rather than starting from scratch with a new company – much less show that there was *no* rational basis for the Amendment. Reasonable minds may differ on the prudence of these

14

**IV.      Plaintiff Lacks Standing, And Is Time Barred, From Challenging The Agreement.**

Plaintiff did not exist at that time of the 2011 RFP or the resulting 2013 Agreement, and thus was not harmed by the selection process used.  Nonetheless, Plaintiff claims that it has standing to challenge the Agreement because "it was the City's choices at that time that later precluded Plaintiff from competing for the [2019 contract]."  Dkt. 29 at 14.  This is wrong.  It was the City's decision, in 2019, to enter into an amendment of the Agreement, rather than reopen the bikeshare program to a new RFP process, that precluded Plaintiff from applying for the 2019 contract.  Plaintiff cites dicta from *Young v. Village of Glen Ellyn*, 120 Ill. App. 3d 692, 696 (1983), a case that upheld a contract not submitted to competitive bidding, in support of its standing argument.  But the pertinent dicta (Plaintiff cites only a portion of it) said only that if the village was required to follow competitive bidding, the contract had to adhere to the terms of the bid; the case says nothing about standing to challenge that contract based on the creation of a new and separate contract years after the fact.  Nor does Plaintiff explain how its challenge to the 2013 Agreement is timely.  Plaintiff argues, in reference to the *2019 Amendment*, that its injury occurred when it was prevented from bidding on that contract, and thus the statute of limitations began to run at that time.  This hardly helps Plaintiff, for, under this logic, Plaintiff's injury from the Agreement occurred at the time *that* contract was awarded, which was in 2013.  Thus, any challenge to the Agreement or the selection process preceding it is time-barred by the applicable 5-year statute of limitations.[10]

decisions, but that difference of opinion does not show that the City lacked a rational basis.  *See National Paint & Coatings v. City of Chicago*, 45 F. 3d 1124, 1127-30 (7th Cir. 1995).

[10]  Plaintiff argues that if the Court finds that it lacks standing or is time-barred from challenging the Agreement, a city could award a *de minimis* contract, wait five years, and then award a multi-million dollar contract through amendment without complying with applicable procurement laws.  This is untrue.  The challenge to the *de minimis* contract would be barred, but standing would still exist to challenge the multi-million dollar contract as violative of applicable laws, and such a claim could be timely brought.

## CONCLUSION

For all of the foregoing reasons, Defendants request that the Court grant their motion to

dismiss and dismiss the Complaint in its entirety with prejudice.

Dated: November 1, 2019.                     Respectfully submitted,

                                             MARK A. FLESSNER
                                             Corporation Counsel, City of Chicago


                                             By: /s/ Andrew Worseck
                                             Chief Assistant Corporation Counsel

                                             John Hendricks
                                             Deputy Corporation Counsel
                                             Andrew W. Worseck
                                             Chief Assistant Corporation Counsel
                                             Peter Cavanaugh
                                             Assistant Corporation Counsel
                                             City of Chicago, Department of Law
                                             Constitutional and Commercial Litigation Division
                                             30 North LaSalle Street, Suite 1230
                                             Chicago, Illinois 60602
                                             (312) 744-6975 / 4-7129 / 4-4216

                                             Fiona A. Burke
                                             Chief Assistant Corporation Counsel
                                             City of Chicago, Department of Law
                                             Aviation, Environmental, Regulatory,
                                                   & Contracts Division
                                             30 N. LaSalle Street, Suite 1400
                                             Chicago, IL 60602
                                             (312)744-6929

                                             *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on November 1, 2019, I caused a copy of the forgoing **Defendants' Reply In Support Of Their Motion to Dismiss Plaintiff's Complaint** to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.


/s/ Andrew Worseck

17