IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| SOCIAL BICYCLES LLC d/b/a JUMP,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO DEPARTMENT OF TRANSPORTATION; CITY OF CHICAGO,<br><br>Defendants. | Case No. 19-cv-05253<br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Social Bicycles LLC d/b/a JUMP ("JUMP"), by and through its undersigned counsel, for its Complaint against Defendants the City of Chicago Department of Transportation ("CDOT") and the City of Chicago (the "City"), alleges as follows:

**INTRODUCTION**

1. This lawsuit arises from a massive public contract that the City of Chicago granted, without regard for public contracting laws or basic constitutional principles, to give a preferred private entity an exclusive right to do business throughout the City.

2. In 2013, the City entered a $65 million contract with Alta Bicycle Share, Inc.—which was later acquired by one of JUMP's principal competitors—to set up a defined bicycle-sharing program. Six years later, in March 2019, the City announced that it had decided to "renegotiate" that contract in order to "dramatically expand" its scope, principally by granting JUMP's competitor sweeping exclusive rights to operate throughout the City. The City did all of this without ever engaging in a competitive bidding or request for proposal process, as required by state and local public contracting laws. The City fundamentally restructured the contract governing the bikeshare program without engaging a competitive bidding process, in violation of not only public contracting

laws, but also basic principles of due process and fundamental fairness. The City's renegotiated contract is thus the result of a flawed and unlawful process, and it cannot stand.

## THE PARTIES

3. Plaintiff JUMP is an LLC whose sole member, SMB Holding Corporation, is a Delaware corporation with its principal place of business in California.

4. Defendant Chicago Department of Transportation is a department of the City of Chicago responsible for public way infrastructure, including planning, design, construction, maintenance and management.

5. Defendant City of Chicago is a municipal corporation located in Cook County, Illinois and duly incorporated under the laws of the State of Illinois.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds $75,000.

   a. Plaintiff JUMP is an LLC whose sole member is incorporated in Delaware with its principal place of business in California.

   b. Defendants CDOT and the City are citizens of Illinois.

   c. The object of this litigation exceeds $75,000 in value to JUMP.

7. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because JUMP asserts claims arising under the U.S. Constitution. Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over JUMP's claims arising under the Illinois Constitution and the laws of the State of Illinois and the City of Chicago because they are so related to the federal claim asserted in this action that they form part of the same case or controversy under Article III of the U.S. Constitution.

8. This Court may declare the legal rights and obligations of the parties in this action pursuant to 28 U.S.C. § 2201 because the action presents an actual controversy within the Court's jurisdiction.

9. Venue is proper under 28 U.S.C. § 1391 because the Defendants are located and reside in this judicial district and in the State of Illinois, and because a substantial part of the events giving rise to the claims

for relief occurred in this judicial district, or in the alternative, because the Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

**I. Bikesharing**

10. A bikeshare system is a program in which bicycles are made available for short-term, usually one-way, rentals.

11. The past several years have seen a significant expansion of bikeshare systems around the globe. The advance of the internet—and the smartphone in particular—have made it far easier to offer these services on a large scale in urban environments. Internet applications enable users to monitor the availability of nearby bikes using GPS and to unlock access to and pay for those bikes directly from their smartphone.

12. Recently, bikeshare systems have advanced in other ways, such as through the advent of electric-assisted bikes and "dockless" bikes that, unlike traditional "docked" systems, are not tethered to fixed docking stations. This shared "micro-mobility" space has grown to include other forms of transportation, including the short-term rental of electric scooters.

13. Municipalities that wish to implement bikeshare services generally do not opt to provide them as a public good out of the general tax fund. Nor is it common for municipalities to operate the systems themselves, as they often do with, for example, bus or rail service. Rather, a common model for a docked bikeshare system is for municipalities to purchase the required components of the system (often in conjunction with grant funding and sponsors), and to partner with a private bikeshare company that operates the system and charges users directly. As alleged below, this is the model that the City of Chicago chose when it initially decided to launch the docked bikeshare system at issue here. For a fully dockless program, cities typically have no need to purchase anything because there is little to no infrastructure required for such a program. However, some cities have required dockless operators to apply for and receive permits prior to beginning operations.

