IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SOCIAL BICYCLES LLC d/b/a JUMP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 19 C 5253 |
| ) | |
| CITY OF CHICAGO DEPARTMENT OF ) | Judge Joan H. Lefkow |
| TRANSPORTATION; CITY OF ) | |
| CHICAGO, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Plaintiff Social Bicycles LLC doing business as JUMP ("JUMP"), a provider of bikeshare systems, has sued the City of Chicago and the City's Department of Transportation ("CDOT") for entering into an exclusive contract with a competitor in alleged violation of state and municipal competitive bidding requirements. Defendants move to dismiss the complaint for lack of standing and failure to state a claim. (Dkt. 21.) The motion is granted.[1]

## BACKGROUND[2]

Municipal-sponsored bikeshare systems—programs in which bicycles are made available for short-term rentals—have gained popularity around the world in recent years. (Dkt. 34 ¶¶ 10–11.) This case involves Chicago's "Divvy" bikeshare system, which was launched in 2013 as a

---

[1] The court has jurisdiction under 28 U.S.C. § 1332 because JUMP is a limited liability company whose sole member is a Delaware corporation with its principal place of business in California and defendants are citizens of Illinois. (Dkt. 34 ¶¶ 3-6.) Venue is proper in this district under 28 U.S.C. § 1391 because defendants are located and reside here and a substantial part of the events giving rise to the claims occurred here. (*Id.* ¶ 9.)

[2] This statement of facts is taken from the well-pleaded allegations in JUMP's complaint, which are presumed true for purposes of this motion. *See Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011); *Apex Digital, Inc.* v. *Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009).

system of docked bicycles, in which users can rent bicycles to ride between a network of fixed locations that house the bicycles when not in use. (*Id.* ¶¶ 12-13.) JUMP challenges the contract CDOT entered into with Alta Bicycle Share, Inc. ("Alta") to create the Divvy system ("the 2013 Agreement") and a subsequent renewal and "dramatic expansion" of that contract ("the 2019 Amendment") as violating competitive bidding requirements of state and municipal law. The 2019 Amendment was negotiated by former Mayor Rahm Emanuel's administration "behind closed doors" with a "favored private partner" and was "hastily" approved by the City Council as the end of Mayor Emanuel's term approached. (*Id.* ¶¶ 34-40; dkt. 29 at 2.)[3]

**The 2011 Request for Proposal**

The 2013 Agreement arose from a request for proposal ("RFP") process the City initiated in 2011. That year, the City received an $18 million grant from the Federal Highway Administration to build the infrastructure necessary for a bikeshare program. (Dkt. 34 ¶ 15.) The City's Department of Procurement Services ("DPS") issued an RFP on behalf of CDOT to select a private vendor to operate the bikeshare program, the component parts of which the City planned to purchase. (*Id.* ¶ 16.)

The RFP included information on the process through which proposals would be evaluated. (*Id.* ¶ 18.) It provided that an Evaluation Committee composed of CDOT, DPS, and other city officials would review and evaluate the proposals based on nine listed criteria, including technical competence and cost. (*Id.*; dkt. 32-1 at 20.) The Evaluation Committee would then make a recommendation to the CDOT Commissioner, who was granted authority to select a proposal irrespective of the Evaluation Committee's recommendation. (*Id.* ¶¶ 18, 19.) The RFP

---

[3] All pincites are to the numbering generated by the CM/ECF system and may differ from the page numbering used by the parties.

also provided that the "[e]xecution of a contract by the CDOT Commissioner must be authorized by City Council." (*Id.*)

JUMP argues that the RFP "noted in several instances the City's purported commitment to comply with state and local public contracting laws." (*Id.* ¶ 20.) JUMP highlights Section 8.2 of the RFP, which states that the city may "utilize . . . procurement method[s] available under the Municipal Purchasing Act ["MPA"] and the Municipal Code of Chicago ["MCC"], to obtain the Services described here." (*Id.*; dkt. 32-1 at 22.) JUMP also points to the following sections:

- Section 4.2.F states: "Section 2-92-418 of the [MCC] requires for each competitively bid contract and each request for proposal where the estimated dollar value of the contract . . . exceeds $10,000,000.00 that each bidder or proposer submit with its proposal a non-refundable 'submittal fee' in the amount of $900.00," and "[a]s a result, a submittal fee to the City with its Proposal to this RFP is required." (Dkt. 34 ¶ 21; dkt. 32-1 at 8 (emphasis removed).)

- Section 5.3.3 requires proposers to comply with section 8-10-8.5 of the MPA and Chapter 2-154 of the MCC, each of which requires that entities submitting bids or proposals for significant public contracts disclose each individual that has a certain economic interest in the entity. (Dkt. 34 ¶ 21.)

- Section 5.3.2 requires proposers to present evidence of their ability to provide a sufficient performance bond in light of Illinois' Public Construction Bond Act and section 2-92-030 of the MCC, each of which requires such bonds of entities engaged in significant public projects. (*Id.* ¶ 21.)