## II. Chicago Launches its Bikeshare Program, "Divvy"

14. In 2007, then-Mayor of Chicago Richard Daley announced his intention to launch a bikeshare program in Chicago after seeing such a program in Paris.[1] Rather than operate the system itself (by, for example, running it through the Chicago Transit Authority, as the City does with bus and rail service), the City sought to contract with a private company that would operate the bikeshare program largely on its own. The City issued a request for proposals (RFP) from private partners. Only two companies came forward to submit proposals and the City viewed them as too costly, so it tabled the effort.[2]

15. In 2011, then-Mayor Rahm Emanuel relaunched the idea upon the City's receipt of an $18 million grant from the Federal Highway Administration (FHA). The FHA grant was issued specifically to pay for the City's purchase and installation of the infrastructure necessary to establish a bikeshare program. The City told potential operators that "[e]stablishing a bicycle sharing system is one of Mayor Rahm Emanuel's key strategies to achieving goals that the City becomes the most bicycle-friendly city in the United States."

16. The City issued another RFP to select the private vendor that would receive the contract to operate the bikeshare program, the component parts of which the City would purchase. Specifically, the City's Department of Procurement Services distributed on behalf of CDOT a "Request for Proposal ('RFP') for the Purchase, Installation and Operation of a Bicycle Sharing System in the City of Chicago" (the "2011 RFP"). The 2011 RFP "invite[d] the submission of proposals from firms or organizations experienced in establishing and operating large bicycle sharing systems and with expertise in purchasing, installing, and operating of a bicycle sharing system."

17. In structuring the RFP, the City appeared to believe that the awarded contract would be lucrative for the company selected to operate the bikeshare system. As the 2011 RFP acknowledged, "Chicago is the third largest city in the United States, with a population of 2.7 million residents. . . . Chicago's flat topography, high

---

[1] Eleanor Beardsley, *Paris' Popular Bike Program May Inspire Others*, NPR (Sept. 15, 2017), https://www.npr.org/templates/story/story.php?storyId=14429468?storyId=14429468

[2] Adam Doster, *What Chicago Can Learn From Other Cities' Bike-Sharing Programs*, CHICAGO MAGAZINE (Apr. 25, 2013), https://www.chicagomag.com/Chicago-Magazine/The-312/April-2013/Chicago-Bike-Share/

-4-

transit usage, and population density make it an ideal city for a bicycle sharing system." Indeed, as it turned out, Chicago's bikeshare system is currently the nation's second largest, assisted by the fact that Chicago was the first major city to construct a complete downtown network of protected bike lanes.[3] And as a general matter, not only does the operation of such a massive bikeshare program have the potential to be profitable in itself, but also the ability to operate in a large and sprawling urban environment such as Chicago allows vendors to experiment with novel technologies that are shaping the rapid growth of other innovative micro-mobility products.

18. Consistent with the potential value of such a bikeshare contract, the City purported to outline in the 2011 RFP what might have appeared to be a robust process for the evaluation of the proposals. The 2011 RFP provided that an "Evaluation Committee, which will include the representatives of the Chicago Department of Transportation, and the Department of Procurement Services and may include representatives of other departments of the City . . . will review and evaluate the Proposals." The "Evaluation Committee [was to] review the overall responsiveness and completeness of the Proposal" in light of a list of nine "Evaluation Criteria." "Afterwards, the Evaluation Committee [was to] make a final evaluation, including a final ranking of the Respondents, and [was to] submit a recommendation for one or more Respondents to the Commissioner of CDOT."

19. Despite this somewhat detailed process for the *evaluation* of proposals, the RFP made clear that the CDOT Commissioner was ultimately granted full authority to select whichever proposal she or he desired, irrespective of the Evaluation Committee's recommendation: "The CDOT Commissioner will select one or more Respondents for contract negotiations," and, "the Commissioner of CDOT may terminate negotiations with the selected Respondent(s), and negotiate with any of the other qualified Respondents, until such time as the City has negotiated a contract meeting its needs." The 2011 RFP's only limitation on the CDOT Commissioner's power to select the vendor that would operate the City's bikeshare program was that the "[e]xecution of a contract by the CDOT Commissioner must be authorized by City Council."

---

[3] Ian Dille, *The 50 Best Bike Cities of 2016*, Bicycling.com, https://www.bicycling.com/news/a20048181/the-50-best-bike-cities-of-2016/ (naming Chicago the best bike city in the nation in 2016).