Three companies responded to the RFP. (*Id.* ¶ 22.) JUMP was not one of them, as it did not enter the public bikeshare market until years later. (*Id.* ¶¶ 22, 28; dkt. 29 at 2) The Evaluation Committee unanimously selected Alta's proposal despite its being significantly more expensive than the two alternative proposals. (Dkt. 34 ¶ 22.)

**The 2013 Agreement**

On April 18, 2012, the City Council passed an ordinance (the "2012 Ordinance") to establish the bikeshare program to be operated by Alta. (*Id.* ¶ 24.) The ordinance authorized the

3

CDOT Commissioner to negotiate with Alta and execute the relevant lease, easement, license, and other agreements necessary for the bikeshare system. (*Id.*)

On January 24, 2013, Alta and CDOT finalized a comprehensive agreement contemplating the City's initial purchase of 3,000 bicycles and 301 docking stations and providing for Alta to operate the program for an initial term of sixty months, with the City retaining the right to extend the Agreement for up to two additional sixty-month terms. (*Id.* ¶ 25.) The City launched the bikeshare system under the Divvy brand name in June 2013. (*Id.* ¶ 26.) The Divvy system has never turned an annual profit, and the City and Alta have split its losses. (*Id.* ¶ 27; *see also* dkt. 22-3 at 4.)

**The 2019 Amendment**

In October 2017, the CDOT Commissioner notified Alta—now renamed Motivate— that the City was exercising its right to extend the Agreement for a term of sixty months, to January 23, 2023. (Dkt. 34 at 9 n. 8.) In or around July 2018, Motivate was acquired by Lyft, Inc., which is the principal competitor of JUMP's parent company, Uber. (*Id.* ¶ 31.) Lyft approached CDOT Commissioner Rebekah Scheinfeld shortly after its acquisition of Motivate to seek a broadening of its bikeshare deal with the City. (*Id.* ¶ 32.) Lyft and officials in Mayor Rahm Emanuel's administration then negotiated amendments to the 2013 Agreement over a period of several months. (*Id.*) Lyft and the officials agreed to terms of the 2019 Amendment, which would provide for the introduction of dockless and electric bikes to the system, grant Motivate "exclusive rights to offer bicycle sharing on the public right of way"—as to "any type of bicycle"—and commit the City to future negotiations to expand Motivate's operation to include other micromobility fields, such as electric scooters. (Dkt. 34 ¶¶ 33, 36, 37.) (JUMP currently competes with Lyft in providing scooters. (*Id.*))

4

In March 2019, the Emanuel administration publicly announced its intention to go forward with the 2019 Amendment. (*Id.* ¶ 34.) On April 10, 2019, the City Council passed an ordinance (the "2019 Ordinance") authorizing the Amendment, noting it would "dramatically expand the System in terms of size and technological sophistication." (*Id.* ¶¶ 34, 41.) The Amendment was executed on May 8, 2019. (Dkt. 22 at 4; dkt. 22-4.)

**The Complaint**

JUMP alleges the City and CDOT violated provisions of the MPA, MCC, and the due process clauses of the Illinois and United States Constitutions by failing to follow applicable competitive bidding requirements for both the Agreement and the Amendment.[4] JUMP seeks a declaratory judgment that the Agreement and Amendment are void because of those purported violations.

Defendants move under Rule 12(b)(6) to dismiss the complaint in its entirety for failure to state a claim for relief.[5] (Dkt. 21.) They also argue JUMP lacks standing to contest the 2013 Agreement and is time-barred from bringing any claims related to that Agreement under Illinois' five-year "catch all" statute of limitations. 735 Ill. Comp. Stat. 5/13-205.

---

[4] Section 8-10-3 of the MPA provides that "all purchase orders or contracts of whatever nature, for labor, services or work, the purchase, lease, or sale of personal property, materials, equipment or supplies, involving amounts in excess of $10,000, made by or on behalf of any such municipality, shall be let by free and open competitive bidding after advertisement, to the lowest responsible bidder." 65 Ill. Comp. Stat. 5/8-10-3.

Section 2-92-615 of the MCC provides: "When the chief procurement officer determines in writing that the use of competitive sealed bidding is either not practicable or not advantageous to the city, she may enter into contracts through competitive sealed proposals."

[5] Defendants' motion was addressed to JUMP's original complaint. (Dkts. 1, 21.) The court ordered JUMP to amend its complaint to address a deficiency in its jurisdictional allegations, which it did. (Dkts. 33-34.) Because JUMP's amended complaint is identical to its original complaint in all respects except the jurisdictional allegations, the court treats defendants' motion as if it were directed to the amended complaint.

**ANALYSIS**

**I.      Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim on which relief may be granted. In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). The allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. At the same time, the plaintiff need not plead legal theories; it is the facts that count. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010).