20. The 2011 RFP also noted in several instances the City's purported commitment to comply with state and local public contracting laws. For example, Section 8.2 of the RFP acknowledged that the City may only "utilize . . . procurement method[s] available under the Municipal Purchasing Act and the Municipal Code of Chicago, to obtain the Services described here."

21. In other places, the 2011 RFP reiterated the City's intention to follow relevant state and local laws. For example:

    a. Section 4.2.F of the 2011 RFP required a fee for the submission of proposals under "Section 2-92-418 of the Municipal Code of the City of Chicago [which is] require[d] for each competitively bid contract and each request for proposal where the estimated dollar value of the contract . . . exceeds $10,000,000," and that "**[a]s a result, a submittal fee to the City with its proposal to this RFP is required.**"

    b. Section 5.3.3 of the 2011 RFP purported to require compliance with the requirements of § 8-10-8.5 of the Illinois Municipal Purchasing Act and Chapter 2-154 of the Municipal Code of Chicago, each of which requires that entities submitting bids or proposals for significant public contracts disclose each individual that has a sufficient economic interest in the entity.

    c. Section 5.3.2 of the 2011 RFP required proposers to offer evidence of their ability to provide a bond in light of Illinois' Public Construction Bond Act and § 2-92-030 of the Municipal Code of Chicago, each of which requires entities engaged in significant projects on public contracts to post a bond to insure the performance of their work.

22. On information and belief, three companies responded to the 2011 RFP: (i) Alta; (ii) BikeChicago; and (iii) Tracetel. On information and belief, an Evaluation Committee made up of representatives of the Chicago Transit Authority, Chicago's Department of Procurement Services, and CDOT unanimously selected Alta's

proposal (even though Alta's proposal was significantly more expensive for the City than that of BikeChicago or Tracetel).[4]

23. Despite the City's repeated statements in the 2011 RFP that it would adhere to competitive bidding as required by state law, neither the process followed nor the selection of Alta's proposal was consistent with state law, which requires "free and open competitive bidding after advertisement, to the lowest responsible bidder." 65 ILCS 5/8-10-3. On information and belief, the City has never contended that the awarding of a contract to operate a bikeshare system in the City is not amenable to competitive bidding—nor could it so plausibly contend.

24. On April 18, 2012, the Chicago City Council passed an ordinance to establish the bikeshare program to be operated by Alta (the "2012 Ordinance"), the vendor chosen pursuant to the 2011 RFP. The 2012 Ordinance provided that the City intended "to purchase and cause to be installed the System's infrastructure, including docking stations and bicycles, as well as appurtenant, informational signage and panels, and to procure the System's operation, marketing and maintenance." Consequently, the 2012 Ordinance authorized the CDOT Commissioner "to execute such lease agreements, easement agreements, license agreements, and other use and ancillary agreements as may be necessary or appropriate to locate and operate bikesharing system stations on public and private properties." Further, the 2012 Ordinance authorized the CDOT Commissioner "to negotiate and enter into an agreement with the selected Operator [Alta]."

25. On January 24, 2013, Alta and CDOT finalized the agreement that they negotiated pursuant to the 2012 Ordinance. The agreement was titled "Agreement Between the City of Chicago Department of Transportation and Alta Bicycle Share, Inc. for a Bicycle Sharing System" (the "Bikeshare Agreement" or "Agreement"). The Bikeshare Agreement echoes the 2012 Ordinance in noting the City's "desire[] to purchase and implement a bicycle-sharing system," and identifies that the "purpose of this Agreement is for Alta to provide, install, implement, operate and maintain a bike sharing System for use by the public." The parties agreed to an initial sixty-month term, with the City retaining the right to extend the Agreement for up to two additional sixty-

---

[4] Deanna Isaacs, *Is the city's shiny new bike-sharing program a dirty deal?*, CHICAGO READER (May 9, 2012), https://www.chicagoreader.com/chicago/bike-sharing-contract-may-be-inside-job/Content?oid=6674245&showFullText=true

month terms. The parties contemplated the City's initial purchase of 3,000 bicycles and 301 docking stations and valued the parties' agreement at $65 million.