Rule 12(b)(1) permits a defendant to move to dismiss for lack of standing. *Retired Chicago Police Ass'n* v. *City of Chicago,* 76 F.3d 856, 862 (7th Cir. 1996). Challenges to standing may be either facial or factual. *Apex Digital, Inc.* v. *Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). A facial challenge requires the court only to look to the complaint and see if the plaintiff has sufficiently alleged the existence of standing. *Id.* A factual challenge, in contrast, concedes the formal sufficiency of the complaint but contends the elements of standing are not met in actuality. *Id.*

Defendants here bring a facial challenge. As with motions to dismiss under Rule 12(b)(6), a court addressing a facial challenge to standing must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's

favor. *Id.* at 443. The plaintiff bears the burden of showing standing exists. *Lujan* v. *Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130 (1992).

**II.     Standing**

Standing is a threshold issue that a court must address before deciding whether a plaintiff has stated a claim. *Bland* v. *Edward D. Jones & Co., L.P.*, 375 F. Supp. 3d 962, 972 (N.D. Ill. 2019). Defendants argue JUMP lacks standing to challenge the 2013 Agreement and the RFP process initiated in 2011 because JUMP did not submit a proposal in response to the RFP. (Dkt. 22 at 10.) JUMP responds that it has standing to challenge the 2013 Agreement and the 2011 RFP process because "it was the City's choices at that time that later precluded Plaintiff from competing for the [2019] Amendment." (Dkt. 29 at 15.)

The standing requirement comes from Article III of the Constitution, which confines federal courts to adjudicating actual cases or controversies. U.S. Const. art. III, § 2. To satisfy that constraint, a plaintiff must show "(1) an injury in fact; (2) fairly traceable to the defendant's action; and (3) capable of being redressed by a favorable decision from the court." *Parvati Corp.* v. *City of Oak Forest*, 630 F.3d 512, 516 (7th Cir. 2010) (citing *Lujan*, 504 U.S. at 560–61). An "injury in fact" consists of an "invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical." *Lee* v. *City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003). Such an injury may arise from the denial of a state-created legal right. *FMC Corp.* v. *Boesky,* 852 F.2d 981, 992 (7th Cir. 1988).

Illinois courts have held that parties that bid for government contracts have a "right to participate in a fair bidding process." *Aramark Corr. Servs., LLC* v. *Cty. of Cook*, No. 12 C 6148, 2012 WL 3961341, at *5 (N.D. Ill. Sept. 10, 2012) (quoting *Walsh/II in One Joint Venture III* v. *Metro. Water Reclam. Dist. of Greater Chi.*, 904 N.E.2d 1158, 1166, 389 Ill. App. 3d 138 (2009)). Accordingly, Illinois law generally holds that parties that bid for government contracts

7

and lose ("disappointed" or "unsuccessful" bidders) have standing to sue the government agency awarding the contract to "invoke the procedural protections of [a] competitive bidding statute."[6] *Kim Const. Co.* v. *Bd. of Trs. of Vill. of Mundelein*, 14 F.3d 1243, 1249 (7th Cir. 1994) (citing *Stanley Magic-Door, Inc.* v. *City of Chicago,* 393 N.E.2d 535, 536–37, 74 Ill. App. 3d 595 (1979)). Those protections allow a disappointed bidder to allege that the bidding process was infected with "fraud, lack of authority, unfair dealing, favoritism, or similar arbitrary conduct," *Court St. Steak House, Inc.* v. *Cty. of Tazewell*, 643 N.E.2d 781, 783, 163 Ill.2d 159, 164 (1994), or that a contract was awarded to an "unqualified bidder." *Stanley Magic-Door, Inc.*, 393 N.E.2d at 536-37. Those protections also allow a party to bring a claim that a contract was improperly awarded without following competitive bidding procedures at all. *O'Hare Exp., Inc.* v. *City of Chicago*, 601 N.E.2d 846, 851, 235 Ill. App. 3d 202 (1992) (citing *City of Chicago* v. *Hanreddy*, 71 N.E. 834, 211 Ill. 24 (1904)).

Where a party seeks to challenge a procurement process it did not participate in, however, courts generally hold that they lack standing absent a showing that they were restrained or precluded from participating. *Brown* v. *Ill. Dep't of Human Servs.*, No. 16 C 6295, 2017 WL 4570316, at *2 (N.D. Ill. July 11, 2017) (holding plaintiff lacked standing because "she never bid on the contract"); *Amtech Sys. Corp.* v. *Ill. State Toll Highway Auth.*, 637 N.E.2d 619, 626, 264 Ill. App. 3d 1095, 1105 (1994) ("Amtech has not presented this court with any persuasive