26. The City launched the bikeshare system in June 2013, operating under the name "Divvy." In furtherance of the program, the City spent an initial $30 million in federal and local funding to buy the bikes and stations.[5] As the *Chicago Tribune* reported at the time, "Alta was shielded from the bulk of the risk because taxpayers funded all of Divvy's startup costs."[6]

27. Since its launch, the Divvy system has not turned an annual profit, forcing the City and Alta (later renamed Motivate after being purchased by Bikeshare Holdings LLC) to split the losses.

### III. JUMP Enters the Bikeshare Market

28. In April 2013, JUMP launched its first public dockless bikeshare system, which implemented JUMP's innovative bikes that relied on an integrated locking mechanism which meant that fixed docking stations were not required.

29. In April 2018, JUMP was acquired by Uber Technologies, Inc., and since then, has sought to substantially grow JUMP's presence around the country and beyond. As of the filing of this Complaint in August 2019, JUMP provides thousands of bikes in 20 cities across the world.[7]

30. JUMP continues to seek new locations in which it can expand and add more bikes. In that process, JUMP has spent considerable time and resources assessing, considering, and strategizing on potential entry into the Chicago bikeshare market, which it views as particularly amenable to its fleet of dockless and electric bicycles. As alleged below, however, those efforts appear to have been for naught in light of the City's unilateral (and unlawful) decision to only allow one bikeshare operator on City streets without regard to public contracting laws.

---

[5] Mary Wisniewski and Gregory Pratt, *Chicago sees drop in Divvy income following expansion into South, West sides*, CHICAGO TRIBUNE (Dec. 27, 2017), https://www.chicagotribune.com/news/local/breaking/ct-met-divvy-income-drop-20171226-story.html

[6] Diana Sroka Rickert, *Chicago is overpaying for Divvy*, CHICAGO TRIBUNE (Aug. 26, 2014), https://www.chicagotribune.com/news/opinion/commentary/ct-divvy-pay-chicago-milwaukee-oped-0826-20140825-story.html

[7] Megan Rose Dickey, *Uber acquires bike-share startup JUMP*, TECHCRUNCH.COM, https://techcrunch.com/2018/04/09/uber-acquires-bike-share-startup-jump/; JUMP BY UBER: CITIES, https://jump.com/cities/ (last visited July 29, 2019).

IV. **The Emanuel Administration Renegotiates the Bikeshare Agreement Out of Public View, Publicly Announces a Transformative "Amendment" to the Agreement Months Later, and Then Calls for a Hasty City Council Vote**

31. In or around July 2018,[8] Motivate was acquired by Lyft, Inc., the principal competitor of JUMP's parent company, Uber.[9]

32. Lyft approached CDOT Commissioner Rebekah Scheinfeld shortly after its acquisition of Motivate to seek a broadening of its bikeshare arrangement with the City. Over the following months, the Emanuel Administration and Lyft negotiated outside of public view to amend the existing Bikeshare Agreement.

33. Rather than a true "amendment" to the parties' public contract, however, what resulted was a massive expansion and reimagination of the services that were to be provided pursuant to the Bikeshare Agreement (the "Amendment"). Not only were the scope of services to dramatically expand under the resulting Amendment, the Agreement would be revised to include a new and sweeping exclusive right (which did not exist in the earlier agreement) that would lock out all of Motivate's competitors—including JUMP—from renting out any type of bicycle (*i.e.*, docked or dockless) on the streets of Chicago.

34. The Administration announced to the public its intention to enter into the Amendment in March 2019, but did not engage in a proposal process as required by law, and a City Council vote was hastily scheduled for just weeks later. The ordinance as ultimately passed (the "2019 Ordinance") noted that the Amendment would "dramatically expand the System in terms of size and technological sophistication." As one city alderman stated, the Amendment "changes the whole dynamic" of the Bikeshare Agreement.[10]

35. If implemented, the changes to the Divvy system wrought by the Amendment will be foundational and massive.

---

[8] The initial term of the Bikeshare Agreement was set to expire on January 23, 2018. In October 2017, however, the CDOT Commissioner notified Motivate that the City was exercising its option to extend the initial term of the Agreement for sixty months, thereby extending the term of the Agreement to January 23, 2023.