---

[6] The rationale underpinning disappointed bidder standing balances two competing interests. On one hand, "an award of a contract to a bidder other than the lowest responsible bidder is contrary to the taxpayers' interest in having the lowest bidder get the contract. Taxpayers will not directly protect this interest because no individual taxpayer has an interest sufficiently large to justify incurring the expenses of a lawsuit." *AT/Comm, Inc.* v. *Ill. State Toll Highway Auth.*, No. 96 C 6961, 1997 WL 222875, at *5 (N.D. Ill. Apr. 24, 1997). On the other hand, the public also has an interest in a government agency being able to perform its duties in a "timely and efficient" manner and avoid the costs of litigating contracting decisions. *Id.* at *6; *accord Keefe-Shea*, 773 N.E.2d at 1162.

authority supporting its position that an entity, such as itself, which has not bid has standing to file suit after the contract has been awarded"); *AT/Comm, Inc.* v. *Ill. State Toll Highway Auth.*, No. 96 C 6961, 1997 WL 222875, at *6 (N.D. Ill. Apr. 24, 1997) (holding that subcontractors did not have standing to sue where the general contractor whose bid package they were part of elected not to sue); *see also I.C.S. Ill., Inc.* v. *Waste Mgmt. of Ill., Inc.*, 931 N.E.2d 318, 329, 403 Ill. App. 3d 211, 225 (2010) ("a plaintiff cannot establish standing to challenge the result of a bidding competition without establishing that he would have been successful but for defendants' conduct").

Here, JUMP did not participate in the RFP process leading to the 2013 Agreement and concedes it was not precluded from doing so. JUMP argues it nevertheless has standing to challenge the RFP process because defendants "structured their sweeping sweetheart deal in 2019 as an 'Amendment' and not a separate contract," and thus it was defendants' "initial failure to follow competitive bidding laws that locked Plaintiffs out of bidding for the 2019 Amendment." (Dkt. 29 at 15.) Further to this point, JUMP argues that the 2013 Agreement and the 2019 Amendment together form one single contract,[7] and that the entire contract is "void *ab initio*" for failing to follow competitive bidding requirements. (*Id.*)

JUMP's argument, stated another way, is that whenever a municipality renews a competitively-bid contract without conducting a new bidding process, that action retroactively

---

[7] JUMP states in passing that the City and Alta/Motivate "expressly agreed" that the "bikeshare deal" is a "unified whole," but it cites nothing in support of that contention. (Dkt. 29 at 16.) Its only relevant citation to the 2019 Amendment is to section 1.2, which provides only that the terms of the 2013 Agreement "remain in full force and effect except as modified in this Amendment." (Dkt. 29 at 14; dkt. 22-4 at 5.)

9

confers standing on a competitor to challenge the original contract.[8] That argument is implausible on its face. Indeed, one of the cases JUMP cites in support of its standing argument suggests the contrary. *Young* v. *Vill. of Glen Ellyn*, 458 N.E.2d 1137, 1140, 120 Ill. App. 3d 692 (1983) (modifications to a contract that are "contemplated in the original bid proposal will not . . . act to invalidate the contract") (citing *M.A. Lombard & Son Co.* v. *Pub. Bldg. Comm'n of Chi.*, 428 N.E.2d 889, 101 Ill. App. 3d 514 (1981)).

The 2011 RFP expressly contemplated that the resulting contract "may provide that the City may elect to extend the contract up to two 5-year periods," and similar terms were incorporated into both the 2012 Ordinance and the 2013 Agreement, with the 2012 Ordinance further specifying that extensions would be "on the same terms and conditions." (Dkt. 32-1 at 5, § 2.2; dkt. 22-1 at 5; dkt. 22-2 at 31, § 4.3; dkt. 34 ¶ 25.) JUMP does not contend that such a renewal provision is generally impermissible under competitive bidding requirements, nor would such a contention be viable. Renewal options allow the City to take advantage of having infrastructure and experienced personnel already in place, to incentivize and reward a contractor's good performance, and to avoid the transaction costs of conducting multiple procurement processes.[9] *See Cent. Fla. Enters., Inc.* v. *F.C.C.*, 683 F.2d 503, 507 (D.C. Cir.

---

[8] The court's research has identified some authority for the idea that a renewal of a contract on existing terms does not constitute a new contract and rather merely extends the duration of the original contract. *Savage* v. *State*, 75 Wash. 2d 618, 620, 453 P.2d 613, 615 (1969) ("This purchase agreement giving the state an option to extend the duration of the contract, under the same terms and conditions, for limited, specified periods does not create successive new contracts but, rather, merely extends the duration of a single existing contract"). *Savage* does not help JUMP, however, because it does not follow that a renewal would give JUMP standing to challenge the formation of the original contract where it was otherwise lacking.