[9] Eric Newcomer, *Lyft buys company behind Divvy, joining bike-rental business*, CHICAGO TRIBUNE (July 2, 2018), https://www.chicagotribune.com/business/ct-biz-lyft-motivate-divvy-deal-20180702-story.html

[10] Fran Spielman, *City Council committee Oks Lyft bike-share deal to expand Divvy citywide by 2021*, CHICAGO SUN TIMES (Apr. 8, 2019), https://chicago.suntimes.com/business/city-council-bike-sharing-deal-lyft-emanuel-uber-jump-divvy/

36. Not only will the Amendment "introduce into the system e-bicycles, dockless bicycles, bicycle hubs, [and] electrified stations," it grants Motivate "*exclusive rights to offer bicycle sharing on the public right of way*," and defines that exclusivity to include "any type of bicycle, including electric bicycles, docked bicycles, dockless bicycles and/or any combination or hybrid thereof." Indeed, the City acknowledges through the Amendment that any other party's operation of a bicycle rental business on public rights of way will be unlawful and that "the City will take enforcement measures against the violating party."

37. Even further, the City commits itself to negotiate in the future with Motivate ever broader expansions of its exclusive rights as to "[o]ther [m]icromobility [f]ields," such as scooters (another field in which JUMP directly competes with Lyft, including currently in Chicago).

38. In short, the Amendment categorically transforms what in essence was a discrete operational deal for a traditional docked bike rental program into a sprawling and exclusive arrangement that granted one company a monopoly over the offering of increasingly valuable bikeshare services on City streets.

39. Public reaction against the wide-ranging Amendment negotiated behind closed doors with Motivate was swift and damning.

    a. Then-Mayor-Elect Lori Lightfoot described that the deal "seemingly came out of nowhere without proper vetting and transparency," and is "precisely the style of governance that we have to move away from."[11]

    b. The *Chicago Sun Times* reported that Mayor Emanuel's "decision to choose Lyft over Uber to become the exclusive operator of Chicago's bike-sharing program was likened . . . to the widely despised parking meter deal," which "benefited the Daley family [and] robbed the residents . . . of Chicago."[12]

---

[11] Fran Spielman, *City Council committee Oks Lyft bike-share deal to expand Divvy citywide by 2021*, CHICAGO SUN TIMES (Apr. 8, 2019), https://chicago.suntimes.com/business/city-council-bike-sharing-deal-lyft-emanuel-uber-jump-divvy/

[12] Fran Spielman, *Community groups liken Divvy bike expansion deal with Lyft to parking meter deal*, CHICAGO SUN TIMES (Mar. 27, 2019), https://chicago.suntimes.com/business/bike-share-divvy-lyft-deal-parking-meter-uber-jump-protest/

   c. Noted Rev. Andre Smith, the CEO of Chicago Against Violence, said: "Unfortunately, what we are witnessing now is the city striking a no-bid, backroom deal with Lyft-owned Divvy that gives Divvy a monopoly over all bike-share programs in the city with no expansion to the South and West Side for two years. . . . [I]t makes no sense that the city would choose a plan that delivers fewer bikes and fewer locations with fewer jobs at a slower pace."[13]

   d. Others questioned whether it was appropriate for Mayor Emanuel to have "push[ed] this exclusive deal" on the heels of his exit from office. For example, the CEO of the Washington Park Chamber of Commerce asked: "Why not postpone the deal and let the new administration negotiate the contract? Or make the deal not exclusive if the mayor wants to have another win before leaving office?"[14]

40. For its part, JUMP sought to inform the public of the pitfalls of the Emanuel Administration's unlawful process: "Without proper vetting or transparency, Chicago is entering into yet another no-bid, exclusive contract with a private company that leaves money, jobs, and transportation access on the table without even considering alternatives that offer more."

41. The public's outcry and JUMP's protestations fell on deaf ears. The City Council approved the unlawful Amendment on April 10, 2019, just weeks before Rahm Emanuel's term as Mayor would come to an end.

42. Lori Lightfoot assumed the office of Mayor of Chicago on May 20, 2019. Although JUMP is not in a position to know whether Mayor Lightfoot has executed the amended agreement with Lyft, on information and belief, she is authorized to do so and could sign the amendment at any time without JUMP's knowledge.