[9] The court does not mean to suggest that the 2019 Amendment was truly a mere renewal as contemplated by any of these documents; to the contrary, the 2019 Amendment contains several material differences from the 2013 Agreement that make it better thought of as a separate contract. *See PENPAC, Inc.* v. *Morris Cty. Mun. Utilities Auth.*, 690 A.2d 1094, 1098, 299 N.J. Super. 288, 295 (App. Div. 1997) (holding that purported "renewal" of a competitively-bid contract contained a "substantial change in

1982) (discussing benefits to public of giving a degree of "renewal expectancy" to incumbent contract holders); *McGraw* v. *Caperton*, 446 S.E.2d 921, 930, 191 W. Va. 528, (1994) (stating that allowing competitively bid contracts to be renewed for a specified period of time, under the same terms and conditions, is "eminently sensible"); *Wheeler* v. *Charter Twp. of Shelby*, 697 N.W.2d 180, 189, 265 Mich. App. 657 (2005) ("an extension provision is not, in and of itself, unreasonable considering the successful bidder's substantial commitment of equipment and other resources required to ensure the fulfillment of its contractual obligations").

Furthermore, JUMP's argument that the purported unitary contract could be deemed void *ab initio* does not obviate the need for JUMP to establish standing.[10] *See In re Vic Supply Co., Inc.*, 227 F.3d 928, 931 (7th Cir. 2000) ("Obviously the fact that a third party would be better off if a contract were unenforceable does not give him standing to sue to void the contract").

JUMP argues, in the alternative, that even if the 2013 Agreement and the 2019 Amendment are construed as two separate contracts, defendants "would have been required to reengage the procurement laws in order to enter into the second agreement, which they admittedly did not do." (Dkt. 29 at 14-15.) This argument is not responsive to defendants' motion, however, as it is not an argument as to why JUMP has standing to challenge the 2013 Agreement. Furthermore, even cases that have held that purported renewals of a competitively bid contract resulted in a materially different, separate contract have not suggested that a failure

---

material terms" and thus constituted a separate contract that should have been competitively bid). Rather, the point is that even accepting JUMP's premise that the 2019 Amendment and 2013 Agreement formed a unitary contract, JUMP would not thereby gain standing to challenge the 2013 Agreement. Indeed, the cases cited in this section suggest it is only because of the material differences between the Amendment and the Agreement that JUMP has standing to challenge the Amendment.

[10] For the principle that a contact entered into in violation of competitive bidding requirements is void, see 65 Ill. Comp. Stat. 5/8-10-21; *1550 MP Rd. LLC* v. *Teamsters Loc. Union No. 700*, 131 N.E.3d 99, 107 (Ill. 2019) ("[W]here a municipality exceeds its statutory authority in entering into a contract, the municipality's act is *ultra vires*, and the resulting contract is void *ab initio*").

11

to follow competitive bidding procedures on the purported renewal invalidated the original contract. *PENPAC,* 690 A.2d at 1098; *Mayor & City Council of Baltimore* v. *Bio Gro Sys., Inc.*, 477 A.2d 783, 787, 300 Md. 248, 255 (1984) ("option to extend" in a competitively bid municipal contract was "nothing more than an agreement by the parties to negotiate for an extension of the duration of the original contract"; the resulting second contract was void for not being competitively bid).

The court thus holds that JUMP lacks standing to challenge the 2011 RFP process and the 2013 Agreement.

## III. Statute of Limitations

For completeness, the court also will address defendants' argument that JUMP's challenge to the 2013 Agreement is untimely. The parties agree that the statute of limitations applicable to JUMP's claims is Illinois' five-year "catch all" statute, 735 ILCS 5/13-205, but dispute when the five-year clock started running.

Defendants argue that JUMP's claims accrued at the time the contract was either awarded or executed. (Dkt. 22 at 10-11.) For its part, JUMP does not meaningfully dispute this and rather concedes that its injury occurred "when it was prevented from bidding for the deal that came out of the 2019 'Amendment.'"[11] (Dkt. 29 at 16.) Following from its position on standing discussed above, JUMP argues that the 2013 Agreement and the 2019 Amendment form one single contract, and that its remedy for its challenge to the 2019 Amendment should be to void the whole thing, going back to its inception. JUMP, predictably, cites no case that supports such a notion. The court concludes that JUMP's challenge to the 2013 Agreement is untimely.

---

[11] As this concession illustrates, JUMP seeks to have its cake and eat it too by arguing that it was injured by the 2011 RFP process for standing purposes but that it was injured by the 2019 Agreement for purposes of the statute of limitations.

### IV. Whether the 2019 Amendment Violates the MPA

Defendants do not contest JUMP's standing to challenge the 2019 Amendment itself as violative of applicable competitive bidding laws, or the timeliness of that challenge. Defendants argue, however, that the 2019 Amendment was exempt from the competitive bidding requirements in the MPA and MCC pursuant to the City's home rule authority and various statutory exceptions.