---

[13] Fran Spielman, *Community groups liken Divvy bike expansion deal with Lyft to parking meter deal*, CHICAGO SUN TIMES (Mar. 27, 2019), https://chicago.suntimes.com/business/bike-share-divvy-lyft-deal-parking-meter-uber-jump-protest/

[14] Fran Spielman, *Community groups liken Divvy bike expansion deal with Lyft to parking meter deal*, CHICAGO SUN TIMES (Mar. 27, 2019), https://chicago.suntimes.com/business/bike-share-divvy-lyft-deal-parking-meter-uber-jump-protest/

## **CLAIMS**

### **COUNT I – VIOLATION OF § 8-10-3 OF THE ILLINOIS MUNICIPAL PURCHASING ACT**

43. JUMP incorporates all of the preceding paragraphs as if fully set forth herein.

44. Section 8-10-3 of the Illinois Municipal Purchasing Act provides that, "[e]xcept as otherwise herein provided, all purchase orders or contracts of whatever nature, for labor, services or work, the purchase, lease, or sale of personal property, materials, equipment or supplies, involving amounts in excess of $10,000, made by or on behalf of any such municipality, shall be let by free and open competitive bidding after advertisement, to the lowest responsible bidder, depending upon whether such municipality is to expend or to receive money."

45. Section 8-10-21 of the Illinois Municipal Purchasing Act provides that "[a]ny purchase order or contract executed in violation of this Division 10 shall be null and void . . . "

46. The above sections of the Illinois Municipal Purchasing Act "circumscribe[] municipal contracting," and "guard[] against favoritism, improvidence, extravagance, fraud and corruption, [and help] to secure the best work or supplies at the lowest price practicable." *McMahon v. City of Chicago*, 339 Ill. App. 3d 41, 49 (1st Dist. 2003).

47. Defendants' execution of the Bikeshare Agreement, and, separately and in conjunction, the Amendment, without "free and open competitive bidding" violated (or will violate) § 8-10-3 of the Illinois Municipal Purchasing Act.

### **COUNT II - VIOLATION OF § 2-92-615 OF THE MUNICIPAL CODE OF CHICAGO**

48. JUMP incorporates all of the preceding paragraphs as if fully set forth herein.

49. Section 2-92-615 of the Municipal Code of Chicago provides: "When the chief procurement officer determines in writing that the use of competitive sealed bidding is either not practicable or not advantageous to the city, she may enter into contracts through competitive sealed proposals."

50. On information and belief, the City's chief procurement officer did not determine in writing that the use of competitive sealed bidding with respect to the services provided pursuant to the Bikeshare Agreement, and, separately and in conjunction, the Amendment, was either not practicable or not advantageous to the City.

51. It would have been both practicable and advantageous to the City to use competitive sealed bidding with respect to the services provided pursuant to the Bikeshare Agreement, and, separately and in conjunction, the Amendment.

52. The City did not enter the initial Bikeshare Agreement, or the Amendment, through competitive sealed proposals.

53. Defendants' execution of the Bikeshare Agreement, and, separately and in conjunction, the Amendment, without "competitive sealed bidding" or "competitive sealed proposals," violated (or will violate) § 2-92-615 of the Municipal Code of Chicago.

**COUNT III – VIOLATION OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND CLAIM FOR INJUNCTIVE RELIEF, PURSUANT TO 42 U.S.C. § 1983 AND THE COURT'S EQUITABLE POWERS**

54. JUMP incorporates all of the preceding paragraphs as if fully set forth herein.

55. The Fourteenth Amendment prohibits the government from "depriv[ing] any person of life, liberty, or property, without due process of law." Not only does this right prohibit municipalities from depriving entities such as JUMP of life, liberty, or property without proper procedural protections, this right also protects against "arbitrary [and] wrongful government actions regardless of the fairness of the procedures used to implement them." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 368 (7th Cir. 2019).

56. By awarding the Bikeshare Agreement and then fundamentally transforming the nature of that Agreement through a purported "amendment" that "dramatically expands" the parties' arrangement, without ever engaging a competitive bidding (or request for proposal) process as required by state and local public contracting laws, Defendants acted unlawfully to the derogation of JUMP's rights.

57. In negotiating a massive and exclusive deal out of public view with JUMP's principal competitor—which thereby locked JUMP entirely out of a lucrative market without explanation— Defendants unlawfully singled out for the awarding of a public contract JUMP's competitor with no public-policy justification, and therefore acted arbitrarily, irrationally, wrongfully, and in a way that shocks the conscience.