#### A. Whether Home Rule Exempts the City from the Competitive Bidding Requirements of the MPA

The City of Chicago is a home rule unit under the Illinois Constitution. *See* Ill. Const. 1970, art. VII, § 6(a); *Indep. Voters of Illinois Indep. Precinct Org.* v. *Ahmad,* 13 N.E.3d 251, 265, 2014 IL App (1st) 123629. JUMP concedes that home rule units "ordinarily are not required to engage in competitive bidding." (Dkt. 29 at 10-11 (quoting *Keefe-Shea Joint Venture* v. *City of Evanston*, 773 N.E.2d 1155, 1165, 332 Ill. App. 3d 163 (2002).) JUMP contends, however, that the City demonstrated a commitment to comply with the MPA in two ways: (1) by issuing the 2011 RFP through the Department of Procurement Services; and (2) by purportedly stating in the 2011 RFP that it would use "procurement method[s] available under the Municipal Purchasing Act and the Municipal Code of Chicago, to obtain the Services described here." (Dkt. 29 at 12.)

As an initial matter, both of these arguments are based on the notion that the City bound itself to the MPA's competitive bidding procedures through the 2011 RFP. But it is difficult to see how JUMP can avail itself of the City's purported commitments in the 2011 RFP in a challenge to the 2019 Amendment. The 2011 RFP did not, of course, create contractual obligations running in JUMP's favor and, to the extent the 2011 RFP conferred "state-created legal rights" upon responding proposers of the sort that confer standing, *FMC Corp,* 852 F.2d at

13

992, the court has already held that JUMP lacks standing to enforce those rights. Those principles alone are dispositive of JUMP's arguments.

Nevertheless, for completeness and because the result is the same, the court will address JUMP's arguments in more detail. JUMP first contends that because the RFP was issued by DPS, and section 2-92-010 of the MCC provides that the head of that office's "powers, functions, duties and obligations are provided for by the [MPA]," that DPS was obligated to follow state law competitive bidding rules. (Dkt. 29 at 11-12.) JUMP's argument is essentially that every contract entered into by DPS must comply with the MPA. JUMP cites no authority establishing that rule. The only case JUMP cites, *General Electric Co.* v. *Cook County*, No. 00-cv-6587, 2001 WL 417321, at *34 (N.D. Ill. Mar. 5, 2001), stands only for the proposition—which the City does not dispute—that a government agency can be bound by competitive bidding requirements where they are "specifically incorporated" into the agency's solicitations. In that case the court held that Cook County had specifically incorporated competitive bidding procedures by drafting instructions to bidders that stated: "This contract is a competitively bid public contract of Cook County government, subject to laws and ordinances governing public contracts." *Id.* Section 2-92-010 of the MCC contains no such specific adoption of competitive bidding requirements. *See generally Shachter* v. *City of Chicago*, 52 N.E.3d 339, 350, 2016 IL App (1st) 150442, ¶ 42 ("any preemption of home rule power requires specific, express statement to that effect"); *Am. Health Care Providers, Inc.* v. *Cty. of Cook*, 638 N.E.2d 772, 780, 265 Ill. App. 3d 919 (1994) (stating that home-rule counties need not abide by competitive bidding requirements of Counties Code absent an expression of "clear intent").

Moreover, even if one assumes that section 2-92-010 obligated the head of DPS to follow the MPA in all respects, the MPA itself exempts a variety of procurement decisions from

competitive bidding requirements, including, for example, contracts for services requiring a high degree of professional skill. *See* 65 Ill. Comp. Stat. 5/8-10-4. While, as will be seen in the section below, the court does not address whether any of the exemptions applies here, the room for debate on that question (illustrated by JUMP's lengthy argument on that issue) underscores a conclusion that incorporation of the MPA does not equate to a specific commitment to abide by its competitive bidding procedures.

JUMP's second argument is that defendants committed to the MPA's competitive bidding procedures by purportedly stating in the RFP their intent to use "procurement method[s] available under the Municipal Purchasing Act and the Municipal Code of Chicago[] to obtain the Services described here." (Dkt. 29 at 12.) But JUMP's quotation of this part of the RFP is selective and somewhat misleading.[12] The quoted sentence comes from the section of the RFP titled "City's Right to Reject Proposals" and reads in full: "If no Respondent is selected through this RFP process, then the Chief Procurement Officer may utilize any other procurement method available under the Municipal Purchasing Act and the Municipal Code of Chicago, to obtain the Services described here." RFP § 8.2. Thus, the passage is not a direct commitment to use procurement methods available under the MPA, as JUMP suggests but rather only a commitment to use "other procurement methods available under the MPA" if the RFP process is not used. Being charitable to JUMP, the sentence's reference to "other procurement methods available under the MPA" arguably implicitly identifies the RFP process as one such method. But the passage can reasonably be understood in another way as distinguishing the RFP process from "other procurement methods" and identifying the latter as "available under the Municipal

---

[12] The court may consider the actual contents of the RFP since it is referenced in JUMP's complaint and central to its claims. *Hecker* v. *Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009).