58. Pursuant to 42 U.S.C. § 1983 and this Court's equitable powers, JUMP seeks declaratory relief that the Bikeshare Agreement, and, separately and in conjunction, the Amendment, are null and void.

## COUNT IV – VIOLATION OF ARTICLE I, § 2 OF THE ILLINOIS CONSTITUTION

59. JUMP incorporates all of the preceding paragraphs as if fully set forth herein.

60. Article 1, § 2 of the Illinois Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law." Not only does this right prohibit municipalities from depriving entities such as JUMP of life, liberty, or property without proper procedural protections, this right "bars arbitrary, wrongful government action." *People v. Jurisec*, 199 Ill.2d 108, 129 (Ill. 2002).

61. By awarding the Bikeshare Agreement and then fundamentally transforming the nature of that Agreement through a purported "amendment" that "dramatically expands" the parties' arrangement, without ever engaging a competitive bidding (or request for proposal) process as required by state and local public contracting laws, Defendants acted unlawfully and in derogation of JUMP's rights.

62. In negotiating a massive and exclusive deal out of public view with JUMP's principal competitor—which thereby locked JUMP entirely out of a lucrative market without explanation— Defendants unlawfully singled out for the awarding of a public contract JUMP's competitor with no public-policy justification, and therefore acted arbitrarily, irrationally, wrongfully, and in a way that shocks the conscience.

63. Pursuant to this Court's equitable powers, JUMP seeks declaratory relief that the Bikeshare Agreement, and, separately and in conjunction, the Amendment, are null and void.

## COUNT V – DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201

64. JUMP incorporates all of the preceding paragraphs as if fully set forth herein.

65. This action presents an actual controversy between JUMP and the Defendants concerning the validity of the Bikeshare Agreement, and, separately and in conjunction, the Amendment. Based on the foregoing allegations, JUMP is entitled to a declaration, pursuant to 28 U.S.C. § 2201, that the Bikeshare Agreement, and the Amendment, are null and void as violative of § 8-10-3 of the Illinois Municipal Purchase Act, § 2-92-615 of the Municipal Code of Chicago, the Fourteenth Amendment to the U.S. Constitution, and Article 1, § 2 of the Illinois Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, JUMP respectfully requests that the Court:

i. Declare that the City's execution of the Bikeshare Agreement, and, separately and in conjunction, the Amendment, violate (or would violate) § 8-10-3 of the Illinois Municipal Purchasing Act, and that the Bikeshare Agreement and its Amendment are therefore null and void pursuant to § 8-10-21 of that Act;

ii. Declare that the City's execution of the Bikeshare Agreement, and, separately and in conjunction, the Amendment, violate (or would violate), § 2-92-615 of Municipal Code of Chicago and are therefore null and void;

iii. Declare that the City's execution of the Bikeshare Agreement, and, separately and in conjunction, the Amendment, violate (or would violate) the Fourteenth Amendment to the U.S. Constitution because they operate to deprive JUMP of life, liberty, or property, without due process of law;

iv. Declare that the City's execution of the Bikeshare Agreement, and, separately and in conjunction, the Amendment, violate (or would violate) Article I, § 2 of the Illinois Constitution because they operate to deprive JUMP of life, liberty, or property, without due process of law;

v. Permanently enjoin the City and CDOT; their agencies, officers, agents, servants, employees, and attorneys; and all persons acting in concert or participation with them, from taking any actions to execute or implement the Bikeshare Agreement or the Amendment;

vi. Award JUMP its reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

vii. Award JUMP such other and further relief as the Court deems just and proper.

Dated: January 15, 2020

/s/ Roberta A. Kaplan

Roberta A. Kaplan
John C. Quinn
Benjamin D. White
KAPLAN, HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
bwhite@kaplanhecker.com


/s/ Leonard A. Gail

Leonard A. Gail
Suyash Agrawal
Massey & Gail LLP
50 E. Washington Street, Suite 400
Chicago, Illinois 60602
(312) 283-1590
lgail@masseygail.com
sagrawal@masseygail.com

*Attorneys for Plaintiff Social Bicycles LLC d/b/a/ JUMP.*