15

Purchasing Act." And even proceeding from JUMP's preferred interpretation leaves two problems. First, as illustrated above, that is not the kind of specific incorporation of competitive bidding procedures that courts have found binding. Second, for the reasons stated above, identifying the RFP process as a procurement method available under the MPA does not equate to committing to the competitive bidding procedures therein.[13]

### B. Whether the Statutory Exceptions to the MPA's Competitive Bidding Requirements Apply

Section 8-10-4 of the MPA states that the competitive bidding procedures of section 8-10-3 do not apply to contracts that "are not adapted to award by competitive bidding." 65 Ill. Comp. Stat. 5/8-10-4. The statute lists various types of contracts that meet that definition. *Id.* Defendants point to three exceptions here: (1) contracts "for the services of individuals possessing a high degree of professional skill where the ability or fitness of the individual plays an important part;" (2) contracts issued "pursuant to powers conferred by laws, ordinances or resolutions . . . or other authorizations by the corporate authorities of the municipality;" and (3)

---

[13] JUMP's complaint lists three other sections of the RFP that purportedly evince the City's intent to follow competitive bidding laws, sections 4.2.F, 5.3.2, and 5.3.3. (*See* dkt. 34 ¶ 21; dkt. 29 at 13.)

Section 4.2.F states: "Section 2-92-418 of the Municipal Code of the City of Chicago requires for each competitively bid contract and each request for proposal where the estimated dollar value of the contract . . . exceeds $10,000,000.00 that each bidder or proposer submit with its proposal a non-refundable 'submittal fee' in the amount of $900.00," and "[a]s a result, a submittal fee to the City with its Proposal to this RFP is required." (Dkt. 32-1 at 8.) This section does not suggest the contemplated contract is subject to competitive bidding because it applies equally to either bid competitions or requests for proposals, which are distinct processes.

Section 5.3.2 requires proposers to submit proof of their ability to provide a performance bond and states that such bond may be used for the purposes specified in sections 2-92-030 and -040 of the MCC. (*Id.* at 16.) Mere reference to those parts of the MCC, however, does not amount to adoption of any competitive bidding requirements therein.

Section 5.3.3 requires proposers to abide by the economic disclosure requirements in 65 Ill. Comp. Stat. 5/8-10-8.5, and Chapter 2-154 of the MCC. (*Id.* at 17.) But, similarly, adoption of those requirements does not equate to adoption of competitive bidding requirements.

16

contracts (other than the sale or lease of personal property) "pursuant to which the municipality is the recipient of money[.]" (Dkt. 22 at 5.)

Defendants' arguments as to each of these exceptions consist only of a single sentence, without citation to legal authority. Those arguments are thus forfeited. *DDI Seamless Cylinder Int'l, Inc.* v. *Gen. Fire Extinguisher Corp.*, 14 F.3d 1163, 1168 (7th Cir. 1994); *Lattimore* v. *Klein*, No. 17-CV-8683, 2019 WL 1028121, at *4 n.3 (N.D. Ill. Mar. 4, 2019).

## V. Whether the 2019 Amendment Violates the MCC

JUMP alleges defendants violated section 2-92-615 of the MCC in entering into the 2019 Amendment. That section provides: "When the chief procurement officer determines in writing that the use of competitive sealed bidding is either not practicable or not advantageous to the city, she may enter into contracts through competitive sealed proposals." *Id.* JUMP alleges the City violated this provision because the CPO never made such a written determination. (Dkt. 34 at 12-13.) Defendants respond that section 2-92-615 applies only to contracts entered into by the CPO, and the 2019 Amendment was properly executed by the CDOT commissioner pursuant to authority granted by city ordinances. (Dkt. 22 at 7.) Defendants further argue that a contract cannot be invalidated for failure to comply with a general city ordinance, such as section 2-92-615, when a later ordinance specifically authorizes it. (*Id.*)

The court agrees with defendants that the 2019 Ordinance specifically authorizing the Amendment supersedes section 2-92-615. The Illinois Supreme Court has instructed, with respect to state statutes, that "when two statutes appear to be in conflict, the one which was enacted later should prevail, as a later expression of legislative intent." *Vill. of Chatham* v. *Cty. of Sangamon*, 837 N.E.2d 29, 46, 216 Ill.2d 402, 431 (2005). The Court also has instructed that "where there are two statutory provisions, one of which is general and designed to apply to cases

17

generally, and the other is particular and relates to only one subject, the particular provision must prevail." *Id.*

The Court has further emphasized the principle that a city council's violation of its own rules to adopt an ordinance does not justify voiding the ordinance:

> This court cannot handle matters which in effect are attempts to overrule decisions of a legislative body based upon alleged failure to follow requirements imposed by that body itself. . . . We have authority to invalidate legislation adopted by the city council only upon grounds that the enactment violates a provision of the Federal or State constitutions or violates the mandate of a State or Federal statute.

*Landmarks Pres. Council of Ill.* v. *City of Chicago*, 125 Ill. 2d 164, 179, 531 N.E.2d 9, 15 (1988) (citation omitted); *see also Aramark*, 2012 WL 3961341, at *8. Taken together, these principles compel the conclusion that the 2019 Ordinance trumps the earlier-enacted, more general provisions of section 2-92-615, and that this court lacks authority under Illinois law to hold the 2019 Ordinance void.[14]

## VI. Whether the 2019 Amendment Violates JUMP's Due Process Rights

Where government action does not infringe an individual's fundamental rights, courts will not interfere if the action passes rational basis review. *Goodpaster* v. *City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013). The Seventh Circuit has explained the deference afforded under this standard as follows:

> Under rational basis review, a state law is constitutional even if it is unwise, improvident, or out of harmony with a particular school of thought. The law must merely bear a rational relationship to some legitimate end. It is irrelevant whether the reasons given actually motivated the legislature; rather, the question is whether some rational basis exists upon which the legislature could have based the challenged law. Those attacking a statute on rational basis grounds have the burden to negate every conceivable basis which might support it.

---

[14] JUMP argues that the 2019 Ordinance violated the MPA, (dkt. 29 at 14 n. 6), but the court disagrees for the reasons stated in section IV above.

18

*Id.* (internal punctuation and citations omitted). The court also has stated that the complained-of governmental act must "shock the conscience." *Geinosky* v. *City of Chicago*, 675 F.3d 743, 750 (7th Cir. 2012). JUMP makes no argument that the applicable standard is different under the Illinois Constitution (*see* dkt. 29 at 14); thus the court will analyze the two claims together.[15]

JUMP argues that it has stated a claim under this standard through its allegation that the City "fail[ed] to competitively bid a contract so that the mayor could select his favored partner (which offered by far the costliest proposal), and then, in secret, massively expand[ed] that deal on his way out of office without any open competitive process." (Dkt. 29 at 13 n. 7 (citation omitted).) Were that the only conceivable explanation for defendants' actions, JUMP may have a claim. But it is not. Defendants may have concluded that entering into the 2019 Amendment without competitive bidding was the best course of action on a cost-benefit basis. JUMP cites no case reasonably close to supporting the notion that its allegations have stated a claim for relief.[16]

---

[15] The Illinois Supreme Court has held that the Illinois Constitution's due process protections sweep more broadly than the United States Constitution's in some respects. *See, e.g., People* v. *Washington*, 665 N.E.2d 1330, 1336, 171 Ill. 2d 475 (1996). Generally speaking, in order to interpret an Illinois constitutional provision more expansively than its federal counterpart, a court must find in the language of the Illinois constitution, or in the debates and committee reports of the constitutional convention, something indicating the provisions are to be construed differently. *People* v. *Winterhalter*, 730 N.E.2d 1158, 1162–63, 313 Ill. App. 3d 972 (2000). The court's own research suggests Illinois courts apply rational basis scrutiny under the Illinois due process clause identically to its federal counterpart. *Arangold Corp.* v. *Zehnder*, 787 N.E.2d 786, 790, 204 Ill. 2d 142 (2003).

[16] JUMP cites *Zaintz* v. *City of Albuquerque*, 739 F. Supp. 1462, 1470 (D.N.M. 1990), which held that a material question of fact existed as to whether local government officials selectively enforced local zoning ordinances in a politically biased manner. The government action challenged there was "the regular and impartial administration of government rules," *id.* at 1470 (citation omitted), as opposed to legislative decision-making of the sort reflected in the City's ordinance authorizing the 2019 Amendment.

JUMP also cites *Merrifield* v. *Lockyer*, 547 F.3d 978, 991 n. 15 (9th Cir. 2008), for the proposition that "mere economic protectionism for the sake of economic protectionism is irrational with respect to determining if a classification survives rational basis review." That case goes on to state, however, that "there might be instances when economic protectionism might be related to a legitimate governmental interest and survive rational basis review." *Id.* Here, such legitimate interests are apparent from the 2019 Ordinance, of which the court takes judicial notice. *Newcomb* v. *Brennan,* 558 F.2d 825,

**VII. Declaratory Relief**

JUMP's request for a declaratory judgment is predicated on its substantive claims discussed above, and thus also is dismissed.

**CONCLUSION**

Defendants' motion to dismiss is granted, in part for lack of standing and, in part for failure to state a claim upon which relief can be granted. Dismissal is without prejudice to repleading in an amended complaint, which must be filed by February 6, 2020.

Date: January 22, 2020

U.S. District Judge Joan H. Lefkow

---

829 (7th Cir. 1977) ("matters of public record such as state statutes, city charters, and city ordinances fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice"). That Ordinance calls for the expansion of the bikeshare system, the introduction of electric and dockless bikes, and placing "the financial burden of expansion . . . operation and maintenance of the System solely on [Motivate]," among other things, all of which are conceivably in the public interest. (Dkt. 22-3 at 4.)